# Exhibit 3

Appendix to Defendant The United States' Motion to Strike Plaintiff's "Corrected Infringement Contentions" and to Dismiss Plaintiff's Sixth Amended Complaint

## TABLE OF CONTENTS

| Document | Page Nos. |
|---|---|
| Plaintiff's August 18, 2021 "Corrected Preliminary Infringement Contentions" (Apple Cover Pleading) | A0001 – A0008 |
| Plaintiff's August 18, 2021 "Corrected Preliminary Infringement Contentions" (Apple Claim Charts) | A0009 – A0664 |
| Plaintiff's August 18, 2021 "Corrected Preliminary Infringement Contentions" (Samsung Cover Pleading) | A0665 – A0671 |
| Plaintiff's August 18, 2021 "Corrected Preliminary Infringement Contentions" (Samsung Claim Charts) | A0672 – A1326 |
| Plaintiff's August 18, 2021 "Corrected Preliminary Infringement Contentions" (LG Cover Pleading) | A1327 – A1333 |
| Plaintiff's August 18, 2021 "Corrected Preliminary Infringement Contentions" (LG Claim Charts) | A1334 – A1988 |
| Plaintiff's August 23, 2021 "Corrected Preliminary Infringement Contentions—Patent Rule 4(E)" | A1989 – A1996 |
| "NODE: a modular, handheld powerhouse of sensors" (Dec. 9, 2013), *available at* https://www.kickstarter.com/projects/soldermaster/node-a-modular-handheld-powerhouse-of-sensors/description | A1997 – A2005 |

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LARRY GOLDEN,

    Plaintiff,

     V.

UNITED STATES,

    Defendant.

1:13-cv-307-EGB

Senior Judge Eric G. Bruggink

August 18, 2021

## PLAINTIFF'S CORRECTED PRELIMINARY INFRINGEMENT CONTENTIONS

Pursuant to this Court's order, filed 07/29/2021 in this Case No. 13-307C; Dkt. No. 239, Plaintiff ("Larry Golden") is filing his "Corrected Preliminary Infringement Contentions". The Corrected Preliminary Infringement Contentions illustrates Plaintiff's claimed allegations that the Government caused the manufacture, by at least that of third-party contractor Apple Inc.; of certain products Plaintiff believes infringes, either literally or under the "doctrine of equivalents", Plaintiff's claimed inventions, that are covered in his patents.

Plaintiff's "Corrected Preliminary Infringement Contentions" are as follows:

- Ten (10) alleged infringing products of Apple Inc. that, upon information and belief, Plaintiff is alleging infringes twenty-five (25) independent claims of Plaintiff's '497, '752, '189, '439, & '287 patents. (Ex-A)

## GUIDE FOR REVIEWING PLAINTIFF'S INFRINGEMENT CHARTS

"Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and

A0001

development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones… (U.S. Dept. of Homeland Security, 2011a).

**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds…

**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection… system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product…"

**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5..." *United States Department of Homeland Security, Petitioner, V. Larry Golden*, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

2

## PRODUCT DESIGN FOR THE DEFENDANT'S *"CELL-ALL"* PROJECT

"DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the 'commercialization of technology developed for government purposes'" (U.S. Department of Homeland Security, 2010). https://publicsurveillance.com/papers/Geoforum_Monahan_Mokos.pdf



Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture left). Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from Google Play and the Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android or Apple's iOS operating systems. According to Doug Hoffman, program manager at Qualcomm, whenever abnormal chemical levels are detected, the phone will send those data to a network gateway; the gateway will authenticate the sensor and phone to determine whether they are authorized to be on the network.

During the development of second-generation prototypes, chemical sensors were separated from the phones. (U.S. Department of Homeland Security, 2011a). Both Synkera and NASA independently produced sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones; that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



3



"Homeland Security's Smartwatch Will Detect Nuclear Bombs"
https://www.popularmechanics.com/military/research/a18161/
homeland-security-smartwatch-detect-nuclear-bombs/

"Smartwatch turns into biochemical monitoring system"
https://tectales.com/wearables-sensors/smartwatch-turns-into-
biochemical-monitoring-system.html

"The US Military's Latest Wearables Can Detect Illness Two
Days Before You Get Sick" https://www.defenseone.com
/technology/2020/09/militarys-latest-wearables-can-detect-
illness-two-days-you-get-sick/168664/

"Studies reveal smartwatch biometrics can detect COVID-19
before symptoms surface" https://www.biometricupdate.com
/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-
19-before-symptoms-surface

## **PLAINTIFF'S CENTRAL PROCESSING UNIT (CPU)**

Plaintiff believes the Defendant and third-party contractor; Apple Inc. is infringing Plaintiff's claim limitation under the "doctrine of equivalents" ("substantially the same function; in substantially the same way; to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854)), for Plaintiff's "central processing unit", that is interconnected to, integrated with, or embedded into Plaintiff's CMDC devices (i.e., new and improved cell phones, smartwatches, smartwatches, etc.)

The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use

4

A0004

of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.

All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. The performance of the CPU, that's a part of the chipset, is vital for processing instructions.

## Alleged infringing Chipsets/CPUs (see claims 4, 5, & 6 of the '287 patent)

- ➢ **Apple iPhone 7 Chipset**: Apple A10 Fusion (16 nm).
- ➢ **Apple iPhone 7 CPU**: Quad-core 2.34 GHz (2x Hurricane + 2x Zephyr).
- ➢ **Apple iPhone 8 Chipset**: Apple A11 Bionic (10 nm).
- ➢ **Apple iPhone 8 CPU**: Hexa-core (2x Monsoon + 4x Mistral).
- ➢ **Apple Watch Series 3 Chipset**: Apple S3.
- ➢ **Apple Watch Series 3 CPU**: Dual-core
- ➢ **Apple iPhone SE Chipset**: Apple A9 (14 nm).
- ➢ **Apple iPhone SE CPU**: Dual-core 1.84 GHz Twister.
- ➢ **Apple iPhone XS Chipset**: Apple A12 Bionic (7 nm).
- ➢ **Apple iPhone XS CPU**: Hexa-core (2x2.5 GHz Vortex + 4x1.6 GHz Tempest).
- ➢ **Apple Watch Series 4 Chipset**: Apple S4.
- ➢ **Apple Watch Series 4 CPU**: Dual-core
- ➢ **Apple iPhone 11 Chipset**: Apple A13 Bionic (7 nm+).
- ➢ **Apple iPhone 11 CPU**: Hexa-core (2x2.65 GHz Lightning + 4x1.8 GHz Thunder).
- ➢ **Apple iPhone 12 Chipset**: Apple A14 Bionic (5 nm).
- ➢ **Apple iPhone 12 CPU**: Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm).
- ➢ **Apple Watch Series 5 Chipset**: Apple S5.
- ➢ **Apple Watch Series 5 CPU**: Dual-core.
- ➢ **Apple Watch Series 6 Chipset**: Apple S6.
- ➢ **Apple Watch Series 6 CPU**: Dual-core

**Apple and Samsung's Contract**: Apple first used SoCs in early versions of the iPhone and iPod touch. They combine in one package a single ARM-based processing core (CPU), a graphics processing unit (GPU), and other electronics necessary for mobile computing. The APL0098 (also 8900B or S5L8900) is a package on package (PoP) system on a chip (SoC) that was introduced on June 29, 2007, at the launch of the original iPhone. It includes a 412 MHz single-core ARM11 CPU

The Apple A4 is a PoP SoC manufactured by Samsung, the first SoC Apple designed in-house. It combines an ARM Cortex-A8 CPU – also used in Samsung's S5PC110A01 SoC – and a PowerVR SGX 535 graphics processor (GPU), all built on Samsung's 45-nanometer silicon chip fabrication process. The design emphasizes power efficiency. The A4 commercially debuted in 2010, in Apple's iPad tablet, and was later used in the iPhone 4 smartphone.

The Apple A5 is an SoC manufactured by Samsung that replaced the A4. The chip commercially debuted with the release of Apple's iPad 2 tablet in March 2011, followed by its release in the iPhone 4S smartphone later that year. Compared to the A4, the A5 CPU "can do twice the work" and the GPU has "up to nine times the graphics performance", according to Apple.

The Apple A6 is a PoP SoC introduced on September 12, 2012, at the launch of the iPhone 5. The A6 is manufactured by Samsung on a high-κ metal gate (HKMG) 32 nm process. The A6 is said to use a 1.3 GHz custom Apple-designed ARMv7 based dual-core CPU…

The Apple A9 is a 64-bit ARM-based SoC that first appeared in the iPhone 6S and 6S Plus, which were introduced on September 9, 2015. Apple states that it has 70% more CPU performance and 90% more graphics performance compared to its predecessor, the Apple A8. It is dual sourced, a first for an Apple SoC; it is manufactured by Samsung on their 14 nm FinFET LPE process and by TSMC on their 16 nm FinFET process. It was subsequently included in the first-generation iPhone SE, and the iPad (5th generation).

The Apple A9 was the last CPU that Apple manufactured through a contract with Samsung, as all A-series chips after are manufactured by TSMC.

6

Respectfully submitted,


s/ Larry Golden

Larry Golden, Plaintiff, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of August, 2021, a true and correct copy of the foregoing PLAINTIFF'S CORRECTED PRELIMINARY INFRINGEMENT CONTENTIONS was served upon the following defendant via e-mail:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

202-305-2513

s/ Larry Golden

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LARRY GOLDEN,

      Plaintiff,

        V.

UNITED STATES,

      Defendant.

1:13-cv-307-EGB

Senior Judge Eric G. Bruggink

August 18, 2021

# PLAINTIFF'S CORRECTED PRELIMINARY INFRINGEMENT CONTENTIONS

Pursuant to this Court's order, filed 07/29/2021 in this Case No. 13-307C; Dkt. No. 239, Plaintiff ("Larry Golden") is filing his "Corrected Preliminary Infringement Contentions". The Corrected Preliminary Infringement Contentions illustrates Plaintiff's claimed allegations that the Government caused the manufacture, by at least that of third-party contractor Samsung Electronics Inc.; of certain products Plaintiff believes infringes, either literally or under the "doctrine of equivalents", Plaintiff's claimed inventions, that are covered in his patents.

Plaintiff's "Corrected Preliminary Infringement Contentions" are as follows:

- Nine (9) alleged infringing products of Samsung Electronics Inc. that, upon information and belief, Plaintiff is alleging infringes twenty-five (25) independent claims of Plaintiff's '497, '752, '189, '439, & '287 patents. (Ex-A)

# GUIDE FOR REVIEWING PLAINTIFF'S INFRINGEMENT CHARTS

"Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and

development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones… (U.S. Dept. of Homeland Security, 2011a).

**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds…

**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection… system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product…"

**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5..." *United States Department of Homeland Security, Petitioner, V. Larry Golden*, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

2

## PRODUCT DESIGN FOR THE DEFENDANT'S *"CELL-ALL"* PROJECT

"DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the 'commercialization of technology developed for government purposes'" (U.S. Department of Homeland Security, 2010). https://publicsurveillance.com/papers/ Geoforum_Monahan_Mokos.pdf



Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture left). Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. Smartphone users can download the app from Google Play and the Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android or Apple's iOS operating systems. According to Doug Hoffman, program manager at Qualcomm, whenever abnormal chemical levels are detected, the phone will send those data to a network gateway; the gateway will authenticate the sensor and phone to determine whether they are authorized to be on the network.

During the development of second-generation prototypes, chemical sensors were separated from the phones. (U.S. Department of Homeland Security, 2011a). Both Synkera and NASA independently produced sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones; that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



3



"Homeland Security's Smartwatch Will Detect Nuclear Bombs"
https://www.popularmechanics.com/military/research/a18161/
homeland-security-smartwatch-detect-nuclear-bombs/

"Smartwatch turns into biochemical monitoring system"
https://tectales.com/wearables-sensors/smartwatch-turns-into-
biochemical-monitoring-system.html

"The US Military's Latest Wearables Can Detect Illness Two
Days Before You Get Sick" https://www.defenseone.com
/technology/2020/09/militarys-latest-wearables-can-detect-
illness-two-days-you-get-sick/168664/

"Studies reveal smartwatch biometrics can detect COVID-19
before symptoms surface" https://www.biometricupdate.com
/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-
19-before-symptoms-surface

## **PLAINTIFF'S CENTRAL PROCESSING UNIT (CPU)**

Plaintiff believes the Defendant and third-party contractor; Samsung Electronics Inc. is infringing Plaintiff's claim limitation under the "doctrine of equivalents" ("substantially the same function; in substantially the same way; to obtain the same result", quoting *Winans v. Denmead*, 15 How. 330, 344 (1854)), for Plaintiff's "central processing unit", that is interconnected to, integrated with, or embedded into Plaintiff's CMDC devices (i.e., new and improved cell phones, smartphones, smartwatches, etc.)

The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use

4

A0668

of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.

All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. The performance of the CPU, that's a part of the chipset, is vital for processing instructions.

## Alleged infringing Chipsets/CPUs (see claims 4, 5, & 6 of the '287 patent)

➤ **Samsung Galaxy Note 8 Series Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China

➤ **Samsung Galaxy Note 8 Series CPU**: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

➤ **Samsung Galaxy S8 Series Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China

➤ **Samsung Galaxy S8 Series CPU**: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

➤ **Samsung Gear S3 Classic Series Chipset:** Exynos 7 Dual 7270 (14 nm)

➤ **Samsung Gear S3 Classic Series CPU:** Dual-core 1.0 GHz Cortex-A53

➤ **Samsung Galaxy S9 Series Chipset**: Qualcomm SDM845 Snapdragon 845 (10 nm) – USA/China

➤ **Samsung Galaxy S9 Series CPU**: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver)-USA/China

➤ **Samsung Galaxy S10 Series Chipset**: Qualcomm SM8150 Snapdragon 855 (7 nm) - USA/China

➤ **Samsung Galaxy S10 Series CPU**: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)-USA/China

➤ **Samsung Galaxy Watch Active 2 Series Chipset:** Exynos 9110 (10 nm)

➤ **Samsung Galaxy Watch Active 2 Series CPU:** Dual-core 1.15 GHz Cortex-A53

A0669

- ➢ **Samsung Galaxy S20 Series chipset:** Qualcomm SM8250 Snapdragon 865 5G (7 nm+) – USA

- ➢ **Samsung Galaxy S20 Series CPU**: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585)-USA

- ➢ **Samsung Galaxy S21 Series chipset:** Qualcomm SM8350 Snapdragon 888 5G (5 nm)

- ➢ **Samsung Galaxy S21 Series CPU**: Octa-core (1x2.84 GHz Kryo 680 & 3x2.42 GHz Kryo 680 & 4x1.8 GHz Kryo 680)-USA

- ➢ **Samsung Galaxy Watch 3 Series Chipset:** Exynos 9110 (10 nm)

- ➢ **Samsung Galaxy Watch 3 Series CPU:** Dual-core 1.15 GHz Cortex-A53

**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. The Snapdragon line includes processors, modems, Wi-Fi chips and mobile charging products.

Respectfully submitted,

s/ Larry Golden

Larry Golden, Plaintiff, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

6

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 18th day of August, 2021, a true and correct copy of the foregoing PLAINTIFF'S CORRECTED PRELIMINARY INFRINGEMENT CONTENTIONS was served upon the following defendant via e-mail:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

202-305-2513

s/ Larry Golden

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

7

# Samsung Electronics

▶ **Patent Owner's Claim Charts for:**

- ▶ Claim 1 of the '497 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)

- ▶ Claim 10 of the '752 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)

- ▶ Claims 1-9 of the '189 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)

- ▶ Claims 13-23 of the '439 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)

- ▶ Claims 4-6 of the '287 patent (Alleged infringing products are Samsung Galaxy S8, Galaxy Note 8, Galaxy S9, S10, S20, & S21)

- ▶ Representative Chart for Samsung Gear S3 Classic, Galaxy Watch Active 2, & Galaxy Watch 3

1

A0672

# Samsung's
## New and Improved Cell Phones

**Samsung Galaxy S8**          **Samsung Galaxy Note 8**

          

A0673

# Samsung's
## Gear S3 Classic

**Radiation and Chemical
Detection**

**Medical Chem/Bio
Detection**





3

| Patent #: 7,385,497; Independent Claim 1 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to |

4

existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display

5

of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

6

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**

**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"

**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.

---

| a detector case including a front side, a rear side, a power source and a Central Processing Unit (cpu); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| --- | --- |

| | |
|---|---|
| a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of one specific chemical, biological and radiological agent and compound; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |
| an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>Samsung Galaxy Note 8 & Galaxy S8 Series: GPS with A-GPS. Enhanced tracking and location, that combines satellite and cellular, for the new and improved cell phones<br><br><br><br>**Security feature:** The Trusted Internet Connection (TIC) Initiative is designed to reduce the number of U. S. Gov't (USG) network boundary connections. USG agencies must route connections for the increasing number of mobile users accessing cloud services via smart phones through their agency network. |

A0679

| | |
|---|---|
| a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector case; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |
| each detector including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |

| | |
|---|---|
| an automatic/ mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

10

| | |
|---|---|
| whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and initiates signal transmission from the cpu to the automatic/mechanical lock disabler to lock or disable the lock of the product thereby preventing further contamination about the product and denying access to the product by unauthorized, untrained and unequipped individuals. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br><br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br><br>*FBI tried to unlock the Android Phone* |

11

| Patent #: 8,106,752; Independent Claim 10 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A multi-sensor detection and lock disabling system for monitoring products and for detecting explosive, nuclear, contraband, chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>    **Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>    **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>    **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended |

12

A0683

to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display

13

of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

14

A0685

|  | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen. |
| at least one cell phone detector case having a front side, a rear side, a power source, and a Central processing unit (cpu); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |

15

A0686

| | |
|---|---|
| a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of at least one specific chemical, biological and radiological agent or compound; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |
| a plurality of interchangeable cell phone sensors for detecting the chemical, biological, and radiological agents and compounds and capable of being disposed within the detector case; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

16

| | |
|---|---|
| each detector case including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/ article/3236299/best-smart-smoke-detector.html |
| an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>Samsung Galaxy Note 8 & Galaxy S8 Series: GPS with A-GPS. Enhanced tracking and location, that combines satellite and cellular, for the new and improved cell phones<br><br><br><br>**Security feature:** The Trusted Internet Connection (TIC) Initiative is designed to reduce the number of U. S. Gov't (USG) network boundary connections. USG agencies must route connections for the increasing number of mobile users accessing cloud services via smart phones through their agency network. |

A0688

| | |
|---|---|
| an automatic/ mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

18

| | |
|---|---|
| whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and sends out a signal to another cell phone case, a handheld, a computer terminal located at a monitoring site, followed by and communicating with the cpu of the multi-sensor detection and automatic/mechanical lock disabler for exchanging information. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home apps and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br><br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br><br>*FBI tried to unlock the Android Phone* |

A0690

| Patent #: 9,096,189; Independent Claim 1 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

20

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

21



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

22

A0693

| | |
|---|---|
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

23

A0694

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

A0695

| | |
|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>The alleged infringing devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants |

| | |
|---|---|
| | (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |

26

<table>
<tr>
<td></td>
<td>

**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.



*FBI tried to unlock the Android Phone*

</td>
</tr>
<tr>
<td>

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF)

</td>
<td>

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.

</td>
</tr>
</table>

27

| Patent #: 9,096,189; Independent Claim 2 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

28

A0699

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below, is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App. Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS." (Samsung & LG's Android; and Apple's iOS)

29



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

30

A0701

| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| --- | --- |
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series receives signals, or data or from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized |

| | individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |
|---|---|
| | **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

A0704

| | |
|---|---|
| monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage and disengage or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series: The devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

34

| | |
|---|---|
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection.<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device.<br><br> |

A0706

| Patent #: 9,096,189; Independent Claim 3 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

37



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

38

| | |
|---|---|
| at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and any of a plurality product group based on the categories of a multi-sensor detection device, a maritime cargo container device, or o locking device. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets.<br><br>Samsung's Gal Note 8 & Gal S8 Series communicates with any of the products listed in any of the product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a receiver for receiving signals, data or messages from at least one of plurality of product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device, wherein the signals, data or messages are of agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is |

40

A0711

|  | [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
|---|---|
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

41

| | |
|---|---|
| whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is capable of the activation or deactivation of at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device. |

42

A0713



| | |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 September 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

43

| Patent #: 9,096,189; Independent Claim 4 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

44

A0715

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

45



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

46

| | |
|---|---|
| comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)." |

47

| | |
|---|---|
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

| | |
|---|---|
| wherein the built-in embedded multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

49

A0720

| | |
|---|---|
| wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-long or short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

50

| | |
|---|---|
| wherein the built-in embedded multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds…<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

| Patent #: 9,096,189; Independent Claim 5 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

53



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

54

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |
|---|---|
| a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor; | **DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *__"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"__*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone. Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a *__nanosensor-embedded ''sleeve''__* for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

A0726

| | |
|---|---|
| wherein the built-in multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the built-in multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

|  | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**

**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or **_light up_**, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**Integrating Biochemiluminescence Detection on Smartphones**

 |
| a light alarm indicator that has a plurality of colored lights that correspond to specific ones of the at least two agents; | |

| | |
|---|---|
| wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| Patent #: 9,096,189; Independent Claim 6 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, and breach, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

60



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

61

| | |
|---|---|
| a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans |
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

62

| | |
|---|---|
| wherein the built-in, multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. |

63

| | |
|---|---|
| | **Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"** <br><br> "The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6. <br><br> Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch radius. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

| Patent #: 9,096,189; Independent Claim 7 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

65

A0736

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

66



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

67

| | |
|---|---|
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |
| monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

68

A0739

| | |
|---|---|
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |
| at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br> |

69

| | |
|---|---|
| | **Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, ***satellite cell phones***, cell phones, personal digital assistants (PDAs), and ***satellite monitoring***. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, ***Cellular***, ***Satellite***… |
| at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy Note 8 & Galaxy S8 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web |

A0741

|  | applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |

| | |
|---|---|
| wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain… airport security, police, highway patrol, security guard, military personnel, HAZMAT personnel, the CIA, the FBI, Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

| | |
|---|---|
| wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

73

| Patent #: 9,096,189; Independent Claim 8 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" <br><br> **Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment." <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

74

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

76

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communications and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

| | |
|---|---|
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually |

78

| | |
|---|---|
| | five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen. <br><br><br>*FBI tried to unlock the Android Phone* |
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |

79

A0750

| | |
|---|---|
| at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, *satellite cell phones*, cell phones, personal digital assistants (PDAs), and *satellite monitoring*. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, *Cellular*, *Satellite*… |

80

A0751

| | |
|---|---|
| at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy Note 8 & Galaxy S8 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of 'geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

81

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>    **GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>    Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |
| wherein the multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>    Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>    **Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

82

A0753

| | |
|---|---|
| wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products. | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

| Patent #: 9,096,189; Independent Claim 9 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

85

A0756

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

86

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors… The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…"<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

87

| | |
|---|---|
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals<br><br> |

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, ***satellite cell phones***, cell phones, personal digital assistants (PDAs), and ***satellite monitoring***. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, ***Cellular***, ***Satellite***… |
|---|---|
| at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; | |

89

| | |
|---|---|
| at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy Note 8 & Galaxy S8 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

90

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or from a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| | |
|---|---|
| wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

A0763

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"** |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. | "The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.

"A joint research group including senior researcher Shinsuke Ishihara at the Frontier Molecules Group, International Center for Materials Nanoarchitectonics (MANA), National Institute for Materials Science (NIMS), and Professor Timothy M. Swager, at the Massachusetts Institute of Technology (MIT), developed a chemical sensing material whose electrical conductivity dramatically increases when exposed to toxic gases. In addition, the group integrated the sensing material into the electronic circuit in a near-field communication (NFC) tag, which is embedded in smart cards… [w]e created a toxic gas sensor whose measurement can be read on smartphones by integrating the chemical sensing material into the electronic circuit present in a commercially available NFC tag. Users can readily determine the presence/absence of toxic gas by holding an NFC-compatible smartphone over a sensor-embedded NFC tag while making sure that communication between the two devices is intact. The sensor is disposable, and 1 g of the chemical sensing material makes 4 million sensors. So, it is feasible to mass-produce the sensor at low cost."

Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.

**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" |

93

| Patent #: 9,589,439; Independent Claim 13 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

95

A0766



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

96

A0767

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

97

| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| --- | --- |
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

98

A0769

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

99

A0770

| | |
|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series Security feature: The devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the communication device receives a signal via any of one or more products in any product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, |

| | |
|---|---|
| | desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |

| | |
|---|---|
| | **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

102

| Patent #: 9,589,439; Independent Claim 14 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below, is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App. Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS." (Samsung & LG's Android; and Apple's iOS)

104



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

105

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

106

A0777

| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
|---|---|
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, maritime cargo container, the cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series receives signals, or data or from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized |

108

A0779

| | individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |
| --- | --- |
| | **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

| | |
|---|---|
| monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series Security feature: The devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

110

A0781

| | |
|---|---|
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device.<br><br> |

111

| Patent #: 9,589,439; Independent Claim 15 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| Monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

113



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

114

| | |
|---|---|
| at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and at least one of a multi-sensor detection device, a maritime cargo container device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets.<br><br>Samsung's Gal Note 8 & Gal S8 Series communicates with any of the products listed in any of the product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a transmitter for transmitting signals and messages to at least one of the multi-sensor detection device, the maritime cargo container device, or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container device or the locking device, wherein the signals, data or messages are of agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is |

116

| | |
|---|---|
| | [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS |
| the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

117

A0788

| | |
|---|---|
| whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of the multi-sensor detection device, the maritime cargo container device or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series is capable of the activation or deactivation of at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device. |

118

A0789



| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"** |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be at least one of received or transmitted between the tag and the monitoring equipment. | "The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 September 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

119

| Patent #: 9,589,439; Independent Claim 16 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built-in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

120

A0791

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

121



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

122

| | |
|---|---|
| comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)." |

123

| | |
|---|---|
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

| | |
|---|---|
| wherein the built-in embedded multi-sensor detection device receives a signal via any of one or more products in any product grouping categories; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-long range radio frequency, product-to-short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

126

| | |
|---|---|
| wherein the built-in embedded multi-sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of the several product groupings of design similarity. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a _**nanosensor-embedded "sleeve"**_ for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds…<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

127

A0798

| Patent #: 9,589,439; Independent Claim 17 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**

**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.

**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

128

A0799

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

129



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring devices; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

130

| | |
|---|---|
| a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone. Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a _**nanosensor-embedded ''sleeve''**_ for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

131

A0802

| | |
|---|---|
| wherein the built-in multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the built-in multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**

**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or ***light up***, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**Integrating Biochemiluminescence Detection on Smartphones**



a light alarm indicator that has a plurality of colored lights that correspond to specific agents of the at least two agents;

133

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |
|---|---|
| wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for at least one of a receipt or transmission of signals therebetween. | Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

134

A0805

| Patent #: 9,589,439; Independent Claim 18 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

135

A0806

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

136



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

A0808

| | |
|---|---|
| a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans |
| monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

| | |
|---|---|
| wherein the built-in, multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. |

139

A0810

|  | **Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch radius. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

| Patent #: 9,589,439; Independent Claim 19 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

141

A0812

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

142



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

143

| | |
|---|---|
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |
| monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

144

A0815

| | |
|---|---|
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |
| at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br> |

145

| | |
|---|---|
| | **Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, ***satellite cell phones***, cell phones, personal digital assistants (PDAs), and ***satellite monitoring***. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, ***Cellular***, ***Satellite***… |
| at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy Note 8 & Galaxy S8 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of data back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web |

146

A0817

| | applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |

147

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |
|---|---|
| wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | Samsung's Gal Note 8 & Gal S8 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain… airport security, police, highway patrol, security guard, military personnel, HAZMAT personnel, the CIA, the FBI, Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment…" |

148

A0819

| | |
|---|---|
| wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing communications are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

149

A0820

| Patent #: 9,589,439; Independent Claim 20 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

150

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7— operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

152

A0823

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

153

A0824

| | |
|---|---|
| monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually |

154

<table>
<tr><td></td><td>

five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.



*FBI tried to unlock the Android Phone*

</td></tr>
<tr><td>

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment;

</td><td>

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.

**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment";

</td></tr>
</table>

155

A0826

| | |
|---|---|
| at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, _**satellite cell phones**_, cell phones, personal digital assistants (PDAs), and _**satellite monitoring**_. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, _**Cellular**_, _**Satellite**_… |

156

A0827

| | |
|---|---|
| at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy Note 8 & Galaxy S8 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of 'geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

157

A0828

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |
| wherein the multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

158

| | |
|---|---|
| wherein the multi-sensor detection device is for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency connection is in signal communication with a transmitter and a receiver of the monitoring equipment or multi-sensor detection device and transceivers of the products | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

159

A0830

| Patent #: 9,589,439; Independent Claim 21 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

160

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…"
"During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

161

A0832

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

162

A0833

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors… The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…"<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include "'something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device'"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

163

A0834

| | |
|---|---|
| monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals<br><br> |

164

| | |
|---|---|
| at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, **_satellite cell phones_**, cell phones, personal digital assistants (PDAs), and **_satellite monitoring_**. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, **_Cellular_**, **_Satellite_**… |

165

| | |
|---|---|
| at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy Note 8 & Galaxy S8 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of 'geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

166

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor data to be sent to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>    Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>    **GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| | |
|---|---|
| wherein the multi-sensor detection device for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

168

A0839

| | |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>"A joint research group including senior researcher Shinsuke Ishihara at the Frontier Molecules Group, International Center for Materials Nanoarchitectonics (MANA), National Institute for Materials Science (NIMS), and Professor Timothy M. Swager, at the Massachusetts Institute of Technology (MIT), developed a chemical sensing material whose electrical conductivity dramatically increases when exposed to toxic gases. In addition, the group integrated the sensing material into the electronic circuit in a near-field communication (NFC) tag, which is embedded in smart cards… [w]e created a toxic gas sensor whose measurement can be read on smartphones by integrating the chemical sensing material into the electronic circuit present in a commercially available NFC tag. Users can readily determine the presence/absence of toxic gas by holding an NFC-compatible smartphone over a sensor-embedded NFC tag while making sure that communication between the two devices is intact. The sensor is disposable, and 1 g of the chemical sensing material makes 4 million sensors. So, it is feasible to mass-produce the sensor at low cost."<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" |

169

A0840

| Patent #: 9,589,439; Independent Claim 22 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

170

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

171



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

A0843

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

173

| | |
|---|---|
| at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

A0846

| | |
|---|---|
| the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>    Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>    **Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>    **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. The "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen. |

176

<table>
<tr>
<td></td>
<td>



*FBI tried to unlock the Android Phone*

</td>
</tr>
<tr>
<td>

the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use;

</td>
<td>

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64

**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.

</td>
</tr>
</table>

177

A0848

| | |
|---|---|
| the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>"A joint research group including senior researcher Shinsuke Ishihara at the Frontier Molecules Group, International Center for Materials Nanoarchitectonics (MANA), National Institute for Materials Science (NIMS), and Professor Timothy M. Swager, at the Massachusetts Institute of Technology (MIT), developed a chemical sensing material whose electrical conductivity dramatically increases when exposed to toxic gases. In addition, the group integrated the sensing material into the electronic circuit in a near-field communication (NFC) tag, which is embedded in smart cards… [w]e created a toxic gas sensor whose measurement can be read on smartphones by integrating the chemical sensing material into the electronic circuit present in a commercially available NFC tag. Users can readily determine the presence/absence of toxic gas by holding an NFC-compatible smartphone over a sensor-embedded NFC tag while making sure that communication between the two devices is intact. The sensor is disposable, and 1 g of the chemical sensing material makes 4 million sensors. So, it is feasible to mass-produce the sensor at low cost."<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" |

178

A0849

| | |
|---|---|
| whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, a cellular connection, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| | |
|---|---|
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, or the central processing unit (CPU). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, **_satellite cell phones_**, cell phones, personal digital assistants (PDAs), and **_satellite monitoring_**. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, **_Cellular_**, **_Satellite_**… |

| Patent #: 9,589,439; Independent Claim 23 | Samsung Galaxy Note 8 & Galaxy S8 Series and Samsung Gear S3 Classic Series |
|---|---|
| A cell phone comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

182

A0853



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

183

A0854

| | |
|---|---|
| a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

184

A0855

| | |
|---|---|
| a receiver for receiving signals from the cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, **_satellite cell phones_**, cell phones, personal digital assistants (PDAs), and **_satellite monitoring_**. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, **_Cellular_**, **_Satellite_**… |

185

A0856

| | |
|---|---|
| the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung's Gal Note 8 & Gal S8 Series Security feature: The devices are capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |

A0857

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

187

| | |
|---|---|
| wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, ***satellite cell phones***, cell phones, personal digital assistants (PDAs), and ***satellite monitoring***. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, ***Cellular***, ***Satellite***… |

188

A0859

| | |
|---|---|
| wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |

189

A0860

| | |
|---|---|
| whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

190

| Patent #: 10,163,287; Independent Claim 4 | Samsung Galaxy Note 8 & Galaxy S8 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A communication device comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

191

A0862

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

192

A0863



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Samsung Galaxy Note 8 Series Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
**Samsung Galaxy Note 8 Series CPU**: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

**Samsung Galaxy S8 Series Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
**Samsung Galaxy 8 Series CPU**: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

193

A0864

| | |
|---|---|
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))** |
| | The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. |
| | All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))** |
| | The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. |
| | All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one of an internet connection Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

196

| | |
|---|---|
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

198

| | |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

199

| Patent #: 10,163,287; Independent Claim 5 | Samsung Galaxy Note 8 & Galaxy S8 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A monitoring device, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

201



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Samsung Galaxy Note 8 Series Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
**Samsung Galaxy Note 8 Series CPU**: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

**Samsung Galaxy S8 Series Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
**Samsung Galaxy S8 Series CPU**: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

| | |
|---|---|
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

203

A0874

| | |
|---|---|
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

204

| | |
|---|---|
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

205

A0876

| | |
|---|---|
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))** <br><br> The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. <br><br> All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))** <br><br> The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. <br><br> All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A0877

| | |
|---|---|
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

207

| | |
|---|---|
| at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| Patent #: 10,163,287; Independent Claim 6 | Samsung Galaxy Note 8 & Galaxy S8 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A monitoring equipment, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy Note 8 & Galaxy S8 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Samsung Galaxy Note 8 Series Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
**Samsung Galaxy Note 8 Series CPU**: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

**Samsung Galaxy S8 Series Chipset**: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China
**Samsung Galaxy S8 Series CPU**: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top side 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

| | |
|---|---|
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

213

| | |
|---|---|
| at least one light indicator in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of an internet connection or Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

215

A0886

| | |
|---|---|
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

217

| | |
|---|---|
| at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))** <br><br> The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. <br><br> All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. <br><br> **Smart Watches** <br><br> Homeland Security's Smartwatch Will Detect Nuclear Bombs <br> https://www.popularmechanics.com/military/research/a18161/homeland-security-smartwatch-detect-nuclear-bombs/ <br><br> The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick <br> https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/ <br><br> Studies reveal smartwatch biometrics can detect COVID-19 before symptoms surface: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" <br> https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface |

218

A0889

| | |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |



220

A0891

# Samsung's
## Galaxy Watch Active 2

**Radiation and Chemical
Detection**

**Medical Chem/Bio
Detection**





221

| Patent #: 7,385,497; Independent Claim 1 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to |

222

A0893

existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display

223

A0894

of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

224

A0895

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**

**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"

**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.

| | |
|---|---|
| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |

a detector case including a front side, a rear side, a power source and a Central Processing Unit (cpu);

| | |
|---|---|
| a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of one specific chemical, biological and radiological agent and compound; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |
| an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>Samsung Galaxy S9 & Galaxy S10 Series: GPS with A-GPS. Enhanced tracking and location, that combines satellite and cellular, for the new and improved cell phones<br><br><br><br>**Security feature:** The Trusted Internet Connection (TIC) Initiative is designed to reduce the number of U. S. Gov't (USG) network boundary connections. USG agencies must route connections for the increasing number of mobile users accessing cloud services via smart phones through their agency network. |

| | |
|---|---|
| a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector case; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |
| each detector including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |

227

A0898

| | |
|---|---|
| an automatic/ mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

228

| | |
|---|---|
| whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and initiates signal transmission from the cpu to the automatic/mechanical lock disabler to lock or disable the lock of the product thereby preventing further contamination about the product and denying access to the product by unauthorized, untrained and unequipped individuals. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/ article/3236299/best-smart-smoke-detector.html<br><br><br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

229

| Patent #: 8,106,752; Independent Claim 10 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A multi-sensor detection and lock disabling system for monitoring products and for detecting explosive, nuclear, contraband, chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 <br><br> **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended |

to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display

of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

232

A0903

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**

**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"

**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.

---

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |
|---|---|
| at least one cell phone detector case having a front side, a rear side, a power source, and a Central processing unit (cpu); | **Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |

233

A0904

| | |
|---|---|
| a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of at least one specific chemical, biological and radiological agent or compound; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |
| a plurality of interchangeable cell phone sensors for detecting the chemical, biological, and radiological agents and compounds and capable of being disposed within the detector case; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

234

| | |
|---|---|
| each detector case including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |
| an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>Samsung Galaxy S9 & Galaxy S10 Series: GPS with A-GPS. Enhanced tracking and location, that combines satellite and cellular, for the new and improved cell phones<br><br><br><br>**Security feature:** The Trusted Internet Connection (TIC) Initiative is designed to reduce the number of U. S. Gov't (USG) network boundary connections. USG agencies must route connections for the increasing number of mobile users accessing cloud services via smart phones through their agency network. |

| | |
|---|---|
| an automatic/ mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

236

| | |
|---|---|
| whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and sends out a signal to another cell phone case, a handheld, a computer terminal located at a monitoring site, followed by and communicating with the cpu of the multi-sensor detection and automatic/mechanical lock disabler for exchanging information. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br><br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

| Patent #: 9,096,189; Independent Claim 1 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

A0911

| | |
|---|---|
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Galaxy S9 & Galaxy S10 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

241

A0912

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Galaxy S9 & Galaxy S10 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Galaxy S9 & Galaxy S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

242

A0913

| | |
|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>The alleged infringing devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Galaxy S9 & Galaxy S10 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, |

| | |
|---|---|
| | desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Galaxy S9 & Galaxy S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |

| | |
|---|---|
| | **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.  *FBI tried to unlock the Android Phone* |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF) | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** <br><br> **Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

245

| Patent #: 9,096,189; Independent Claim 2 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced... "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 <br><br> **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones..." "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below, is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App. Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS." (Samsung & LG's Android; and Apple's iOS)

247



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

A0919

| | |
|---|---|
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

249

A0920

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series receives signals, or data or from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized |

A0921

individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"

**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.


*FBI tried to unlock the Android Phone*

| | |
|---|---|
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

251

| | |
|---|---|
| monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage and disengage or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series: The devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

252

| | |
|---|---|
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection.<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device.<br><br> |

| Patent #: 9,096,189; Independent Claim 3 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 <br><br> **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

255



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring devices; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

256

A0927

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |
|---|---|
| at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and any of a plurality product group based on the categories of a multi-sensor detection device, a maritime cargo container device, or o locking device. | **Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets.<br><br>Samsung Gal S9 & Gal S10 Series communicates with any of the products listed in any of the product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

A0928

| | |
|---|---|
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a receiver for receiving signals, data or messages from at least one of plurality of product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device, wherein the signals, data or messages are of agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is |

258

A0929

| | |
|---|---|
| | [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

A0930

| | |
|---|---|
| whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, is capable of the activation or deactivation of at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device. |

260

A0931

| | |
|---|---|
| |  |
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 September 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

261

A0932

| Patent #: 9,096,189; Independent Claim 4 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

264

| | |
|---|---|
| comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)." |

| | |
|---|---|
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

266

| | |
|---|---|
| wherein the built-in embedded multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-long or short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

268

A0939

| | |
|---|---|
| wherein the built-in embedded multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds…<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

269

A0940

| Patent #: 9,096,189; Independent Claim 5 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

270

A0941

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

271

A0942



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

272

A0943

| | |
|---|---|
| a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone. Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a _**nanosensor-embedded ''sleeve''**_ for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

| | |
|---|---|
| wherein the built-in multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the built-in multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

274

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**

**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or ***light up***, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**Integrating Biochemiluminescence Detection on Smartphones**



a light alarm indicator that has a plurality of colored lights that correspond to specific ones of the at least two agents;

275

A0946

| | |
|---|---|
| wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

276

A0947

| Patent #: 9,096,189; Independent Claim 6 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, and breach, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *__"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"__*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

<center>277</center>

<center>A0948</center>

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

278



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

279

| | |
|---|---|
| a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans |
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

| | |
|---|---|
| wherein the built-in, multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>    Samsung Gal S9 & Gal S10 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>    **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_<br><br>    **Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>    **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals thereinbetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>    Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>    **Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>    **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. |

| | |
|---|---|
| | **Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch radius. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

282

A0953

| Patent #: 9,096,189; Independent Claim 7 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

284



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

285

A0956

| | |
|---|---|
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |
| monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

286

A0957

| | |
|---|---|
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |
| at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br> |

| | |
|---|---|
| | **Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, _**satellite cell phones**_, cell phones, personal digital assistants (PDAs), and _**satellite monitoring**_. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, _**Cellular**_, _**Satellite**_… |
| at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy S9 & Galaxy S10 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web |

288

A0959

<table>
<tr>
<td></td>
<td>applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.

**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)…</td>
</tr>
<tr>
<td>whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;</td>
<td>**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.

Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.</td>
</tr>
</table>

| | |
|---|---|
| wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain… airport security, police, highway patrol, security guard, military personnel, HAZMAT personnel, the CIA, the FBI, Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

290

A0961

| | |
|---|---|
| wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

| Patent #: 9,096,189; Independent Claim 8 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

293

A0964

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

294

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

| | |
|---|---|
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>    **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>    **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>    **Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>    **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually |

<table>
<tr>
<td></td>
<td>

five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.



*FBI tried to unlock the Android Phone*

</td>
</tr>
<tr>
<td>at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment;</td>
<td>

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.

**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment";

</td>
</tr>
</table>

297

| | |
|---|---|
| at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, *__satellite cell phones__*, cell phones, personal digital assistants (PDAs), and *__satellite monitoring__*. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, *__Cellular__*, *__Satellite__*… |

298

A0969

| | |
|---|---|
| at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

Internet communication between the multi sensor detection device and the monitoring equipment

**Internet for Samsung Galaxy S9 & Galaxy S10 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.

**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |
| wherein the multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

| | |
|---|---|
| wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products. | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment…" |

301

A0972

| Patent #: 9,096,189; Independent Claim 9 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…"
"During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** <br><br> **Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans <br><br> **The Department of Homeland Security's Cell-All project.** "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors… The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include "'something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device'".* Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

305

A0976

| | |
|---|---|
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals<br><br> |

A0977

<table>
<tr>
<td>

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

</td>
<td>

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**

**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.



**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.

**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, ***satellite cell phones***, cell phones, personal digital assistants (PDAs), and ***satellite monitoring***. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, ***Cellular***, ***Satellite***…

</td>
</tr>
</table>

307

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

Internet communication between the multi sensor detection device and the monitoring equipment

**Internet for Samsung Galaxy S9 & Galaxy S10 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.

**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS),

---

| at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
|---|

308

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
| --- | --- |
| whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or from a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| | |
|---|---|
| wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

A0981

| | |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>"A joint research group including senior researcher Shinsuke Ishihara at the Frontier Molecules Group, International Center for Materials Nanoarchitectonics (MANA), National Institute for Materials Science (NIMS), and Professor Timothy M. Swager, at the Massachusetts Institute of Technology (MIT), developed a chemical sensing material whose electrical conductivity dramatically increases when exposed to toxic gases. In addition, the group integrated the sensing material into the electronic circuit in a near-field communication (NFC) tag, which is embedded in smart cards… [w]e created a toxic gas sensor whose measurement can be read on smartphones by integrating the chemical sensing material into the electronic circuit present in a commercially available NFC tag. Users can readily determine the presence/absence of toxic gas by holding an NFC-compatible smartphone over a sensor-embedded NFC tag while making sure that communication between the two devices is intact. The sensor is disposable, and 1 g of the chemical sensing material makes 4 million sensors. So, it is feasible to mass-produce the sensor at low cost."<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" |

311

A0982

| Patent #: 9,589,439; Independent Claim 13 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

312

A0983

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

314

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

315

A0986

| | |
|---|---|
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

316

A0987

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

317

A0988

| | |
|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series Security feature: The devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the communication device receives a signal via any of one or more products in any product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, |

| | |
|---|---|
| | desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>    Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>    **Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |

319

|  | **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.  *FBI tried to unlock the Android Phone* |
|---|---|
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

320

A0991

| Patent #: 9,589,439; Independent Claim 14 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 <br><br> **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below, is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App. Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS." (Samsung & LG's Android; and Apple's iOS)

322

A0993



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

324

A0995

| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| --- | --- |
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, maritime cargo container, the cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series receives signals, or data or from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized |

| | individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |
|---|---|
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

327

| | |
|---|---|
| monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series Security feature: The devices are capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

328

A0999

| | |
|---|---|
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device.<br><br> |

A1000

| Patent #: 9,589,439; Independent Claim 15 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| Monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." " "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 <br><br> **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

331

A1002



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

332

A1003

| | |
|---|---|
| at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and at least one of a multi-sensor detection device, a maritime cargo container device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets.<br><br>Samsung Gal S9 & Gal S10 Series communicates with any of the products listed in any of the product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

A1004

| | |
|---|---|
| a transmitter for transmitting signals and messages to at least one of the multi-sensor detection device, the maritime cargo container device, or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container device or the locking device, wherein the signals, data or messages are of agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is |

334

A1005

| | |
|---|---|
| | [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS |
| the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

A1006

| | |
|---|---|
| whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of the multi-sensor detection device, the maritime cargo container device or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series is capable of the activation or deactivation of at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device. |

336

A1007



| | |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be at least one of received or transmitted between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 September 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

337

| Patent #: 9,589,439; Independent Claim 16 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include '"something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

| | |
|---|---|
| comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a _**nanosensor-embedded "sleeve"**_ for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a _**nanosensor-embedded "sleeve"**_ for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)." |

| | |
|---|---|
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

| | |
|---|---|
| wherein the built-in embedded multi-sensor detection device receives a signal via any of one or more products in any product grouping categories; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

A1014

| | |
|---|---|
| wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-long range radio frequency, product-to-short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ___"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"___.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

A1015

| | |
|---|---|
| wherein the built-in embedded multi-sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of the several product groupings of design similarity. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a _**nanosensor-embedded "sleeve"**_ for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds…<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

345

A1016

| Patent #: 9,589,439; Independent Claim 17 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

348

A1019

| | |
|---|---|
| a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone. Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a _**nanosensor-embedded ''sleeve''**_ for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

349

A1020

| | |
|---|---|
| wherein the built-in multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the built-in multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**

**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or ***light up***, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



### Integrating Biochemiluminescence Detection on Smartphones



a light alarm indicator that has a plurality of colored lights that correspond to specific agents of the at least two agents;

351

A1022

| | |
|---|---|
| wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for at least one of a receipt or transmission of signals therebetween. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

A1023

| Patent #: 9,589,439; Independent Claim 18 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

355

A1026

| | |
|---|---|
| a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans |
| monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

356

A1027

| | |
|---|---|
| wherein the built-in, multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *__"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"__*<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *__"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"__*. |

| | |
|---|---|
| | **Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

| Patent #: 9,589,439; Independent Claim 19 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include "'something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 <br><br> **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

361

A1032

| | |
|---|---|
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |
| monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

| | |
|---|---|
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |
| at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br> |

363

A1034

| | |
|---|---|
| | **Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, _**satellite cell phones**_, cell phones, personal digital assistants (PDAs), and _**satellite monitoring**_. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, _**Cellular**_, _**Satellite**_… |
| at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy S9 & Galaxy S10 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web |

364

A1035

| | applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |

| | |
|---|---|
| wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain… airport security, police, highway patrol, security guard, military personnel, HAZMAT personnel, the CIA, the FBI, Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **"built in, embedded" is construed to include "*"something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment…" |

366

A1037

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |
|---|---|
| wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | **Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing communications are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

367

A1038

| Patent #: 9,589,439; Independent Claim 20 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

368

A1039

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

369

A1040

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

370

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

371

A1042

| | |
|---|---|
| monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually |

| | five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.  *FBI tried to unlock the Android Phone* |
|---|---|
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** **Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network. **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |

| | |
|---|---|
| at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, *satellite cell phones*, cell phones, personal digital assistants (PDAs), and *satellite monitoring*. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, *Cellular*, *Satellite*… |

374

A1045

| | |
|---|---|
| at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy S9 & Galaxy S10 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |
| wherein the multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

| | |
|---|---|
| wherein the multi-sensor detection device is for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency connection is in signal communication with a transmitter and a receiver of the monitoring equipment or multi-sensor detection device and transceivers of the products | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

377

A1048

| Patent #: 9,589,439; Independent Claim 21 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

378

A1049

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

380

| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
|---|---|
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors… The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…"<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

| | |
|---|---|
| monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include "'something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals<br><br> |

382

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**

**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.



**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.

**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, ***satellite cell phones***, cell phones, personal digital assistants (PDAs), and ***satellite monitoring***. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, ***Cellular***, ***Satellite***… |

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

383

| | |
|---|---|
| at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy S9 & Galaxy S10 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

384

A1055

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor data to be sent to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| | |
|---|---|
| wherein the multi-sensor detection device for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

| | |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>"A joint research group including senior researcher Shinsuke Ishihara at the Frontier Molecules Group, International Center for Materials Nanoarchitectonics (MANA), National Institute for Materials Science (NIMS), and Professor Timothy M. Swager, at the Massachusetts Institute of Technology (MIT), developed a chemical sensing material whose electrical conductivity dramatically increases when exposed to toxic gases. In addition, the group integrated the sensing material into the electronic circuit in a near-field communication (NFC) tag, which is embedded in smart cards… [w]e created a toxic gas sensor whose measurement can be read on smartphones by integrating the chemical sensing material into the electronic circuit present in a commercially available NFC tag. Users can readily determine the presence/absence of toxic gas by holding an NFC-compatible smartphone over a sensor-embedded NFC tag while making sure that communication between the two devices is intact. The sensor is disposable, and 1 g of the chemical sensing material makes 4 million sensors. So, it is feasible to mass-produce the sensor at low cost."<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" |

387

A1058

| Patent #: 9,589,439; Independent Claim 22 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." " "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

388

A1059

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

389



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

390

A1061

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

391

A1062

| | |
|---|---|
| at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

A1063

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

A1064

| | |
|---|---|
| the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. The "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen. |



*FBI tried to unlock the Android Phone*

|  | |
|--|--|
| the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |

| | |
|---|---|
| the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>"A joint research group including senior researcher Shinsuke Ishihara at the Frontier Molecules Group, International Center for Materials Nanoarchitectonics (MANA), National Institute for Materials Science (NIMS), and Professor Timothy M. Swager, at the Massachusetts Institute of Technology (MIT), developed a chemical sensing material whose electrical conductivity dramatically increases when exposed to toxic gases. In addition, the group integrated the sensing material into the electronic circuit in a near-field communication (NFC) tag, which is embedded in smart cards… [w]e created a toxic gas sensor whose measurement can be read on smartphones by integrating the chemical sensing material into the electronic circuit present in a commercially available NFC tag. Users can readily determine the presence/absence of toxic gas by holding an NFC-compatible smartphone over a sensor-embedded NFC tag while making sure that communication between the two devices is intact. The sensor is disposable, and 1 g of the chemical sensing material makes 4 million sensors. So, it is feasible to mass-produce the sensor at low cost."<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" |

| | |
|---|---|
| whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, a cellular connection, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| | |
|---|---|
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, or the central processing unit (CPU). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, _**satellite cell phones**_, cell phones, personal digital assistants (PDAs), and _**satellite monitoring**_. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, _**Cellular**_, _**Satellite**_… |

398

| Patent #: 9,589,439; Independent Claim 23 | Samsung Galaxy S9 & Galaxy S10 Series and Samsung Galaxy Watch Active 2 Series |
|---|---|
| A cell phone comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

401

| | |
|---|---|
| a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication device, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

| | |
|---|---|
| a receiver for receiving signals from the cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, *__satellite cell phones__*, cell phones, personal digital assistants (PDAs), and *__satellite monitoring__*. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, *__Cellular__*, *__Satellite__*… |

| | |
|---|---|
| the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S9 & Gal S10 Series Security feature: The devices are capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |

A1075

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"** |

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**

**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.



The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.***

| | |
|---|---|
| wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, ***satellite cell phones***, cell phones, personal digital assistants (PDAs), and ***satellite monitoring***. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, ***Cellular***, ***Satellite***… |

406

A1077

| | |
|---|---|
| wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |

| | |
|---|---|
| whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| Patent #: 10,163,287; Independent Claim 4 | Samsung Galaxy S9 & Galaxy S10 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A communication device comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

410

A1081



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Samsung Galaxy S9 Series Chipset**: Qualcomm SDM845 Snapdragon 845 (10 nm) – USA/China
**Samsung Galaxy S9 Series CPU**: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver)-USA/China

**Samsung Galaxy S10 Series Chipset**: Qualcomm SM8150 Snapdragon 855 (7 nm) - USA/China
**Samsung Galaxy S10 Series CPU**: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)-USA/China

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

411

| | |
|---|---|
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

412

A1083

| | |
|---|---|
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1084

| | |
|---|---|
| at least one of an internet connection Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

414

A1085

| | |
|---|---|
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

415

A1086

| | |
|---|---|
| at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

417

A1088

| Patent #: 10,163,287; Independent Claim 5 | Samsung Galaxy S9 & Galaxy S10 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A monitoring device, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Samsung Galaxy S9 Series Chipset**: Qualcomm SDM845 Snapdragon 845 (10 nm) – USA/China
**Samsung Galaxy S9 Series CPU**: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver)-USA/China

**Samsung Galaxy S10 Series Chipset**: Qualcomm SM8150 Snapdragon 855 (7 nm) - USA/China
**Samsung Galaxy S10 Series CPU**: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)-USA/China

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

| | |
|---|---|
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1093

| | |
|---|---|
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

423

A1094

| | |
|---|---|
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

427

A1098

| Patent #: 10,163,287; Independent Claim 6 | Samsung Galaxy S9 & Galaxy S10 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A monitoring equipment, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S9 & Galaxy S10 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Samsung Galaxy S9 Series Chipset**: Qualcomm SDM845 Snapdragon 845 (10 nm) – USA/China
**Samsung Galaxy S9 Series CPU**: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver)-USA/China

**Samsung Galaxy S10 Series Chipset**: Qualcomm SM8150 Snapdragon 855 (7 nm) - USA/China
**Samsung Galaxy S10 Series CPU**: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)-USA/China

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

430

A1101

| | |
|---|---|
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1102

| | |
|---|---|
| at least one light indicator in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1103

| | |
|---|---|
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of an internet connection or Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

433

A1104

| | |
|---|---|
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

434

A1105

| | |
|---|---|
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1106

| | |
|---|---|
| at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output interface system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices.<br><br>**Smart Watches**<br><br>Homeland Security's Smartwatch Will Detect Nuclear Bombs<br>https://www.popularmechanics.com/military/research/a18161/homeland-security-smartwatch-detect-nuclear-bombs/<br><br>Smartwatch turns into biochemical monitoring system<br>https://tectales.com/wearables-sensors/smartwatch-turns-into-biochemical-monitoring-system.html<br><br>The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick<br>https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/<br><br>Studies reveal smartwatch biometrics can detect COVID-19 before symptoms surface: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive"<br>https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface |

| | |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

# Samsung's
## New and Improved Cell Phones

**Samsung Galaxy S20**     **Samsung Galaxy S21**




# Samsung's
## Galaxy Watch3

### Radiation and Chemical Detection

### Medical Chem/Bio Detection





439

| Patent #: 7,385,497; Independent Claim 1 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to |

existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display

441

A1112

of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

442

A1113

<table>
<tr>
<td></td>
<td>

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**

**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"

**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.

</td>
</tr>
<tr>
<td>

a detector case including a front side, a rear side, a power source and a Central Processing Unit (cpu);

</td>
<td>

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets.

</td>
</tr>
</table>

443

A1114

| | |
|---|---|
| a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of one specific chemical, biological and radiological agent and compound; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |
| an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>Samsung Gal S20 & Gal S21 Series: GPS with A-GPS. Enhanced tracking and location, that combines satellite and cellular, for the new and improved cell phones<br><br><br><br>**Security feature:** The Trusted Internet Connection (TIC) Initiative is designed to reduce the number of U. S. Gov't (USG) network boundary connections. USG agencies must route connections for the increasing number of mobile users accessing cloud services via smart phones through their agency network. |

444

| | |
|---|---|
| a plurality of interchangeable detectors for detecting the chemical, biological and radiological agents and compounds and capable of being disposed within the detector case; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |
| each detector including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |

445

A1116

| | |
|---|---|
| an automatic/ mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infriging Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disenguaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

| | |
|---|---|
| whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and initiates signal transmission from the cpu to the automatic/mechanical lock disabler to lock or disable the lock of the product thereby preventing further contamination about the product and denying access to the product by unauthorized, untrained and unequipped individuals. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br><br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

| Patent #: 8,106,752; Independent Claim 10 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A multi-sensor detection and lock disabling system for monitoring products and for detecting explosive, nuclear, contraband, chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended |

to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display

449

A1120

of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

450

A1121

|  | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen. |
| at least one cell phone detector case having a front side, a rear side, a power source, and a Central processing unit (cpu); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |

451

A1122

| | |
|---|---|
| a plurality of indicator lights located on the front side with each indicator light corresponding to and indicating the detection of at least one specific chemical, biological and radiological agent or compound; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |
| a plurality of interchangeable cell phone sensors for detecting the chemical, biological, and radiological agents and compounds and capable of being disposed within the detector case; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

| | |
|---|---|
| each detector case including a sound alarm indicator, a readings panel, a light alarm indicator and a sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html |
| an Internet connection, a GPS connection, and a power connection located on the rear side and which are interconnected with the cpu; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>Samsung Gal S20 & Gal S21 Series: GPS with A-GPS. Enhanced tracking and location, that combines satellite and cellular, for the new and improved cell phones<br><br><br><br>**Security feature:** The Trusted Internet Connection (TIC) Initiative is designed to reduce the number of U. S. Gov't (USG) network boundary connections. USG agencies must route connections for the increasing number of mobile users accessing cloud services via smart phones through their agency network. |

453

A1124

| | |
|---|---|
| an automatic/ mechanical lock disabler interconnected to the cpu and which is mounted to a lock on a product for receiving transmission from the cpu to lock or disable the lock on the product to prevent access to the product by unauthorized, untrained and unequipped individuals; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

A1125

| | |
|---|---|
| whereupon detection of specific chemical, biological, or radiological agents or compounds by the detectors causes the lighting of the corresponding indicator light for visual confirmation of the detection and sends out a signal to another cell phone case, a handheld, a computer terminal located at a monitoring site, followed by and communicating with the cpu of the multi-sensor detection and automatic/mechanical lock disabler for exchanging information. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br><br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br><br>*FBI tried to unlock the Android Phone* |

| Patent #: 9,096,189; Independent Claim 1 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

458

A1129

| | |
|---|---|
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

| | |
|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>The alleged infringing devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, |

461

A1132

| | |
|---|---|
| | desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |

| | |
|---|---|
| | **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen. <br><br>  <br> *FBI tried to unlock the Android Phone* |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF) | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** <br><br> **Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

A1134

| Patent #: 9,096,189; Independent Claim 2 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

464

A1135

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below, is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App. Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS." (Samsung & LG's Android; and Apple's iOS)

465

A1136



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
|---|---|
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

467

A1138

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives signals, or data or from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized |

468

A1139

| | individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |
|---|---|
| | **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen. <br><br>  <br> *FBI tried to unlock the Android Phone* |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** <br><br> Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

469

A1140

| | |
|---|---|
| monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage and disengage or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series: The devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

A1141

| | |
|---|---|
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection.<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device.<br><br> |

| Patent #: 9,096,189; Independent Claim 3 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

474

A1145

| | |
|---|---|
| at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and any of a plurality product group based on the categories of a multi-sensor detection device, a maritime cargo container device, or o locking device. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets.<br><br>Samsung Gal S20 & Gal S21 Series communicates with any of the products listed in any of the product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a receiver for receiving signals, data or messages from at least one of plurality of product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device, wherein the signals, data or messages are of agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is |

476

A1147

| | |
|---|---|
| | [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

477

A1148

| | |
|---|---|
| whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series is capable of the activation or deactivation of at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device. |

478

A1149



| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"** |
| --- | --- |
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring. | "The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 September 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

479

| Patent #: 9,096,189; Independent Claim 4 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

480

A1151

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

481



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

| | |
|---|---|
| comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a ***nanosensor-embedded "sleeve"*** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a ***nanosensor-embedded "sleeve"*** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)." |

| | |
|---|---|
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

| | |
|---|---|
| wherein the built-in embedded multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-long or short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

486

A1157

| | |
|---|---|
| wherein the built-in embedded multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.

Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a _**nanosensor-embedded "sleeve"**_ for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds…

**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories."

487

A1158

| Patent #: 9,096,189; Independent Claim 5 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

489



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

490

A1161

| | |
|---|---|
| a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone. Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded ''sleeve''_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

| | |
|---|---|
| wherein the built-in multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the built-in multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

| | |
|---|---|
| a light alarm indicator that has a plurality of colored lights that correspond to specific ones of the at least two agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or ***light up***, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).<br><br><br><br>**Integrating Biochemiluminescence Detection on Smartphones**<br><br> |

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |
|---|---|
| wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween | Samsung Gal S20 & Gal S21 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

494

| Patent #: 9,096,189; Independent Claim 6 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, and breach, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

497

A1168

| | |
|---|---|
| a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans |
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include "'something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

498

| | |
|---|---|
| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the built-in, multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | |
| wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals thereinbetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**. |

499

A1170

| | |
|---|---|
| | **Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"** <br><br> "The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6. <br><br> Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch radius. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

500

A1171

| Patent #: 9,096,189; Independent Claim 7 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 <br><br> **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

502



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

503

A1174

| | |
|---|---|
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |
| monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

504

A1175

| | |
|---|---|
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |
| at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br> |

505

| | |
|---|---|
| | **Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, ***satellite cell phones***, cell phones, personal digital assistants (PDAs), and ***satellite monitoring***. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, ***Cellular***, ***Satellite***… |
| at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy S20 & Galaxy S21 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web |

| | applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
| whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |

| | |
|---|---|
| wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain… airport security, police, highway patrol, security guard, military personnel, HAZMAT personnel, the CIA, the FBI, Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment…" |

508

A1179

| | |
|---|---|
| wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing communications networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

509

A1180

| Patent #: 9,096,189; Independent Claim 8 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

512

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

| | |
|---|---|
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually |

|  | five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |
|---|---|
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |

| | |
|---|---|
| at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, _**satellite cell phones**_, cell phones, personal digital assistants (PDAs), and _**satellite monitoring**_. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, _**Cellular**_, _**Satellite**_… |

516

A1187

| | |
|---|---|
| at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy S20 & Galaxy S21 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

517

A1188

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |
| wherein the multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

| | |
|---|---|
| wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short-range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products. | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment…" |

| Patent #: 9,096,189; Independent Claim 9 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

521

A1192

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7— operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors… The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…"<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include "'something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

| | |
|---|---|
| monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ___**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**___. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals<br><br> |

524

| | |
|---|---|
| at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, _**satellite cell phones**_, cell phones, personal digital assistants (PDAs), and _**satellite monitoring**_. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, _**Cellular**_, _**Satellite**_… |

525

A1196

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |
|---|---|
| at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; | Internet communication between the multi sensor detection device and the monitoring equipment |
| | **Internet for Samsung Galaxy S20 & Galaxy S21 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of 'geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy. |
| | **Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

526

A1197

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or from a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| | |
|---|---|
| wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

| | |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>"A joint research group including senior researcher Shinsuke Ishihara at the Frontier Molecules Group, International Center for Materials Nanoarchitectonics (MANA), National Institute for Materials Science (NIMS), and Professor Timothy M. Swager, at the Massachusetts Institute of Technology (MIT), developed a chemical sensing material whose electrical conductivity dramatically increases when exposed to toxic gases. In addition, the group integrated the sensing material into the electronic circuit in a near-field communication (NFC) tag, which is embedded in smart cards… [w]e created a toxic gas sensor whose measurement can be read on smartphones by integrating the chemical sensing material into the electronic circuit present in a commercially available NFC tag. Users can readily determine the presence/absence of toxic gas by holding an NFC-compatible smartphone over a sensor-embedded NFC tag while making sure that communication between the two devices is intact. The sensor is disposable, and 1 g of the chemical sensing material makes 4 million sensors. So, it is feasible to mass-produce the sensor at low cost."<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" |

| Patent #: 9,589,439; Independent Claim 13 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." " "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

531



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

533

A1204

| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| --- | --- |
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

A1205

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

| | |
|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series Security feature: The devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the communication device receives a signal via any of one or more products in any product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, |

A1207

| | |
|---|---|
| | desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system".**<br><br>**Patent specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108" |

| | **Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.  *FBI tried to unlock the Android Phone* |
|---|---|
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

538

A1209

| Patent #: 9,589,439; Independent Claim 14 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below, is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App. Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS." (Samsung & LG's Android; and Apple's iOS)

540

A1211



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

541

A1212

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

542

A1213

| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
|---|---|
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

A1214

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, maritime cargo container, the cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives signals, or data or from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized |

544

A1215

individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"

**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.



*FBI tried to unlock the Android Phone*

| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>    Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |
| --- | --- |

545

| | |
|---|---|
| monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series Security feature: The devices are is capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |
| wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

| | |
|---|---|
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device.<br><br> |

A1218

| Patent #: 9,589,439; Independent Claim 15 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| Monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 <br><br> **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

| | |
|---|---|
| at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and at least one of a multi-sensor detection device, a maritime cargo container device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets.<br><br>Samsung Gal S20 & Gal S21 Series communicates with any of the products listed in any of the product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| a transmitter for transmitting signals and messages to at least one of the multi-sensor detection device, the maritime cargo container device, or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container device or the locking device, wherein the signals, data or messages are of agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications:** Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is |

A1223

<table>
<tr>
<td></td>
<td>[are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel"</td>
</tr>
<tr>
<td>at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection;</td>
<td>**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS</td>
</tr>
<tr>
<td>the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and</td>
<td>**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.</td>
</tr>
</table>

553

A1224

| | |
|---|---|
| whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of the multi-sensor detection device, the maritime cargo container device or the locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series is capable of the activation or deactivation of at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS<br><br>**Monitoring Equipment:** The Smart Watch performs substantially the same function; in substantially the same way; to achieve substantially the same results as the alleged infringing products, and is therefore included in the product grouping category that is based on "*common features of design similarity*"; communication devices or monitoring equipment. The Smart Watch is interconnected through Bluetooth to the host device (i.e., new and improved cell phone), and has the ability to operate as a stand-alone detection device. |



| | |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be at least one of received or transmitted between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 September 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

| Patent #: 9,589,439; Independent Claim 16 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

557



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

| | |
|---|---|
| comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced... "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**.<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced... "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a **_nanosensor-embedded "sleeve"_** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)." |

A1230

| | |
|---|---|
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.<br><br><br>*FBI tried to unlock the Android Phone* |

| | |
|---|---|
| wherein the built-in embedded multi-sensor detection device receives a signal via any of one or more products in any product grouping categories; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** |
| | Samsung Gal S20 & Gal S21 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories. |
| | **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. |
| | **Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

561

A1232

| | |
|---|---|
| wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-long range radio frequency, product-to-short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for communication therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

Samsung Gal S20 & Gal S21 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.

**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html

**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.

**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

| | |
|---|---|
| wherein the built-in embedded multi-sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of the several product groupings of design similarity. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***.<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a ***nanosensor-embedded ''sleeve''*** for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds…<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

| Patent #: 9,589,439; Independent Claim 17 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

| | |
|---|---|
| a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone. Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a _**nanosensor-embedded ''sleeve''**_ for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

| | |
|---|---|
| wherein the built-in multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the built-in multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**.<br><br>**Patent Specifications:** "Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories." |

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**

**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or ***light up***, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**Integrating Biochemiluminescence Detection on Smartphones**



a light alarm indicator that has a plurality of colored lights that correspond to specific agents of the at least two agents;

| | |
|---|---|
| wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for at least one of a receipt or transmission of signals therebetween. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

A1241

| Patent #: 9,589,439; Independent Claim 18 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).** <br><br> **Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween. <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 <br><br> **The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

573

A1244

| | |
|---|---|
| a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br><br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans |
| monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include "'something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

| | |
|---|---|
| wherein the built-in, multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for the receipt and transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Smartphone smoke and carbon monoxide (CO) detectors**: Once installed and powered up, you download the relevant app and connect to the device wirelessly. Then, when the alarm goes off, not only do you receive an audio alert—many include helpful voice instructions instead of just a siren—your smart phone also tells you what the problem is (whether it's smoke or CO, which alarm was activated, and sometimes even the severity of the smoke). Many smart smoke detectors hook into additional smart home gear and IFTTT, so you can get even more clever by having the lights start flashing if smoke has been detected, for example. https://www.techhive.com/article/3236299/best-smart-smoke-detector.html<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, _**"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"**_. |

575

A1246

| | |
|---|---|
| | **Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |

576

A1247

| Patent #: 9,589,439; Independent Claim 19 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, *"built in, embedded" is construed to include "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"*. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"

| | |
|---|---|
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |
| monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |

| | |
|---|---|
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |
| at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br> |

A1252

| | |
|---|---|
| | **Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, *__satellite cell phones__*, cell phones, personal digital assistants (PDAs), and *__satellite monitoring__*. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, *__Cellular__*, *__Satellite__*… |
| at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy S20 & Galaxy S21 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web |

<table>
<tr>
<td></td>
<td>

applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.

**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)…

</td>
</tr>
<tr>
<td>

whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data;

</td>
<td>

**Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**

**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.

Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.

</td>
</tr>
</table>

| | |
|---|---|
| wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, receives a signal via any of one or more products listed in any of the plurality of product grouping categories.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain… airport security, police, highway patrol, security guard, military personnel, HAZMAT personnel, the CIA, the FBI, Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

| | |
|---|---|
| wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Alleged Infringing Devices Turned into Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing communications are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |

| Patent #: 9,589,439; Independent Claim 20 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

586

A1257

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

587

A1258

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

<table>
<tr>
<td></td>
<td><strong>Patent Specifications</strong>: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…"</td>
</tr>
<tr>
<td>a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;</td>
<td><p style="text-align:center"><strong>Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation</strong></p>
<p><strong>Patent Specifications</strong>: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans</p>
<p><strong>IPR Final Written Decision</strong>. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, <strong><em>"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"</em></strong>. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015</p></td>
</tr>
</table>

| | |
|---|---|
| monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually |

| | five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/*. You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen.  *FBI tried to unlock the Android Phone* |
|---|---|
| at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Cell Towers**: Cell towers, also known as cell sites, are where electric communications equipment and antennae are mounted, allowing the surrounding area to use wireless communication devices. Whenever a cell phone is used, it emits an electromagnetic radio wave, called a radio frequency, that is received by the nearest cell tower's antenna. Once the cell tower receives this signal, it will transmit the signals to a switching center. This allows the call to be connected to either another mobile phone or to a telephone network. The equipment on cell towers includes transceivers and other supporting technology. There are multiple antennas attached to a cell tower, typically mounted on a head frame. When a phone is connected to a cellular network, it continually checks the signal strength of nearby towers and communicates that information to the network.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; |

591

| | |
|---|---|
| at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, *satellite cell phones*, cell phones, personal digital assistants (PDAs), and *satellite monitoring*. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, *Cellular*, *Satellite*… |

592

A1263

| | |
|---|---|
| at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy S20 & Galaxy S21 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology. |
| wherein the multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available."<br><br>**Patent Specifications:** Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… |

| | |
|---|---|
| wherein the multi-sensor detection device is for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series, is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency connection is in signal communication with a transmitter and a receiver of the monitoring equipment or multi-sensor detection device and transceivers of the products | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

| Patent #: 9,589,439; Independent Claim 21 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…"<br><br>**Patent Specifications:** "Each detector can also be used as a manual, stand-alone hand-held scanner… Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners… FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound… a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner… The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment."<br><br>**IPR Final Written Decision.** "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. |

to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015

**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing

597

A1268

the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

598

A1269

| | |
|---|---|
| | **Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174… the integration of portable electronic communication or telecommunication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188…" |
| a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation** <br><br> **Patent Specifications**: Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans <br><br> **The Department of Homeland Security's Cell-All project.** "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors… The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" <br><br> **IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015 |

| monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, ***"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"***. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals<br><br> |

|  | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**

**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.



**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.

**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, ***satellite cell phones***, cell phones, personal digital assistants (PDAs), and ***satellite monitoring***. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, ***Cellular***, ***Satellite***… |

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

| | |
|---|---|
| at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Internet communication between the multi sensor detection device and the monitoring equipment<br><br>**Internet for Samsung Galaxy S20 & Galaxy S21 Series**: Smartphones connecting to the Internet anytime and anywhere through public Wi-Fi hotspots that connect to the Internet through a shared connection. Mobile Internet is a smaller Internet scaled down to fit the dimensions of a mobile phone. The mobile phone network is an example of a cellular network. A cellular network has a cluster of 'geographic locations together known as a 'cell' which connect to the Internet through satellites. Each cell has a transmitting tower at its centre through which information is passed to and fro via digital radio waves. Two ways to connect to the internet through your mobile phone – Via a cellular telephone service provider or by using standard Wi-Fi. A Wi-Fi enabled device lets you surf the Web at free Wi-Fi hotspots. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Through a cellular service provider, the phone connects to the Internet through data transfer the same way a PC does, but with a wireless link. We can access the same Web applications just like in our PCs if we use a Wireless Application Protocol (WAP)-enabled cell phone. WAP is the universal standard for wireless communications and applications. For operating mobile phone networks, Global System for Mobile Communications (GSM) and Code Division Multiple Access (CDMA) are the most commonly deployed. GSM and CDMA use different algorithms which allow multiple mobile phone users to share the same digital radio frequency without causing interfering for each other. Cell phones have an in-built antenna which is used to send packets of digital information back and forth with cell-phone towers via radio waves. Mobile phones connect to a cell tower in the area, and instead of connecting to another phone it connects to the Internet and can fetch or retrieve data. Mobile Voice goes in one channel and IP or SMS signaling over Mobile Internet in another. The General Packet Radio Service (GPRS) network provides a gateway to the internet through different frequency channels for uploading and downloading. The transfer of data between a wireless device and the Internet. The main component is Radio frequency (RF) energy.<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), |

| | General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS)… |
|---|---|
| whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor data to be sent to the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| | |
|---|---|
| wherein the multi-sensor detection device for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series is built in any of one or more products listed in any of the plurality of product grouping categories.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**<br><br>**Patent Specifications**: Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to…<br><br>**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals |
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products; | **Plaintiff believes the Defendant & third-party Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications:** Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS)…<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, **_"built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device"_**. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment..." |

A1275

| | |
|---|---|
| at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>"A joint research group including senior researcher Shinsuke Ishihara at the Frontier Molecules Group, International Center for Materials Nanoarchitectonics (MANA), National Institute for Materials Science (NIMS), and Professor Timothy M. Swager, at the Massachusetts Institute of Technology (MIT), developed a chemical sensing material whose electrical conductivity dramatically increases when exposed to toxic gases. In addition, the group integrated the sensing material into the electronic circuit in a near-field communication (NFC) tag, which is embedded in smart cards… [w]e created a toxic gas sensor whose measurement can be read on smartphones by integrating the chemical sensing material into the electronic circuit present in a commercially available NFC tag. Users can readily determine the presence/absence of toxic gas by holding an NFC-compatible smartphone over a sensor-embedded NFC tag while making sure that communication between the two devices is intact. The sensor is disposable, and 1 g of the chemical sensing material makes 4 million sensors. So, it is feasible to mass-produce the sensor at low cost."<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" |

605

A1276

| Patent #: 9,589,439; Independent Claim 22 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

607

A1278



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7—operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

608

A1279

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

609

A1280

| | |
|---|---|
| at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between a host computer and other devices; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series transmits signals and messages to at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |

610

A1281

| | |
|---|---|
| a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series receives signals, data or messages from at least one of plurality product groups.<br><br>**Patent Specifications**: Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars…Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, biometric sensors, high security locks, door sensors, disabling locking systems, detection of humans… Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, detector cases of locks, detector cases of tags, detector cases that is [are] mounted to, detector cases that is [are] affixed to, detector cases that is [are] outside of, detector cases that is [are] inside of, and detector cases that is [are] adjacent to… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, desktop personal computers (PCs), notebook personal computers (PCs), laptops, cell phones, personal digital assistants (PDAs), handhelds… Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Internet, Wireless, Wired, Text Messaging, Cellular, Satellite, Radio Frequency (RF), Global Positioning System (GPS)… Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature… Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel" |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short-range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection. |

A1282

| | |
|---|---|
| the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents" for Plaintiff's "lock disabling system", that is interconnected to, or integrated with, Plaintiff's CMDC device(s).**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56… a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock… The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety… and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108"<br><br>**Example:** Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Google Account Login. On Android Phone, multiple attempts (usually five attempts) with an unknown or a wrong pin will go either into a 30 seconds delay before further attempts are allowed or the phone will allow entry using your Google account password to unlock the phone. *https://mashtips.com/unlock-samsung-phone-not-recognizing-fingerprint-or-alternative-password/.* You can have your irises and multiple fingerprints registered along with a backup PIN, pattern or password. The "Lock Network & Security" feature as my security net if my phone is stolen. The "Lock Network & Security" feature is supposed to prevent anyone else from turning OFF your phone and your wifi/data when your phone is locked, for purposes such guaranteeing that you will still be able to track or remotely control your phone when it is lost or stolen. |

| | |
|---|---|
| | *FBI tried to unlock the Android Phone* |
| the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint. |

613

| | |
|---|---|
| the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>"The combination of NFC tags with sensors becomes a new route to realize wireless communication sensed functions, which endows a smartphone with capabilities to rapidly obtain sensing information by simply reading an NFC tag integrated with a sensor" Opperman C.A., Hancke G.P. Using NFC-enabled phones for remote data acquisition and digital control; Proceedings of the IEEE Africon '11; Livingstone, Zambia. 13–15 Sept. 2011; pp. 1–6.<br><br>"A joint research group including senior researcher Shinsuke Ishihara at the Frontier Molecules Group, International Center for Materials Nanoarchitectonics (MANA), National Institute for Materials Science (NIMS), and Professor Timothy M. Swager, at the Massachusetts Institute of Technology (MIT), developed a chemical sensing material whose electrical conductivity dramatically increases when exposed to toxic gases. In addition, the group integrated the sensing material into the electronic circuit in a near-field communication (NFC) tag, which is embedded in smart cards… [w]e created a toxic gas sensor whose measurement can be read on smartphones by integrating the chemical sensing material into the electronic circuit present in a commercially available NFC tag. Users can readily determine the presence/absence of toxic gas by holding an NFC-compatible smartphone over a sensor-embedded NFC tag while making sure that communication between the two devices is intact. The sensor is disposable, and 1 g of the chemical sensing material makes 4 million sensors. So, it is feasible to mass-produce the sensor at low cost."<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology.<br><br>**Patent Specifications:** "The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements… As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one--and preferably many--detector case 12 that can be placed in, on, upon or adjacent the product…" |

614

A1285

|  |  |
|---|---|
| whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, a cellular connection, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

| | |
|---|---|
| wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, or the central processing unit (CPU). | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone.<br><br><br><br>**Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, _**satellite cell phones**_, cell phones, personal digital assistants (PDAs), and _**satellite monitoring**_. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, _**Cellular**_, _**Satellite**_… |

616

A1287

| Patent #: 9,589,439; Independent Claim 23 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A cell phone comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

618

A1289



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS—operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7— operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

619

A1290

| | |
|---|---|
| a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) of the alleged infringing devices are the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The components for a processor are condensed to fit in the smartphone, and exist as a mobile application processor, or a System-on-a-Chip (SoC), that includes the CPU. Mobile application processors are found in smartphones, smartwatches, and tablets. |
| a transmitter for transmitting signals and messages to a cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

| | |
|---|---|
| a receiver for receiving signals from the cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."<br><br> |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series are literally infringing the wireless protocols listed in the claim limitation of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection.<br><br>**Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, *satellite cell phones*, cell phones, personal digital assistants (PDAs), and *satellite monitoring*. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, *Cellular*, *Satellite*… |

A1292

| | |
|---|---|
| the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Smartphones are equipped with NFC technology, that is used in peer-to-peer payment and data transfer apps. NFC stands for near-field communication, and it allows phones, tablets, laptops, and other devices to share data with other NFC-equipped devices. NFC's small radius is a major security benefit, and one reason why NFC has taken off as a secure alternative to RFID technology. An NFC connection is automatically started when another NFC device enters into the wireless standard four-inch range. Once in range, the two devices instantly communicate. The alleged infringing devices (i.e., new and improved cell phones, smartphones, smartwatches, or cell phone detection devices) are equipped with NFC technology. |
| whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Samsung Gal S20 & Gal S21 Series Security feature: The devices are capable of sending signals to lock and unlock doors; activate or deactivate security systems in homes, buildings, or vehicles; detect for Chemical, Biological, Radiological, Nuclear, or Explosive's agents; to stop, stall, or slowdown vehicles, to include driverless land and aerial vehicles; of diagnosing biological and/or chemical medical conditions, and receiving data that the intended task has been accomplished. |

| | |
|---|---|
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"**<br><br>**Interchangeable Sensors**: Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can transmit data from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and transmits the data it gathers using Bluetooth wireless technology. Variable converted off-the-shelf sensors, such as infrared thermometers, color referencers, motion sensors and barcode readers, into *interchangeable modules* that can be snapped onto either end of smartphone or other smart device, so two modules can be used simultaneously. There is a module for carbon dioxide detection and another that senses carbon monoxide, nitric oxide and other gases. "Using a common platform for multiple sensor modules, you save a lot of money," Yu says. The NODE+ is compatible with Android and Apple smart devices.<br><br><br><br>The NODE+ platform can be outfitted with an array of different sensor modules and can store data or transmit it to a smart device using Bluetooth wireless technology. ***Credits: Variable Inc.*** |

| | |
|---|---|
| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents"** |
| | **Satellite Phone.** Turn Your Smartphone into a Satellite Phone with Thuraya SatSleeve. The SatSleeve is a case that cradles your Smartphone and transforms it into a satellite phone. You can place calls and send text messages whenever you're under Thuraya's satellite footprint, which is just about everywhere in the world. All you have to do is pop the Phone into its included adapter then slide that into the full SatSleeve. The SatSleeve functions over Bluetooth to wireless provide your Smartphone with the total coverage you desire. It has its own dedicated emergency button. If you're ever in a dangerous situation, one press sends a call out to a predetermined number of your choice for help. It works even when your Smartphone is out of the SatSleeve. It comes with its own built-in rechargeable battery, so it can recharge your Phone. |
| wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; |  |
| | **Satellite mobile phones**: Utilize satellites to communicate with landline, cellular, or other satellite phones in most regions of the world. Responders use satellite mobile phones for emergency communications in order to coordinate response and recovery efforts in remote areas, where there are no landline or cellular telephone networks, or in areas where existing networks are damaged or overloaded during a natural disaster (e.g., severe weather or earthquake) or a manmade incident, including potential chemical, biological, radiological, nuclear, or explosive events. Satellite mobile phones can help maintain command and control functions during an emergency when existing communications networks are not functioning. Satellite mobile phones can communicate with satellite phone systems and transmit the information signals, from voice or Short Message Service (SMS) text, to a receiving mobile phone. The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders. |
| | **Patent Specifications**: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, wireless communication devices, monitoring sites, desktop personal computers (PCs) laptops, *satellite cell phones*, cell phones, personal digital assistants (PDAs), and *satellite monitoring*. Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, *Cellular*, *Satellite*… |

624

A1295

| | |
|---|---|
| wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>**Patent Specifications**: "FIG. 1 is a perspective view of the… an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler… FIG. 14 is a representative schematic view of the… lock disabling system of the present invention illustrating interconnection of the… fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public… The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40… for receiving transmissions therefrom after detection… has occurred so that the lock… can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64<br><br>**Facial and Fingerprint Recognition on Android Phones (i.e., Samsung and LG):** Android manufacturers offer facial recognition technology, and many Android phones allow you to unlock them using only your face. Password supports fingerprint on Android devices. You can unlock your password database on Android smartphones and tablets using your fingerprint.<br><br> |

625

| | |
|---|---|
| whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation**<br><br>Building on the system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform — a cylinder not much bigger than a thumb that can *transmit data* from sensors to a smartphone or other smart device or store it to be uploaded to any computer. The NODE+ operates independently of the cell phone and *transmits* the data it gathers using Bluetooth wireless technology.<br><br>**GPS Receiver:** The primary difference between GPS and Wi-Fi locating technologies is in the method of gathering location data. GPS uses satellites that orbit around the Earth to triangulate a user's location, whereas Wi-Fi locating technology uses relative network signal strength gathered at network access points. The Global Positioning System (GPS) is a government-owned navigation system that operates using radio waves. In order to properly use GPS, you must have a clear line of sight with at least four GPS satellites. Cellular location technology is actually an umbrella term that is used to describe a couple of locating technologies, including Wi-Fi and Sim-based methods. Where GPS lacks, cellular seems to fill in the gaps. Its capabilities shine well in populated areas where cell towers are more densely located. Cellular methods thrive in buildings, cities and densely-populated areas because of how it uses crowdsourced Wi-Fi data.<br><br> |

626

A1297

| Patent #: 10,163,287; Independent Claim 4 | Samsung Galaxy S20 & Galaxy S21 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A communication device comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

628



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Samsung Galaxy S20 Series chipset:** Qualcomm SM8250 Snapdragon 865 5G (7 nm+) – USA
**Samsung Galaxy S20 Series CPU**: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585)-USA

**Samsung Galaxy S21 Series chipset:** Qualcomm SM8350 Snapdragon 888 5G (5 nm)
**Samsung Galaxy S21 Series CPU**: Octa-core (1x2.84 GHz Kryo 680 & 3x2.42 GHz Kryo 680 & 4x1.8 GHz Kryo 680)-USA

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

A1300

| | |
|---|---|
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

630

A1301

| | |
|---|---|
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

631

A1302

| | |
|---|---|
| at least one of an internet connection Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

632

A1303

| | |
|---|---|
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1304

| | |
|---|---|
| at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1305

| | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))** |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1306

| Patent #: 10,163,287; Independent Claim 5 | Samsung Galaxy S20 & Galaxy S21 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A monitoring device, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." " As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

A1308



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Samsung Galaxy S20 Series chipset:** Qualcomm SM8250 Snapdragon 865 5G (7 nm+) – USA
**Samsung Galaxy S20 Series CPU**: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585)-USA

**Samsung Galaxy S21 Series chipset:** Qualcomm SM8350 Snapdragon 888 5G (5 nm)
**Samsung Galaxy S21 Series CPU**: Octa-core (1x2.84 GHz Kryo 680 & 3x2.42 GHz Kryo 680 & 4x1.8 GHz Kryo 680)-USA

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

638

A1309

| | |
|---|---|
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

640

A1311

| | |
|---|---|
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

642

A1313

| | |
|---|---|
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))** <br><br> The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. <br><br> All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))** <br><br> The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices. <br><br> All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1314

| | |
|---|---|
| at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

644

A1315

| | |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| Patent #: 10,163,287; Independent Claim 6 | Samsung Galaxy S20 & Galaxy S21 Series and Qualcomm Technologies Inc.'s Snapdragon Processors |
|---|---|
| A monitoring equipment, comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their |

current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.

647

A1318



**Qualcomm, Inc. Snapdragon Processors**: Snapdragon is a suite of system on a chip (SoC) semiconductor product for mobile devices designed and marketed by Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. As such, Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches and other devices. In addition to the processors, the Snapdragon line includes modems, Wi-Fi chips and mobile charging products.

**Samsung Galaxy S20 Series chipset:** Qualcomm SM8250 Snapdragon 865 5G (7 nm+) – USA
**Samsung Galaxy S20 Series CPU**: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585)-USA

**Samsung Galaxy S21 Series chipset:** Qualcomm SM8350 Snapdragon 888 5G (5 nm)
**Samsung Galaxy S21 Series CPU**: Octa-core (1x2.84 GHz Kryo 680 & 3x2.42 GHz Kryo 680 & 4x1.8 GHz Kryo 680)-USA

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

648

A1319

| | |
|---|---|
| at least one central processing unit (CPU); | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one motion sensor in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one light indicator in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one viewing screen for monitoring in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

650

A1321

| | |
|---|---|
| at least one global positioning system (GPS) connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of an internet connection or Wi-Fi connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

| | |
|---|---|
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

A1323

| | |
|---|---|
| at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

653

A1324

| | |
|---|---|
| at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output interface system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices.<br><br>**Smart Watches**<br><br>Homeland Security's Smartwatch Will Detect Nuclear Bombs<br>https://www.popularmechanics.com/military/research/a18161/homeland-security-smartwatch-detect-nuclear-bombs/<br><br>Smartwatch turns into biochemical monitoring system<br>https://tectales.com/wearables-sensors/smartwatch-turns-into-biochemical-monitoring-system.html<br><br>The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick<br>https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/<br><br>Studies reveal smartwatch biometrics can detect COVID-19 before symptoms surface: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface |

A1325

| | |
|---|---|
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and, | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is infringing Plaintiff's claim limitation under the "doctrine of equivalents". ("substantially the same function in substantially the same way to obtain the same result", quoting Winans v. Denmead, 15 How. 330, 344 (1854))**<br><br>The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs). To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the brain of computers, smartphones and tablets because of the central role they play in the functioning of your devices.<br><br>All of the different components that make up a computer's processor have to be condensed to fit in the smartphone, where they exist as a mobile application processor, or a System-on-a-Chip (SoC). Mobile application processors are found in many different mobile devices, such as smartphones, tablets, and navigational devices. |

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LARRY GOLDEN,

        Plaintiff,

           V.

UNITED STATES,

        Defendant.

1:13-cv-307-EGB

Senior Judge Eric G. Bruggink

August 22, 2021

## PLAINTIFF'S CORRECTED PRELIMINARY INFRINGEMENT CONTENTIONS—PATENT RULE 4(E)

    Pursuant to this Court's order, filed 07/29/2021 in this Case No. 13-307C; Dkt. No. 239, Plaintiff ("Larry Golden") is filing his "Corrected Preliminary Infringement Contentions for Patent Rule 4(e)".

    The Corrected Preliminary Infringement Contentions illustrates that, "for each patent that claims priority to an earlier application, the priority date to which each asserted claim allegedly is entitled and whether the patentee [Plaintiff] is relying on the filing date or an earlier conception date as the priority date." APPENDIX J: PATENT RULES OF THE UNITED STATES COURT OF FEDERAL CLAIMS; TITLE III. PATENT DISCLOSURES. Rule 4. Preliminary Disclosure of Infringement Contentions—(e). Plaintiff's "Corrected Preliminary Infringement Contentions" are as follows:

➢ Thirty (30) alleged infringing products of Apple Inc. that, upon information and belief, Plaintiff is alleging infringes twenty-five (25) independent claims of Plaintiff's '497, '752, '189, '439, & '287 patents.

➤ Twenty-seven (27) alleged infringing products of Samsung Electronics Inc. that, upon information and belief, Plaintiff is alleging infringes twenty-five (25) independent claims of Plaintiff's '497, '752, '189, '439, & '287 patents.

➤ Twenty-seven (27) alleged infringing products of LG Electronics Inc. that, upon information and belief, Plaintiff is alleging infringes twenty-five (25) independent claims of Plaintiff's '497, '752, '189, '439, & '287 patents.

## PRIORITY AND CONCEPTION DATES

| | |
|---|---|
| Each asserted independent claim of the '752, '189, '439, & '287 patents (i.e., 24 claims) are allegedly entitled to the filing date of the '497 patent. | Filing date of the '497 patent is **04/05/2006** |
| Each asserted independent claim of the '497, '752, '189, '439, & '287 patents (i.e., 25 claims) are allegedly entitled to the filing date of the Plaintiff's Disclosure Document filed with USPTO. Doc. No. 565732 | Disclosure Document filed on **11/26/2004** |
| Each asserted independent claim of the '497, '752, '189, '439, & '287 patents (i.e., 25 claims) are allegedly entitled to the "conception of the technical rational"; inventions Plaintiff alleged are major components to the completion of Plaintiff's three economic stimulus packages submitted to the Government. The Affidavit submitted under 37 CFR §1.131 and §1.132 into record of the '752 patent (IFW) on 07/21/2010, establishes a priority date of Dec. 16, 2002 to overcome 102 and 103 objections.   *A true copy of the document is attached* | Earlier conception filed with the Honorable Congressman Elijah E. Cummings: **12/16/2002** |

**All Twenty-Five Claims are Asserted Against the Following New and Improved Cell Phones (i.e., Smartphones) Manufactured and Used by Apple.**

➤ Claim 1 of the '497 patent (Alleged infringing products are Apple iPhones 7, 8, SE, XS, 11, & 12)

➤ Claim 10 of the '752 patent (Alleged infringing products are Apple iPhones 7, 8, SE, XS, 11, & 12)

2

- Claims 1-9 of the '189 patent (Alleged infringing products are Apple iPhones 7, 8, SE, XS, 11, & 12)
- Claims 13-23 of the '439 patent (Alleged infringing products are Apple iPhones 7, 8, SE, XS, 11, & 12)
- Claims 4-6 of the '287 patent (Alleged infringing products are Apple iPhones 7, 8, SE, XS, 11, & 12)

**All Twenty-Five Claims are Asserted Against the Following Watches, Chipsets, and CPUs Used by Apple.**

- Representative Chart for Apple Watch Series 3, 4, 5, & 6
- Apple iPhone 7 Chipset: Apple A10 Fusion (16 nm).
- Apple iPhone 7 CPU: Quad-core 2.34 GHz (2x Hurricane + 2x Zephyr).
- Apple iPhone 8 Chipset: Apple A11 Bionic (10 nm).
- Apple iPhone 8 CPU: Hexa-core (2x Monsoon + 4x Mistral).
- Apple Watch Series 3 Chipset: Apple S3.
- Apple Watch Series 3 CPU: Dual-core
- Apple iPhone SE Chipset: Apple A9 (14 nm).
- Apple iPhone SE CPU: Dual-core 1.84 GHz Twister.
- Apple iPhone XS Chipset: Apple A12 Bionic (7 nm).
- Apple iPhone XS CPU: Hexa-core (2x2.5 GHz Vortex + 4x1.6 GHz Tempest).
- Apple Watch Series 4 Chipset: Apple S4.
- Apple Watch Series 4 CPU: Dual-core
- Apple iPhone 11 Chipset: Apple A13 Bionic (7 nm+).
- Apple iPhone 11 CPU: Hexa-core (2x2.65 GHz Lightning + 4x1.8 GHz Thunder).
- Apple iPhone 12 Chipset: Apple A14 Bionic (5 nm).
- Apple iPhone 12 CPU: Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm).
- Apple Watch Series 5 Chipset: Apple S5.
- Apple Watch Series 5 CPU: Dual-core.
- Apple Watch Series 6 Chipset: Apple S6.
- Apple Watch Series 6 CPU: Dual-core

3

**All Twenty-Five Claims are Asserted Against the Following New and Improved Cell Phones (i.e., Smartphones) Manufactured and Used by Samsung.**

➢ Claim 1 of the '497 patent (Alleged infringing products are Samsung Galaxy Note 8, Galaxy S8, S9, S10, S20, & S21)

➢ Claim 10 of the '752 patent (Alleged infringing products are Samsung Galaxy Note 8, Galaxy S8, S9, S10, S20, & S21)

➢ Claims 1-9 of the '189 patent (Alleged infringing products are Samsung Galaxy Note 8, Galaxy S8, S9, S10, S20, & S21)

➢ Claims 13-23 of the '439 patent (Alleged infringing products are Samsung Galaxy Note 8, Galaxy S8, S9, S10, S20, & S21)

➢ Claims 4-6 of the '287 patent (Alleged infringing products are Samsung Galaxy Note 8, Galaxy S8, S9, S10, S20, & S21)

**All Twenty-Five Claims are Asserted Against the Following Watches, Chipsets, and CPUs Used by Samsung.**

➢ Representative Chart for Samsung Gear S3 Classic Series, Galaxy Watch Active 2 Series, & Galaxy Watch 3 Series

➢ Samsung Galaxy Note 8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China

➢ Samsung Galaxy Note 8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

➢ Samsung Galaxy S8 Series Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm) – USA/China

➢ Samsung Galaxy S8 Series CPU: Octa-core (4x2.35 GHz Kryo & 4x1.9 GHz Kryo) - USA & China

➢ Samsung Gear S3 Classic Series Chipset: Exynos 7 Dual 7270 (14 nm)

➢ Samsung Gear S3 Classic Series CPU: Dual-core 1.0 GHz Cortex-A53

➢ Samsung Galaxy S9 Series Chipset: Qualcomm SDM845 Snapdragon 845 (10 nm) – USA/China

➢ Samsung Galaxy S9 Series CPU: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver)-USA/China

A1992

- Samsung Galaxy S10 Series Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm) - USA/China
- Samsung Galaxy S10 Series CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)-USA/China
- Samsung Galaxy Watch Active 2 Series Chipset: Exynos 9110 (10 nm)
- Samsung Galaxy Watch Active 2 Series CPU: Dual-core 1.15 GHz Cortex-A53
- Samsung Galaxy S20 Series chipset: Qualcomm SM8250 Snapdragon 865 5G (7 nm+) – USA
- Samsung Galaxy S20 Series CPU: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585)-USA
- Samsung Galaxy S21 Series chipset: Qualcomm SM8350 Snapdragon 888 5G (5 nm)
- Samsung Galaxy S21 Series CPU: Octa-core (1x2.84 GHz Kryo 680 & 3x2.42 GHz Kryo 680 & 4x1.8 GHz Kryo 680)-USA
- Samsung Galaxy Watch 3 Series Chipset: Exynos 9110 (10 nm)
- Samsung Galaxy Watch 3 Series CPU: Dual-core 1.15 GHz Cortex-A53

**All Twenty-Five Claims are Asserted Against the Following New and Improved Cell Phones (i.e., Smartphones) Manufactured and Used by LG.**

- Claim 1 of the '497 patent (Alleged infringing products are LG V30, LG G6, LG G7, LG G8, LG V50, & LG V60)
- Claim 10 of the '752 patent (Alleged infringing products are LG V30, LG G6, LG G7, LG G8, LG V50, & LG V60)
- Claims 1-9 of the '189 patent (Alleged infringing products are LG V30, LG G6, LG G7, LG G8, LG V50, & LG V60)
- Claims 13-23 of the '439 patent (Alleged infringing products are LG V30, LG G6, LG G7, LG G8, LG V50, & LG V60)
- Claims 4-6 of the '287 patent (Alleged infringing products are LG V30, LG G6, LG G7, LG G8, LG V50, & LG V60)

**All Twenty-Five Claims are Asserted Against the Following Watches, Chipsets, and CPUs Used by Samsung.**

5

A1993

- ➢ Representative Chart for LG Watch Sport Series, LG Watch Style Series, & LG Watch W7 Series
- ➢ LG V30 Chipset: Qualcomm MSM8998 Snapdragon 835 (10 nm)
- ➢ LG V30 CPU: Octa-core (4x2.45 GHz Kryo & 4x1.9 GHz Kryo)
- ➢ LG G6 Chipset: Qualcomm MSM8996 Snapdragon 821 (14 nm)
- ➢ LG G6 CPU: Quad-core (2x2.35 GHz Kryo & 2x1.6 GHz Kryo)
- ➢ LG Watch Sport Chipset: Qualcomm MSM8909W Snapdragon Wear 2100
- ➢ LG Watch Sport CPU: Quad-core 1.1 GHz Cortex-A7
- ➢ LG G7 Chipset: Qualcomm SDM845 Snapdragon 845 (10 nm)
- ➢ LG G7 CPU: Octa-core (4x2.8 GHz Kryo 385 Gold & 4x1.7 GHz Kryo 385 Silver)
- ➢ LG G8 Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm)
- ➢ LG G8 CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)
- ➢ LG Watch Style Chipset: Qualcomm MSM8909W Snapdragon Wear 2100
- ➢ LG Watch Style CPU: Quad-core 1.1 GHz Cortex-A7
- ➢ LG V50 Chipset: Qualcomm SM8150 Snapdragon 855 (7 nm)
- ➢ LG V50 CPU: Octa-core (1x2.84 GHz Kryo 485 & 3x2.42 GHz Kryo 485 & 4x1.78 GHz Kryo 485)
- ➢ LG V60 Chipset: Qualcomm SM8250 Snapdragon 865 5G (7 nm+)
- ➢ LG V60 CPU: Octa-core (1x2.84 GHz Kryo 585 & 3x2.42 GHz Kryo 585 & 4x1.8 GHz Kryo 585)
- ➢ LG Watch W7 Chipset: Qualcomm MSM8909W Snapdragon Wear 2100
- ➢ LG Watch W7 CPU: Quad-core 1.3 GHz Cortex-A7

Plaintiff's is submitting his infringement contentions as a "Corrected Preliminary Infringement Contentions" that complies with Patent Rule 4. This is not an amendment. Plaintiff has always alleged the Defendants are infringing Plaintiff's central processing unit (CPUs). Plaintiff was ordered to identify the make and model of the CPUs in accordance to Patent Rule 4.

6

Respectfully submitted,

s/ Larry Golden

Larry Golden, Plaintiff, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

7

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 22nd day of August, 2021, a true and correct copy of the foregoing PLAINTIFF'S CORRECTED PRELIMINARY INFRINGEMENT CONTENTIONS—PATENT RULE 4(E) was served upon the following defendant via e-mail:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

202-305-2513

Respectfully served by:

s/ Larry Golden

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

8

# KICKSTARTER

Discover   Start                                                    🔍   Log in

## Share this project

Done

☐ Share   ☐ Tweet   ◁▷ Embed

## Share this project

Done

☐ Tweet

☐ Share

✉ Email

# NODE: a modular, handheld powerhouse of sensors





A1997

World, meet NODE. With this modular, bluetooth enabled device, Variable Tech puts the power of practical sensors in your hands.



Created by

George Yu

**373 backers** pledged $76,340 to help bring this project to life.

📅 Last updated December 9, 2013

**Campaign**     Rewards     FAQ <sup>7</sup>     Updates <sup>28</sup>     Comments <sup>138</sup>     Community




A1998

NODE - a modular handheld powerhouse of sensors by Large & Sons — Kickstarter

Project We Love    📍 Chattanooga, TN    🏷 Technology

**$76,340**
pledged of $50,000 goal

**373**
backers

New Pledge options for Radiation sensor module and Carbon Monoxide module.

The radiation sensor module is a PIN diode radiation sensor with adjustable sensitivity levels. It is only meant for low levels of radiation ranging from 0.1uSv/h to 10uSv/h

The Carbon Monoxide module is an industrial grade electrochemical gas sensor with a 0 - 400 ppm concentration range.

NODE is iPad 3 compatible.

Compatibility list and other specs in FAQ (go to the bottom of the long page)

**If you have any thoughts on how this future product can be improved, don't hesitate to send me a message.**

Variable Technologies is proud to introduce our newest product: NODE. This device allows everyone, from the code-literate techie to the simple homeowner, to explore the fun and power of sensors.

**Bluetooth 4.0**

A1999

A modular device, NODE communicates with smartphones via Bluetooth. Bluetooth requires less energy than Wifi and can send information directly to your Bluetooth enabled device. With new Bluetooth Low Energy, NODE can communicate with iPhone 4S and some Android phones at up to 50 meters with even less energy than conventional Bluetooth. With multiple NODEs networked in your home or office, you can control the different devices by your location.

## Modules

Here are the basics of each NODE:

- Arduino compatible
- Lithium Polymer battery (650 mAh)
- 12-14 hours battery life with continuous Bluetooth use
- 2 MB memory
- 3-axis accelerometer
- 3-axis magnetometer
- 3-axis gyroscope
- Audio buzzer
- Bluetooth 2.1 or Bluetooth Low Energy
- 2 module ports
- 2 dimmable blue LEDs
- micro-USB for charging and firmware programming

But, we wanted even more from this device. We wanted to make a tool with endless uses. So, we made a handheld sensor device that's easy to carry, attractive, *and* modular. NODE comes fitted with three standard sensors, but can run two additional sensor units, or modules, when attached to either end. Since these modules are interchangeable, you can tailor your device to suit whatever situation you run into.

## Open API, Open Firmware, Open Source Code

A2000

The hardware of NODE is fixed, but we've left the firmware and API open and compatible with the Arduino platform. We'll also provide you with the free NODE demo app source code. At Variable, we're really big on making awesome tools and gadgets, but we're also big on collaboration. We have fantastic imaginations, but we can't imagine everything. That's why we've left lots of room for you to control the behavior and applications of these quality sensors. We want to see how you would use them.

# Kore

Each NODE comes stock with Kore. This is our fancy way of saying that the core of every NODE consists of three triaxial sensors: gyroscope, magnetometer, and accelerometer. You can use NODE as a level to hang pictures or a motion-based remote control. Use it to map motion or set it up to notify you when your dryer stops moving after finishing a cycle. NODE can tell if it's simply being jostled or if it's flipping from end to end.

The first two interchangeable modules available from Variable are Clima and Luma.

# Clima

Whether you spend a lot of time on the trails or just want to manage your greenhouse better, Clima allows you to measure the climate around you. Sensing barometric pressure, wind speed, temperature, and humidity, NODE allows you to find your elevation while hiking up a mountain, determine windchill when you take the kids to the park, or see how well the landlord insulated the attic.

# Luma

A state-of-the-art flashlight, Luma uses 8 LEDs to light the space around you. With the NODE app from Variable, you can select how many of those LEDs you want to turn on or off and even assign a flashing pattern. Use NODE as a simple compact flashlight around your

car. Power outage? Turn on Luma from your smartphone instead of stumbling around your kitchen in the dark looking for that other flashlight.

# Coming Soon

In the near future, Variable will be rolling out more modules, including infrared thermometers, infrared transceivers, radiation detectors, and chemical sensors. The fun, and usefulness, of NODE is just beginning.

### Oxa

After Kickstarter, we'll be releasing our line of gas sensor modules, called Oxa, perfect for many professional and scientific settings. Each Oxa module will detect and measure one of the following:

- Carbon Monoxide (0 - 400 ppm)
- Carbon Dioxide (500 ppm to 90%)
- Chlorine (0 - 10 ppm)
- Nitric Oxide (0 - 40 ppm)
- Hydrogen (0 - 20 ppm)
- Sulfur Dioxide (0 - 10 ppm)

### Apps and Beyond

With NODE apps for iPhone and Android, we got the ball rolling. But trust us, we've barely skimmed across the surface. At Variable, we aim to give you the tools, then learn how they might be used. We put the challenge to you: what can you imagine? With the freedom of open API and the toolbelt that is NODE, what could you build? Anywhere you can imagine it, you can use it.

Imagine away.

## Risks and challenges

[Learn about accountability on Kickstarter](#)

Questions about this project? **Check out the FAQ**

---

[Report this project to Kickstarter](#)

### Funding period

Feb 19 2012 - Mar 23 2012 (33 days)

Case 3:23-cv-00349-FDB   Document 1   Filed 03/01/23   Page 689 of 1192

## EXPLORE

Arts
Comics & Illustration
Design & Tech
Film
Food & Craft
Games
Music
Publishing

## ABOUT

About us
Our charter
Stats
Press
Jobs

## SUPPORT

Help Center
Our Rules
Creator Resources
Patrons
Brand assets

## MORE FROM KICKSTARTER

Newsletters
Kickstarter Magazine
The Creative Independent
Mobile apps
Research

Kickstarter, PBC © 2021

   

English ▼

$ US Dollar (USD) ▼

A2004

Trust & Safety    Terms of Use    Privacy Policy    Cookie Policy    Accessibility Statement

CA Notice of Consent

A2005

# Exhibit 4

Receipt Number CFC100004418

# In the United States Court of Federal Claims

Larry Golden
_Larry Golden_
_____

_____

**Plaintiff(s),**

**v.**

**THE UNITED STATES,**

**Defendant.**

)
)
)
)
)
)
)
)
)
)
)
)

**Case No.** ___19-104 C___

**Judge** _____

## COMPLAINT

Your complaint must be clearly handwritten or typewritten, and you must sign and declare under penalty of perjury that the facts are correct. If you need additional space, you may use another blank page.

If you intend to proceed without the prepayment of filing fees (*in forma pauperis* (IFP)), pursuant to 28 U.S.C. § 1915, you must file along with your complaint an application to proceed IFP.

1. **JURISDICTION.** State the grounds for filing this case in the United States Court of Federal Claims. The United States Court of Federal Claims has limited jurisdiction (*see e.g.,* 28 U.S.C. §§ 1491-1509).

This is a claim pursuant to 28 U.S.C. 1491(a) for recovery of Plaintiff's reasonable and entire compensation for the unlicensed use and manufacture, for and by the United States, of inventions described in and covered by United States Patent Numbers: 7,385,497; 7,636,033; 8,106,752; 8,334,761; 8,531,280; ,RE43,891; RE43,990; 9,096,189; 9,589,439; and, 10,163,287. The jurisdiction of this Court is based on the provisions of 28 U.S.C. 1491(a): 28 U.S.C. 1491 : "The United States Court of Federal Claims shall have jurisdiction to render judgement upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with bthe United States, or for liquidated or unliquidated damages in cases not sounding in tort". The Fifth Amendment of the United States Constitution includes a provision known as the Taking Clause, which states that "private property [shall not] be taken for public use, without just compensation."

Received - USCFC

JAN 1 7 2019

A-5

## 2. PARTIES

Plaintiff, Larry Golden _____, resides at 740 Woodruff Road, #1102 _____
(Street Address)

Greenville, SC 29607 _____, 864-288-5605 _____
(City, State, ZIP Code)        (Telephone Number)

If more than one plaintiff, provide the same information for each plaintiff below.

_____

_____

_____

**RELATED CASES.** Is this case directly related to any pending or previously filed cases in the United States Court of Federal Claims? ● Yes ○ No

If yes, please list the case(s) below, including case number(s):

Larry Golden v. The United States; Case No. 13-307 C

## 3. STATEMENT OF THE CLAIM.

State as briefly as possible the facts of your case. Describe how the United States is involved. You must state exactly what the United States did, or failed to do, that has caused you to initiate this legal action. Be as specific as possible and use additional paper as necessary.

PLAINTIFF LARRY GOLDEN, (hereinafter, "Complainant", " Plaintiff", or "Patent Owner") individually files this Complaint against Defendant UNITED STATES OF AMERICA (hereinafter, " Defendant", "Government", "United States", "DOJ", "DHS", " Claims Court", "PTAB Court", or "Appeals Court"). Plaintiff alleges the following based on information and belief, and personal knowledge as to the allegations pertaining to itself. Plaintiff Larry Golden makes the following allegations in support of his claim for relief and recovery of Plaintiff's reasonable and entire compensation under 28 U.S.C. 1491(a): " Government" 'Takings' of a Patent under the Fifth Amendment Clause" (hereinafter, "Fifth Amendment Takings" or "Takings"). PLAINTIFF LARRY GOLDEN, is filing this Complaint pursuant to RCFC 40(b): Seperate Trails. "For convenience, to avoid prejudice, or to expedite and economize...

A-6

**4. RELIEF.** Briefly state exactly what you want the court to do for you.

Enter judgement that the "Government" has "Taken" Plaintiff's
property within the meaning of the Fifth Amendment to the
United States Constitution, and award Plaintiff his full and just
compensation for the unconstitutional "Takings" of Plaintiff's prop

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___17th___ day of ___January___, ___2019___.
       (day)             (month)         (year)

_____
                (Signature of Plaintiff(s)

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LARRY GOLDEN,

        Plaintiff,

        V.

UNITED STATES,

        Defendant.

Case No: **19-104 C**

Judge:_____

January 17, 2019

## **COMPLAINT**

PLAINTIFF LARRY GOLDEN (hereinafter, "Complainant", "Plaintiff" or "Patent Owner") individually files this Complaint against Defendant UNITED STATES OF AMERICA (hereinafter, "Defendant", "Government", "United States", "DOJ", "DHS", "Claims Court", "PTAB Court", or "Appeals Court"). Plaintiff alleges the following based on information and belief, and personal knowledge as to the allegations pertaining to itself.

Plaintiff Larry Golden makes the following allegations in support of its claim for relief and recovery of Plaintiff's reasonable and entire compensation under 28 U.S.C. § 1491(a): "Government 'Takings' of a Patent under the Fifth Amendment Clause" (hereinafter, "Fifth Amendment Takings" or "Takings").

## PARTIES

Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

The United States is the Defendant to this action based upon the actions and conduct of its agents, including at least the following: Court of Federal Claims (CFC); Department of Justice (DOJ); Department of Homeland Security (DHS), Court of Appeals for the Federal Circuit (CAFC) and all other Government Agencies and personnel named in this pleadings.

## MANDATORY NOTICE OF RELATED PROCEEDINGS

The Plaintiff's United States Patents: 7,385,497; 7,636,033; 8,106,752; 8,334,761; 8,531,280; RE43,891; RE43,990; 9,096,189; 9,589,439; and, 10,163,287 is being asserted by Patent Owner against the UNITED STATES OF AMERICA in the United States Federal Court of Claims (CFC) through a suit *Larry Golden v. United States*, Case No. 13-307 C. The case was filed on May 1, 2013 under the statutes: 28 U.S.C. § 1491(a) "Government Takings of a Patent under the Fifth Amendment Clause" and 28 U.S.C. § 1498(a) "Government Infringement". The 28 U.S.C. § 1491(a) "Government Takings of a Patent under the Fifth Amendment Clause" alleged in this complaint is POST the May 1, 2013 filing date of Case No. 13-307 C currently pending in the United States Federal Court of Claims (CFC). See Final Amended Complaint (Dkt. No. 121) filed 08/10/2017 and Final Claim Chart (Dkt. No. 121) filed 08/10/2017

## PARTIES

Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

The United States is the Defendant to this action based upon the actions and conduct of its agents, including at least the following: Court of Federal Claims (CFC); CFC Senior Judge

Susan G. Braden, CFC Senior Judge Eric G. Bruggink, Department of Justice (DOJ);

Department of Homeland Security (DHS), Court of Appeals for the Federal Circuit (CAFC) and

all other Government Agencies and personnel named in this pleadings.

## JURISDICTION

This is a claim pursuant to 28 U.S.C. § 1491(a) for recovery of Plaintiff's reasonable and

entire compensation for the unlicensed use and manufacture, for and by the United States, of

inventions described in and covered by United States Patent Numbers: 7,385,497; 7,636,033;

8,106,752; 8,334,761; 8,531,280; RE43,891; RE43,990; 9,096,189; 9,589,439; a Continuation

Patent Application 15/530,839 filed March 06, 2017 that published on 06/29/2017 under

Publication No: US 2017-0186259 A1 and Issued as Patent Number 10,163,287 on December

25, 2018; a Continuation Patent App. to the now issued patent 10,163,287, filed January, 2019

The jurisdiction of this Court is based on the provisions of 28 U.S.C. § 1491(a): 28

U.S.C. § 1491(a): The United States Court of Federal Claims shall have jurisdiction to render

judgment upon any claim against the United States founded either upon the Constitution, or any

Act of Congress or any regulation of an executive department, or upon any express or implied

contract with the United States, or for liquidated or unliquidated damages in cases not sounding

in tort.

The Fifth Amendment of the United States Constitution includes a provision known as

the Takings Clause, which states that "private property [shall not] be taken for public use,

without just compensation."

## CONSTITUTIONAL PROVISION: 28 U.S.C. §§ 1491

When the Government takes property without following the eminent domain procedure,

the affected property owner (Plaintiff) has the right to bring an inverse condemnation "Takings"

lawsuit against the Government entity(s) that has taken his property The "Government Fifth Amendment Takings" lawsuit that is filed under 28 U.S.C. § 1491 by the Plaintiff is "inverse" rather than "direct" because it is brought by the patent owner, not by the Government agency(s) or other entities having eminent domain power. Therefore, the Plaintiff understands he carries the burden of proof that his property rights were taken without the payment of compensation. This differs from a direct condemnation following eminent domain procedures which places the burden of proof upon the Government.

Inverse condemnation is not limited to the permanent physical taking of the Plaintiff's property. Rather, it can include a temporary taking or occupation of private or personal property that includes government regulation which burdens the property in such a way that the Patent Owner cannot derive any economical use out of it. When Government regulation significantly burdens private or personal property the inverse condemnation may be referred to as a "regulatory taking." Most importantly, in an inverse condemnation or regulatory taking scenario the government has failed to pay just compensation for the private property rights that have been taken.

Intangible assets are non-physical assets (such as franchises, trademarks, patents, copyrights, and goodwill) that grant the potential for certain rights and privileges as well as the possibility for economic benefits to the owner. The subject matter of a patented invention is considered intangible. In Ruckelshaus v. Monsanto Company, 467 U.S. 986 (1984) the Court held that a trade secret (i.e. intellectual property) is constitutionally protected property, and a claim for its taking is within Tucker Act cognizance: "Although this Court never has squarely addressed the question whether a person can have a property interest in a trade secret, which is admittedly intangible, the Court has found other kinds of intangible interests to be property for

4

purposes of the Fifth Amendment's Taking Clause." See, e.g., Armstrong v. United States, 364 U.S. 40, 44, 46 (1960) (materialman's lien provided for under Maine law protected by Taking Clause); Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 596 -602 (1935) (real estate lien protected); Lynch v. United States, 292 U.S. 571, 579 (1934) (valid contracts are property within meaning of the Taking Clause). . . ." 467 U.S. at 1003. That patent rights are property rights, entitled to just compensation when taken by the United States, is not subject to revision at this late date. The premises as explained in 1910 remain intact, as explained in the record of that enactment: Rep. Dalzell. But if the Government, through an authorized officer, has seen fit to appropriate a patent of a citizen… every time that the United States Government assumes to take forcibly, without the consent of the owner, a patented process, it violates the constitutional provision which says no man's property shall be taken without compensation and without due process of law. 45 Cong. Rec. 8755 at 8780.

## STATEMENT OF FACTS

1.     Between the years 2003-2006 the Plaintiff presented three "Economic Stimulus and Terrorist Prevention Packages" to President Bush, his Cabinet, the Council of Economic Advisers, the Black Congressional Caucus, the U.S. Senate, and the vast majority of the U.S. Congress, that detailed the strategy of "Product Grouping" CD of Patent Owner's Discovery Documents **Vol. I, Appx.1.** The "Product Grouping" strategy detailed how we as a Nation could not only deter and prevent terrorist acts and activities, but would also stimulate the economy as well. The strategy involved the grouping of products, devices, and systems needed from the different industries; the grouping of products, devices, and systems needed to form a network(s) for the ubiquitous communicating, monitoring, detecting (sensing), and controlling the events and activities of our Nation's land, sea, and air.

2.      The Government's job in the strategy was to create competition through solicitations that would drive the cost down; making the cost to participate in the ubiquitous communicating, monitoring, detecting (sensing), and controlling, affordable to everyone and every industry (e.g. the government, the military, first responders, Law enforcement, the automobile industry, the lock industry, the detection industry, the medical industry, the telecommunication industry, and the security industry).

3.      The next step was to innovate: Plaintiff filed with the USPTO on November 17, 2004 a Disclosure Document that is used as evidence of conception of a device that is capable of communicating, monitoring, detecting, and controlling. The device was designed for Government and military use and therefore had to include security features (e.g. biometric technology that includes at least fingerprint and facial; disabling lock to deny entry after multiple failed attempts; radio frequency (RF) near-field communication (NFC) as a safer option to RFID.

4.      The Product Groupings strategy for preventing terrorism and stimulating the economic was started by the Plaintiff in the year 2004. NASA, Apple, Samsung, LG, and Qualcomm began administrating the strategy in the year 2008 when the DHS S&T Directorate awarded the Companies contracts to develop a modified a cell phone (smartphone) device for communicating, monitoring, detecting (sensing), and controlling. The development contracts were based on the same technology Plaintiff shared with the Department of Homeland Security (DHS) in a response to their Cell-All solicitation in the year 2007. Plaintiff also shared the same technology in a discussion with Mr. Edward Turner, Program Manager; DHS/S&T Directorate during an invite to the DHS in January, 2008. Example of stimulus strategy:

5.      Apple's total revenue for the year 2008 was $11.9 billion; Apple's total revenue for the year 2016 was $246.3 billion. Apple's market capitalization for the year 2008 was $88.68

billion; Apple's market capitalization for the year 2016 was $625.27 billion, and as of Dec. 6, 2017, Apple's market capitalization was $867.75 billion. Apple is on track to having $1 trillion in market capitalization by year-end 2018. Apple's total number of employees for the year 2008 was 32,000; Apple's total number of employees for the year 2016 was 123,000.

6.      The Plaintiff wouldn't be here if the Government had authorized Apple, Samsung, LG, and Qualcomm to develop a different version of a modified smartphone. The Government authorized Apple, Samsung, LG, and Qualcomm to develop the Plaintiff's version of a communicating, monitoring, detecting and controlling (CMDC) device but chose to keep the same generic name of their product (e.g. smartphone).

7.      Based on hindsight, Plaintiff understands it seems like all of what Plaintiff mentioned above was obvious to the development of the smartphone and was done first by Apple, Samsung, LG, and Qualcomm. But that's not possible when the Plaintiff's CMDC device, which was conceived in the year 2004, antedates Steve Job's smartphone that was introduced in January of 2007 and only introduced GPS for the smartphone in January of 2008.

8.      Upon information and belief, the United States has "taken" and continues to "take" the Plaintiff's personal property for the benefit of the public without paying just compensation for the "takings". Plaintiff believes the first Government solicitation (request) for a cell phone device capable of detecting chemical and biological agents, that included the subject matter for the Plaintiff's Communicating, Monitoring, Detecting, Controlling (CMDC) Device was issued on October 20, 2007 when the Department of Homeland Security (DHS) published a pre-solicitation (Solicitation number BAA07-10), titled "Cell-All Ubiquitous Biological and Chemical Sensing" ("Cell-All Solicitation"). The Cell-All Solicitation called for multiple miniaturized sensors to be integrated with common devices ("Cell-All Devices"). Cell-All

7

Devices are cell phones equipped with multiple sensors used to identify and alert individuals and agencies of potential biological, chemical, radiological, or explosive threats.

9. On November 28, 2007, the Plaintiff responded to the Cell-All Solicitation with a proposal, and in that proposal notified the agency that the Cell-All Solicitation called for a multi sensor detection system that incorporated the '497 Patent's technology: "CELL-ALL technical approach & rational taken from, 'Multi Sensor-Detection and Lock Disabling System.' (Patent Pending; Pub., 10-18-07; App. #11/397,118)."

10. On September 28, 2011, the Department of Homeland Security gave a Cell-All Live Demonstration for Environmental Sensing. During this presentation the NASA Ames Research Center, Synkera Technologies, NC4, and Qualcomm gave a demonstration of prototype Cell All Devices. These prototypes utilized a separate sensor module, which communicates via Bluetooth with Qualcomm software to an Android phone. The cellphone, via a wireless network, sends the sensor data to a monitoring system. The monitoring system can send messages back to the phone to receive more or less information, and can contact emergency responders if necessary.

11. Plaintiff is submitting a CD that illustrates at least an implied or express contract between DHS, NASA Ames Research Center, Synkera Technologies, NC4, and Qualcomm. Upon information and belief the elements of the at least implied or express contract between DHS, NASA Ames Research Center, Synkera Technologies, NC4, and Qualcomm are listed below. The passages provides proof of such a contract; authorization and consent; and, Government use (Fitzpatrick—Attorney Work Product—CD; 11-09-27-cellall-v-all.mp4) **Vol. I Appx.2** Below is a summary of the CD:

8

Welcome and Introduction made by Stephen Dennis, DHS Program Manager for the
"Cell-All Ubiquitous Chemical Sensing Project".

- 16 minutes in: diagram of Qualcomm's sensing device and the needed specifications for the Apple iPhone.
- 21 minutes in: Cell-All prototype demonstration begins.
- 32 minutes in: quote from Dr. Jing Lee, "we have many phones in the field".
- 37 minutes in: diagram featuring Qualcomm.
- 38 minutes in: quote from Doug Hoffman, Program Manager for Qualcomm, "use commercial cell phone ecosystem".
- 41 minutes in: diagram showing at least twenty-five (25) necessary stakeholders (far exceeds the four (4) stakeholders of Apple, Samsung, LG, and Qualcomm named in Plaintiff-Appellant's complaint).
- 1:19 minutes in: quote from the "DHS Program Manager for the "Cell-All Ubiquitous Chemical Sensing Project" Stephen Dennis, "already for sell this week".
- 1:44 minutes in: quote from the "DHS Program Manager for the "Cell-All Ubiquitous Chemical Sensing Project" Stephen Dennis, "cooperative agreements".

12.     The Cell-All CD **Vol. I Appx.2** is Plaintiff's factual evidence and proof of Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device, "manufactured for and by the Government" with "authorization and consent" on the heightened standard of "clear and convincing evidence.

13.     "*In Larson v. United States*, the Claims Court recognized that implied authorization "may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement." The purpose behind permitting the government's authorization or consent to be implied is tied to the

government's need to procure items without disruption, and avoid the need for government agencies to perform an exhaustive patent search for products or services they wish to procure.

14.    *In TVI Energy*, "the Federal Circuit found implied authorization or consent where the government required a contractor to demonstrate an allegedly infringing device as part of bidding requirements under a United States military solicitation for disposable thermal targets." The Government has "taken" and is using the Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device without a license. For that reason alone, the Plaintiff has stated a claim for which relief may be granted.

## THE GOVERNMENT'S CONTINUED REQUEST FOR PLAINTIFF'S "COMMUNICATING, MONITORING, DETECTING, AND CONTROLLING (CMDC) DEVICE"

15.    2013: Smartphones and Handheld Devices for Defense and Homeland Security Strategies, Plans, Challenges & Opportunities Symposium:

"U.S. Coast Guard Smartphones Needs, Challenges & Opportunities" Rear Admiral Robert E. Day, Jr., Assistant Commandant for Command, Control, Communications, Computers & Information Technology, (C4IT) & Director, Coast Guard Cyber Command, Pre-Commissioning Detachment, U.S. Coast Guard.

"DoD Mobile Strategy" Mr. Mark Norton, Senior Engineer, Department of Defense, Office of the Chief Information Officer, Office of the Under Secretary of Defense (CIO/OSD).

"Update on Spectrum Sharing for Mobile Devices at the Tactical Edge" Mr. Julius Knapp, Chief Engineer, Office of Engineering and Technology, Federal Communications Commission (FCC).

"Secure Smartphone Computing, Needs and Opportunities for a Secure yet Mobile Platform" Mr. Keith Trippie, Executive Director, Enterprise System Development, Office of the Chief Information Officer, Department of Homeland Security (DHS).

"DISA's Strategic Mobility Vision" Mr. Gregory Youst, Chief Mobility Engineer, Technology and Integration Division, Chief Technology Officer, Defense Information Systems Agency (DISA) (invited).

"Content-Based Mobile Edge Networking (CBMEN)" Dr. Keith Gremban, PhD., Program Manager, Content Based Mobile Edge Networking (CBMEN), Defense Advanced Research Project Agency (DARPA).

"Transformative Apps Program" Mr. Doran Michaels, Program Manager, Transformative Apps, DARPA.

"Windshear II Update" Mr. John-Isaac Clark, Chief Innovation Officer, Thermopylae Sciences & Technology & Mr. Lenwood Washington, Senior Systems Engineer, Mission Integration Directorate, Acquisition and Engineering, National Reconnaissance Office (NRO).

"Advancements in Mobile Devices for Chem-Bio Detection and Characterization" Dr. Calvin CHUE, PhD., Research Biologist, U.S. Army Research, Development and Engineering Command (RDECOM).

"ADAPT Unattended Ground Sensor Using Android Operating System and Original Design Manufacturers" Mr. Mark Rich, Program Manager, Strategic Technology Office, DARPA.

16.     2013: "The U.S. Department of Defense confirmed in a statement on Friday that Apple's iOS 6 mobile operating system is secure enough to connect to secure Pentagon networks."

11

17.     2013: "The U.S. Department of Defense confirmed in a statement on Friday that Apple's iOS 6 mobile operating system is secure enough to connect to secure Pentagon networks."

18.     2013: "Samsung's potential government deal signals new era for mobile security: Samsung may be ready to sign deals with the FBI and the U.S. Navy. Analysts say the news is proof that mobile in the enterprise has arrived. Samsung is close to inking a deal with the FBI and the U.S. Navy for mobile devices."

19.     2013: "National Institute of Standards and Technology (NIST), which examines and tests mobile devices and technologies for security clearance, granted the Apple software FIPS 140-2 certification (Level 1) last Friday. This approves iPhones and iPads running the software in conjunction with the U.S. government's lowest level of national security clearance."

20.     2013: "The U.S. Department of Defense announced today that it was further dropping its exclusive BlackBerry contract and opening all of its mobile communications networks to Apple, Google, and other device makers. 'The Department of Defense is taking a leadership role in leveraging mobile device technology by ensuring its workforce is empowered with mobile devices,' Defense Department Chief Information Officer Teri Takai said in a statement today."

21.     2013: "Samsung recently received the nod from the Pentagon for any Samsung device protected by the Knox security software, which includes the Galaxy S4 and other compatible tablets."

22.     2013: "For the first time, Apple's push into federal use opens up the U.S. government and military to competition for device procurement in the mobile space."

23.    2014: "The mobile device management system–MDM–began operating Jan. 31 as a control system through which approved devices must operate to get access to Defense Department networks. The MDM enforces security policies by blocking or permitting certain functions on smartphones and tablets."

24.    2014: "By opening its networks to Samsung and Apple devices, Defense Information Systems Agency (DISA) intends to broaden the variety of mobile computers that troops and civilian Defense Department employees can use in the field, on bases, in offices and elsewhere to receive and send information and work almost anywhere at any time."

25.    2014: "Samsung has announced that five of its Galaxy devices have been approved for the U.S government's Defense Information System Agency (DISA) products list. The devices include the Galaxy S4, Galaxy S4 Active, Galaxy Note 3, the Galaxy Note Pro 12.2 and the Galaxy Note 10.1 2014 Edition. All of them are using Android 4.4 (KitKat) along with Samsung's KNOX secure workspace platform, which includes system-level encryption for enterprise-based apps."

26.    2014: "The United States Air Force is replacing 5000 legacy BlackBerry smartphones with Apple's iPhone, and eventually all of their BlackBerry users will have to make the changeover. The announcement, reported by Defense News, comes as the future of BlackBerry within the Department of Defense is debated, with the chips seeming to fall on the side of transitioning away from a network supporting a mish-mash of BlackBerry 6 and 7 devices to a mix of modern devices — though apparently without BlackBerry 10 in that mix."

27.    2015: "Navy Plans for Android and iOS Devices. The Navy Enterprise Networks (NEN) Program Office is making progress on plans to transition to more modern mobile devices. Early users will be able to choose between the iPhone 5c and 5s, but the Navy wants to be as

flexible as possible and allow users to pick the devices that will work best for them, and plans to approve a wider range of devices. Approval to use the iPhone 6 and iPad Air is expected in Jan. or Feb. 2015, and approval to use Samsung Android phones and tablets is expected in March."

28.    2016: "This fiscal year Marines will receive Samsung smart phones that make calling for fire support easier, quicker and more accurate. The Target Handoff System Version 2, or THS V.2, is a portable system designed for use by dismounted Marines to locate targets, pinpoint global positioning coordinates and call for close air, artillery and naval fire support using secure digital communications."

29.    2016: "Both the LG Electronics G5 and V10 received a security certification from the U.S. Defense Information Systems Agency, as well as a certification by the National Information Assurance Partnership, which administers independent tests to see if the devices are reliable and secure. The two newer LG smartphone models have joined the select list of official devices that can be used by Department of Defense employees, according to the handset manufacturer and a DOD website. LG's older models, the G3 and G4 also received DISA certifications. The phones come equipped with LG's encryption technology from 2013, LG GATE. The advanced tech has secure email options, supports Virtual Private Network (VPN), and can remotely wipe the phone's memory."

30.    2016: "Use of Mobile Technology for Information Collection and Dissemination": A DACS Technology Assessment Report: The Data & Analysis Center for Software (DACS) was one of several United States Department of Defense (DoD) sponsored Information Analysis Centers (IACs), administered by the Defense Technical Information Center (DTIC). It was managed by the U.S. Air Force Research Laboratory (AFRL) and operated by Quanterion Solutions Inc. under a long term DoD contract. The website is no

longer available and was replaced by https://www.csiac.org/ DACS Report Number 518055:
Contract FA1500-10-D-0010; Prepared for the Defense Technical Information Center; Prepared
By: Chet Hosmer, Chief Scientist; Carlton Jeffcoat, Vice President, Cyber Security Division;
Matt Davis, Malware Analyst; Wetstone/Allen Corporation of America; 10400 Eaton Place;
Fairfax, VA 22030; Thomas McGibbon, DACS Director; Quanterion Solutions Inc. 100
Seymour Road Utica, NY 13502. (Paragraphs 79-84 below were taken from the Report)

31.     Mobile technology is increasingly being utilized as a tool for information
dissemination and collection across the Government. The Department of Defense (DoD),
Department of Homeland Security (DHS), Intelligence communities, and law enforcement are
among those agencies utilizing mobile technology for information management. The primary
mobile devices being utilized are the iPad®, iPhone®, Android™, and Windows Mobile™. The
open architecture of these devices is advantageous for rapid application development and release.

32.     New mobile technologies such as the iPhone®, iPad®, Android™ and similar
devices have revolutionized the way information can be distributed. In the past, mobile devices
such as Personal Data Assistants (PDAs) primarily focused on data storage and display. Today,
an increasingly large number of devices are focusing not only on data storage and display, but
also on communication and processing. As a result organizations have begun leveraging mobile
technology as a means of information dissemination. These organizations include, but are not
limited to, Government organizations such as the Department of Defense (DoD), the United
States Army, the Department of Homeland Security (DHS), and a number of critical
infrastructure organizations.

33.     Significant advancements in mobile technology have occurred since September
11, 2001, both in the advancement of the devices and the infrastructures that support them. For

example, mobile devices like the Android™ and iPad® can now operate equally and seamlessly via traditional cellular networks, as well as with infrastructure/ad hoc wireless networks.

34.     The Defense Advanced Research Projects Agency (DARPA) has launched a program known as the Transformative Apps Program. The purpose of this program is to place the correct mobile applications into the hands of warfighters. To facilitate this, a military application store is being created to promote collaboration between developers and users in the field.

35.     Another DoD initiative is Connecting Soldiers to Digital Applications (CSDA), sponsored by the Army Capabilities Integration Center (ARCIC) and the Army CIO/G6, with support from the Army Training and Doctrine Command (TRADOC) deputy commanding general for Initial Military Training, and other Army organizations. The purpose of this initiative is to determine the value of giving soldiers applications on mobile devices [ARMY]. During Phase One of the initiative the Army experimented with several types of smart phones to evaluate the effectiveness and usefulness of various mobile applications in the field. Devices tested included the Apple iPhone®, Google Android™ devices, and Microsoft Windows Mobile™ phones [C4ISR]. On these devices, applications were tested which covered a wide range of functions.

36.     DoD is also starting to integrate chemical and biological sensors into mobile devices. Researchers from the University of California, San Diego have developed a miniature chemical sensor which can detect harmful gas in the air and automatically send the information about the type and transmitting range of the gas. The chemical sensor is a silicon chip with hundreds of independent miniature sensors. These can identify the molecule of specific toxic gas and then report on it.

16

## COUNT I: TAKING OF PROPERTY WITHOUT JUST COMPENSATION

37.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

38.     Plaintiff is the sole holder of all rights, titles, and interests in and to the '497; '033, '752; '761, '280, '891; '990, '189, '439 and '287 patents, including all rights to enforce this patent and collect past and future damages for a "Government Takings".

39.     Plaintiff brings this claim on behalf of itself.

40.     The Government is prohibited from taking "property . . . for public use, without just compensation." U.S. Const. Amend. V. The issuance of a patent to Plaintiff recognized a property right in each of the inventions embodied in the relevant claims, and those property rights were presumed valid, and when issued those property rights vested in Plaintiff. See, e.g., Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings Bank, 527 U. S. 627, 642 (1999) (patents as property right); James v. Campbell, 104 U. S. 356, 358 (1882) (same).

41.     Plaintiff's patents granted him the right to dispose of, transfer, or exclude others from the use of the invention. See Adams v. United States, 391 F.3d 1212, 1224 (Fed. Cir. 2004) (Under the Takings Clause, "property" is defined as a "legally-recognized property interest such as one in real estate, personal property, or intellectual property.")

42.     Upon information and belief, the United States has "taken" and continues to "take" the Plaintiff's personal property for the benefit of the public without paying just compensation for the "takings". Pursuant to the guidelines of a "Government Fifth Amendment Takings of a Patent" through the power of "eminent domain": the Government has taken the private and personal property subject matter as outlined in the Plaintiff's U.S. Patent No. 7,385,497 ("'497 Patent"), U.S. Patent No. 7,636,033 ("'033 Patent"), U.S. Patent No. 8,106,752 ("'752 Patent"), U.S. Patent No. 8,334,761 ("761" Patent"), U.S. Patent No. 8,531,280 ("280

17

Patent"), U.S. Reissue Patent No. RE43,891 ("'891 Patent"), U.S. Reissue Patent No. RE43,990

("'990 Patent"), U.S. Patent No. 9,096,189 ("'189 Patent"), U.S. Patent No. 9,589,439 ("'439

Patent"), and U.S. Patent No. 10,163,287 ("'287 Patent) specifications and patent claims that are

significantly the same or equivalent to the claimed inventions of the Plaintiff.

  43.  It is the belief of the Plaintiff that the "Government" was given adequate notice,

made aware of, and told or signaled that the private and personal property subject matter as

outlined in the Plaintiff's patent(s) specifications and patent claims that was "taken" by the

"Government" are significantly the same or equivalent to the claimed inventions of the Plaintiff;

the "Government" has taken and used for the benefit of the public, the private and personal

property subject matter as outlined in the Plaintiff's patent(s) specifications and patent claims

that are significantly the same or equivalent to the claimed inventions of the Plaintiff; resulting in

the Government's manufacture and development of products, devices, methods, and systems that

are significantly the same or equivalent to the claimed inventions of the Plaintiff.

  44.  It is the belief of the Plaintiff that the resulting economic impact of the "Takings"

is a reduction in value of the Plaintiff's property and by virtue of the access, disclosure,

manufacture, development or use, by or for the Government and its third party awardees, has

destroyed the Patent Owner's competitive edge; through the use, disposal, and right of a

government to take private or personal property for public use, the "Takings" has had a

substantial adverse impact (means unfavorable or harmful; preventing success or development)

on "the reasonable investment-backed expectations" of the Plaintiff.

  45.  It is the belief of the Plaintiff that the character of the Government's action was

triggered when the "Takings" caused a permanent invasion of the Plaintiff's property and

eliminated all economically beneficial uses of such property; without authorization and consent

from the Patent Owner and without just compensation to the

46.     It is the belief of the Plaintiff that the Claims Court ("Government") fail to adhere

to the proper or accepted standard of proceedings when the Claims Court ("Government") on

March 31, 2014 stayed the Plaintiff's complaint of a 28 U.S.C. § 1491(a), "Government Takings

of a Patent under the Fifth Amendment Clause" and proceeded only on the 28 U.S.C. § 1498(a),

"Government Infringement" claims.

47.     It is the belief of the Plaintiff that the Claims Court ("Government") decision to

proceeded only on the 28 U.S.C. § 1498(a), "Government Infringement" claims,  has allowed the

DOJ ("Government"), the DHS ("Government"), and the PTAB Court ("Government") to

improperly "take" three independent patent claims (11, 74, and 81) of the '990 patent. The

character of the Government's action was triggered when the "takings" caused a permanent

invasion of the Plaintiff's property and eliminated all economically beneficial uses of such

property by way of the Government's "takings" of Plaintiff's '990 patent.

48.     It is the belief of the Plaintiff that the Claims Court ("Government") decision to

proceeded only on the 28 U.S.C. § 1498(a), "Government Infringement" claims,  has allowed the

DOJ ("Government"),  and the Claims Court ("Government") to improperly "take" nine

independent patent claims (1-9) of the '189 patent, eleven independent claims (13-23) of the

'439 patent, and thirty-eight dependent claims (12, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 29,

30, 31, 32, 35, 39, 41, 44, 55, 78, 79, 92, 97, 99, 104, 108, 113, 118, 119, 122, 124, 126, 132,

134, 135, 148) of the '990 patent on what was flagged "jurisdictional discovery". The character

of the Government's action was triggered when the "takings" caused a permanent invasion of the

Plaintiff's property and eliminated all economically beneficial uses of such property by way of
the Government's "takings" of Plaintiff's '990 patent.

    49.    It is the belief of the Plaintiff that the Claims Court ("Government") fail to adhere
to the proper or accepted standard of proceedings when the Claims Court ("Government") stayed
the Plaintiff's 28 U.S.C. § 1498(a), "Government Infringement" claims to allow the DOJ
("Government"), and the DHS ("Government") to litigate in the PTAB Court ("Government"), in
Case No. IPR2014-00714, the Declaration of Dr. Sriram Vishwanath, that the "Government"
knew, or should have known, should have been stricken from the record because he owned and
was co-inventor of several patents and patent applications that covers wireless technology
involving a communication device and that the Patent Owner's RE43,990 patent antedated his
patents. Plaintiff believes the Government's action resulted in the "takings" of Plaintiff's three
independent patent claims (11, 74, and 81) of the '990 patent. Dr. Vishwanath's claims involving
a communication device can be found in provisional application 62/266,701 filed on 12-13-2015
(one month after the close of the IPR filed by DHS); patent application 15/377,902 filed on 12-
13-2016 @ [0013] "Communications devices may be, e.g. mobile devices such as cell phones
which may communize wirelessly to other user devices or base stations, fixed devices such as
stationary base stations or communications devices which communicate, e.g., send and/or
receive, RF signals"; the patent 10,110,306 issued on 10-23-2018. Dr. Vishwanath also filed on
12/03/2012, "Wireless communication methods, systems, and computer program products".
After reviewing the patent application [US 20130083722 A1 or 13/701,449], the Plaintiff
realized the very thing Dr. Vishwanath was fighting so hard to take away from the Patent Owner,
he was equally fighting to get for himself. "The brief from Cato and ACUF reiterates the private
property right... intellectual property. These amici cite an 1876 ruling: 'A patent for an invention

is as much property as a patent for land. The right rests on the same foundation... Neither an individual nor the public can trench upon or appropriate what belongs to the other.'"

50.     It is the belief of the Plaintiff that the Claims Court ("Government") fail to adhere to the proper or accepted standard of proceedings when the Claims Court ("Government") stayed the Plaintiff's 28 U.S.C. § 1498(a), "Government Infringement" claims to allow the DOJ ("Government"), and the DHS ("Government") to litigate in the PTAB Court ("Government"), in Case No. IPR2014-00714, eighteen prior art publications the DOJ ("Government"), the

DHS ("Government"), the Claims Court ("Government"), and the PTAB Court ("Government") knew, or should have known, did not antedate the priority filings (11-17-04) of the Plaintiff's inventions. The Plaintiff believes the Government's action to allow unqualified prior art is one of several ways the "Gov't" is "taking" the Patents asserted in Case No. 13-307C.

51.     It is the belief of the Plaintiff that when the Patent Owner introduced the Disclosure Document Deposit Request (Disclosure Document No. 565732) that was filed on Nov. 17, 2004 with the USPTO. The PTAB Court simply dismissed the document as being unimportant to the 2 ½ years spent prosecuting the RE43,990 patent asserted in the IPR; the estimated $45,000 dollars the Patent Owner spent on prosecuting the RE43,990 patent asserted in the IPR; and, the independent and dependent claims the Patent Owner will lose as a result of the PTAB Court choosing not to accept the Patent Owner's Disclosure Document. The Patent Owner's RE43,990 patent antedated Mostov's patent  under 102(b) and 102(e) – Mostov's Provisional Application 60/648,260 was filed on 01-28-2005. Plaintiff believes the Government's action resulted in the "takings" of Plaintiff's three independent patent claims (11, 74, and 81) of the '990 patent and Plaintiff's three substitute independent claims (154, 155, and 156) introduced in the IPR

52. It is the belief of the Plaintiff that the Claims Court ("Government") fail to adhere to the proper or accepted standard of proceedings when the Claims Court ("Government") stayed the Plaintiff's 28 U.S.C. § 1498(a), "Government Infringement" claims to allow the DOJ ("Government"), and the DHS ("Government") to litigate in the PTAB Court ("Government"), in Case No. IPR2014-00714, three prior art patents (Astrin, Breed, and Mostov) that the DOJ ("Government"), the DHS ("Government"), the Claims Court ("Government"), the PTAB Court ("Government") knew, or should have known, did not antedate the priority filings (November 17, 2004)[1] of the Plaintiff's inventions. The Plaintiff believes the Government's action to allow unqualified prior art is one of several ways the "Government" is "taking" the Patents asserted in Case No. 13-307 C.

| 53. Reference | Filing Date | Publication Date | Basis for anticipation |
|---|---|---|---|
| U.S. Patent Application Publication No. 2006/0250235 ("Astrin") | | 11/09/2006 | 102(b) |
| U.S. Patent Application Publication No. 2006/0181413 ("Mostov") | 01/28/2005* | 08/17/2006 | 102(e) - 102(b) |
| U.S. Patent No. 7,961,094 ("Breed") | 11/29/2007 | | 102(e) |

\* Mostov's Provisional Application [60/648,260] was filed on 01-28-2005. Plaintiff's Disclosure Document [565732] was filed on November 17, 2004.

---

[1]The Reissue U.S. Patent No. 43,990 patent ("'990 patent") is a reissue divisional of U.S. Patent No. 7,636,033 patent ("'033 patent") issued from U.S. Patent Application No. 12/155,573 ("'573 application") which is a continuation-in-part of the U.S. Patent Application No. 11/397,118 ("'118 application"), now U.S. Patent No. 7,385,497, ("'497 patent"). '118 application was filed on April 5, 2006 and a Disclosure Document Deposit Request (Disclosure Document No. 565732) was filed on November 17, 2004. The DOJ ("Government") and the DHS ("Government") alleged that the following references were available as prior art under 35 U.S.C. 102(b) and (e) and therefore anticipate claims 11, 71 and 81 of the '990 patent.

54.     It is the belief of the Plaintiff that the Claims Court ("Government") fail to adhere to the proper or accepted standard of proceedings when the Claims Court ("Government") stayed the Plaintiff's 28 U.S.C. § 1498(a), "Government Infringement" claims to allow the DOJ ("Government"), and the DHS ("Government") to litigate in the PTAB Court ("Government"), in Case No. IPR2014-00714, eighteen prior art publications the DOJ ("Government"), the

DHS ("Government"), the Claims Court ("Government"), and the PTAB Court ("Government") knew, or should have known, did not antedate the priority filings (November 17, 2004) of the Plaintiff's inventions. The Plaintiff believes the Government's action to allow unqualified prior art is one of several ways the "Government" is "taking" the Patents asserted in Case No. 13-307 C.

55.     It is the belief of the Plaintiff that when the Patent Owner introduced the Disclosure Document Deposit Request (Disclosure Document No. 565732) that was filed on Nov. 17, 2004 with the USPTO to the PTAB, the PTAB Court simply dismissed the document as being unimportant to the 2 ½ years spent prosecuting the RE43,990 patent asserted in the IPR; the estimated $45,000 dollars the Patent Owner spent on prosecuting the RE43,990 patent asserted in the IPR; and, the independent and dependent claims the Patent Owner will lose as a result of the PTAB Court choosing not to accept the Patent Owner's Disclosure Document. The Patent Owner's RE43,990 patent antedated Mostov's patent under 102(b) and 102(e) – Mostov's Provisional Application 60/648,260 was filed on 01-28-2005. Plaintiff believes the Government's action resulted in the "takings" of Plaintiff's three independent patent claims (11, 74, and 81) of the '990 patent and Plaintiff's three substitute independent claims (154, 155, and 156) introduced in the IPR.

56.     It is the belief of the Plaintiff that the Claims Court ("Government") fail to adhere to the proper or accepted standard of proceedings when the Claims Court ("Government") stayed the Plaintiff's 28 U.S.C. § 1498(a), "Government Infringement" claims to allow the DOJ ("Government"), and the DHS ("Government") to litigate in the PTAB Court ("Government"), in Case No. IPR2014-00714, the Declaration of Dr. Sriram Vishwanath, that the DOJ ("Government"), the DHS ("Government"), the Claims Court ("Government"), the PTAB Court ("Government") knew, or should have known, did not antedate the priority filings (November 17, 2004) of the Plaintiff's inventions. The Plaintiff believes the Government's action to allow an unqualified declaration as prior art is one of several ways the "Government" is "taking" the Patents asserted in Case No. 13-307 C.

57.     It is the belief of the Plaintiff that the Claims Court ("Government") fail to adhere to the proper or accepted standard of proceedings when the Claims Court ("Government") stayed the Plaintiff's 28 U.S.C. § 1498(a), "Government Infringement" claims to allow the DOJ ("Government"), and the DHS ("Government") to litigate in the PTAB Court ("Government"), in Case No. IPR2014-00714, the redundancy rulings of the PTAB Court ("Government"), that the DOJ ("Government"), the DHS ("Government"), the Claims Court ("Government"), the PTAB Court ("Government") knew, or should have known, that during the institution review of the Petitioners' petition for Inter Partes Review (IPR) and the Patent Owner's opposition to the IPR, the PTAB Court dropped Mostov as being redundant. The Patent Owner's patent [RE43,990] still antedated Astrin and Breed and the Patent Owner continued to argue Mostov throughout the proceedings. After eighteen months of litigation cost and time in the PTAB Court, the PTAB issued its Final Decision. In the PTAB Court's Final Decision, the PTAB added the Mostov patent back and dismissed the Astrin and Breed Patents as unqualified prior art. In *CRFD*

*Research Ltd. v. Matal*, No. 2016-2198 (Fed. Cir. Dec. 5, 2017), the Federal Circuit determined that the PTAB erred in its obviousness analysis, in part by failing to consider an argument the IPR petitioner made in a ground that the PTAB determined was "redundant" to the instituted grounds. The PTAB erred in its analysis, according to the court, because Hulu expressly incorporated this argument in the instituted grounds, and the court determined that to refuse to consider this argument "would also raise questions about the propriety of the Board's redundancy decision." Plaintiff believes the Government's action to allow the opinions expressed in the PTAB's Final Decision to be used as a guide for the direction the Claims Court should adjudicate, is one of several ways the "Government" is "taking" the Patents asserted in Case No. 13-307 C.

58.     It is the belief of the Plaintiff that the Claims Court ("Government") fail to adhere to the proper or accepted standard of proceedings when the Claims Court ("Government") stayed the Plaintiff's 28 U.S.C. § 1498(a), "Government Infringement" claims to allow the DOJ ("Government"), and the DHS ("Government") to litigate in the PTAB Court ("Government"), in Case No. IPR2014-00714—under the allowed statues of 35 U.S.C. 102 and 35 U.S.C. 103—that the DOJ ("Government"), the DHS ("Government"), the Claims Court ("Government"), the PTAB Court ("Government") knew, or should have known, the rules governing the IPR proceedings, only allow the petition under 35 U.S.C. 102 and 35 U.S.C. 103. Petitioner's IPR petition included objections: 35 U.S.C. 101, "Operability"; 35 U.S.C. 112, "Lack of Utility"; 35 U.S.C. 112, "Indefiniteness"; 35 U.S.C. 120 "Benefit of Earlier Filing Date"; and, 35 U.S.C. 102, "Anticipation" beyond the standard "single prior art patent" to "three prior art patents". The Patent Owner introduced three substitute claims because the PTAB Court allowed the written description objection. If the PO had left the description (§ 112) in the claims would have held

invalid and because I took the description (§ 112) out the claims were said to be invalid because of broadening. Either way the Plaintiff claims was going to be "taken" by the PTAB ("Government"). "The PTAB may institute IPR proceedings only on the basis of certain prior art that is potentially invalidating under § 102 (novelty) or § 103 (obviousness). The PTAB may not institute IPR on any other unpatentability grounds, including, for example, § 101 (patentable subject matter) or § 112 (definiteness, enablement, written description)". Plaintiff believes the Government's action resulted in the "takings" of Plaintiff's three independent patent claims (11, 74, and 81) of the '990 patent and Plaintiff's three substitute independent claims (154, 155, and 156) introduced in the IPR.

59.     It is the belief of the Plaintiff that the independent claims 13, 14, 15, 22, and 23 of the asserted Patent 9,589,439 in Case No. 13-307 C, are significantly the same as independent claims 1, 2, and 3 of the asserted Patent 9,096,189 in Case No. 13-307 C, that covers the Plaintiff's "communication device" and/or "monitoring device", are significantly the same as Reissued Patent RE43,990 independent claim 11. Plaintiff believes the Government's action resulted in the "takings" of the independent patent claims listed above of the '439, '189, and '990 patent.

60.     It is the belief of the Plaintiff that the Claims Court ("Government"), which initiated the unfair and unjust proceedings that was held at the PTAB Court ("Government") in Case No. IPR2014-00714 participated in the "takings" of independent claims 11, 74, and 81 of the '990 patent by allowing the unfair and unjust decisions of the PTAB Court ("Government") to be carried over into Case No. 13-307 C.

61.     It is the belief of the Plaintiff that the Claims Court ("Government") has "taken" independent claim 11 of the '990 patent; and, has "taken" the Plaintiff's use of independent

claims 13, 14, 15, 22, and 23 of the asserted '439 patent as substitute claims for independent claim 11 of the '990 patent in Case No. 13-307 C.

62.     It is the belief of the Plaintiff that the Claims Court ("Government") has "taken" the Plaintiff's use of independent claims 1, 2, and 3 of the asserted '189 patent as substitute claims for independent claim 11 of the '990 patent in Case No. 13-307 C.

63.     It is the belief of the Plaintiff that the DOJ ("Government"), the DHS ("Government"), the PTAB Court ("Government"), and the Claims Court ("Government"), has unfairly and unjustly "taken" the Plaintiff's use of dependent claims 12, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 29, 30, 31, 32, 35, 39, 41, 44, 55, 78, 79, 92, 97, 99, 104, 108, 113, 118, 119, 122, 124, 126, 132, 134, 135, 148 of the '990 patent asserted in Case No. 13-307 C which depends on independent claims 11, 74, and 81 of the '990 patent that was unfairly and unjustly "taken" by the "Government".

64.     It is the belief of the Plaintiff that the Claims Court ("Government") has "taken" the Plaintiff's use of dependent claims 12, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 29, 30, 31, 32, 35, 39, 41, 44, 55, 78, 79, 92, 97, 99, 104, 108, 113, 118, 119, 122, 124, 126, 132, 134, 135, 148 of the ('990) patent asserted in Case No. 13-307 C which depends on the substitute independent claims 13, 14, 15, 22, and 23 of the asserted '439 patent and the independent claims 1, 2, and 3 of the asserted '189 patent, that are substantially and significantly the same as independent claim 11 of the '990 patent.

65.     It is the belief of the Plaintiff that the "takings" of the independent claims by the "Government" of the '439 and '189 patents that are substantially and significantly the same as independent claim 11 of the '990 patent, and the "takings" by the "Government" of the dependent claims of the '990 patent that depends on the substitute independent claims of the

'439 and '189 patents has resulted in a reduction in value of the Plaintiff's property by virtue of the "Government" dismissal of claims, access, disclosure, manufacture, development or use, by or for the Government and its third party awardees; has destroyed the Plaintiff's competitive edge; has had a substantial adverse impact (means unfavorable or harmful; preventing success or development) on "the reasonable investment-backed expectations" of the Plaintiff.

66.     It is the belief of the Plaintiff that the independent claims 16, 17, and 18 of the asserted Patent 9,589,439 in Case No. 13-307 C, are significantly the same as independent claims 4, 5, and 6 of the asserted Patent 9,096,189 in Case No. 13-307 C, that covers the Plaintiff's "communication device" and/or "monitoring device", are significantly the same as Reissued Patent RE43,990 independent claim 74. Plaintiff believes the Government's action resulted in the "takings" of the independent patent claims listed above of the '439, '189, and '990 patent.

67.     It is the belief of the Plaintiff that the Claims Court ("Government"), which initiated the unfair and unjust proceedings that was held at the PTAB Court ("Government") in Case No. IPR2014-00714 participated in the "takings" of independent claims 11, 74, and 81 of the '990 patent by allowing the unfair and unjust decisions of the PTAB Court ("Government") to be carried over into Case No. 13-307 C.

68.     It is the belief of the Plaintiff that the Claims Court ("Government") has "taken" independent claim 74 of the '990 patent; and, has "taken" the Plaintiff's use of independent claims 16, 17, and 18 of the asserted '439 patent as substitute claims for independent claim 74 of the '990 patent in Case No. 13-307 C.

69.     It is the belief of the Plaintiff that the Claims Court ("Government") has "taken" the Plaintiff's use of independent claims 4, 5, and 6 of the asserted '189 patent as substitute claims for independent claim 74 of the '990 patent in Case No. 13-307 C.

70. It is the belief of the Plaintiff that the DOJ ("Government"), the DHS ("Government"), the PTAB Court ("Government"), and the Claims Court ("Government"), has unfairly and unjustly "taken" the Plaintiff's use of dependent claims 12, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 29, 30, 31, 32, 35, 39, 41, 44, 55, 78, 79, 92, 97, 99, 104, 108, 113, 118, 119, 122, 124, 126, 132, 134, 135, 148 of the '990 patent asserted in Case No. 13-307 C which depends on independent claims 11, 74, and 81 of the '990 patent that was unfairly and unjustly "taken" by the "Government".

71. It is the belief of the Plaintiff that the Claims Court ("Government") has "taken" the Plaintiff's use of dependent claims 12, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 29, 30, 31, 32, 35, 39, 41, 44, 55, 78, 79, 92, 97, 99, 104, 108, 113, 118, 119, 122, 124, 126, 132, 134, 135, 148 of the '990 patent asserted in Case No. 13-307 C which depends on the substitute independent claims 16, 17, and 18 of the asserted '439 patent and the independent claims 4, 5, and 6 of the asserted '189 patent, that are substantially and significantly the same as independent claim 74 of the '990 patent.

72. It is the belief of the Plaintiff that the "takings" by the "Government" of the independent claims of the '439 and '189 patents that are substantially and significantly the same as independent claim 74 of the '990 patent, and the "takings" by the "Government" of the dependent claims of the '990 patent that depends on the substitute independent claims of the '439 and '189 patents has resulted in a reduction in value of the Plaintiff's property by virtue of the "Government" dismissal of claims, access, disclosure, manufacture, development or use with or for the public's benefit; by or for the "Government" and its third party awardees; has destroyed the Plaintiff's competitive edge; has had a substantial adverse impact (means

unfavorable or harmful; preventing success or development) on "the reasonable investment-backed expectations" of the Plaintiff.

73.     It is the belief of the Plaintiff that the independent claims 19, 20, and 21 of the asserted Patent 9,589,439 in Case No. 13-307 C, are significantly the same as independent claims 7, 8, and 9 of the asserted Patent 9,096,189 in Case No. 13-307 C, that covers the Plaintiff's "communication device" and/or "monitoring device", are significantly the same as Reissued Patent RE43,990 independent claim 81. Plaintiff believes the Government's action resulted in the "takings" of the independent patent claims listed above of the '439, '189, and '990 patent.

74.     It is the belief of the Plaintiff that the Claims Court ("Government"), which initiated the unfair and unjust proceedings that was held at the PTAB Court ("Government") in Case No. IPR2014-00714 participated in the "takings" of independent claims 11, 74, and 81 of the '990 patent by allowing the unfair and unjust decisions of the PTAB Court ("Government") to be carried over into Case No. 13-307 C.

75.     It is the belief of the Plaintiff that the Claims Court ("Government") has "taken" independent claim 81 of the '990 patent; and, has "taken" the Plaintiff's use of independent claims 19, 20, and 21 of the asserted '439 patent as substitute claims for independent claim 81 of the '990 patent in Case No. 13-307 C.

76.     It is the belief of the Plaintiff that the Claims Court ("Government") has "taken" the Plaintiff's use of independent claims 7, 8, and 9 of the asserted '189 patent as substitute claims for independent claim 81 of the '990 patent in Case No. 13-307 C.

77.     It is the belief of the Plaintiff that the DOJ ("Government"), the DHS ("Government"), the PTAB Court ("Government"), and the Claims Court ("Government"), has unfairly and unjustly "taken" the Plaintiff's use of dependent claims 12, 15, 16, 17, 18, 20, 21,

22, 23, 25, 26, 28, 29, 30, 31, 32, 35, 39, 41, 44, 55, 78, 79, 92, 97, 99, 104, 108, 113, 118, 119, 122, 124, 126, 132, 134, 135, 148 of the '990 patent asserted in Case No. 13-307 C which depends on independent claims 11, 74, and 81 of the '990 patent that was unfairly and unjustly "taken" by the "Government".

78.     It is the belief of the Plaintiff that the Claims Court ("Government") has "taken" the Plaintiff's use of dependent claims 12, 15, 16, 17, 18, 20, 21, 22, 23, 25, 26, 28, 29, 30, 31, 32, 35, 39, 41, 44, 55, 78, 79, 92, 97, 99, 104, 108, 113, 118, 119, 122, 124, 126, 132, 134, 135, 148 of the ('990) patent asserted in Case No. 13-307 C which depends on the substitute independent claims 19, 20, and 21 of the asserted '439 patent and the independent claims 7, 8, and 9 of the asserted '189 patent, that are substantially and significantly the same as independent claim 81 of the '990 patent.

79.     It is the belief of the Plaintiff that the "takings" by the "Government" of the independent claims of the '439 and '189 patents that are substantially and significantly the same as independent claim 81 of the '990 patent, and the "takings" by the "Government" of the dependent claims of the '990 patent that depends on the substitute independent claims of the '439 and '189 patents has resulted in a reduction in value of the Plaintiff's property by virtue of the "Government" dismissal of claims, access, disclosure, manufacture, development or use with or for the public's benefit; by or for the "Government" and its third party awardees; has destroyed the Plaintiff's competitive edge; has had a substantial adverse impact (means unfavorable or harmful; preventing success or development) on "the reasonable investment-backed expectations" of the Plaintiff.

80.     It is the belief of the Plaintiff that the Claims Court ("Government") abused its discretion by disallowing the Plaintiff to bring an action against, or filed in its pleadings a claim

against the Department of Justice (DOJ), more specifically an agency that operates under the DOJ's umbrella; the National Institute of Justice (NIJ). The Plaintiff had an alleged infringement claim against the NIJ. But when the issue was discussed in a teleconference hearing (Transcript; December 02, 2016; Discovery). The Court disallowed the Plaintiff the opportunity to litigate finding against the NIJ. Judge Braden states in a teleconference hearing on December 2, 2016; "there is no such thing as the National Institute of Justice". NIJ is the research, development and evaluation agency of the U.S. Department of Justice. NIJ awards grants and agreements for: Research, development and evaluation (CFDA 16.560). NIJ funds physical and social science research, development and evaluation projects about criminal justice through competitive solicitations. The focus of the solicitations varies from year to year based on research priorities and available funding. As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439', '189, '891, and '990 patents and has **open the door for the continued use by the government of Plaintiff's inventions without paying just compensation**. In *Horne v. Department of Agriculture,* 2012, Chief Justice Roberts, writing for the Court, cited a Supreme Court opinion from the late nineteenth century: "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation…"

81.     It is the belief of the Plaintiff that Judge Braden's "lack of impartiality" is the only logical explanation to why Judge Braden issued on November 30, 2016 a Memorandum Opinion and Order Denying the Government's Motion to Dismiss (Dkt. No. 94) pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. In a teleconference hearing just two (2) days later on December 2, the Judge favored the DOJ ("Government") by giving them another chance "a do-over" to file another Motion to Dismiss pursuant to Rules 12(b)(1)

and 12(b)(6) of the Federal Rules of Civil Procedure on the very same devices she just ruled on (Transcript; December 02, 2016; Discovery). Under normal procedures the Department of Justice ("Government") would have at least had to ask to Judge for a chance to "redo" it over again and at least state the reason(s) why. The proper procedure would have been for the Department of Justice ("Government") to ask for leave of the Court to file a Motion for Reconsideration, stating the reason(s) why. If all else fails, the Department of Justice ("Government") could file a Motion of Appeal to the U.S. Court of Appeals for the Federal Circuit (CAFC), stating the reason(s) why. Judge Braden never gave an explanation to "why" she took it upon herself to grant the Department of Justice ("Government") leave to file another Motion to Dismiss on the same devices. The Plaintiff was ordered to do jurisdictional discovery on the same devices the he had done jurisdictional discovery on and had submitting his findings in a Response (Dkt. No.90; filed 07/05/2016) to the Government's Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6). As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439', '189, '891, and '990 patents and has **open the door for the continued use by the government of Plaintiff's inventions without paying just compensation**. In *Horne v. Department of Agriculture,* 2012, Chief Justice Roberts, writing for the Court, cited a Supreme Court opinion from the late nineteenth century: "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation…"

82. It is the belief of the Plaintiff that the Claims Court ("Government") abuse its discretion by inappropriately and improperly, diverting and redirecting this case away from the products, devices, methods and processes the Plaintiff has alleged is being infringed by the Government to falsely accusing the Plaintiff of stating a Broad Agency Announcement (BAA) is

a contract. Judge Braden initially states in her Opinion denying the Government's Motion to dismiss Certain Devices filed on November 30, 2016 (Dkt. No. 94). "*Hughes Aircraft Co.*, 534 F.2d at 898 (finding that the government's participation in a satellite program was "for the Government," because the program was vital to the military defense and security of the United States). Moreover, under section 1498(a), "Government authorization or consent" can be implied by circumstances. See TVI Energy Corp, 806 F.2d at 1060'. In this case, the February 12, 2016 Amended Complaint alleges that DHS contracted with iControl to develop and commercialize M-Lock. This contractual relationship supports a reasonable inference that the Government authorized the manufacture and use of the infringing device." Therefore, it was the M-Lock the Plaintiff is alleging the Government is infringing, not the contract with iControl. The Judge later states in her opinion on March 29, 2018 "**e. Patent Infringement Allegations Concerning Broad Agency Announcements Must Be Dismissed Under RCFC 12(b)(6)...** As a result of contracts with the [DNDO], Passport Systems, Inc., Panasonic Corporation, and the Samsung Group for the development and commercialization of the l"x2" Detection Device (DD) Samsung Galaxy s6 Smartphone; 2"x2" Detection Device (DD) Samsung Galaxy s6 Smartphone; NetS2 SmartShield G300 Radiation Detector Samsung Galaxy s6 Smartphone; NetS2 SmartShield G500 Radiation Detector Samsung Galaxy s6 Smartphone; and the Passport Systems Base Control Unit (BCU) "TOUGHBOOK 31" Panasonic Laptop... Indeed, the Fifth Amended Complaint fails to identify a single "contract" with the DNDO. Instead, it alleges only that the DNDO issued a BAA; a BAA, however, is not a "contract." *See* 48 C.F.R. § 2.101(b) (defining a "BAA" as "a general announcement of an agency's research interest including criteria for selecting proposals and soliciting the participation of all offerors capable of satisfying the Government's needs"). Again, without more, the Fifth Amended Complaint has not met the

requirements of *Twombly* and *Iqbal*. And, conclusory allegations that the Government used or authorized the use of the "Samsung Galaxy s6 Smartphone" in a manner that infringes Plaintiffs patents are likewise insufficient, as such "(t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678; *see also Sioux Honey Ass 'n,* 672 F.3d at 1062 (holding that a complaint "require[s] more than labels and conclusions"). For these reasons, the court has determined that the patent infringement allegations contained in paras. 161-67 of the August 10, 2017 Fifth Amended Complaint must be dismissed under RCFC 12(b)(6)." Again, as noted above, the Plaintiff is alleging the Government is infringing the numerous devices manufactured as a result of contracts with DNDO, not the contracts themselves. As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439', '189, '891, and '990 patents and has **open the door for the continued use by the government of Plaintiff's inventions without paying just compensation**. In *Horne v. Department of Agriculture,* 2012, Chief Justice Roberts, writing for the Court, cited a Supreme Court opinion from the late nineteenth century: "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation…"

83.     It is the belief of the Plaintiff that the Claims Court ("Government") abuse its discretion for failing to realize that according to the Tucker Act the Federal Claims Court has jurisdiction over all claims arising under a Federal Contract. Judge Braden initially states in her Opinion denying the Government's Motion to dismiss Certain Devices filed on November 30, 2016 (Dkt. No. 94). "The court has held that a research grant or cooperative agreements from the National Science Foundation (NSF) and the National Institute of Health (NIH) was a contract within Tucker Act jurisdiction. The National Science Foundation (NSF) and the National

Institute of Health (NIH) waiver of sovereign immunity under federal law within the Tucker Act, provides the United States Court of Federal Claims with jurisdiction over all claims arising under a Federal Contract and '[t]here is no further jurisdictional requirement that plaintiff make additional nonfrivolous allegation[s] that [he] is entitled to relief under the relevant money-mandating source'". Also, '[t]he February 12, 2016 Amended Complaint's NSF claims also allege sufficient facts to plausibly establish that the use of the accused devices was with the authorization or consent of the Government.' Authori-zation or consent can be implied from the circumstances." Judge Braden later states in her Opinion filed on March 29, 2018, (Dkt. No. 130). "The court does not have jurisdiction under 28 U.S.C. § 1498(a) to adjudicate patent infringement allegations concerning NSF and NIH grants and cooperative agreements, because any benefit to the Government, at best, would be incidental. In addition, none of the grants or cooperative agreements evidence any "express or implied authorization and consent by the [G]overmnent... Likewise, the award of NSF and NIH grants does not evidence implied authorization, because the Government does not direct or exercise control over the activities of awardees. Although the cooperative agreements may involve a measure of Government involvement, they do not contain any text evidencing Government "authorization [or] consent to infringe another's patent." As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439', '189, '891, and '990 patents and has **open the door for the continued use by the government of Plaintiff's inventions without paying just compensation**. In *Horne v. Department of Agriculture,* 2012, Chief Justice Roberts, writing for the Court, cited a Supreme Court opinion from the late nineteenth century: "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation…"

84.    Upon information and belief, Judge Braden has "taken" all the independent claims asserted in the Final Amended Complaint of the '439 patent, and all of the independent claims in the Amended Complaint of the '189 patent that are the Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (e.g. smartphones and other consumer devices). Sixty-one of the seventy-two alleged 28 U.S.C. 1498 "Government Infringement" claims of the Plaintiff in the Final Amended Complaint are relating to the Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (e.g. smartphones and other consumer devices). Judge Braden made the following statement in the Memorandum Opinion and Order (Dkt. No. 130; filed 03/29/2018) "The paragraphs in the Fifth Amended Complaint that include patent infringement allegations "relating generally to smartphones and other consumer devices"... To support this allegation, the Fifth Amended Complaint repeatedly cites to paras... of the Fifth Amended Complaint. These paragraphs describe the Government's intent to "allow" or "approve" the "use" of various "smartphones and other consumer devices," e.g., "the iPhone... The Fifth Amended Complaint, however, does not allege that the Government's intent to "allow" or "approve" the use of "smartphones and other consumer devices" infringes Plaintiffs patents. Instead, the Fifth Amended Complaint alleges that the Government's use of these devices in combination with other "devices" or "programs," e.g., the "'Cell-All' initiative," infringes Plaintiffs patents... No factual allegations, however, support assuming that the Government used or authorized the use of these other "devices" or "programs" to infringe Plaintiffs patents... For these reasons, the court has determined that even if the August 10, 2017 Fifth Amended Complaint established jurisdiction as to the patent infringement allegations contained in paras... of the Fifth Amended Complaint, the allegations contained therein failed to state a claim upon which relief may be granted and must be dismissed under RCFC 12(b)(6)." The DOJ

37

("Government") and the Claims Court ("Government") denial and dismissive attitude that the "use by or manufacture for the Government"; that there was never "authorization and consent"; that the Plaintiff "failed to state a claim upon which relief may be granted and must be dismissed under RCFC 12(b)(6)"; and, private conduct incidentally benefitting the Government does not constitute use "for the benefit of the Government", never existed, has resulted in the "takings" of Plaintiff's patents. Referring back to paras. 11 and 12 of this document, the Plaintiff has produced a CD **Vol. I, Appx2** of the "Cell-All" initiative and an outline of minutes of where certain information can be viewed that rebuts the opinion of the Claims Court. It is the belief of the Plaintiff that the Government has "taken" the Plaintiff's '439 and '189 patents so that a determination of whether the Government has infringed Plaintiff's patents cannot be made.

85.    It is the belief of the Plaintiff, that Judge Braden's "Lack of Impartiality" in the Case (13-307 C) of ordering the Plaintiff to produce **all** of his discovery to the DOJ and never ordered the DOJ to do the same, created an unfair advantage for the DOJ and has resulted in the eventual "takings" of Plaintiff's patents. On May 24, 2017, the court convened a telephone status conference. Pursuant to the status conference, the court grants Plaintiff leave to file a Final Amended Complaint and a Final Amended Claim Chart by August 15, 2017. The court ordered the Plaintiff in the telephone status conference: "to file a clean amended complaint that includes **all** of your [Plaintiff] concerns, **all** of your [Plaintiff] charges against the Government in one document"… "You're going to put together a **whole** fifth and final complaint and a final claim chart, two documents". Judge Braden later states in her Opinion filed on March 29, 2018: Dkt. No. 130) "The Fifth Amended Complaint also fails to allege that "the accused use or manufacture was undertaken ... for the Government's benefit." *See Hughes Aircraft Co.,* 534 F.2d at 897. The Fifth Amended Complaint contains no <u>factual</u> allegations establishing anything more

38

than "incidental benefit" to the NSF. *See Advanced Software Design Corp.,* 583 F.3d at 1379

(holding that "an interest in [a] program generally, or [where the Government] funds or

reimburses all or part of [a program's] costs, is too remote to make the [G]overnment the

program's beneficiary for the purposes underlying § 1498" (quoting *Larson,* 26 Cl. Ct. at 369));

*see also IRIS Corp.,* 769 F.3d at 1362 ("Incidental benefit to the [G]overnment is insufficient" to

satisfy the requirements of 28 U.S.C. § 1498(a).). Nor does the Fifth Amended Complaint allege

that "the Government gave its authorization or consent for the accused use or manufacture." *See*

*Hughes Aircraft Co.,* 534 F.2d at 897. The Fifth Amended Complaint does not contain any

<u>factual</u> allegations establishing that the NSF, at any time, authorized or consented to infringing

use or manufacture. For example, the Fifth Amended Complaint does not cite any portions of the

NSF grants or communications between the NSF and grant awardees "expressly" or "implicitly"

authorizing infringing conduct. *See Larson,* 26 Cl. Ct. at 369-70 ("[A]uthorization or consent

requires explicit acts or extrinsic evidence sufficient to prove the [G]overnment's intention to

accept liability for a specific act of infringement."). Nor does the Fifth Amended Complaint

include any <u>factual</u> allegations that could be construed as "express" or "implicit" authorization or

consent by the NSF to infringe Plaintiffs patents. *See Hughes Aircraft Co.,* 534 F.2d at 901

(holding that implied authorization may be presumed when the Government provides

"instructions ... specifications [,] or drawings which impliedly sanction and necessitate

infringement"); *see also IRIS Corp.,* 769 F.3d at 1362 (holding that "the [G]overnment ... clearly

provided its authorization or consent [,] because [the contractor] ... cannot comply with its legal

obligations without engaging in the allegedly infringing activities"). Instead, each of the NSF

grants incorporated a standard clause advising that the NSF "cannot assume any liability for ...

claims arising out of any work supported by an award for unauthorized use of patented ...

materials" or, more generally, "with respect to ... property of ... third parties." Therefore,
awardees were warned that the use of "property of ... third parties," including "patented ...
materials," was "unauthorized." *See Carrier Corp.,* 534 F.2d at 247-49 (holding that the
Government "cap limit ... authorization and consent" by "inclusion ... of a standard clause [that]
limits the Government's authorization and consent"). For these reasons, the court has determined
that the patent infringement allegations contained in paras. 184-85, 199-200, 235-36, 260-61,
265-66, 270-71, 275-76, 280-81, 285-86, 290-91, 295-96, 300-01, 305-06, and 350-51 of the
August 10, 2017 Fifth Amended Complaint failed to satisfy Plaintiffs burden to establish
jurisdiction under 28 U.S.C. § 1498(a). Further, the Government failed to produce the findings of
the at least seventy-two Freedom of Information (FOIA) Request relating to the seventy-two
infringement Claims asserted in Case No. 13-307 C. The Plaintiff submitted three hundred,
seventy-six FOIA requests to the DOJ ("Government"); the Claims Court ("Government"), and
the numerous various "Government" agencies in the third quarter of the year 2015. Included
were the seventy-two infringement claims asserted in the Case No. 13-307 C. Plaintiff did not
receive from the DOJ ("Government") and the Claims Court ("Government"), and the numerous
various "Government" agencies any of the information requested and needed to answer the
factual requirements of Judge Braden in a jurisdictional discovery. As a result of the Government
actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439', '189,
'891, and '990 patents.

      86.    It is the belief of the Plaintiff that the Claims Court ("Government") has erred in
its decision regarding pre and post issuance. Judge Braden made the following statement in the
Memorandum Opinion and Order (Dkt. No. 130; filed 03/29/2018). "**g. Patent Infringement
Allegations Concerning Unissued Patent Applications and Pre-Issuance Use or**

**Manufacture Must Be Dismissed Under RCFC 12(b)(l)...** The Government argues that patent infringement allegations concerning... pre-issuance use or manufacture of the '439 Patent should be dismissed under RCFC 12(b)(l)... the '439 Patent issued on March 7, 2017, but the Fifth Amended Complaint alleges infringement of the '439 Patent, based on Government "programs" that were cancelled in April 2014, almost three years prior to issuance of the '439 Patent (a June 10, 2014 United States Government Accountability Office Report, explaining the DHS's decision to cancel the "Bio Watch Gen-3" program in April 2014). In addition, the Fifth Amended Complaint alleges infringement of the '439 Patent, based on NSF grants that expired prior to issuance of the '439 Patent. Am. Comp. paras. 184-85, 199-200, 260-61, 275-76, 280-81, 295-96, and 305-06. The court's jurisdiction under 28 U.S.C. § 1498(a) is limited to allegations "against the [G]overnment arising out of post-issuance [G]overnment use [or manufacture] of an invention." The Plaintiff has demonstrated he has a right to receive post-issuance damages for the ongoing and continuing use and manufacture of the seventy-two (72) alleged infringing products, devices, etc. Plaintiff never alleged infringement of a Government contract, solicitation, grant, or program (i.e. DNDO solicitation; NSF and NIH grants; Bio-Watch Gen 3 program). The Plaintiff is alleging the Government is infringing the numerous devices manufactured as a result of contracts, solicitations, grants, or programs, not the contracts, solicitations, grants, or programs themselves. The Plaintiff has further demonstrated he has a right to receive pre-issuance damages because the Plaintiff has satisfied the "actual notice" requirement and the "substantially identical" requirement under Section 154(d). As to damages, the jury awarded $1,405,708 in lost profit damages starting in September 2007, the time of the patent's issuance, and $167,455 in reasonable-royalty damages for the pre-issuance period starting in October 2006, the date the patent application was published. With respect to pre-

41

issuance damages, the district court had already ruled, in denying a summary-judgment motion by MGA, that such damages would be permissible under 35 U.S.C. § 154(d) because the scope of the issued claims are substantially identical to the scope of the published application's claims. That case, *Innovention Toys, LLC v. MGA Entm't, Inc.*, 611 Fed. Appx. 693, 695 (Fed. Cir. 2015), explained that "[C]laims are 'identical' to their original counterparts if they are 'without substantive change.'" As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439', '189, '891, and '990 patents and has **open the door for the continued use by the government of Plaintiff's inventions without paying just compensation**. In *Horne v. Department of Agriculture,* 2012, Chief Justice Roberts, writing for the Court, cited a Supreme Court opinion from the late nineteenth century: "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation…"

      87.    It is the belief of the Plaintiff that Judge Braden erred in her decision to allow the opinions of the PTAB Court ("Government") to be entered into this Case No. 13-307 C. The Claims Court ("Government") and the PTAB Court ("Government") cooperatively, alone with the DOJ ("Government"), in collaboration, join forces to proceed with the "Takings" of Plaintiff's independent claims 11, 74, and 81 of the '990 Patent in the Inter Partes Review (IPR); independent substitute claims 154-156 asserted in the Inter Partes Review (IPR), and dependent claims of the '990 Patent asserted in this Case No. 13-307 C. The Plaintiff asserted in Case No. 13-307 C, the substitute independent claims of the '439 patent that the dependent claims of the '990 Patent depend on, in at least fifty-nine (59) of the infringement claims of Case No. 13-307 C. The DOJ ("Government") in its Motion; DEFENDANT THE UNITED STATES' LIST OF REMAININC PATENT INFRINGEMENT CLAIMS & REOUEST FOR STATUS

CONFERENCE; Case 1:13-cv-00307-EGB Document 148 Filed 11/02/18; GOVERNMENT'S LIST OF REMAINING PATENT INFRINGEMENT CLAIMS writes: "In answer to the Court's Orders, the Government submits that the following patent allegations[2] have not been expressly addressed by the Court... [2]The cited references are the accused instrumentalities identified in Plaintiff's Fifth Amended Complaint. DKT. 120, Complaint. For clarity we have also provided the particular patents and claims of those patents that are alleged to be infringed. The list does not include instances where Plaintiff asserted dependent claims (i.e., of the dismissed '439 Patent), but did not allege infringement of the underlying independent claim." Senior Judge Eric G. Bruggink; Order; Case 1:13-cv-00307-EGB Document 151 Filed 11/28/18 writes: "Plaintiff does not dispute that the eighteen claims at issue only allege infringement of dependent patent claims. As a matter of law, infringement of dependent patent claims is insufficient to demonstrate infringement of the patent entitling Plaintiff to compensation... Since Plaintiff could not prevail on its infringement claim, there is no reason for these patent claims to proceed to claim construction. The court therefore grants defendant summary judgement regarding the eighteen patent infringement allegations at issue. The eighteen patent infringement allegations set forth in the chart at the bottom of this order are dismissed." As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439' and '990 patents and has **open the door for the continued use by the government of Plaintiff's inventions without paying just compensation**.

88.     Upon information and belief Judge Braden, in the Memorandum Opinion filed on March 29, 2018 in Case No. 13-307 C, inability to clarify exactly what infringement claims was actually dismissed for lack of jurisdiction has resulted in confusion amongst the Partes and the current presiding Judge. When Plaintiff asked Judge Braden what infringement claims were

43

dismissed for lack of jurisdiction, she couldn't provide that information (see the Transcript of August 17, 2018). Instead the Judge granted authority to the DOJ (Defendant) to pick-and-chose what infringement claims they believe were dismissed (this of course created a conflict of interest). The "Government" determined all of the fifty-nine (59) infringement claims involving the '439 patent was dismissed. When the Plaintiff provided the DOJ ("Government") with a worksheet list of all seventy-two infringement claims and ask the DOJ ("Government") to check off which of the seventy-two infringement claims was dismissed because of lack of jurisdiction the DOJ ("Government") could not provide the answers. When the Plaintiff provided the Claims Court ("Government"); Senior Judge Eric G. Bruggink presiding, with the same worksheet list of all seventy-two infringement claims and ask the Claims Court ("Government") to check off which of the seventy-two infringement claims was dismissed because of lack of jurisdiction the Claims Court ("Government"); Senior Judge Eric G. Bruggink presiding, could not provide the answers. As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439' and '990 patents and has **open the door for the continued use by the government of Plaintiff's inventions without paying just compensation**.

89.     It is the belief of the Plaintiff that Senior Judge Eric G. Bruggink has decided to continue with the "Takings" efforts of the DOJ ("Government) and the Claims Court ("Government") Judge Susan Braden. The Plaintiff has tried on several occasions to "fix" the problems by submitting Motions, only to have those Motions denied or stricken from the record. Plaintiff was also ordered not to submit any more Motions. Senior Judge Eric G. Bruggink; Order; Case 1:13-cv-00307-EGB Document 151 Filed 11/28/18 writes: "Next, to the extent that plaintiff's submission can be construed as a motion pursuant to RCFC 60(b), the court denies

plaintiff's motion for relief from the March 29, 2018 opinion granting in part defendant's motion

to dismiss. Plaintiff has not demonstrated that any of the grounds listed in RCFC 60(b)(1)-(6) are

present that would entitle him to relief from dismissal of the patent infringement allegations

addressed in that opinion…Likewise, to the extent plaintiff's submission can be construed as a

motion for reconsideration under RCFC 59(a)(1) of the March 29, 2018 opinion granting in part

defendant's motion to dismiss or the denial of plaintiff's motion for entry of a final judgement or

for a certificate of appeal pursuant to RCFC 54(b), the court denies plaintiff's motion." As a

result of the Government actions outlined above, Plaintiff believes the "Government" has

"taken" Plaintiff's '439', '189, '891, and '990 patents and has **open the door for the continued**

**use by the government of Plaintiff's inventions without paying just compensation**.

90.     It is the belief of the Plaintiff that Senior Judge Eric G. Bruggink has decided to

continue with the "Takings" efforts of the DOJ ("Government) and the Claims Court

("Government") Judge Susan Braden. The Plaintiff filed a response (Case 1:13-cv-00307-EGB

Document 156 Filed 01/09/19) to Senior Judge Eric G. Bruggink; Order (Case 1:13-cv-00307-

EGB Document 151 Filed 11/28/18). The Judge docketed the Response under "Notice" when in

fact it was a request for discovery documents. The Judge fail to "Order" the DOJ ("Government)

to produce the discovery documents. The Plaintiff writes in the response: "Before the Plaintiff

can respond to the Claim Court's order, '[i]f Plaintiff can identify post-issuance activity

incorporated within these paragraphs that is not otherwise dismissed, the court will reconsider

dismissal of those relevant portions', the Plaintiff specifically seeks all documents relating to (a)-

request for proposals or applications; (b)- the awards, contracts, agreements or grants made to the

third parties that includes the authorization and consent; (c)- the name of the products, devices,

etc. and, (d)- date of commercialization for the seventy-two products, devices, etc. The Claim

Court has provided the Government with the tools to retrieve those documents from the various Government Agencies in the past (See the December 2, 2016 Transcript) and should therefore not have a problem doing the same. Plaintiff has a right to all of the Government's discovery documents pertaining to this case, but has not yet received any." As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439', '189, '891, and '990 patents and has **open the door for the continued use by the government of Plaintiff's inventions without paying just compensation**.

91.          It is the belief of the Plaintiff that United States Court of Appeals for the Federal Circuit (CAFC) has decided to continue with the "Takings" efforts of the DOJ ("Government) and the Claims Court ("Government"). The Plaintiff filed a PETITION for Writ of Mandamus (with appendix) pursuant to Fed. R. App. P. 21 by Petitioner Larry Golden. Service: 09/28/2018 by US mail. [554658] [MJL] [Entered: 10/03/2018 04:40 PM]. The CAFC ("Government") denied the petition and writes: Mr. Golden filed this petition asking the court to either adjudicate his takings claims or to direct the Claims Court to decide them… First, Mr. Golden has not clearly and indisputably shown that the Claims Court erred in staying his takings claims. The Claims Court concluded that those takings claims appeared to be duplicative of his claims under § 1498(a). Adjudication of the takings claims could therefore await adjudication of the § 1498(a) claims. That determination has not been shown to be clearly contrary to the law or the record here. Second, Mr. Golden has not shown that any delay here on the part of the Claims Court in adjudicating Mr. Golden's claims is so egregious as to warrant mandamus relief. The Claims Court has adjudicated a number of the claims asserted by Mr. Golden and has recently sought input from the parties as to what remains and how the case should proceed. We expect that all claims in the case will now be addressed. Moreover, any delay in reaching a final

46

decision in this case is in no small way attributable to Mr. Golden's own strategy of adding claims every time he believes the government has prolonged this case. Finally, Mr. Golden has not shown entitlement to mandamus relief concerning the Claims Court's rejection of his motion to supplement his complaint, denial of his motion for summary judgment, and determinations concluding his claims, because he has not shown that an appeal after a final judgment in the case is not an adequate alternative means to obtain the relief he seeks. Plaintiff believes that at any time a case is filed by a Complainant under the statue 28 U.S.C. § 1491(a) "Government Takings of a Patent under the Fifth Amendment Clause" the Claims Court's options are to dismiss the case for lack of subject matter jurisdiction or to adjudicate the case as is. It is not within the Claims Court authority to change, at their discretion, the statue for which the Complainant has filed simply because the DOJ ("Government") and the Claims Court ("Government") believes the § 1491(a) appeared to be duplicative of his claims under § 1498(a). There were no claims under the § 1498(a) because the Plaintiff had not officially introduced any when the Judge made that decision for the Plaintiff. What law states, as the Appeals Court ("Government") has determined, "[a]djudication of the takings claims could therefore await adjudication of the § 1498(a) claims? Therefore it is contrary to the law or record. The Plaintiff has a right, according to the 28 U.S.C. § 1498(a) that states: "Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture", to continue filing infringement claims against the Government. The key word in the statue is "Whenever". It means "at any time"; at all times"; "at whatever time"; "on whatever occasion", and, it also

47

means, "a lack of restriction". It doesn't matter that the Plaintiff increased the number of infringement claims when the Claims Court ("Government") ordered the Plaintiff to do in the Amended Complaint (Dkt. No. 68, filed on 02/12/2016) and the Final Amended Complaint (Dkt. No. 120, filed on 08/10/2017). The reason for the delay in time is because the Claims Court ("Government") changed the statue. As a result of the Government actions outlined above, Plaintiff believes the "Government" has "taken" Plaintiff's '439', '189, '891, and '990 patents and has **open the door for the continued use by the government of Plaintiff's inventions without paying just compensation**. In *Horne v. Department of Agriculture,* 2012, Chief Justice Roberts, writing for the Court, cited a Supreme Court opinion from the late nineteenth century: "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation…"

<u>**RELIEF SOUGHT**</u>

92.    Plaintiff respectfully requests the following relief:

A.  entry of a judgment in favor of Plaintiff against Defendant ("Government") on all of Plaintiff's claims;

B.  entry of a judgment that Defendant has "Taken" Plaintiff's property within the meaning of the Fifth Amendment to the United States Constitution;

C.  entry of judgment awarding Plaintiff his full and just compensation, in an amount to be proven at trial, for the Defendant's ("Government") unconstitutional "taking" of Plaintiff's property, including but not limited to expected royalties and other payments related to use of the patents;

D.  an accounting for damages suffered by Plaintiff and judgment requiring Defendant ("Government") to compensate Plaintiff for such damages;

E. an award of any pre-judgment and post-judgment interest, costs, fees, expenses, and attorneys' fees to which Plaintiff may be entitled; and

F. such other and further relief as the Court may deem just and proper.

93. Plaintiff, on behalf of itself, hereby asserts that the amount claimed to be owed by Defendant ("Government") is greater than $1 billion.

## CONCLUSION

The attached Exhibits are in support of the Petitioner's 28 U.S.C. § 1491 "Gov't Takings case:

EXHIBIT 1: Copy of the Plaintiff's Disclosure Document Deposit Request (Dis. Doc. No. 565732) filed at the USPTO on 11/17/2004.

EXHIBIT 2: Requirements for a 28 U.S.C. § 1491 "Fifth Amendment Government Takings of a Patent.

EXHIBIT 3: Additional Notices given the United States.

EXHIBIT 4: Sample "Testing Mechanism" Claim Chart for the 28 U.S.C. § 1491 "Gov't Takings.

EXHIBIT 5: Copy of the list Plaintiff provided to both the DOJ ("Government") and the Claims Court ("Government"); Senior Judge Eric G. Bruggink presiding, to check off which of the seventy-two infringement claims was dismissed for lack of jurisdiction (see paragraph 88 of this document).

Volume I, Appendix 1, CD of Discovery Documents

Volume I, Appendix 2, CD of Cell-All Project

Respectfully submitted,

s/ Larry Golden

Larry Golden

Plaintiff, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

# Exhibit 5

# In the United States Court of Federal Claims

No. 19-104C
(Filed: May 14, 2019)
NOT FOR PUBLICATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

LARRY GOLDEN,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Takings; takings of intangible patented subject matter; 28 U.S.C. § 1491 (2012); 28 U.S.C. § 1498(a) (2012); subject matter jurisdiction; duplicate claims.

## ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS

Pending before the court is defendant's motion to dismiss plaintiff's complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims. The motion is fully briefed. Oral argument is deemed unnecessary. The court grants defendant's motion, because plaintiff's complaint alleges a duplicative claim over which this court lacks jurisdiction and which also fails to state a claim.

The duplicate claims arise in a different proceeding, *Golden v. United States*, No. 13-307C. In that action, Mr. Golden first alleged in 2013 that the government was infringing one of his patents under 28 U.S.C. § 1498(a) (2012).[1] The court permitted Mr. Golden to amend his complaint four times over the next four years, and Mr. Golden added more patents and claims of infringement with each amendment. After plaintiff alleged for the first time in an amended complaint that the United States had "taken" the subject matter of his at least six of his patents, the court stayed his takings claims to consider the patent infringement allegations first, because the claims appeared to duplicate each other.

---

[1] The background facts are drawn from the briefing on this motion and the procedural history developed in *Golden*, No. 13-307C.

Amid amended complaints and procedural motions, the government petitioned for *inter partes review* ("IPR") of plaintiff's '990 Patent, just one of many patents involved in these cases, before the USPTO Patent Trial and Appeal Board. The PTAB decided to initiate IPR of three independent claims of the '990 Patent. Mr. Golden made a non-contingent motion to amend those claims. The PTAB's final decision granted Mr. Golden's motion to amend, which resulted in cancellation of those three independent claims of the '990 Patent. The PTAB denied plaintiff's request for rehearing.

After plaintiff's fourth amended complaint, the government moved to dismiss certain of Mr. Golden's patent infringement claims. The court denied that motion because plaintiff had stated sufficient facts to survive a motion to dismiss. Plaintiff sought to amend his complaint yet again. The court permitted plaintiff to file a fifth complaint comprehensively stating his claims against the United States. His 2017 final complaint alleged seventy-two patent infringement counts involving approximately ten patents, along with takings claims paralleling each patent infringement claim. *Golden*, No. 13-307C, ECF No. 120. Defendant moved to partially dismiss that complaint. The court granted defendant's motion, dismissing many of plaintiff's patent infringement claims. Mr. Golden appealed the dismissal to the Federal Circuit. The Federal Circuit dismissed the appeal. Mr. Golden next petitioned the Federal Circuit for a writ of mandamus, which the Federal Circuit denied.

*Golden*, No. 13-307C, was transferred to this judge in September 2018. The court has since lifted the stay on consideration of plaintiff's takings claims. The government filed a motion to dismiss plaintiff's takings claims and the court granted that motion. *See* Order of May 8, 2019. The court also determined how many patent infringement allegations remain and dismissed counts that relied solely on dependent patent claims. Mr. Golden's remaining patent infringement claims in the related action are awaiting claim construction.

Mr. Golden filed the present claim on January 17, 2019, alleging that, under 28 U.S.C. § 1491(a), he is entitled to compensation for the unauthorized use "for and by the United States, of inventions described in and covered by [several] United States Patent[s]." Compl. 1. Plaintiff alleges that his claim arises out of the Takings Clause of the Fifth Amendment of the United States Constitution and that various arms of the government, including the Department of Justice, Department of Homeland Security, this court, the Federal Circuit, and the PTAB, have taken the subject matter of his patents. The court consolidated this action with *Golden*, No. 13-

2

307C, on January 29, because the two claims share questions of law and fact.

Plaintiff's complaint, in large part, repeats the substance of his original takings claims in *Golden*, No. 13-307C. For instance, the jurisdiction section of both complaints alleges unauthorized use by the United States of the same patents. *Comp.* Compl. 3 *with Golden*, No. 13-307C, Compl. ¶ 3. He simply adds allegations that this court, the PTAB, and the Federal Circuit, in addition to the other accused entities, have also "taken" the subject matter of his patents.

"A trial court has discretion to dismiss a complaint which simply duplicates another pending related action." *Finch v. Hughes Aircraft Co.*, 926 F.2d 1574, 1577 (Fed. Cir. 1991). Mr. Golden's complaints repeat the same substantive allegations that the United States has "taken," through unauthorized use, the subject matter of his patents. Because Mr. Golden's takings claims are duplicates, we dismiss the complaint to the extent that it alleges the same takings dismissed in *Golden*, No. 13-307C.

Even if plaintiff's complaint did not duplicate his other pending action, we must also dismiss plaintiff's takings claim for lack of subject matter jurisdiction under Rules 12(b)(1) and 12(h). Plaintiff, even though he is proceeding *pro se*, must demonstrate that the court has jurisdiction over his claim. *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 747-48 (Fed. Cir. 1988). The court accepts as true plaintiff's factual allegations but is not required to credit conclusory or frivolous statements. *Id.; see also Bell v. Hood*, 327 U.S. 678, 682 (1946).

As discussed in our order granting defendant's motion to dismiss the takings claims in *Golden*, No. 13-307C, plaintiff cannot label what amounts to a patent infringement claim a "taking" in order to proceed under this court's Tucker Act jurisdiction. The Supreme Court first held that the Tucker Act did not waive the United States' sovereign immunity for the unauthorized use of a patent in 1894. *Schillinger v. United States*, 155 U.S. 163, 168-69 (1894). Congress thereafter passed the predecessor to 28 U.S.C. § 1498(a), waiving sovereign immunity with respect to certain patent claims against the United States. Since then, patent infringement claims are pursued exclusively under § 1498(a). *Zoltek v. United States*, 442 F.3d 1345, 1350-53 (Fed. Cir. 2006) (reciting the history between *Schillinger* and § 1498 and finding that *Schillinger* remains the law), *vacated on other grounds*, 672 F.3d 1309 (Fed. Cir. 2012) (en banc). In his response, plaintiff in fact relies on *Christy, Inc. v. United States*, 141 Fed. Cl. 641, 657-60 (2019) in which this court found that "patent rights are not cognizable property interests for

3

Takings Clause purposes." This court does not have jurisdiction to decide claims for patent infringement under the Tucker Act.[2]

Finally, as we held in the related action, plaintiff fails to state a claim to the extent that his complaint alleges a taking by the actions of this court, the Federal Circuit, or the PTAB. When considering a motion to dismiss under Rule 12(b)(6), the court takes factual allegations as true and makes reasonable inferences in plaintiff's favor, but plaintiff's complaint must plead facts that demonstrate "plausibility of 'entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[L]abels and conclusions" are not sufficient to state a claim. *Twombly*, 550 U.S. at 555. Here, plaintiff must at least point to "a cognizable Fifth Amendment property interest" and a "government[] action that amount[s] to a compensable taking of that interest." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1348 (Fed. Cir. 2013).

Plaintiff appears to argue that the cancellation of his '990 independent claims in the IPR at the PTAB constitutes a taking by the PTAB. Setting aside whether an action by the PTAB could ever constitute a government taking, plainly the cancellation was the result of Mr. Golden's voluntary amendment of his claims. Nor could the actions of the Federal Circuit and this court result in a taking of patent rights. Both courts *adjudicate* rights in patents, and, in any event, as Mr. Golden himself notes, both courts have allowed his patent claims to continue in Docket No. 13-307C.

In sum, plaintiff's takings claim duplicates his related patent action in Docket No. 13-307C, asserts claims over which this court does not have jurisdiction, and fails to state a takings claim. Defendant's motion is granted pursuant to Rule 12(b)(1) and 12(b)(6). Plaintiff's complaint is therefore dismissed. The Clerk is directed to enter judgment accordingly.

ERIC G. BRUGGINK
Senior Judge

---

[2] Plaintiff is not without recourse. His remaining patent infringement claims are moving on to claim construction. *Golden*, No. 13-307C, May 8, 2019 Order at 5.

4

7018 0040 0001 1393 4304

# Exhibit 6

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF SOUTH CAROLINA - GREENVILLE

RECEIVED
USDC, CLERK GREENVILLE, SC
2019 OCT 15  AM 10: 49

LARRY GOLDEN,

        Plaintiff,

        V.

(1) APPLE INC.
(2) SAMSUNG ELECTRONICS, USA
(3) LG ELECTRONICS, USA, INC.
(4) QUALCOMM INC.
(5) MOTOROLA SOLUTIONS INC.
(6) PANASONIC CORPORATION
(7) AT&T INC.
(8) VERIZON CORPORATE SERVICES
GROUP
(9) SPRINT CORPORATION
(10) T-MOBILE USA, INC.
(11) FORD GLOBAL TECHNOLOGIES,
LLC
(12) FAIRWAY FORD LINCOLN OF
GREENVILLE
(13) GENERAL MOTORS COMPANY
(14) KEVIN WHITAKER CHEVROLET
(15) FCA US LLC
(16) BIG O DODGE CHRYSLER JEEP
RAM

        Defendants.

CASE NO: <u>6:19-cv-2557-DCC-KFM</u>

**JURY TRIAL DEMANDED**

October 14, 2019

 **COMPLAINT FOR PATENT INFRINGEMENT**

    This is an action of patent infringement in which plaintiff, Larry Golden

("Golden"), complains against defendants, Apple Inc. ("Apple"), Samsung

Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm

Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation

("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group

("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"),

Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville

("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet

("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep

Ram ("Big O") as follows:

## THE PARTIES

1.      Plaintiff Larry Golden is a citizen of South Carolina and has a

principal place of business and residence at 740 Woodruff Road, #1102,

Greenville, S.C. 29607.

2.      On information and belief, Apple is a California corporation with a

principal place of business at 1 Infinite Loop, Cupertino, CA 95014 and does

business in this judicial district by, among other things, committing jointly, directly

and/or indirectly the tort of patent infringement giving rise to this complaint. Apple

may be served at its principal place of business at 1 Infinite Loop, Cupertino, CA

95014.

3.      On information and belief, Samsung is a New Jersey corporation with

a principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey

07660 and does business in this judicial district by, among other things,

committing jointly, directly and/or indirectly the tort of patent infringement giving

rise to this complaint. Samsung may be served at its principal place of business at

85 Challenger Rd. Ridgefield Park, New Jersey 07660.

4.      On information and belief, LG is a New Jersey corporation with a

principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey

07632 and does business in this judicial district by, among other things,

committing jointly, directly and/or indirectly the tort of patent infringement giving

rise to this complaint. LG may be served at its principal place of business at 1000

Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

5.      On information and belief, Qualcomm is a California corporation with

a principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 and

does business in this judicial district by, among other things, committing jointly,

directly and/or indirectly the tort of patent infringement giving rise to this

complaint. Qualcomm may be served at its principal place of business at 5775

Morehouse Drive, San Diego, CA 92121.

6.      On information and belief, Motorola is an Illinois corporation with a

principal place of business at 500 W Monroe Street, Suite 4400, Chicago, IL

60661 and does business in this judicial district by, among other things,

committing jointly, directly and/or indirectly the tort of patent infringement giving

rise to this complaint. Motorola may be served at its principal place of business at 500 W Monroe Street, Suite 4400, Chicago, IL 60661.

7.      On information and belief, Panasonic is a New Jersey corporation with a principal place of business at Two Riverfront Plaza, 828 McCarter Hwy, Newark, NJ 07102 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Panasonic may be served at its principal place of business at Two Riverfront Plaza, 828 McCarter Hwy, Newark, NJ 07102.

8.      On information and belief, AT&T is a Texas corporation with a principal place of business at 208 S. Akard St. Dallas, TX 75202 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. AT&T may be served at its principal place of business at 208 S. Akard St. Dallas, TX 75202.

9.      On information and belief, Verizon is a New Jersey corporation with a principal place of business at 295 N. Maple Ave. Basking Ridge, NJ 07920 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Verizon may be served at its principal place of business at 295 N. Maple Ave. Basking Ridge, NJ 07920.

10.     On information and belief, Sprint is a Kansas corporation with a principal place of business at 6200 Sprint Pkwy. Overland Park, KS 66251 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Sprint may be served at its principal place of business at 6200 Sprint Pkwy. Overland Park, KS 66251.

11.     On information and belief, T-Mobile is a Washington corporation with a principal place of business at 12920 SE 38th St. Bellevue, WA 98006 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. T-Mobile may be served at its principal place of business at 12920 SE 38th St. Bellevue, WA 98006.

12.     On information and belief, Ford is a Michigan corporation with a principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan 48126 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Ford may be served at its principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan 48126.

13.    On information and belief, Fairway Ford is a South Carolina corporation with a principal place of business at 2323 Laurens Road, Greenville, SC 29607and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Fairway Ford may be served at its principal place of business at 2323 Laurens Road, Greenville, SC.

14.    On information and belief, GM is a Michigan corporation with a principal place of business at 300 Renaissance Center, Detroit, MI 48243 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. GM may be served at its principal place of business at 300 Renaissance Center, Detroit, MI 48243.

15.    On information and belief, Whitaker Chevrolet is a South Carolina corporation with a principal place of business at 2320 Laurens Rd. Greenville, SC 29607 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Whitaker Chevrolet may be served at its principal place of business at 2320 Laurens Rd. Greenville, SC 29607.

16.    On information and belief, FCA is a Michigan corporation with a principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326 and

6

does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. FCA may be served at its principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326.

17.     On information and belief, Big O is a South Carolina corporation with a principal place of business at 2645 Laurens Rd. Greenville, SC 29607 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Big O may be served at its principal place of business at 2645 Laurens Rd. Greenville, SC 29607.

## JOINDER OF PARTIES (35 U.S. Code § 299)

18.     "(a)Joinder of Accused Infringers.—With respect to any civil action arising under any Act of Congress relating to patents, other than an action or trial in which an act of infringement under section 271(e)(2) has been pled, parties that are accused infringers may be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial, only if—

(1) any right to relief is asserted against the parties jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the making, using, importing into the United States, offering for sale, or selling of the same accused product

or process; *In re EMC Corporation, Misc.* Dkt. No. 100 (Fed. Cir. May 4, 2012).

"On May 4, 2012, a Federal Circuit panel decided the circumstances when a plaintiff may join multiple defendants with unrelated products in a patent infringement suit. The court concluded that independent defendants satisfy the same transaction-or-occurrence test required for joinder when there is a logical relationship between the separate causes of action.  This occurs if there is substantial evidentiary overlap in the facts giving rise to the cause of action. That is, the defendants' allegedly infringing acts, which give rise to the individual claims of infringement, must share an aggregate of operative facts. The Plaintiff is making the argument that the defendants' in this case has satisfied the same transaction-or-occurrence test, and that substantial evidentiary overlap in the facts give rise to this cause of action: The defendants Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic all share the same or similar series of transactions or occurrences relating to the making, offering for sale, or selling of the same accused product (a smartphone—Plaintiff's CMDC device); Qualcomm provides the same or similar wireless modems, system-on-a-chip (SoC), and central processing units (CPUs) for each of the above named smartphone manufacturers relating to the making, offering for sale, or selling of the same accused process. Substantial evidentiary overlap occurs: Qualcomm supplies essential parts to the CMDC device(s) the Plaintiff is alleging the smartphone manufacturers are making; the

8

service providers (i.e. AT&T, Verizon, Sprint, & T-Mobile), are providing

essential connectivity to the CMDC device(s) the Plaintiff is alleging the

smartphone manufacturers are making, the development process of the car

manufactures (i.e. Ford, Chevrolet, & FCA), and a connected vehicle feature

offered for sale by the car dealerships (i.e. Fairway Ford, Whitaker Chevrolet, &

Big O Dodge).

(2) questions of fact common to all defendants or counterclaim defendants

will arise in the action. "[a]fter the Plaintiff's claims are construed, the claims are

compared to the accused (allegedly infringing) device or method. The Plaintiff's

invention described in the patent is not determinative – the claims set forth what is

protected. Infringement cannot be determined by comparing the Plaintiff's

invention that is disclosed in the patent to the accused device or method (an iPhone

for comparison, or a Samsung phone for comparison). For infringement to exist,

each element (or its equivalent under certain circumstances) of the claim must be

present in the accused device or method. Although the Plaintiff's patent may have

many claims, only one claim need be infringed for the patent to be infringed. In an

infringement action, this step is a question of fact."

19.    With respect to any civil action arising under any Act

of Congress relating to patents, <u>other than an action or trial in which an act of

infringement under section 271(e)(2)</u> has been pled, parties that are accused

infringers may be joined in one action as defendants or counterclaim defendants, or have their actions consolidated for trial...

Section 271(e)(2):

> (e)(2). It shall be an act of infringement to submit—(A)an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent; (B)an application under section 512 of such Act or under the Act of March 4, 1913 (21 U.S.C. 151–158) for a drug or veterinary biological product which is not primarily manufactured using recombinant DNA, recombinant RNA, hybridoma technology, or other processes involving site specific genetic manipulation techniques; (C) if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug, veterinary biological product, or biological product claimed in a patent...

20.    Joinder allows a plaintiff to aggregate multiple defendants into a single lawsuit for cost, efficiency, strategy, and other reasons. Under the Federal Rules of Civil Procedure, a plaintiff can join multiple defendants to a single lawsuit only if any claim raised against each defendant arises out of the "same transaction, occurrence, or series of transactions or occurrences."

21.     Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic induces the service provider companies (i.e. AT&T, Verizon, Sprint, & T-Mobile) to offer for sell, or sale the alleged infringement device(s). Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic induces the automobile manufacturers (i.e. Ford, General Motors, & FCA) to manufacture the hardware and develop the software that enables the alleged infringement device(s) to be interconnected and used with their vehicles offered for sell, or sold. Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic induces the car dealers (i.e. Fairway Ford, Whitaker Chevrolet, & Big "O") to offer for sell, or sale vehicles adapted to received signals from the alleged infringement device(s). "On June 2, 2014, the US Supreme Court unanimously held that a party cannot be liable for indirect infringement under § 271(b) without a threshold showing of direct infringement under § 271(a) in *Limelight Networks, Inc. v. Akamai Techs., Inc.,* No. 12–786 (2014). This opinion reverses the previous standard proffered by the federal circuit that a showing of direct infringement was not necessary so long as the patentee could demonstrate that every claimed method step was performed by entities under the control and encouragement of the accused inducer. Inducement of infringement under 35 U.S.C. § 271(b):

"[Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic], would be liable for inducement of infringement under 35 U.S.C. § 271(b) for sales

11

made by a third party of an infringing product on the marketplace after

[Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] has been duly

notified of the infringement. It seems that [Apple, Samsung, LG, Qualcomm,

Motorola, and Panasonic] has thus far somehow avoided any lawsuit

properly pleading this form of infringement, which carries the same liability

as direct infringement including injunction and damages. So the patent

owner in such a case could seek full recourse from [Apple, Samsung, LG,

Qualcomm, Motorola, and Panasonic], even where the actual direct infringer

is a foreign entity and/or judgment-proof. To prove inducement of

infringement, a patent owner must show "that the accused inducer took an

affirmative act to encourage infringement with the knowledge that the

induced acts constitute patent infringement."  This requirement resolves into

two parts: 1) inducement, and 2) knowledge. As to the first part, [Apple,

Samsung, LG, Qualcomm, Motorola, and Panasonic] offering and providing

the reach and services… to the seller of an infringing product goes beyond

the typical inducement fact pattern. [Apple, Samsung, LG, Qualcomm,

Motorola, and Panasonic] entices sellers by advertising the benefits of its

[product], it provides the very platform through which the product is

advertised and made available for sale and each sale is transacted, and it

facilitates the consummation of each sale such as by calculating and sending

net funds to the seller's account. These are affirmative acts that inherently encourage each sale, whether or not [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] also fulfills ("picks, packs, and ships") the sales itself. [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] actions may be generally directed to a class more so than particularized to a specific seller or sale, but they are no less inducements. [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] makes these inducements because it earns a significant "fee" as a percentage of each sale.  The second part of the inducement requirement means that [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] must have knowledge that a product is covered by one or more claims of a patent that the seller isn't authorized to practice. On this point it likely behooves one to retain a skilled patent attorney to ensure that [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] is given notice (letters and claim charts was mailed out to each of the smartphone manufacturing companies named in this action beginning in year 2010) that the unauthorized product is covered by specific patent claims. To preclude a defense by [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] that it didn't have adequate basis to know that a product met one or more of a patent's claims, an attorney can prepare and furnish [Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic] a letter providing a detailed

13

comparison of the elements of the claims to the parts of the infringing

product, such as with a "claim chart" and/or pictures of the product's

parts." https://www.keyip.law/amazon-can-be-sued-for-products-sold-on-its-

marketplace-that-infringe-a-patent/

## **RELATED CASES**

22.    Plaintiff Larry Golden has filed an action of patent infringement on

September 11, 2019, at the United States District Court for the District of South

Carolina; Greenville Division (Case No. 6:19-cv-2557) against defendants, Apple

Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA,

Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc.

("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"),

Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"),

T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"),

Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company

("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC

("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O").

23.    The Plaintiff has filed on August 2, 2019 in the Court of Appeals for

the Federal Circuit (Case No. 2019-2134) an appeal from the Judgement, pursuant

to the Court of Federal Claims Order in Case No. 19-104C, filed May 14, 2019,

granting Defendant's motion to dismiss the Plaintiff's "Government Takings of

Property under the Fifth Amendment Clause" claim asserted under 28 U.S.C. §

1491(a); Judge Bruggink presiding. The U.S. Court of Federal Claims has

jurisdiction pursuant to 28 U.S.C. § 1491.

24.    The Plaintiff has filed on 07/02/2019, a petition at the Patent Office

(under the Administrative Procedures Act) to withdraw / unwind the cancellation

certificate regarding the independent claims 11, 74, & 81 of the Plaintiff's

RE43,990 patent. The *Return Mail, Inc. v. United States Postal Service* decision

was based on "subject matter jurisdiction," which means it is Supreme Court law

now that the entire action against Plaintiff's patent was outside of the agency's

statutory authority. The "cure" will be to ask them to nuke the resulting

certificate. Plaintiff respectfully submitted the Petition to strike from the

prosecution file of his U.S. Patent No. RE43,990, a purported *Inter Partes Review*

Certificate, ostensibly created under 35 U.S.C. § 318(b). The USPTO lacked

statutory authorization to generate this document. The existence of the Certificate

is *ultra vires* agency authority. The fact of the Certificate being outside agency

authority only became apparent on June 10, 2019, with issuance of the Supreme

Court's opinion in *Return Mail, Inc. v. United States Postal Service*. The

Certificate is the culmination of an *inter partes review* (IPR) proceeding

commenced (unlawfully, it turns out) by an agency of the United States

government: the Department of Homeland Security ("DHS"). DHS filed its

original IPR petition in 2014, a time when the USPTO was freely accepting and ruling on Federal Government agency-filed petitions. The Plaintiff appeared *pro se* and attempted to defend his patent claims. Eventually, though, the Patent Trial and Appeal Board (PTAB) sided with the Department of Homeland Security (DHS) under the claim construction and review standards of the time, finding all three challenged claims (11, 74, & 81) unpatentable. *"It does seem like the deck is stacked against a private citizen who is dragged into these proceedings. They've got an executive agency acting as judge with an executive director who can pick the judges, who can substitute judges, can reexamine what those judges say, and change the ruling, and you've got another government agency being the prosecutor at the same time. In those situations, shouldn't you have a clear and express rule?" – Justice Sonia Sotomayor*

## JURISDICTION AND VENUE

25.    This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

26.    Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). On information and belief, each defendant has purposely transacted business in this judicial district and has committed acts of joint, direct and/or indirect infringement in this judicial district.

27.    On information and belief, each defendant is subject to this Court's specific and general personal jurisdiction, due at least to their substantial business in this forum, including: (A) at least part of their infringing activities alleged herein, and (B) regularly doing or soliciting business, engaging in others persistent causes of conduct, and/or deriving substantial revenue from goods and services provided to persons and other entities in South Carolina and this judicial district. Each defendant has allegedly used, sold, and/or offered products for sale in South Carolina and is licensed to do business in this state.

28.    The Plaintiff in any matter before any Court cannot decide jurisdiction for that particular Court. Judge Susan Braden, presiding Judge in case no. 13-307C, in June, 2016 stated she cannot precede because the Government has challenged jurisdiction. Judge Braden said she has to "stay" the case until she finds out whether or not she has jurisdiction to adjudicate the case. The Judge also said that we need to determine if the CFC has jurisdiction because if not, I (Plaintiff) may be able to file in another Court that has jurisdiction. The Government submitted its Motion to Dismiss for "Lack of Jurisdiction" and on Nov. 30, 2016 the CFC Judge Braden denied the Government's motion for the following reasons: "[t]he Government argues that, under section 1498(a), a patent owner can sue the United States for patent infringement only if the United States, a contractor, a subcontractor, a person, or a corporation uses or manufactures the patented

17

invention… [t]he Government concedes that NSF Research Grant Awards may be treated as contacts to establish jurisdiction under the Tucker Act… [u]nder the Tucker Act, the United States Court of Federal Claims has jurisdiction to adjudicate a claim if the statute, regulation, or constitutional provision that is the basis for that claim "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained… claims also allege sufficient facts to plausibly establish that the use of the accused devices was "with the authorization or consent of the Government. "Authorization or consent can be implied from the circumstances" e.g., by contracting officer instructions, [or] specifications or drawings which impliedly sanction and necessitate infringement." Hughes Aircraft Co., 534 F.2d at 901. For example, in TVI Energy Corp., the United States Court of Appeals for the Federal Circuit held that the Government impliedly sanctioned the use of a patented invention when it issued a solicitation that required bidders to submit for inspection, and perform live demonstrations of, the accused device… in this case, the relevant NSF grants anticipate that the awardees will develop and test the devices proposed in their applications… [t]he relevant NSF grants are being used to develop: "a portable smartphone attachment that can be used to perform sophisticated field testing to detect viruses and bacteria… "[a device] that derives biological signals from your smartphone's accelerometer . . . [and] [t]his information is useful to base medical diagnoses in

real-life conditions and to help track chronic health conditions and effects of

therapeutic interventions… "a cradle and app for the iPhone to make a handheld

biosensor that uses the phone's own camera and processing power to detect any

kind of biological molecules or cells… "a handheld instrument to help contain the

spread of Ebola, HIV, Tuberculosis, and Malaria… [a portable device for] real-

time detection of explosives, toxicants, and radiation… and highly sensitive rapid

medical diagnostic tests"… Government funding of research that will lead to the

development and testing of an accused device supports a reasonable inference that

the Government impliedly sanctioned infringing activity." *Judge Braden's Opinion*

*in (Case No. 13-307C; filed Nov 30 2016; Dkt. No. 94); "Memorandum Opinion*

*and Order Denying the Government's Motion to Dismiss"*

    29.    Two days after the CFC Judge Braden denied the Government's

motion to dismiss and stated the Plaintiff has proven the CFC has jurisdiction,

Judge Braden changed her mind and decided to give the Government another

chance at showing my pleading lack jurisdiction for the CFC. The Government

submitted its Motion to Dismiss for "Lack of Jurisdiction" and on March 29, 2018

the CFC Judge Braden granted the Government's motion for the following reasons:

"d. Patent Infringement Allegations Concerning The Government's Alleged Use Of

"Smartphones And Other Consumer Devices" Must Be Dismissed Under RCFC

12(b)(l) And 12(b )( 6). "[t]he Government argues that patent infringement

allegations "relating generally to smartphones and other consumer devices" should

be dismissed under RCFC 12(b )(1 ), because the… Complaint "fails to sufficiently

allege actual 'use' by the [G]overnment of the various combinations of consumer

devices, nor would the [G]overnment's use be plausible… ("Incidental benefit to

the [G]overnment is insufficient" to satisfy the requirements of 28 U.S.C. §

1498(a).)" Accordingly, these paragraphs of the… Complaint must be dismissed

under RCFC 12(b)(l). In the alternative, the Government argues that the same

allegations should be dismissed under RCFC 12(b)(6), for "improperly alleg[ing]

infringement by or for the [G]overnment in irreconcilably vague and omnibus

fashion… [c]omplaint does not contain factual allegations supporting that, "[a]s a

result of *contracts, agreements, and procurements* with various Government

Agencies … the United States has used, authorized the use, and manufactured …

Plaintiffs inventions[.]"… the allegations contained therein failed to state a claim

upon which relief may be granted and must be dismissed under RCFC 12(b)(6)…

("Incidental benefit to the [G]overnment is insufficient" to satisfy the requirements

of 28 U.S.C. § 1498(a).)." *Judge Braden's Opinion in (Case No. 13-307C; filed*

*March 29, 2018; Dkt. No. 130); "Memorandum Opinion and Order Granting-in-*

*Part and Denying-in-Part the Government's Motion to Dismiss"*

    30.    The *ONLY* reason the Plaintiff is filing in this Court at this time is

because the Court of Federal Claims has determine it lacks jurisdiction to

adjudicate the Plaintiff's claims of third party developers and manufacturers of, the

smartphone, has and possibly is, infringing the Plaintiff's CMDC device.

31.    This Court has specific jurisdiction over each defendant because each

has committed acts giving rise to this action and has established minimum contacts

within this judicial district such that the exercise of jurisdiction over each

defendant would not offend traditional notions of fair play and justice.

## GOLDEN AND THE PATENTS-IN-SUIT

32.    Plaintiff's patents involve covered and claimed inventions evolved as

a result of the patents technological "product grouping" strategies. The "product

grouping" strategies as outlined in the Plaintiff's patent specifications are: the

grouping of communication devices and products; the grouping of monitoring

devices and products; the grouping of detection devices and products; the grouping

of controlling devices and products; the grouping of stall, stop, and vehicle devices

and products; and, the grouping of disabling locking devices and products. Patent

Specifications: "[d]espite the ingenuity of the above devices, methods, and

systems, there remains a need for a multi-detector and disabling lock system for

use with various types of products collected together by common characteristics…

[i]t is another objective of the present invention to provide… products grouped

together by common features in several product groupings such as design

similarity, similarity in the presentation of security problems and similarity with

regard to the presentation of solutions to preventing terrorist solutions… the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings… utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories… Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds… system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories."

33.    Significant advancements in mobile technology have occurred since September 11, 2001, both in the advancement of the Plaintiff's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices and the infrastructures that support them.

34.    Since Golden began, his planned strategy for the CMDC device was: to have a device capable of communicating, monitoring, detecting, and controlling; to have a device capable of interconnecting with other computing devices, products, methods, and systems from various governmental agencies, industries, and private companies; to have a device capable of detecting for chemical and biological biometric signatures of humans; to have a device capable of monitoring and reporting over cellular networks, government mobile networks, satellite networks, Wi-Fi networks, and capable of viewing the environment in real time; and, to have a CMDC mobile device that can operate equally and seamlessly via traditional cellular networks, as well as with infrastructure/ad hoc wireless networks.

35.    Plaintiff's CMDC device was, and is, designed for integration with at least that of remote locking mechanisms, remote and pre-programmed stall, stop, and/or vehicle slowdown systems, and mobile detection devices (e.g. smartwatches).

36.    Plaintiff's CMDC devices are being manufactured, sold, used, and offered for sale by the alleged infringers as new and improved desktop computers, new and improved PDAs, PCs, laptops, cell phones, tablets, smartphones, and other wearables such as smartwatches, etc. Golden has obtained several United

States patents that cover various aspects of his Communicating, Monitoring, Detecting, and Controlling (CMDC) device:

37.    On December 25, 2018, the United States Patent and Trademark Office (the "PTO") issued Patent No. 10,163,287 ("the '287 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '287 Patent is attached hereto as **Exhibit A**.

38.    On March 07, 2017, the United States Patent and Trademark Office (the "PTO") issued Patent No. 9,589,439 ("the '439 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '439 Patent is attached hereto as **Exhibit B**.

39.    On August 04, 2015, the United States Patent and Trademark Office (the "PTO") issued Patent No. 9,096,189 ("the '189 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '189 Patent is attached hereto as **Exhibit C**.

40.    On February 12, 2013, the United States Patent and Trademark Office (the "PTO") re-issued Patent No. RE43,990 ("the '990 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '990 Patent is attached hereto as **Exhibit D**.

41.    On January 01, 2013, the United States Patent and Trademark Office (the "PTO") issued Patent No. RE43,891 ("the '891 Patent"), entitled "Multi

24

Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden. A true and correct copy of the '891 Patent is attached hereto as **Exhibit E**.

42.    On June 10, 2008, the United States Patent and Trademark Office (the "PTO") issued Patent No. 7,385,497 ("the '497 Patent"), entitled "Multi Sensor Detection, and Lock Disabling System", to Larry Golden. A true and correct copy of the '497 Patent is attached hereto as **Exhibit F**.

43.    Golden is the owner by assignment of all rights, title and interest to and in the '287 Patent, the '439 Patent, the 189 Patent, the '990 Patent, the '891 Patent and the '497 Patent.

## **CHALLENGE TO PLAINTIFF's '990 PATENT**

44.    Plaintiff's '990 patent has a total of 153 claims. Of the total 153 claims there are eight (8) independent claims (11, 33, 56, 74, 81, 125, 136, & 145). Of the eight (8) independent claims only three (3) claims 11, 74, & 81 was challenged by the DHS and DOJ in a Petition for *Inter Partes Review* (IPR) (it is Supreme Court law now that the entire action against Plaintiff's patent was outside of the agencies statutory authority). The DHS and DOJ challenged the Plaintiff's three (3) independent claims with three (3) references (Astrin, Breed, and Mostov) under statue 102 'anticipation' (the standard for USPTO examination for 102 'anticipation' is only one reference); eighteen (18) publications; and one Expert Declaration. The Plaintiff sent the three references; the eighteen publications; and,

one Expert Declaration over to the USPTO for examination. The USPTO said,
"none of the references and disclosures cover the Plaintiff's patents' specifications
and patent claims as a whole under 102 'anticipation' or 103 'obviousness'.
Further, it was determined the Plaintiff's patents and disclosure document filed
Nov. 26, 2004; **(Exhibit G: Disclosure Document No. 565732)** recorded at the
USPTO, all antedate the three (3) references of Astrin, Breed, and Mostov.

| Reference | Filing Date | Publication Date | Basis for anticipation |
|---|---|---|---|
| U.S. Patent Application Publication No. 2006/0250235 ("Astrin") | | 11/09/2006 | 102(b) |
| U.S. Patent Application Publication No. 2006/0181413 ("Mostov") | | 08/17/2006 | 102(b) |
| U.S. Patent provisional filing date is 01/28/2005. Application No. 11/343,560; Patent No. 7,990,270 ("Mostov") | 01/28/2005 | | 102(e) |
| U.S. Patent No. 7,961,094 ("Breed") | 11/29/2007 | | 102(e) |
| *Plaintiff's Disclosure Document filed with USPTO. Disclosure Doc. No. 565732* | *11/26/2004* | | |

45.     Plaintiff was issued the '287 patent on 12-25-2018. The patent has

two (2) independent claims similar to independent claim 11 of the '990 patent; two

(2) independent claims similar to independent claim 74 of the '990 patent; and, two

(2) independent claims similar to independent claim 81 of the '990 patent. The

Information Disclosure Statement (IDS) included the three references, eighteen

publications, and one Expert Declaration submitted in the DHS and DOJ's IPR

petition for review PTAB.

46.     Plaintiff was issued the '439 patent on 03-07-2017. The patent has

four (4) independent claims similar to independent claim 11 of the '990 patent. The

Information Disclosure Statement (IDS) included the three references, eighteen

publications, and one Expert Declaration submitted in the DHS and DOJ's IPR

petition for review at the PTAB.

47.     Plaintiff was issued the '189 patent on 08-04-2015. The patent has

three (3) independent claims similar to independent claim 11 of the '990 patent;

three (3) independent claims similar to independent claim 74 of the '990 patent;

and, three (3) independent claims similar to independent claim 81 of the '990

patent. The Information Disclosure Statement (IDS) included the three references,

eighteen publications, and one Expert Declaration submitted in the DHS and

DOJ's IPR petition for review at the PTAB.

48.     Plaintiff was issued the '189 patent on 08-04-2015. The patent has

three (3) independent claims similar to independent claim 11 of the '990 patent;

three (3) independent claims similar to independent claim 74 of the '990 patent;

and, three (3) independent claims similar to independent claim 81 of the '990

patent. The Information Disclosure Statement (IDS) included the three references,

eighteen publications, and one Expert Declaration submitted in the DHS and

DOJ's IPR petition for review at the PTAB.

49.     Plaintiff submitted a continuation application [16/350,638] that was

filed on 12-19-2018. The application has two (2) independent claims similar to

independent claim 11 of the '990 patent. (In the non-final rejection issued on 07-

09-2019, the Examiner only requested terminal disclaimers, there was no

objections based on prior art references that the Plaintiff needed to respond too).

The Information Disclosure Statement (IDS) included the three references,

eighteen publications, and one Expert Declaration submitted in the DHS and

DOJ's IPR petition for review at the PTAB.

50.     Plaintiff submitted a patent application for re-issue of patent '439

[16/350,874] that was filed on 01-25-2019. The re-issue patent application has

forty (40) dependent claims similar to the dependent claims of independent claims

11, 74, and 81 of the '990 patent. The re-issue patent application has a total of 110

claims. Of the total 110 claims there are nineteen (19) independent claims similar

to the independent claims 11, 74, & 81 of the '990 patent. The Information

Disclosure Statement (IDS) included the three references, eighteen publications,

and one Expert Declaration submitted in the DHS and DOJ's IPR petition.

51.    Challenges made by the Defendants' to Plaintiff's patents asserted in

this complaint be made on the heightened standard of "clear and convincing

evidence". The challenge cannot be made by the lesser standard of "preponderance

of evidence", and cannot be based on an IPR "Final Written Decision" when it is

Supreme Court law now that the entire action against Plaintiff's patent claims (11,

74, & 81 of the '990 patent) was outside of the agencies statutory authority.

## CLAIM CONSTRUCTION

*"Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;*

Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written

Decision entered on October 1, 2015. "In the 'Decision to Institute', we construed

certain claim terms. Those constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11-16

"No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them… [w]e further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10-11. Based on the record adduces during trial, we see no need to construe any other terms…"

52.    "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of *a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site* for monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product grouping category of design similarity (e.g., computer terminal, personal computer (PC))…." Patent Owner contends that this new language is consistent with words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." *Id.* Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type

of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." *"Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015.

## FRCP RULE 11(b): REPRESENTATIONS TO THE COURT

53.    The Plaintiff hereby certifies that to the best of Plaintiff's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that the correspondence from the Plaintiff, cited by the United States Court of Federal Claims; (1) was not presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and, (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or

later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances…

## INTENT TO FORCE DEFENDANTS TO INCUR LEGAL FEES

54.    On information and belief, each defendant has unjustly benefited or profited (i.e. unjust enrichment) at the Plaintiff's expense without making restitution for the reasonable value of any property, services, or other benefits that have been unfairly received and retained. On information and belief, each defendant has infringed Plaintiff's inventions covered in a patent(s), and each defendant has purposely violated the antitrust federal and state laws from business transacted in this judicial district and has committed acts of joint, direct and/or indirect infringement and antitrust law violations in this judicial district.

55.    It is the belief of the Plaintiff that the non-movants (i.e. defendants) in most cases of alleged patent infringement, put forth strategies to incur legal cost and fees to the movant (i.e. plaintiff). An example of this type of behavior can be viewed in *Larry Golden v. The United States*, CFC Case No. 13-307C. During the first 12 months of filing the DOJ and Trial Court delayed the case by repeatedly asking for and being granted motions for a more definitive statement; the following 18 months the Plaintiff spent defending certain patent claims of his '990 patent at the PTAB in response to a frivolous IPR petition; after that the Plaintiff spent 19

32

months proving jurisdiction. After six years the CFC Trial Court have not ordered the DOJ to present any prior art references to challenge the validity of Plaintiff's patent claims, or ordered the DOJ to respond to the Plaintiff's claim charts to show non-infringement. The DOJ and Trial Court has cost the Plaintiff hundreds of thousands of dollars litigating this case. Therefore, in this action Plaintiff don't quite understand how the Plaintiff, whose personal net worth is less than $100K, can incur legal fees upon the multi-million and multi-billion dollar corporations named in this action. It is the prayer of the Plaintiff that this Court won't allow the defendants named in this action to repeat the same behavior of delaying this case to incur upon the Plaintiff unnecessary cost.

56.    If the International Trade Commission (ITC) can conduct an investigation and determine whether there's patent infringement in nine to twelve months then so too can the District Courts. The major difference between the ITC and the District Courts is, the ITC doesn't allow for negative procedural posture that is generated outside the need to show valid patents and infringement or lack thereof.

57.    The actions and behavior of the Defendants has cost the State of South Carolina billions in taxable revenue.

58.    According to Statista.com, the total United States Smartphone Sales for years 2007 thru 2019 is $536.32 billion US dollars: "[t]his statistic shows the

value of smartphone sales in the United States from 2007 to 2018 and also includes

a forecast for 2019. In 2019, the revenue from smartphone sales is projected to

amount to 77.5 billion U.S. dollars". Statista.com, August 30, 2019, Smartphone

sales in the United States from 2005 to 2019 (in billion U.S. dollars). Retrieved

from: https://www.statista.com/statistics/191985/sales-of-smartphones-in-the-us-

since-2005/

59.    The report, titled "The Smartphone Royalty Stack: Surveying Royalty

Demands for the Components within Modern Smartphones", has finally tagged a

dollar amount to what consumers pay toward royalty fees. The figure comes to

about $120 for a hypothetical smartphone that costs $400. This means that 30

percent of a device's cost goes to royalty payments, which is almost equal to the

price of the phone's physical components. Retrieved

from: https://www.digitaltrends.com/mobile/400-smartphone-pay-120-patent-

royalties-research-claims/

60.    Considering the data from above ¶¶ 53-54, if the companies had

entered into a licensing agreement for 2/3 the 30% (20%) for royalty payments to

the Plaintiff on the sale of the smartphones for years 2007 thru 2019 ($536.32B);

the estimated royalty payments to the Plaintiff equals $107.26B. What does that

means to the State of South Carolina? $107.26B subject to a South Carolina state

tax rate of 7.5% equals $8.04B in state tax revenues.

61.     What does that mean for the State of South Carolina? THE

FINANCIAL STATE OF SOUTH CAROLINA; September, 2019:

"A new analysis of the latest available audited financial reports found South

Carolina has a Taxpayer BurdenTM of $14,500, earning it a "D" grade from

Truth in Accounting. South Carolina's overall financial condition improved

by 17 percent from the previous fiscal year. South Carolina's elected

officials have made repeated financial decisions that have left the state with

a debt burden of $21.8 billion. That burden equates to $14,500 for every

state taxpayer. South Carolina's financial problems stem mostly from

unfunded retirement obligations that have accumulated over the years. Of

the $43 billion in retirement benefits promised, the state has not funded $14

billion in pension and $11.1 billion in retiree health care benefits."

62.     If the smartphones manufactures at least satisfies the $107.26B

royalty liability for the sale of the smartphones alone, the estimated $8.04B in state

tax revenue could be used to pay off 37% of the State of South Carolina's debt

burden. The above estimates does not include future royalties from the smartphone

manufacturers; the settlement amount and future royalties from the service

providers; and the settlement amount and future royalties from the automobile

manufacturers and automobile dealers.

63.     If the named Defendants want to limit cost, the Defendants needs to submit and enter their defense to invalidate Plaintiff's patents on a "clear and convincing evidence" standard; submit and enter their non-infringement defense; and/or submit and enter any indemnification agreements made between the defendants, indemnifying a defendant from liability for the making, offering to sell, or selling an infringing product or device. The submissions should be made immediately.

64.     The Plaintiff's conception date is September 11, 2001 for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device needed to administer Plaintiff's three "economic stimulus packages". A documentary video CD is included as **Exhibit H: CMDC Conception CD**.

## SIGNIFICANT HISTORICAL EVENTS

65.     After the events of 9/11 the Plaintiff introduced to the United States ("government") three economic stimulus and terrorism prevention packages: The packages were titled: the "ATPG" project; the "SafeRack" project; and the "V-Tection" project. The Plaintiff submitted the packages to President Bush and his administration, the U.S. Senators and U.S. Congressmen that was in office during the Bush administration beginning in the year 2003. Beginning in year 2004, the Government began enforcing and administering the Plaintiff's intellectual property subject matter strategies. The packages outlined how the Government could

stimulate the economy following the 9/11 attacks and provide protection against future terrorist activities.

**The "ATPG" Project:**

66.     Significant advancements in mobile technology have occurred since September 11, 2001, both in the advancement of the Plaintiff's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices and the infrastructures that support them.

67.     The Plaintiff's planned strategy for the CMDC device was to: have a device capable of communicating, monitoring, detecting, and controlling; have a device capable of interconnecting with other computing devices, products, methods, and systems from various governmental agencies, industries, and private companies; have a device capable of detecting for chemical, biological, radiological, nuclear, explosives, and humans; have a device capable of monitoring and reporting over cellular networks, government mobile networks, satellite networks, Wi-Fi networks, and capable of viewing the environment in real time; and, for example, CMDC mobile devices that can operate equally and seamlessly via traditional cellular networks, as well as with infrastructure/ad hoc wireless networks.

68.     More specifically the Plaintiff's CMDC device was, and is, designed for integration with any of the products grouped under this "ATPG" project, the

"SafeRack" project, and the "V-Tection" project. The CMDC device was designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across all industries, agencies, groups, demographics, race, ages, and gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment to prevent terrorist activity.

69.    Upon information and belief of the Plaintiff the Department of Homeland Security (DHS) entered into cooperative agreements with Apple, Samsung, LG, and Qualcomm under the DHS Cell-All solicitation for the development of Plaintiff's CMDC device described in the Plaintiff's intellectual property subject matter. **Exhibit I: DHS Cell-All video CD**

70.    "Verto Analytics looked at the numbers of Apple, Samsung, and LG (CMDC devices) smartphones currently owned by U.S. consumers, and the equivalent market share. January 2018, Apple leads the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, has 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market. The Government later entered into contracts with Panasonic and Motorola for the use of their versions of CMDC devices (i.e. smartphones, laptops, tablets, etc.)

71.    The Plaintiff's claimed intellectual property subject matter

antiterrorist technology products, devices, etc. can be placed in, on, upon, or

adjacent any of the Plaintiff's claimed Communicating, Monitoring, Detecting, and

Controlling (CMDC) devices that is equivalent to a new and improved personal

digital assistance (PDA), a new and improved personal computer (PC), a new and

improved laptop, a new and improved cell phone, a new and improved tablet, a

new and improved smartphone, and other new and improved wearables (i.e.

pagers, watches, etc.), as they all are grouped together by common features of

design similarities. The Plaintiff's CMDC devices can be placed in, on, upon, or

adjacent; vehicles, locks, medical equipment, detection devices, stall/stop systems.

72.    One of the strategies outlined in the ATPG package was the

development of a Communicating, Monitoring, Detecting, and Controlling

(CMDC) device that is capable of connecting and grouping various products,

devices, methods, systems, networks, etc. for communicating, monitoring,

detecting, and controlling. Beginning in the year 2008, the Government entered

into R&D contracts and cooperative agreements for the development and

commercialization of the CMDC device(s). The contracts and cooperative

agreements for the development of the CMDC device(s) offered protection from

being directly sued for infringement to Apple, Samsung, LG, Qualcomm,

Panasonic, and Motorola.

73.    The Government's request for a communicating, monitoring,

detecting, and controlling (CMDC) device in the form of an improved cell phone,

smartphone, laptop, or tablet to be used for the benefit of the public is significantly

the same or equivalent to the Plaintiff's intellectual property subject matter and

claimed CMDC device(s). The specifications and capabilities of the CMDC

device(s) developed and/or manufactured by Apple, Samsung, LG, Qualcomm,

Panasonic, and Motorola for the Government, are significantly the same as the

Plaintiff's CMDC device(s) as illustrated below:

- Communication: at least one of a satellite connection, Bluetooth connection,
  WiFi connection, internet connection, cellular connection, long and/or short
  range radio frequency (RF) connection, or GPS connection was "taken" for
  the benefit of the Government and for Government "use".

- Monitoring: at least one of a viewing screen for monitoring in real time,
  viewing screen monitoring for CBRNE-H signal alerts, viewing screen
  monitoring for CBRNE-H color coded indicator lights, or viewing screen
  monitoring for tracking, alerts, and heart rate. Turn on chem/bio heart rate
  notifications, so you know if your heart rate remains above or below a chosen
  beats per minute (BPM), or check for an irregular heart rhythm.

- Detecting: at least one of a chemical sensor, a biological sensor, an
  explosive sensor, a human sensor, a contraband sensor, or a radiological
  sensor; that is wired or wireless, capable of being disposed within, on, upon
  or adjacent the CMDC device. *Apple Watch*: "Apr 8, 2019 - The two sensors
  could also be used to detect pollution or carbon monoxide, patents
  from Apple that suggest the company might be working on chemical smell

... devices, which could mean phones, tablets or smartwatches." Article: *New patents suggest Apple wants to teach your Watch to smell, which...* Retrieved from: https://www.mobihealthnews. com/.../new-patents-suggest-apple-wants-teach-your-wat... You can also check your chem/bio heart rate any time using the Heart Rate app.

- Controlling: at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween, for sending signals to at least lock or unlock doors, stall, stop, or slowdown vehicles, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems.

74.    The security features of the Government's CMDC device are significantly the same as the Plaintiff's CMDC device as illustrated below:

- Biometrics: that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and or signature or a face recognition to at least gain access to the CMDC device or to prevent unauthorized use of the CMDC device.

- Lock, Unlock, Disabling Lock: the CMDC device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks after a certain number of failed attempts to unlock.

- Near-Field Communication: Near Field Communication or NFC is a short-range communication channel. The purposes for this technology is to simplify first-time connections to other wireless technologies, like Wi-Fi and Bluetooth. Near Field Communication in a CMDC device can be used as part of a two-factor access control system for unlocking a door. Biometric Fingerprint recognition is used for authentication and NFC is used to

transmit authentication information to a computer controlling the door. NFC is preferred over RFID because RFID has a frequency vulnerable for detonating bombs.

- Location and Tracking: The CMDC tracking is a process for identifying the location of the device, whether stationary or moving. Localization may be effected by a number of technologies, such as using multi literation of radio signals between (several) cell towers of the network and the device, or simply using GPS. Some GPS CMDC devices use wireless-assisted GPS to determine the user's location. In wireless-assisted systems, the device uses the orbiting GPS satellites in conjunction with information about the device's signal. Sometimes called enhanced GPS, wireless-assisted GPS can often get a fix on the user's location faster than a GPS-only receiver. Some wireless-assisted systems can work inside buildings, under dense foliage and in city areas where traditional receivers cannot receive signals. GPS-enabled CMDC devices with view screens can often display turn-by-turn directions as well as announce them through the device's speaker. A database of maps is used to provide the directions. The CMDC device locator provides GPS coordinates and can dial emergency CMDC device numbers. The Government, parents and caregivers can track the device's location by device or online and can receive notification if it leaves a designated "safe area."

75.    The Government's CMDC device comprising a stop, stall, or vehicle slowdown mean; and, the CMDC device being interconnected to the vehicle to control certain operating systems, are significantly the same as the Plaintiff's device as illustrated below:

- Stall, Stop, Slowdown: the CMDC device being equipped to send signals to vehicles (i.e. driver, driverless, autonomous, unmanned aerial, unmanned land, unmanned sea, boats, trucks, etc.) that engages the computer, electrical, fuel, and/or air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to vehicle brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

- Vehicle Operating Systems: ignition start/stop, door lock/unlock, temperature settings and temperature on/off, vehicle brakes, foot peddle, lights, speed controls, and steering.

76.     As a result of the Government sharing Plaintiff's intellectual property subject matter with at least that of Samsung, Apple, LG, Qualcomm, Panasonic and Motorola for the development, manufacture, and commercialization of mobile devices which are substantially the same as Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices: the economic impact is a reduction in value of the Plaintiff's property and by virtue of the access, disclosure, use with the public, and in some instances manufacture and development by or for the Government and its third party awardees; has destroyed the Plaintiff's competitive edge; has resulted in the development and manufacture products, devices, methods, and systems for public use without paying any compensation to Plaintiff; has had a substantial adverse impact (means unfavorable or harmful) on Plaintiff; has prevented the successful development of Plaintiff's CMDC device in accordance with the "reasonable investment-backed expectations" of the Plaintiff; and, the

character of the Defendants' actions was triggered when the Defendants caused a permanent invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property. Some examples are:

77.    It is the belief of the Plaintiff that the U.S. Government Accountability Office, in accordance with the most recent OMB estimate, the federal government spends about $1.2 billion annually on about 1.5 million mobile (CMDC) devices and associated services. View GAO-15-431. For more information, contact Carol R. Cha at (202) 512-4456 or chac@gao.gov.

78.    It is the belief of the Plaintiff that in 2008, the DHS S&T entered into what's known as cooperative research and development agreements with four cell phone (CMDC) manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. Information taken directly from the Department of Homeland Security's website.

79.    It is the belief of the Plaintiff that in 2012, "the U.S. Department of Defense granted two separate security approvals for Samsung's Galaxy (CMDC) smartphones, along with (CMDC) iPhones and iPads running Apple's latest operating system—moves that would boost the number of U.S. government

agencies allowed to use those (CMDC) devices. An approval by the Pentagon is considered as the highest standards in security."

80.    It is the belief of the Plaintiff that in 2013, the U.S. Department of Defense dropped its exclusive BlackBerry contract and opening all of its (CMDC) mobile communications networks to Apple, Google, and other (CMDC) device makers. 'The Department of Defense is taking a leadership role in leveraging (CMDC) mobile device technology by ensuring its workforce is empowered with (CMDC) mobile devices, Defense Department Chief Information Officer Teri Takai said in a statement..."

81.    It is the belief of the Plaintiff that in 2014; by the Defense Information Systems Agency (DISA) opening its networks to Samsung and Apple (CMDC) devices, Defense DISA will broaden the variety of mobile (CMDC) computers that troops and civilian Defense Department employees can use in the field, on bases, in offices and elsewhere to receive and send information and work almost anywhere at any time.

82.    It is the belief of the Plaintiff that in 2014, Samsung has announced that five of its Galaxy (CMDC) devices have been approved for the U.S government's Defense Information System Agency (DISA) products list. All of them are using Android 4.4 (KitKat) along with Samsung's KNOX secure

workspace platform, which includes system-level encryption for enterprise-based apps.

83.    It is the belief of the Plaintiff that in 2014, the United States Air Force replaced 5000 legacy BlackBerry smartphones with Apple's (CMDC) iPhones. The announcement, reported by Defense News, comes as the future of BlackBerry within the Department of Defense is debated, with the chips seeming to fall on the side of transitioning away from a network supporting a mish-mash of BlackBerry devices to a mix of modern (CMDC) devices — though apparently without BlackBerry 10 in that mix.

84.    It is the belief of the Plaintiff that in 2015, the Navy Enterprise Networks (NEN) Program Office made a transition to Android and iOS (CMDC) devices. Early users will be able to choose between the (CMDC) iPhone devices, but the Navy wants to be as flexible as possible and allow users to pick the (CMDC) devices that will work best for them. Approval of the (CMDC) iPhone 6 and iPad Air was made in Feb. 2015, and approval to use the Samsung Android (CMDC) phones and tablets was made in March.

85.    It is the belief of the Plaintiff that in 2016, is the fiscal year Marines received Samsung (CMDC) smartphones that make calling for fire support easier, quicker and more accurate.

86.    As a result of the manufacture, development, offer to sell, sell, or use, of Plaintiff's CMDC devices, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O") has destroyed any competitive edge the Plaintiff may have had for owning the patent rights to the CMDC (i.e. smartphones, laptops, tablets, etc.) devices, and is therefore being "unjustly enriched".

87.    The doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation. In New York, the elements of an unjust enrichment claim are "that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).

47

88.    Unjust enrichment is defined as a method of recovery when a "person has been unjustly enriched at the expense of another[,]" and thus the enriched party is required to make restitution to the other party.  Put another way, it is an equitable principle to ensure "the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." Unjust enrichment is only available in the absence of an express contract.  Stated differently, a plaintiff cannot recover damages for unjust enrichment if he can recover damages for breach of a contract regarding the same act(s).  For this reason, unjust enrichment is often referred to as a "contract implied in law."

89.    Upon information and belief the network service providers for ubiquitous (universal, global, etc.) coverage that is being unjustly enriched as a result of Plaintiff's CMDC devices are AT&T, Verizon, Sprint, and T-Mobile.

90.    It is the belief of the Plaintiff that at least that of Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic began in at least year 2007, the manufacture, development, and use of Plaintiff's CMDC devices (also included are Plaintiff's new and improved smartphones, laptops, tablets, etc.) while under contract with the Federal Government. Section 28 U.S.C. § 1498(a) states:

"Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's

remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture."

91.    This statute does two things: first, it acts as a waiver of the government's immunity, and second, it operates an assumption of liability by the government, thus insulating the government contractor itself from liability. However, during an earlier stage of *Zoltek Corporation v. United States* (Fed. Cir. 2012), the government argued that because the process was partially performed abroad, it did not fall under Section 1498(a). In a 2006 opinion (*Zoltek III*), a panel of the Federal Circuit agreed, and held that the scope of 1498(a) was limited to direct infringement under 35 U.S.C. § 271(a).  Because 271(a) does not include manufacturing processes that are begun abroad and completed in the United States, the court concluded that the United States had not assumed liability under 1498(a).

92.    It is the belief of the Plaintiff that Apple, Samsung, LG, Qualcomm, Motorola, and Panasonic began in at least year 2007, to manufacture at least one process of Plaintiff's CMDC device abroad to avoid liability under Section 1498(a). It wasn't until *Zoltek Corporation v. United States* (Fed. Cir. 2012) that the "loop hole" was closed, "we hold that for the purposes of section 1498, the use or importation 'within the United States [of] a product which is made by a process patented in the United States' constitutes use of the invention without lawful right because the products embody the invention itself." 672 F.3d 1326. It is further the

belief of the Plaintiff that each Defendant saturated the market with the

manufacture, use, offer to sell, or sell of Plaintiff's CMDC devices between the

years of 2007 and 2012 because the "loop hole" existed. As long as the "loop hole"

existed the Defendants could not be held liable for patent infringement and was not

obligated to enter into a licensing agreement with the Plaintiff.

**The "SafeRack" Project:**

93.     Every dollar spent fighting the war on terrorism is a stunning blow to

world productivity and could well be echoed in a slow-down in the economy,

which means higher inflation rates and higher unemployment, followed by a

lowered standard of living. The events of September 11 were, indeed, attacks on

the Nation's economy and on a way of life. The events of 9/11 effectiveness must

be judged in terms of not only lost lives, but also lost livelihoods. Moreover, new

enemies, aware as never before of our society's vulnerabilities, may well attempt to

exploit them in the years ahead. That's why the Plaintiff's coordinated campaign,

introduced as his intellectual property subject matter, to combine terrorism

prevention with economic growth became so crucial. The Plaintiff have ample

precedent for such a campaign. In previous years, the U.S. government has come to

recognize that many military technologies are too expensive to build independently

and are best developed in tandem with civilian applications. Often called "dual-

use" technologies, they have included the integrated circuit.

94.     The Plaintiff's "dual-use technologies" strategies described in his intellectual property subject matter, offer dual economies in the war on terrorism. The strategies are designed to reduce costs by increasing production volume. But just as important, they expand the base of researchers, developers, designers, testers and users, thus greatly expanding the number of smart people evaluating and improving them. Cheaper products and more brainpower—a powerful one-two punch. Saving lives, saving money and saving the environment in one program is the purpose of the Plaintiff's strategies outlined in the "SafeRack" project.

95.     The roll of Congress and the various government agencies (i.e. DHS, DoD, ARL, NRL, DARPA, FEMA, etc.) in the Plaintiff's coordinated campaign, introduced as his intellectual property subject matter, was to create a national and world demand for the research, development, and commercialization of the various antiterrorist technologies introduced as the Plaintiff's intellectual property subject matter. Congress and the various government agencies was tasked with giving full attention to promoting antiterrorist technologies that follow two fundamental guidelines. First, the Plaintiff's technologies should be designed to deny terrorists tools and targets. Second, the Plaintiff's technologies should not be an economic burden on society; they must have a broad and substantial impact on commerce and productivity.

96.    The Plaintiff's coordinated campaign, introduced as his intellectual property subject matter, include "Product Grouping" strategies.  The strategies are to group anti-terrorism wearables (i.e. new and improved smartphones, smartwatches, etc.), networked systems, devices, detection devices, and scanners with communication methods like GPS, radio-frequency (RF), near-field communication (NFC), cellular towers, navigation, internet, wireless, telematics, satellite, alarms, and wired communication to deter and/or prevent terrorist acts, activities or threats while making it economically feasible for commercialization.

97.    The strategy is to group by design similarities of common features, the Plaintiff's intellectual property subject matter antiterrorist technologies into categories based on similarities of security problems, similarities of solutions, similarities of design, similarities of materials, similarities of cost, similarities of technical advancement capabilities, and similarities of availability. *The strategy is centered on creating demands which encourages competition and by mass-producing, can significantly reduce cost.* The advantages of the Plaintiff's intellectual property subject matter "Product Grouping" strategies are: products uniform, greater specialization, optimum utilization of workers and machinery, low production cost per unit, low stock-piling cost, production control is simplified, high sales turnover, and equipment standardized. The strategies are designed to stimulate the economy.

98.     The Government's implementation of the Plaintiff's intellectual property subject matter antiterrorist technology strategies, as part of the "SafeRack" project, gave society interchangeable, integrable sensors and detectors that offer improved dynamic response, greatly reduced size, high precision, increased reliability, specific design, high sensitivity, simplicity, low cost, quick response, low power requirement, that can be micro-machined and mass-produced. The sensors and detectors can be mass-produced in the millions at low prices, which is the main appeal.

99.     The Plaintiff's claimed intellectual property subject matter antiterrorist technology products, devices, etc. can be placed in, on, upon, or adjacent any of the products listed in any of the product grouping categories of: Product grouping 1 (storage & transportation); Product grouping 2 (sensors); Product grouping 3 (detector case; modified and adapted); Product grouping 4 (monitoring & communication devices); Product grouping 5 (communication methods); Product grouping 6 (biometrics); Product grouping 7 (authorized person); Product grouping 8 (chemical / biological / biometric / human heart rate); Product grouping 9 (processors) Product grouping 10 (locking mechanisms); and, Product grouping 11 (stall-to-stop / slowdown means).

100.    The Plaintiff's claimed intellectual property subject matter antiterrorist technology products, devices, etc. can be placed in, on, upon, or

adjacent any of the Plaintiff's claimed Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, to include a new and improved personal digital assistance (PDA), a new and improved personal computer (PC), a new and improved laptop, a new and improved cell phone, a new and improved tablet, a new and improved smartphone, and other new and improved wearables (i.e. pagers, watches, etc.) as they all are grouped together by common features of design similarities.

101.    The "SafeRack" project allows us to group and integrate past government initiatives, current government initiatives and future government initiatives. When an announcement or solicitation is made by the various government agencies (i.e. DHS, DoD, ARL, NRL, DARPA, FEMA, etc.) that a large number of vulnerable places will be equipped with security devices that has an open platform for integrating chemical, biological, explosive, human, radiation, and nuclear sensors and detectors, the industry for developing the needed sensors and detectors will began producing high quality, low cost detectors and sensors to meet that demand. Satisfying and meeting the demand has stimulated the economy.

102.    Unique within the Plaintiff's intellectual property subject matter antiterrorist technologies for meeting the government's standards and requirements for antiterrorist devices to be used with the public, is the Plaintiff's intellectual property subject matter "disabling locking mechanisms". The Plaintiff's

intellectual property subject matter includes grouping the "disabling locking mechanisms" by common features of design similarities for: products that do not have locks (e.g. mail drop boxes, newspaper vending boxes, trash cans, etc.); products that have locks (e.g. cargo containers, mini-storage houses, warehouses, lockers, cluster mail boxes, keyed mail boxes, trailers, etc.); products that have biometric locks (e.g. airport lockers, vehicles, smartphones etc.); and, products that have locks and are mobile (e.g. cars, trains, ships, mail carriers, planes, trucks, vans, buses, campers, etc.).

103.   It is the belief of the Plaintiff that certain members of Congress who entered into an implied-in-fact contract with the Plaintiff and who forwarded the Plaintiff's intellectual property subject matter over to the Department of Homeland Security for procurement has violated state and federal antitrust laws. The members are: the Honorable Senator Fritz Hollings (05/21/2003); the Honorable Senator Fritz Hollings (10/01/2003); the Honorable Senator Lindsey Graham (10/21/2003); the Honorable Senator Jim DeMint (08/01/2004). The Executive Branch: the Office of the Vice President, Dick Cheney (06/03/2003); the Office of the President, George Bush (06/20/2005).

104.   Upon information and belief the result of the Government has entered into contracts with third-party contractors (i.e. Samsung, Apple, LG, Qualcomm, Panasonic and Motorola) for the development, manufacture, and

commercialization of mobile devices which are substantially the same as Plaintiff's

communicating, monitoring, detecting, and controlling (CMDC) devices is a

violation of certain antitrust laws. Examples of the Government contracting with

third party contractors for the development and commercialization of Plaintiff's

CMDC (smartphone) device; capable of detecting for WMDs and hazardous agents

and compounds, are illustrated below:

105.   Upon information and belief, the US Department of Homeland

Security (DHS), NASA's Ames Research Center, (the United States), entered into

cooperative agreements (contracts) with Qualcomm Inc., LG Electronics, Apple

Inc., and the Samsung Group after receiving several notices of Plaintiff's

intellectual property for the development and commercialization of the "Cell-All:

Synkera MikroKera Ultra". The "Cell-All: Synkera MikroKera Ultra" is a low-

cost, low-power, high-speed nanosensor-based chemical sensing chip which

consists of 64 nanosensors to detect deadly gases and plugs into an Apple iTouch

30-pin dock connector. The new device is able to detect and identify chemicals in

the air using a "sample jet" and sends detection data to another phone (e.g. Apple

iPhone) or a computer via telephone communication network or Wi-Fi. Additional

monitoring equipment for this "Cell-All" project is at least a Samsung Galaxy s6

smartphone that has an Android operating system (O/S).

106.   Upon information and belief, the U.S. Army Edgewood Chemical Biological Center (ECBC), the U.S. Army Communications-Electronics Research, Development and Engineering Center (CERDEC), and the Defense Threat Reduction Agency (DTRA), (the United States), entered into a contract(s) with Samsung after receiving several notices of Plaintiff's intellectual property for the development and commercialization of the "Biotouch System / Nett Warrior Smartphone System". The U.S. Army developed a biological and chemical detection system. They developed volatile organic compound (VOC) strips that work with a device called a Biotouch. Biotouch relays information from VOC strips and sends results to a Nett Warrior Samsung Galaxy Note II smartphone, Defense Systems reports.

107.   Upon information and belief, the US Department of Homeland Security (DHS), (the United States), entered into a contract(s) with Samsung after receiving several notices of Plaintiff's intellectual property for the development and commercialization of the "PositiveID / Firefly DX Samsung Galaxy s6 Smartphone". The PositiveID's (PSID) M-BAND was developed by MicroFluidic Systems ("MFS") subsidiary; received funding in excess of $30 million from the Department of Homeland Security (DHS). Firefly DX, builds upon technology advances achieved in development of M-BAND system. Firefly Dx overview: Miniaturized version of M-BAND using same technologies, real-time PCR

detection; Hand-held detection provides sample purification and biological

analysis; A two-part device consisting of a portable handheld instrument with

wireless communication and disposable single-use cartridges all analytical

elements; Data processed in real time and communicated to PC or smartphone

(e.g., Galaxy s6) using mobile applications and cloud storage; Has the ability to

detect and identify common pathogens and diseases as various strains of influenza,

E.coli, MRSA and human papilloma virus ("HPV").

108.   It is the belief of the Plaintiff that the Plaintiff's proposed plan for

government spending on the "war on terrorism" has stimulated our Nation's

economy in the way of increased jobs, and increased revenue for the private sector

which results in increased tax revenue received by the government:

109.   "In the summer of 2017, the Stimson Center convened a nonpartisan

study group to assess the adequacy and transparency of federal efforts to gather

and report data on government wide spending on counterterrorism (CT). Stimson's

research shows that total federal spending – including spending for government

wide homeland security efforts, international programs, and the wars in

Afghanistan, Iraq, and Syria – totaled $2.8 trillion for fiscal years 2002 through

2017. CT spending peaked at $260 billion in 2008 at the height of the wars in

Afghanistan and Iraq. This represents a 16-fold increase over the pre-9/11 total. In

2017, as war funding declined, total CT spending equaled $175 billion, nearly an

11-fold increase from the 2001 level. With this growth, CT spending has become a substantial component of total discretionary spending for programs across a wide range of areas, including defense, education, and medical research. With total U.S. discretionary spending of more than $18 trillion over fiscal years 2002-2017, CT spending made up 15 percent of the total during that period. At its peak in 2008, CT spending amounted to almost 22 percent of total discretionary spending. By 2017, CT spending had fallen to 14 percent of the total."

110.   The Plaintiff must have given the Government notice and have established an implied-in-fact contract(s) with the Government for Plaintiff's intellectual property subject matter: Six months after the DHS was established on November 25, 2002; and, after the Plaintiff had given the Government notice, the Plaintiff received response letters as **Exhibit J: Response Letters**

111.   On May 21, 2003 from the Honorable Senator Fritz Hollings stating, "I have contacted the Department of Justice and the Department of Homeland Security to try to be of assistance";

112.   On June 3, 2003 from the Office of the Vice President, Dick Cheney stating, "[y]our correspondence has been forwarded to the Department of Homeland Security for review. You will hear back directly from the Department";

113.    On October 1, 2003 from the Honorable Senator Fritz Hollings stating, "[t]hank you for contacting me regarding your difficulty with receiving a response from the Department of Homeland Security";

114.    On October 21, 2003 from the Honorable Senator Lindsey Graham stating, "I have contacted the Department of Homeland Security on your behalf. I have asked that they review your request and respond directly to you";

115.    On January 24, 2005 the Honorable Senator Jim DeMint introduced Plaintiff's intellectual property subject matter in a Bill. "S. 3 (109th Congress); January 24, 2005. 1st Session 1. Short Title 'Protecting Americans in the War on Terror Act of 2005' was a bill in the United States Congress".

116.    On June 20, 2005 from the Office of the President, George Bush stating, "[t]hank you for your letter regarding homeland security technology procurement. Please know I have forwarded it to the Department of Homeland Security for review and response".

117.    *Implied-in-Fact Contracts:*

"Williston (1920) moved away from contracts implied by law, saying: "Contracts are express when their terms are stated by the parties. Contracts are implied when their terms are not so stated." This implied-in-fact idea was recognized in *Baltimore & Ohio R. Co. v. United States*, 261 U.S. 592 (1923), where, in interpreting a Federal statute, the court defined an "implied contract" under the

statute to mean "an agreement 'implied in fact' founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." Justice Steakley, of the Texas Supreme Court, wrote that "[o]ur courts have recognized that the real difference between expressed contracts and those implied in fact is in the character and manner of proof required to establish them." *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972).

http://www.orsinger.com/PDFFiles/the-Rise-of-American-Contract-Law.pdf

118.   *Breach of Implied-in-Fact Contracts*:

"To sue the United States for congressional interference with a contract right (public or private), the United States must have waived its sovereign immunity: the United States is immune from suit except as it consents to be sued; *Library of Congress v. Shaw*, 478 U.S. 310, 315 (1986); *United States v. Mitchell*, 463 U.S. 206, 211 (1983). This waiver/consent precondition applies to both breach of contract claims and takings claims; *See, e.g., Perry v. United States*, 294 U.S. 330, 352 (1935) (breach of contract claims). The consent to suit has been given, in both cases, in the form of the Tucker Act; 28 U.S.C. § 1491(a)(1). The Tucker Act gives the U.S. Court of Federal Claims jurisdiction over "claims" against the United States "founded either upon the Constitution… or upon any express or implied

contract with the United States ….." The phrase "upon the Constitution" plainly

includes takings claims against the United States—important not only for

jurisdictional reasons, but because the Takings Clause of the Fifth Amendment is

not construed to contain its own waiver of sovereign immunity. The waiver comes

only from the Tucker Act. As for breach of contract actions, the phrase "upon any

express or implied contract" states the Tucker Act's coverage of such actions

explicitly. However, the phrase "implied contract" has been limited by case law to

contracts implied in fact, excluding contracts implied in law. As mentioned,

plaintiffs filing breach of contract complaints against the United States often add a

takings claim under the Fifth Amendment Takings Clause. The Takings Clause is

relevant because contract rights generally are deemed to constitute "property" as

that term is used in the Takings Clause. *See, e.g., United States Trust Co. v. New

Jersey*, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as

such may be taken … provided that just compensation is paid."), and *Lynch v.

United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether

the obligor be a private individual, a municipality, a State, or the United States.")

A breach by the United States, therefore, can be argued to constitute a taking of

one's property in a contract right. http://nationalaglawcenter.org/wp-content

/uploads/assets/crs/R42635.pdf

119.    As a result of the Government sharing Plaintiff's intellectual property subject matter with at least that of the Defendants for the development, manufacture, and commercialization of antiterrorism devices and mobile devices which are substantially the same as Plaintiff's antiterrorism devices for communicating, monitoring, detecting, and controlling: the economic impact is a reduction in value of the Plaintiff's property and by virtue of the access, disclosure, use with the public, and in some instances manufacture and development by or for the Government and its third party awardees; has destroyed the Plaintiff's competitive edge; has resulted in the development and manufacture products, devices, methods, and systems for public use, without paying any compensation to Plaintiff; has had a substantial adverse impact (means unfavorable or harmful) on Plaintiff; has prevented the successful development of Plaintiff's antiterrorism devices and CMDC devices in accordance with the "reasonable investment-backed expectations" of the Plaintiff; and, the character of the Defendants' actions was triggered when the Defendants caused a permanent invasion of the Plaintiff's property and eliminated all economically beneficial uses of such property.

**The "V-Tection" Project:**

120.    Under the vehicle protection ('V-Tection') project it was the Government's responsibility to institute mandates for the Plaintiff's intellectual

subject matter "stall, stop, and vehicle slow-down systems (SSVSS)" for

Government, private, and consumer vehicles.



121.   Taken from 9/11, the Plaintiff's intellectual subject matter pre-

programmed stall, stop, and vehicle slow-down systems, if applied, possibly could

have prevented the terrorist from taking over the planes because the aircraft would

have been on an autonomous or pilotless flight pattern. If the plane deviated away

from the perimeters established within the flight pattern, the control tower would

receive an alert. If the pre-programmed stall, stop, and vehicle slow-down systems does not control the plane away from a crash and toward a safe landing, the personnel in the control tower has the ability to take control of the plane and steer it to a safe landing (i.e. remote air satellite or cellular).

122.   Some of the Plaintiff's intellectual subject matter pre-programmed stall, stop, and vehicle slow-down systems include: lane departure stall, stop, and vehicle slow-down systems; unintended acceleration stall, stop, and vehicle slow-down systems; adapted cruise control stall, stop, and vehicle slow-down systems; reverse acceleration stall, stop, and vehicle slow-down systems; pre-crash stall, stop, and vehicle slow-down systems; and/or, a crowd sourcing stall, stop, and vehicle slow-down systems.

123.   The operators (i.e. drivers, pilots, conductors, consumers, etc.) are equipped with the Plaintiff's intellectual subject matter CMDC devices (new and improved desktop computers, new and improved PDAs, PCs, laptops, cell phones, tablets, smartphones, and/or other wearables such as smartwatches, etc.) that are interconnected to vehicles' operating systems for initiating a stall, stop, and vehicle slow-down.

124.   The Plaintiff's intellectual property subject matter includes technology to ensure the Government and law enforcement has a way to stop, stall, or slow a vehicle down. The Government and law enforcement MUST have a way

to control the stopping, stalling, and slowing down the autonomous or driverless vehicles (e.g. unmanned land, air, and sea vehicles). This capability is for vehicles equipped with the Plaintiff's programmed systems but have been hacked or overridden. It also include vehicles that have been stolen, vehicles used for kidnapping, or vehicles used as a weapon of mass destruction (WMD).

125.    Some of the Plaintiff's intellectual property subject matter stall, stop, and vehicle slow-down systems intended for Government and law enforcement includes sending signals over cellular or by satellite. The Government can also send signals by way of electromagnetic pulse, electrostatic discharge, microwave beam, or radio frequency using a handheld or some other CMDC device such as a new and improved smartphone, laptop, or tablet.

126.    The result of the Government sharing Plaintiff's intellectual property subject matter with various Government Agencies (i.e. TSA, DoD, DHS), and private industry for the development, manufacture, and commercialization of stall, stop, and vehicle slow-down systems for Government and consumer vehicles. The Government and private industry's SSVSSs are substantially the same as the Plaintiff's intellectual property subject matter stall, stop, and vehicle slow-down systems for Government and consumer vehicles. Examples are illustrated below:

127.    *Connected Vehicles: Connecting through such service providers as defendants AT&T, Verizon, T-Mobile and Sprint.*

"There are already millions of connected cars on the road and most of them connect over the same cellular network your phone does. In 2016, for the first time, cellular connections for cars grew at a faster rate than new phone connections. The Kymeta Corporation is delivering the next generation of the connected car. The company has developed a service called KĀLO, making it possible to gain access to satellite connectivity to deliver seamless, global internet access. It works just like a cellular plan for your car but, because it can use satellite networks, it works even where there are no cell towers."

https://spacenews.com/ satellites-and-the-connected-car/

128.   *American Vision for Safer Transportation through Advancement of Revolutionary Technologies Act or the AV START Act.*

"This bill: (1) establishes a framework for a federal role in ensuring the safety of highly automated vehicles (HAVs); (2) preempts states from adopting, maintaining, or enforcing any law, rule, or standard regulating an HAV or automated driving system (ADS) regarding certain safety evaluation report subject areas; (3) sets forth conditions under which HAVs may be introduced into interstate commerce for testing, evaluation, or demonstration; and (4) applies certain safety exemptions to HAVs. The Department of Transportation shall: (1) establish a technical committee on HAV and ADS safety, (2) establish a working group on ADS education efforts, and (3) research the traffic safety implications of

67

HAVs. Each HAV or ADS manufacturer shall execute a written plan for identifying and reducing cybersecurity risks."

https://www.congress.gov/bill/115th-congress/senate-bill/1885

129. *USDOT Automated Vehicles Activities:*

"The U.S. Department of Transportation (USDOT) is committed to facilitating a new era of transportation innovation and safety and ensuring that our country remains a leader in automation. The Department of Transportation is acting as a convener and facilitator, partnering with a broad coalition of industry, academic, states and local, safety advocacy, and transportation stakeholders to support the safe development, testing, and deployment of automated vehicle technology. U.S. Department of Transportation invites public comment on the document, Preparing for the Future of Transportation: Automated Vehicles 3.0 (AV 3.0) [ISBN 978-0-16-094944-9]. This document builds upon Automated Driving Systems: A Vision for Safety 2.0 (ADS 2.0) and expands the scope to provide a framework and multimodal approach to the safe integration of AVs into the Nation's broader surface transportation system."

130. *Government's stall, stop, or vehicle slowdown systems:*

"1- Eureka Aerospace High Powered Electromagnetic System, or HPEMS; 2- Laser Weapons System (LaWS); 3- ATHENA (Advanced Test High Energy Asset); 4- Counter-Electronics High-Powered Microwave Advanced Missile

Project (CHAMP); 5- Northrop Grumman X-47B UCAS & X-47B Control Display Unit (CDU); 6- Boeing MH-6 Little Bird Helicopter; 7- K-Max Self-flying Helicopter; 8- Oshkosh Defense Autonomous Unmanned Ground Vehicle (UGV) "TerraMax; and, 9- Dream Hammer's "Ballista" Software for Computer, Tablet or Smartphone."

131.    Upon information and belief, the Government (the United States) has entered into contracts and agreements for the development of stall, stop, and vehicle slowdown systems (SSVSS) that's interconnected to at least one CMDC device of a new and improved smartphone, tablet, or laptop, supplied by at least that of Apple, Samsung, LG, Qualcomm, Motorola, or Panasonic (e.g. defendants), and, is serviced by at least the of AT&T, Verizon, Sprint, or T-Mobile. After several notices from the Plaintiff the Government and several third parties (e.g. defendants) continues to violate antitrust laws by taking the Plaintiff's intellectual property subject matter and using it for the benefit of the public without paying the Plaintiff compensation. The SSVSSs are at least those of the Eureka Aerospace High Powered Electromagnetic System, or HPEMS; the Laser Weapons System (LaWS); the ATHENA (Advanced Test High Energy Asset); the Counter-Electronics High-Powered Microwave Advanced Missile Project (CHAMP); the Northrop Grumman X-47B UCAS & X-47B Control Display Unit (CDU); the Boeing MH-6 Little Bird Helicopter; the K-Max Self-flying Helicopter; the

Oshkosh Defense Autonomous Unmanned Ground Vehicle (UGV) "TerraMax;

and, the Dream Hammer's "Ballista" Software for Computer, Tablet or

Smartphone.

132.  It is the belief of the Plaintiff that the Plaintiff's proposed plan for

government spending on "vehicles' occupied, autonomous vehicles, and driverless

vehicles" has stimulated our Nation's economy in the way of increased jobs, and

increased revenue for the private sector which results in increased tax revenue

received by the government:

> "With automakers and technology companies rushing to develop self-driving
> cars, the Obama administration on Thursday pledged to expedite regulatory
> guidelines for autonomous vehicles and invest in research to help bring them
> to market. Until now, the federal government has taken a hands-off approach
> to regulating new technology that allows vehicles to operate independently
> and without an actual driver. But in an announcement here at the North
> American International Auto Show, Transportation Secretary Anthony Foxx
> said the government would remove hurdles to developing autonomous
> vehicles and set further guidelines for them within six months. "We are
> bullish on autonomous vehicles," Mr. Foxx said. The actions we are taking
> today brings us up to speed." The government's new support includes a
> request in President Obama's proposed budget for the next fiscal year for $4
> billion, to be spent over 10 years, to finance research projects and
> infrastructure improvements tied to driverless cars. Mr. Foxx said that
> autonomous vehicles had the potential to reduce traffic accidents and
> significantly improve safety on America's roads. He estimated that as many

as 25,000 deaths could have been avoided last year if driverless technology had been in widespread use."

133.   It is the belief of the Plaintiff that significant advancements in SSVSS technology and CMDC mobile technology that has occurred since September 11, 2001. Plaintiff also believes that significant advancement in antitrust law violations has occurred since September 11, 2001 by the defendants named in this complaint.

134.   As a result of the manufacture, development, offer to sell, sell, or use, of Plaintiff's SSVSSs and CMDC devices, at least that of Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O") has destroyed any competitive edge the Plaintiff may have had for owning the patent rights to the SSVSSs (i.e. remote air SSVSS, remote ground SSVSS, and pre-programmed automatic SSVSS) and CMDC devices (i.e. smartphones, laptops, tablets, etc.), and therefore being "unjustly enriched" by violating certain antitrust laws. The Plaintiff owns at least six patents that covers extensively Plaintiff's SSVSSs and CMDC devices:

135.   On December 25, 2018, the United States Patent and Trademark Office (the "PTO") issued Patent No. 10,163,287 ("the '287 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

136.   On March 07, 2017, the United States Patent and Trademark Office (the "PTO") issued Patent No. 9,589,439 ("the '439 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

137.   On August 04, 2015, the United States Patent and Trademark Office (the "PTO") issued Patent No. 9,096,189 ("the '189 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

138.   On February 12, 2013, the United States Patent and Trademark Office (the "PTO") re-issued Patent No. RE43,990 ("the '990 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

139.   On January 01, 2013, the United States Patent and Trademark Office (the "PTO") issued Patent No. RE43,891 ("the '891 Patent"), entitled "Multi Sensor Detection, Stall to Stop and Lock Disabling System", to Larry Golden (Plaintiff).

140.    On June 10, 2008, the United States Patent and Trademark Office (the "PTO") issued Patent No. 7,385,497 ("the '497 Patent"), entitled "Multi Sensor Detection, and Lock Disabling System", to Larry Golden (Plaintiff).

141.    The Plaintiff is the owner by assignment of all rights, title and interest to and in the '287 Patent, the '439 Patent, the 189 Patent, the '990 Patent, the '891 Patent and the '497 Patent.

142.    Plaintiff first contacted GM/OnStar during the summer months of 2007 to ask if they would like to participate with Plaintiff in responding to a Department of Homeland Security (DHS) solicitation: (Broad Agency Announcement; BAA 07-02A).  The Plaintiff's primary contact person at GM/OnStar was Mr. Jim Culbertson. The Plaintiff asked Mr. Culbertson if GM/OnStar has the capability of bringing a moving vehicle to a stall, stop, or slowdown.  Mr. Culbertson's response to me was, "I need time to find out if we have those capabilities and if there is interest from upper management".

143.    After several conversations and several failed attempts to reach Mr. Culbertson, Plaintiff never heard back from GM/OnStar. Plaintiff noticed while watching TV, an announcement made by GM/OnStar on October 9, 2007 of a new, "Stolen vehicle slow down system" that was being offered by GM/OnStar beginning in the following year on their 2009 models. GM/OnStar's "Stolen vehicle slow down system" is substantially the same as the Plaintiff's "stall, stop,

and vehicle slowdown systems (SSVSS)" that Plaintiff had discussed earlier with GM/OnStar's Mr. Culbertson during the summer months of 2007.

144.   Plaintiff called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791.  Mr. Culbertson referred Plaintiff to Angie Miller at 313-665-1485. When Plaintiff dialed Ms. Miller's number, the answering machine for a Michelle came on; therefore, Plaintiff did not leave a message. On April 14, 2008, Plaintiff faxed a letter to the General Motors Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several members of the General Motors leadership team, to include, Mr. Frederick A. Henderson, President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel. The contents of the letter are stated below:

> I've made several attempts to contact Representatives of GM. I talked with and forwarded information to a few Representatives of both OnStar and GM last year during the months of March and April of 2007.
>
> "I shared with them technology I had at that time "patent pending" that is designed to stop moving vehicles. I wanted OnStar and GM to collaborate with me in responding to a Government solicitation.
>
> I tried again to contact OnStar and GM when you made the announcement on October 8, 2007 of having technology that will stop moving vehicles which caused your share price to move upward $4 dollars over the next 4 days (value, $2.2 billion).

I need to know if you have a patent for the technology. If you do, please send that information to me. My Patent Attorney and the PTO didn't find one. My patent application and all the claims have been allowed by the PTO.

If I don't hear back from you in a couple of days, my plans are to do a cease-and-desist for the 2 million, 2009 vehicles you have scheduled to roll out with that technology."

145.    Plaintiff filed a complaint against GM/OnStar on February 11, 2010 with the U.S. SECURITIES AND EXCHANGE COMMISSION; Atlanta Regional Office.  Plaintiff's compliant was, "GM/OnStar made an announcement to the general public of technology they knew that was patent pending in an effort to prime the market, thus causing GM shares to experience a four dollar per share increase over a four day period".  The SEC file number is ARO-00022399.

146.    Plaintiff filed a complaint against GM/OnStar on February 16, 2010 with the Federal Trade Commission; Bureau of Competition; Office of Policy and Coordination.  Plaintiff compliant was, "GM/OnStar stole the technology Plaintiff presented to them".  The FTC file number is 25448002.

147.    Plaintiff filed a complaint against GM/OnStar on February 16, 2010 with the South Carolina Department of Consumer Affairs.

148.    *GM Bailout:*

"The federal government took over GM and Chrysler in March 2009. The Government fired GM CEO Rick Wagoner. GM entered bankruptcy on June 1,

2009. By the end of July, GM emerged from bankruptcy reorganization, became two separate companies and spun off GMAC into Allied Financial. The Treasury Department began selling off its ownership of GM in 2010. The Obama administration used the take-over to set new auto efficiency standards design to improved air quality and forced U.S. automakers to be more competitive against Japanese and German firms. On December 18, 2014, the Treasury Department ended the bailout. That's when it sold its last remaining shares of Ally Financial, formerly known as General Motors Acceptance Corporation. It had bought them for $17.2 billion to infuse cash into the failing GM subsidiary. The Treasury Department sold the shares for $19.6 billion, making a $2.4 billion profit for taxpayers. On June 1, 2009, GM entered bankruptcy. It had $82 billion in assets and $172.8 billion in liabilities. That month, sales hit their low point of 9.545 million cars and trucks. The government lent GM $30.1 billion to fund operations through June and July while it went through bankruptcy reorganization. It also guaranteed GM's extended warranties. In return, it bought 60 percent of the company in warrants for common stock and preferred stock. The Canadian government bought 12 percent. A union health trust received 17.5 percent stock ownership. That was in lieu of the $20 billion needed to cover benefits for 650,000 retirees. Bondholders received 10 percent stock ownership in lieu of $27 billion in bonds. Stockholders lost all their investment. GM promised to repay the $30

billion loan by 2012 when it planned to break even. The company pledged to cut its debt by $30 billion by converting debt ownership for equity. It agreed to pay union health care benefits to retirees by 2010. It promised to sell its Saab, Saturn, and Hummer divisions, reducing the number of models for sale to 40. It shut down 11 factories, closed 40 percent of its 6,000 dealerships, and cut more than 20,000 jobs. Government funding also provided the following incentives for new car buyers: The government backed all new car warranties; the economic stimulus bill allowed new car buyers to deduct all car sales and excise taxes; Congress approved TARP-funded subsidies of zero percent financing for some Chrysler vehicles. The government intended to make GM more efficient. That would allow it to become profitable when sales returned to 10 million vehicles a year. That happened in July 2009, when sales hit 10.758 million. GM emerged from bankruptcy on July 10, 2009, as two separate companies. Old GM held most of the debt. New GM held the assets, $17 billion in debt, the contract with unions, and its underfunded pension funds. This allowed it to move forward as a profitable company. The new company only has four brands: Chevrolet, Cadillac, GMC, and Buick. The company sold Saab and discontinued Saturn and Hummer. In April 2010, New GM repaid its $6.7 billion TARP loan. In November 2010, Treasury revealed it would sell half its ownership of GM. That sale allowed an initial public offering on the stock market of $33 a share. It had already gotten back $37.2

billion by selling its ownership in GM. In November 2013, the Treasury

Department announced it would sell its remaining 31.1 million shares in GM. In

December 2014, Treasury sold its remaining shares in Ally Financial."

file:///C:/Users/Owner/Documents/Auto%20Industry%20Bailout%20(GM,%20Chr

ysler,%20Ford).html

149.     *Chrysler Bailout*

"The federal government took over Chrysler in March 2009. The Government

required Chrysler to merge with Italy's Fiat S.p.A. Chrysler entered bankruptcy on

April 3, 2009. By the end of July, Chrysler emerged from bankruptcy

reorganization and became a brand owned mostly by Fiat. Chrysler paid off the last

of its loans by 2011. On January 16, 2009, the Treasury Department approved

a $1.5 billion loan for Chrysler Financial. The interest rate for the loans was

one point above Libor. In return, Chrysler Financial promised to pay the

government $75 million in notes and reduce executive bonuses by 40 percent. As a

result, car buyers got zero percent financing for five years on some models.

Chrysler received $4 billion of the $7 billion bridge loan it originally requested. In

return, its owner Cerberus vowed to convert its debt to equity. Chrysler had also

asked for $6 billion from the Energy Department to retool for more energy

efficient vehicles. Chrysler wanted the Big Three to partner with the federal

government in a joint venture to develop alternative energy vehicles. That didn't

happen, and Chrysler didn't get the loan from the Energy Department. Instead,
it pledged to debut an electric vehicle in 2010 and ramp up its production to
500,000 by 2013. On April 30, 2009, Chrysler filed for bankruptcy. Treasury
Secretary Tim Geithner agreed to lend it $6 billion to fund operations while in
bankruptcy. It emerged as a new company, 58.5 percent of which automaker Fiat
S.p.A. of Italy now partly owned. This Fiat-Chrysler merger created the world's
sixth largest automaker. The rest was owned by the United Auto Workers Retiree
Medical Benefits Trust. Chrysler closed underperforming dealerships as part of its
bankruptcy proceedings. In May 2011, Chrysler repaid $11.2 billion of its
outstanding $12.5 billion in TARP loans six years ahead of schedule. Total cost to
taxpayers was $1.3 billion. In 2013, Fiat CEO Sergio Marchionne announced plans
to take Chrysler public on the New York Stock Exchange. This allowed Fiat to
purchase the rest of the company and merge the two into a more competitive global
automaker. In October 2014, it was listed under the ticker symbol "FCAU." The
new company was called Fiat Chrysler Auto Company N.V. Its 2017 market
capitalization was $17 billion."

file:///C:/Users/Owner/Documents/Auto%20Industry%20Bailout%20(GM,%20Chr
ysler,%20Ford).html

150.    *Ford Bailout*

"Ford Credit received its bailout from the Term Asset-Backed Securities Loan Facility, not TARP. That was a government program for auto, student, and other consumer loans. Although Ford did not receive TARP funds, it did receive government loans. These were critical because banks were not lending during the financial crisis. It requested a $9 billion line-of-credit from the government. In return, it pledged to spend $14 billion on new technologies. On June 23, 2009, Ford received a $5.9 billion loan from the Energy Department's Advanced Technology Vehicles Manufacturing program. In return, it pledged to accelerate development of both hybrid and battery-powered vehicles, close dealerships, and sell Volvo. It upgraded factories in Illinois, Kentucky, Michigan, Missouri, and Ohio to produce hybrid vehicles. Ford used the funds to switch its focus to commercial electric vehicles. In 2016, CEO Mark Fields said, "We want to become a top player in electrified solutions. The company wants to lead…we can win such as with our commercial vehicles." Eighty-one percent of the funds went to create new efficiency technologies for gas-powered vehicles. For example, they helped fund Ford's aluminum bodies in the F-series pickups. The Congressional Research Service estimated the loans saved 33,000 jobs. Ford will repay this loan by 2022. Many argue that Ford needed the funds to sustain its cash flow during the recession. Ford says it was in better shape than the other two (e.g. GM and FCA) because it had mortgaged its assets in 2006 to raise $23.6 billion. It used

the loans to retool its product lineup to focus on smaller, energy efficient vehicles. It got the United Automobile Workers to agree it could finance half of a new retiree health care trust with company stock. By April 2009, it retired $9.9 billion of the debt it had taken out in 2006."

file:///C:/Users/Owner/Documents/Auto%20Industry%20Bailout%20(GM,%20Chrysler,%20Ford).html

151.    The U.S. government's $80.7 billion bailout of the auto industry lasted from December 2008 to December 2014. The U.S. Department of the Treasury used funds from the Troubled Asset Relief Program. In the end, taxpayers lost $10.2 billion.

152.    The "Big Three" (defendants: GM, FCA USA, and Ford) automakers asked Congress for help similar to the bank bailout. They warned that General Motors Company and Chrysler LLC faced bankruptcy and the loss of 1 million jobs. The Ford Motor Company didn't need the funds since it had already cut costs. But it asked to be included so it wouldn't suffer by competing with companies who already had government subsidies. The Treasury Department lent money and bought stock ownership in GM and Chrysler. It provided incentives to spur new car purchases. In effect, the government nationalized GM and Chrysler just as it did Fannie Mae, Freddie Mac, and the American International Group. The main purpose of the bailout was to save jobs at GM. But GM had to slash its

employment and production anyway. Toyota and Honda continued to increase their

U.S. factories, providing jobs for American auto workers. If there had been no

bailout, Ford, Toyota, and Honda would have picked up even more market

share. Since they had U.S. plants, they would have increased jobs for Americans

once the recession was over. The loss of GM would be like the loss of Pan Am,

TWA, and other companies that had a strong American heritage but lost their

competitiveness. It would have perhaps tugged at the heartstrings of America but

not really hurt the economy. As a result, the auto industry bailout was not critical

to the U.S. economy, like the rescue of AIG or the banking system.

file:///C:/Users/Owner/Documents/Auto%20Industry%20Bailout%20(GM,%20Chr

ysler,%20Ford).html

153.    *Promoting Innovation through Patent and Antitrust Law and Policy:*

*CHRISTINE A. VARNEY, Assistant Attorney General, Antitrust Division U.S.*

*Department of Justice; Remarks as Prepared for the Joint Workshop of the U.S.*

*Patent and Trademark Office, the Federal Trade Commission, and the Department*

*of Justice on the Intersection of Patent Policy and Competition Policy;*

*Implications for Promoting Innovation. Alexandria, Virginia / May 26, 2010 /*

*"The United States Department of Justice (DOJ)"*

"Invention and innovation are critical in promoting economic growth, creating

jobs, and maintaining our competitiveness in the global economy. In fact, a recent

PTO report estimates that innovation accounts for fully three quarters of our nation's post-World War II growth. Progress in technology and production processes drives prices down and quality up, while expanding the range of consumer choices. Many of the greatest benefits of invention and innovation are hard to measure—the value of technologies that alleviate illness and extend our lives that deliver food and water to vulnerable populations, that allow us to respond to natural disasters, and that allow families separated by oceans to connect face-to-face cannot be quantified in dollars and cents alone. In short, innovation is the essential element not only of economic growth, but of human progress as well. We thus have a vital interest in seeing it flourish. Today, it is widely recognized that patent and antitrust drive innovation in different but complementary ways. Both disciplines promote dynamic efficiency: that is, a system of property rights and market rules that create appropriate incentives for invention, innovation, and risk taking—delivering the greatest returns for society not just for today, but tomorrow as well. The patent grant does this by providing incentives for inventors to take risks and make investments in research and development. Patents transform a claimed piece of intellectual progress into a property right, allowing the inventor to exclude others from using that invention during the term of the patent. Our intellectual property framework further advances follow-on innovation through public disclosure of the invention. Antitrust law core mission is to appropriately

foster and protect the competitive environment by preventing certain conduct that threatens free markets. This environment is what pushes companies to constantly innovate and allows them to profit when they do. Antitrust recognizes the critical role that intellectual property rights play in driving innovation and so values these rights. Yet antitrust applies the same analytical framework to intellectual property as it does to other forms of property, and imposes some rules about how the patent monopoly can—and cannot—be used. Thus, antitrust and patent law work together to create and preserve the appropriate incentives for technological progress by creating property rights and preserving competition around those rights. The stakes are high for competition and innovation if the patent system is not working properly or antitrust enforcement policy is improperly calibrated. Our ability to use one regime to correct for shortcomings in the other is limited. This is what makes sessions like today's so important. The competitive implications of flaws in either system are tremendous, and although many of the issues on the table today are properly issues of only patent or antitrust in the first instance, their ramifications for the other system will certainly be worth consideration in the final analysis. That is why I believe it is important for the Department of Justice to participate regularly in intellectual property cases-such as in *Bilski, Quanta, eBay v. MercExchange*, the Google Books settlement dispute, and, recently, *Arkansas Carpenters Health (the "Cipro" case)*. It is also why both the Antitrust Division of

the Department of Justice and the Federal Trade Commission devote substantial thought to these issues, including the agencies' joint antitrust guidelines for the licensing of intellectual property in 1995, the FTC's substantial 2003 report on patent law and policy, and the agencies' joint workshops and 2007 report on the intersection of antitrust and intellectual property law and policy. Though the issues we will be considering are difficult ones, I am confident that by promoting an ongoing dialogue and even closer working relationship among all of our agencies, we will find ways to make sure our tools work together to further our common goal of promoting innovation and competition. American patent law's devotion to "the progress of science and the useful arts" is as old as the Constitution itself. I am committed to making sure that antitrust equally promotes such progress."

https://www.justice.gov/atr/speech/promoting-innovation-through-patent-and-antitrust-law-and-policy

154.   It is the belief of the Plaintiff that the Defendants named in this complaint: Apple, Samsung, LG, Qualcomm, Motorola, Panasonic, AT&T, Verizon, Sprint, T-Mobile, GM, Whitaker Chevrolet, Ford, Fairway Ford, FCA, and Big O, has violated certain antitrust laws that protects the Plaintiff from anticompetitive behavior, and the Plaintiff's "right to exclude others" in a patent grant owned by the Plaintiff (see the related case filed in the United States District Court of South Carolina; Greenville Division; Case No. 6:19-cv-2557).

## COUNT I
### (Infringement of the '287 Patent)

155.   Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-154.

156.   Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claim 4 & 5 of the '287 patent that covers Plaintiff's communication, monitoring, detecting and controlling (CMDC) device. **Exhibit K: Claim Chart for the '287 Patent**

157.   On information and belief, Apple is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, and Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Apple is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

158.    On information and belief, Apple is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, and Apple Watch series 3, 4, & 5) included without limitation the Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Apple is thereby liable for

infringement of the '287 patent pursuant to 35 U.S.C. § 271. Apple have caused

damage to Golden, which infringement and damage will continue unless and until

Apple is enjoined.

159.    The alleged infringement of Apple identified in this Count has caused

irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a

permanent injunction is warranted and such a remedy would be in the public

interest.

160.    On information and belief, Samsung is jointly, directly and/or

indirectly infringing at least claim 5 of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, making,

using, offering for sale, selling and/or importing computerized communications

devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy

Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2

series) included without limitation Plaintiff's CMDC devices. As set forth in

Golden's preliminary infringement contentions that Samsung is making, using,

offering for sale, selling and/or importing of the CMDC device have at a minimum

directly infringed the '287 patent and Samsung is thereby liable for infringement of

the '287 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to

Golden, which infringement and damage will continue unless and until Samsung is enjoined. **Exhibit M: Claim Chart for Samsung Electronics, USA.**

161.    On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Samsung is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

162.    The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

163.    On information and belief, LG is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, & LG Watch Sport, LG Watch 7) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and LG is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which

infringement and damage will continue unless and until LG is enjoined. **Exhibit N:**

**Claim Chart for LG Electronics, USA, Inc.**

164.  On information and belief, LG is jointly, directly and/or indirectly

infringing at least claim 5 of the '287 patent in this judicial district and elsewhere

in South Carolina and the United States by, among other things, making, using,

offering for sale, selling and/or importing computerized communications devices

(i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG

Watch 7) included without limitation Plaintiff's CMDC's global positioning

system (GPS) used with CMDC devices for locating and tracking; the CMDC's

internet used with CMDC devices for mobile internet to fit the dimensions of a

CMDC device; the CMDC's central processing unit used with CMDC devices for

mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /

biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that LG is making, using, offering for sale, selling and/or

importing of the CMDC device have at a minimum directly infringed the '287 patent and LG is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

165.    The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

166.    On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claim 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Qualcomm is thereby liable for infringement of the '287 patent pursuant to 35

U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

167.   On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claim 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices (i.e. Apple, Samsung, LG, Motorola, and Panasonic) for mobile application processing i.e. system-on-a-chip (SoC);

> Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The following month, Qualcomm acquired Airgo Networks for an undisclosed amount; it said Airgo's 802.11a/b/g and 802.11n Wi-Fi technology would be integrated with the Snapdragon product suite. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor, as well as other semiconductors. The first Snapdragon shipments were of the QSD8250 in November 2007.

The CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Qualcomm is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

168.    The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

169.    On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Motorola is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined. **Exhibit P: Claim Chart for Motorola Solutions Inc. (Motorola Inc.)**

170.   On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /

biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Motorola is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined.

171.   The alleged infringement of Motorola identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

172.   On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claim 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making,

using, offering for sale, selling and/or importing computerized communications

devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power &

ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC

devices. As set forth in Golden's preliminary infringement contentions that

Panasonic is making, using, offering for sale, selling and/or importing of the

CMDC device have at a minimum directly infringed the '287 patent and Panasonic

is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271.

Panasonic have caused damage to Golden, which infringement and damage will

continue unless and until Panasonic is enjoined. **Exhibit Q: Claim Chart for**

**Panasonic Corporation**

173.    On information and belief, Panasonic is jointly, directly and/or

indirectly infringing at least claim 5 of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, making,

using, offering for sale, selling and/or importing computerized communications

devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power &

ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC's

global positioning system (GPS) used with CMDC devices for locating and

tracking; the CMDC's internet used with CMDC devices for mobile internet to fit

the dimensions of a CMDC device; the CMDC's central processing unit used with

CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the

CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '287 patent and Panasonic is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined.

174.    The alleged infringement of Panasonic identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

175.    On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, _using,_ _offering for sale, selling_ and/or importing computerized communications devices (i.e. Apple, Samsung, LG, Motorola, and Panasonic unlocked smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and AT&T is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

176.    On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using,_ _offering for sale, or selling_ at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C

series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and AT&T is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

177.    The alleged infringement of AT&T identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

178.   On information and belief, Verizon is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, selling* and/or importing computerized communications devices (i.e. Apple, Samsung, LG, Motorola, and Panasonic unlocked smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Verizon is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

179.   On information and belief, Verizon is jointly, directly and/or indirectly infringing at least one claim of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple

Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10

series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy

Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG &

Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One

series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C

series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without

limitation the CMDC's global positioning system (GPS) used with CMDC devices

for locating and tracking; the CMDC's internet used with CMDC devices for

mobile internet to fit the dimensions of a CMDC device; the CMDC's central

processing unit used with CMDC devices for mobile application processing i.e.

system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with

CMDC devices for monitoring human heartrate; the CMDC's radio frequency

near-field communication (NFC) used with CMDC devices for short-range reading

of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for

locking the CMDC device after several failed attempts to open the CMDC device;

and, the CMDC's biometric identification (i.e. fingerprint, facial) used with

CMDC devices for identifying an authorized user of the CMDC device. As set

forth in Golden's preliminary infringement contentions that Verizon is using,

offering for sale, selling and/or importing of the CMDC device have at a minimum

directly and/or indirectly infringed the '287 patent and Verizon is thereby liable for

infringement of the '287 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

180.    The alleged infringement of Verizon identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

181.    On information and belief, Sprint is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, selling* and/or importing computerized communications devices (i.e. Apple, Samsung, LG, Motorola unlocked, and Panasonic unlocked smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Sprint is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

182.   On information and belief, Sprint jointly, is directly and/or indirectly

infringing at least one claim of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, *using,*

*offering for sale, or selling*  least one of Apple's iPhone 7 series, iPhone 8 series,

iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple

Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10

series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy

Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG &

Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One

series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C

series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without

limitation the CMDC's global positioning system (GPS) used with CMDC devices

for locating and tracking; the CMDC's internet used with CMDC devices for

mobile internet to fit the dimensions of a CMDC device; the CMDC's central

processing unit used with CMDC devices for mobile application processing i.e.

system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with

CMDC devices for monitoring human heartrate; the CMDC's radio frequency

near-field communication (NFC) used with CMDC devices for short-range reading

of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for

locking the CMDC device after several failed attempts to open the CMDC device;

and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Sprint is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

183.   The alleged infringement of Sprint identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

184.   On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 4 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, selling* and/or importing computerized communications devices (i.e. Apple, Samsung, LG, Motorola, and Panasonic unlocked smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that

T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and T-Mobile is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

185.    On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least one claim of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e.

system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and T-Mobile is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

186.    The alleged infringement of T-Mobile identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

187.    On information and belief, Ford is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Ford is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined. **Exhibit R: Claim Chart for Ford Global Technologies, LLC**

188.   On information and belief, Ford is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone communication devices that includes, without limitation the

CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for

starting and stopping the vehicle's engine; the CMDC's remote operating systems

controls used with CMDC devices for operating the heating and cooling controls;

the CMDC's global positioning system (GPS) used with CMDC devices for

locating and tracking the vehicle; the CMDC's internet used with CMDC devices

for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC

device; the CMDC's central processing unit used with CMDC devices for mobile

application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /

biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that Ford is using the CMDC device have at a minimum

directly and/or indirectly infringed the '287 patent and Ford is thereby liable for

infringement of the '287 patent pursuant to 35 U.S.C. § 271. Ford have caused

damage to Golden, which infringement and damage will continue unless and until Ford is enjoined.

189.    The alleged infringement of Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

190.    On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Fairway Ford is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined. **Exhibit R: Claim Chart for Fairway Ford Lincoln of Greenville**

191.    On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district

and elsewhere in South Carolina and the United States by, among other things,

_using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's

iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR

series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10

series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &

Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35,

V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto

Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone communication devices that includes, without limitation the

CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for

starting and stopping the vehicle's engine; the CMDC's remote operating systems

controls used with CMDC devices for operating the heating and cooling controls;

the CMDC's global positioning system (GPS) used with CMDC devices for

locating and tracking the vehicle; the CMDC's internet used with CMDC devices

for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC

device; the CMDC's central processing unit used with CMDC devices for mobile

application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /

biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Fairway Ford is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined.

192.    The alleged infringement of Fairway Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

193.    On information and belief, GM is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches)

including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and GM is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined. **Exhibit S: Claim Chart for General Motors Company**

194.    On information and belief, GM is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and GM is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined.

195.    The alleged infringement of GM identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

196.    On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Whitaker Chevrolet is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined. **Exhibit S: Claim Chart for Kevin Whitaker Chevrolet**

197.    On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, with its vehicles at least one of the alleged infringing devices* i.e.

115

Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Whitaker Chevrolet is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

198.    The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

199.    On information and belief, FCA is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's

preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and FCA is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart for FCA US LLC**

200.    On information and belief, FCA is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems

controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and FCA is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined.

201.    The alleged infringement of FCA identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

202.   On information and belief, Big O is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Big O is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

203.   On information and belief, Big O is jointly, directly and/or indirectly infringing at least claims 1 & 5 of the '287 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series,

Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung

Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG

G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, &

Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone communication devices that includes, without limitation the

CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for

starting and stopping the vehicle's engine; the CMDC's remote operating systems

controls used with CMDC devices for operating the heating and cooling controls;

the CMDC's global positioning system (GPS) used with CMDC devices for

locating and tracking the vehicle; the CMDC's internet used with CMDC devices

for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC

device; the CMDC's central processing unit used with CMDC devices for mobile

application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /

biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '287 patent and Big O is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined.

204.    The alleged infringement of Big O identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

<div align="center">

### COUNT II
**(Infringement of the '439 Patent)**

</div>

205.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-204.

206.    Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent that covers Plaintiff's communication, monitoring, detecting and controlling (CMDC) device. **Exhibit U: Claim Chart for the '439 Patent**

207.   On information and belief, Apple is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 17, 19, 20, 22, & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Apple is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

208.   On information and belief, Apple is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 17, 19, 20, 22, & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC's global

123

positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Apple is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined.

209.    The alleged infringement of Apple identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a

permanent injunction is warranted and such a remedy would be in the public interest.

210.   On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claims 13, 14, 19, 20, 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Samsung is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined. **Exhibit M: Claim Chart for Samsung Electronics, USA.**

211.   On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claims 13, 14, 19, 20, 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing

computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Samsung is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

212.    The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

213.    On information and belief, LG is jointly, directly and/or indirectly infringing at least claims 13, 14, 19, 20, 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and LG is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined. **Exhibit N: Claim Chart for LG Electronics, USA, Inc.**

214.    On information and belief, LG is jointly, directly and/or indirectly infringing at least claims 13, 14, 19, 20, 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other

things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and LG is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

215.    The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

216.    On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claim 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Qualcomm is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

217.    On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claim 22 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly

infringed the '439 patent and Qualcomm is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

218.  The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

219.  On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Motorola is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until

131

Motorola is enjoined. **Exhibit P: Claim Chart for Motorola Solutions Inc.**
**(Motorola Inc.)**

220.   On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling

and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Motorola is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined.

221.    The alleged infringement of Motorola identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

222.    On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claims 13, 22, & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Panasonic is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement

133

and damage will continue unless and until Panasonic is enjoined. **Exhibit Q:**

## Claim Chart for Panasonic Corporation

223.  On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claims 13, 22, & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for

sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '439 patent and Panasonic is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined.

224.    The alleged infringement of Panasonic identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

225.    On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and AT&T is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to

135

Golden, which infringement and damage will continue unless and until AT&T is enjoined.

226.    On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, offering for sale, or selling_ at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and AT&T is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

227.    The alleged infringement of AT&T identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

228.    On information and belief, Verizon is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches)

including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Verizon is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

229.   On information and belief, Verizon is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's

internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Verizon is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

230.   The alleged infringement of Verizon identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

231.   On information and belief, Sprint is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Sprint is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

232.   On information and belief, Sprint is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, &

Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphones that includes, without limitation the CMDC's global positioning

system (GPS) used with CMDC devices for locating and tracking; the CMDC's

internet used with CMDC devices for mobile internet to fit the dimensions of a

CMDC device; the CMDC's central processing unit used with CMDC devices for

mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /

biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that Sprint is using, offering for sale, selling and/or

importing of the CMDC device have at a minimum directly and/or indirectly

infringed the '439 patent and Sprint is thereby liable for infringement of the '439

patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which

infringement and damage will continue unless and until Sprint is enjoined.

233.    The alleged infringement of Sprint identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

234.    On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and T-Mobile is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

235.    On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 13, 14, 16, 19, 20, 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by,

among other things, _using, offering for sale, or selling_ at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and T-Mobile is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

236.    The alleged infringement of T-Mobile identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

237.    On information and belief, Ford is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Ford is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless

and until Ford is enjoined. **Exhibit R: Claim Chart for Ford Global Technologies, LLC**

238.    On information and belief, Ford is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices

145

for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Ford is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined.

239.    The alleged infringement of Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

240.    On information and belief, Fairway Ford is jointly, directly and/or

indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial

district and elsewhere in South Carolina and the United States by, among other

things, using communications devices (i.e. smartphones, laptops, tablets,

smartwatches) including without limitation the CMDC device. As set forth in

Golden's preliminary infringement contentions that Fairway Ford is using the

CMDC device have at a minimum directly and/or indirectly infringed the '439

patent and Fairway Ford is thereby liable for infringement of the '439 patent

pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which

infringement and damage will continue unless and until Fairway Ford is enjoined.

**Exhibit R: Claim Chart for Fairway Ford Lincoln of Greenville**

241.    On information and belief, Fairway Ford is jointly, directly and/or

indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial

district and elsewhere in South Carolina and the United States by, among other

things, _using, with its vehicles at least one of the alleged infringing devices_ i.e.

Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone

XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy

S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &

Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35,

V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto

Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone communication devices that includes, without limitation the

CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for

starting and stopping the vehicle's engine; the CMDC's remote operating systems

controls used with CMDC devices for operating the heating and cooling controls;

the CMDC's global positioning system (GPS) used with CMDC devices for

locating and tracking the vehicle; the CMDC's internet used with CMDC devices

for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC

device; the CMDC's central processing unit used with CMDC devices for mobile

application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /

biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that Fairway Ford is using the CMDC device have at a

minimum directly and/or indirectly infringed the '439 patent and Fairway Ford is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined.

242.   The alleged infringement of Fairway Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

243.   On information and belief, GM is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that GM is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and GM is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. GM have caused damage to Golden, which infringement and damage will continue unless and until GM is enjoined. **Exhibit S: Claim Chart for General Motors Company**

244.    On information and belief, GM is jointly, directly and/or indirectly

infringing at least claims 22 & 23 of the '439 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, *using,*

*with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7

series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series,

iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series,

Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung

Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG

G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, &

Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone communication devices that includes, without limitation the

CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for

starting and stopping the vehicle's engine; the CMDC's remote operating systems

controls used with CMDC devices for operating the heating and cooling controls;

the CMDC's global positioning system (GPS) used with CMDC devices for

locating and tracking the vehicle; the CMDC's internet used with CMDC devices

for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC

device; the CMDC's central processing unit used with CMDC devices for mobile

150

application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /
biological monitoring used with CMDC devices for monitoring human heartrate;
the CMDC's radio frequency near-field communication (NFC) used with CMDC
devices for short-range reading of NFC tags; the CMDC's lock disabling
mechanism used with CMDC devices for locking the CMDC device after several
failed attempts to open the CMDC device; and, the CMDC's biometric
identification (i.e. fingerprint, facial) used with CMDC devices for identifying an
authorized user of the CMDC device. As set forth in Golden's preliminary
infringement contentions that GM is using the CMDC device have at a minimum
directly and/or indirectly infringed the '439 patent and GM is thereby liable for
infringement of the '439 patent pursuant to 35 U.S.C. § 271. GM have caused
damage to Golden, which infringement and damage will continue unless and until
GM is enjoined.

245.    The alleged infringement of GM identified in this Count has caused
irreparable injury to Golden for which remedies at law are inadequate. Considering
the balance of the hardships between the parties, a remedy in equity, such as a
permanent injunction is warranted and such a remedy would be in the public
interest.

246.    On information and belief, Whitaker Chevrolet is jointly, directly
and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this

judicial district and elsewhere in South Carolina and the United States by, among

other things, using communications devices (i.e. smartphones, laptops, tablets,

smartwatches) including without limitation the CMDC device. As set forth in

Golden's preliminary infringement contentions that Whitaker Chevrolet is using

the CMDC device have at a minimum directly and/or indirectly infringed the '439

patent and Whitaker Chevrolet is thereby liable for infringement of the '439 patent

pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden,

which infringement and damage will continue unless and until Whitaker Chevrolet

is enjoined. **Exhibit S: Claim Chart for Kevin Whitaker Chevrolet**

247.    On information and belief, Whitaker Chevrolet is jointly, directly

and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this

judicial district and elsewhere in South Carolina and the United States by, among

other things, _using, with its vehicles at least one of the alleged infringing devices_

i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series,

iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's

Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S

series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20,

V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7;

Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series;

and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power &

ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Whitaker Chevrolet is thereby liable for infringement of the '439 patent pursuant

to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

248.    The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

249.    On information and belief, FCA is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and FCA is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart for FCA US LLC**

250.    On information and belief, FCA is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, _using,_
_with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7
series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series,
iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series,
Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung
Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG
G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, &
Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's
TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-
F1 smartphone communication devices that includes, without limitation the
CMDC's remote lock/unlock used with CMDC devices for locking and unlocking
vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for
starting and stopping the vehicle's engine; the CMDC's remote operating systems
controls used with CMDC devices for operating the heating and cooling controls;
the CMDC's global positioning system (GPS) used with CMDC devices for
locating and tracking the vehicle; the CMDC's internet used with CMDC devices
for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC
device; the CMDC's central processing unit used with CMDC devices for mobile
application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /
biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and FCA is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined.

251.    The alleged infringement of FCA identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

252.    On information and belief, Big O is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches)

including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Big O is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

253.   On information and belief, Big O is jointly, directly and/or indirectly infringing at least claims 22 & 23 of the '439 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '439 patent and Big O is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined.

254.   The alleged infringement of Big O identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT III
### (Infringement of the '189 Patent)

255.   Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-254.

256.   Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claims 1-5, 7, & 8 of the '189 patent that covers Plaintiff's communication, monitoring, detecting and controlling (CMDC) device. **Exhibit V: Claim Chart for the '189 Patent**

257.   On information and belief, Apple is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling

and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Apple is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

258.   On information and belief, Apple is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device;

160

and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Apple is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined.

259.    The alleged infringement of Apple identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

260.    On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC

161

devices. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Samsung is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined. **Exhibit M: Claim Chart for Samsung Electronics, USA.**

261.    On information and belief, Samsung is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field

communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Samsung is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

262.    The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

263.    On information and belief, LG is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications

devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and LG is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined. **Exhibit N: Claim Chart for LG Electronics, USA, Inc.**

264.    On information and belief, LG is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field

communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and LG is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

265.   The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

266.   On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series,

& 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Qualcomm is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

267.   On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip

(SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Qualcomm is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

268.    The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

269.    On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial

district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Motorola is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined. **Exhibit P: Claim Chart for Motorola Solutions Inc. (Motorola Inc.)**

270.   On information and belief, Motorola is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for

168

mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Motorola is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined.

271.    The alleged infringement of Motorola identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

272.    On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial

district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Panasonic is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined. **Exhibit Q: Claim Chart for Panasonic Corporation**

273.    On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing

unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '189 patent and Panasonic is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined.

274.    The alleged infringement of Panasonic identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

275.   On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and AT&T is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

276.   On information and belief, AT&T is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, offering for sale, or selling_ at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One

172

series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that AT&T is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and AT&T is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

277.    The alleged infringement of AT&T identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

278.    On information and belief, Verizon is jointly, directly and/or indirectly infringing at least one claim of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Verizon is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

279.    On information and belief, Verizon is jointly, directly and/or indirectly infringing at least 1-5, 7, & 8 claim of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, offering for sale, or selling_ at least one of Apple's iPhone 7 series,

iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11

series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note

8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic

and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG

G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series,

Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31

Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that

includes, without limitation the CMDC's global positioning system (GPS) used

with CMDC devices for locating and tracking; the CMDC's internet used with

CMDC devices for mobile internet to fit the dimensions of a CMDC device; the

CMDC's central processing unit used with CMDC devices for mobile application

processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological

monitoring used with CMDC devices for monitoring human heartrate; the

CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that Verizon is using, offering for sale, selling and/or

importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Verizon is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

280.    The alleged infringement of Verizon identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

281.    On information and belief, Sprint is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Sprint is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

282.    On information and belief, Sprint is jointly, directly and/or indirectly

infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, *using,*

*offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series,

iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple

Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10

series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy

Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG &

Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One

series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C

series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without

limitation the CMDC's global positioning system (GPS) used with CMDC devices

for locating and tracking; the CMDC's internet used with CMDC devices for

mobile internet to fit the dimensions of a CMDC device; the CMDC's central

processing unit used with CMDC devices for mobile application processing i.e.

system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with

CMDC devices for monitoring human heartrate; the CMDC's radio frequency

near-field communication (NFC) used with CMDC devices for short-range reading

of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for

locking the CMDC device after several failed attempts to open the CMDC device;

and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Sprint is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

283.    The alleged infringement of Sprint identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

284.    On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale,

selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and T-Mobile is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

285.   On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least claims 1-5, 7, & 8 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application

processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and T-Mobile is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

286.    The alleged infringement of T-Mobile identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

287.   On information and belief, Ford is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Ford is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined. **Exhibit R: Claim Chart for Ford Global Technologies, LLC**

288.   On information and belief, Ford is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series,

Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31

Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone

communication devices that includes, without limitation the CMDC's remote

lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the

CMDC's remote ignition start/stop used with CMDC devices for starting and

stopping the vehicle's engine; the CMDC's remote operating systems controls used

with CMDC devices for operating the heating and cooling controls; the CMDC's

global positioning system (GPS) used with CMDC devices for locating and

tracking the vehicle; the CMDC's internet used with CMDC devices for mobile

internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the

CMDC's central processing unit used with CMDC devices for mobile application

processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological

monitoring used with CMDC devices for monitoring human heartrate; the

CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that Ford is using the CMDC device have at a minimum

directly and/or indirectly infringed the '189 patent and Ford is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined.

289.    The alleged infringement of Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

290.    On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Fairway Ford is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined. **Exhibit R: Claim Chart for Fairway Ford Lincoln of Greenville**

291.   On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile

application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /
biological monitoring used with CMDC devices for monitoring human heartrate;
the CMDC's radio frequency near-field communication (NFC) used with CMDC
devices for short-range reading of NFC tags; the CMDC's lock disabling
mechanism used with CMDC devices for locking the CMDC device after several
failed attempts to open the CMDC device; and, the CMDC's biometric
identification (i.e. fingerprint, facial) used with CMDC devices for identifying an
authorized user of the CMDC device. As set forth in Golden's preliminary
infringement contentions that Fairway Ford is using the CMDC device have at a
minimum directly and/or indirectly infringed the '189 patent and Fairway Ford is
thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271.
Fairway Ford have caused damage to Golden, which infringement and damage will
continue unless and until Fairway Ford is enjoined.

292.    The alleged infringement of Fairway Ford identified in this Count has
caused irreparable injury to Golden for which remedies at law are inadequate.
Considering the balance of the hardships between the parties, a remedy in equity,
such as a permanent injunction is warranted and such a remedy would be in the
public interest.

293.    On information and belief, GM is jointly, directly and/or indirectly
infringing at least claim 1 of the '189 patent in this judicial district and elsewhere

in South Carolina and the United States by, among other things, using

communications devices (i.e. smartphones, laptops, tablets, smartwatches)

including without limitation the CMDC device. As set forth in Golden's

preliminary infringement contentions that GM is using the CMDC device have at a

minimum directly and/or indirectly infringed the '189 patent and GM is thereby

liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. GM have

caused damage to Golden, which infringement and damage will continue unless

and until GM is enjoined. **Exhibit S: Claim Chart for General Motors**

**Company**

294.    On information and belief, GM is jointly, directly and/or indirectly

infringing at least claim 1  of the '189 patent in this judicial district and elsewhere

in South Carolina and the United States by, among other things, _using, with its_

_vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series,

iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11

series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note

8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic

and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG

G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series,

Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31

Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone

186

communication devices that includes, without limitation the CMDC's remote

lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the

CMDC's remote ignition start/stop used with CMDC devices for starting and

stopping the vehicle's engine; the CMDC's remote operating systems controls used

with CMDC devices for operating the heating and cooling controls; the CMDC's

global positioning system (GPS) used with CMDC devices for locating and

tracking the vehicle; the CMDC's internet used with CMDC devices for mobile

internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the

CMDC's central processing unit used with CMDC devices for mobile application

processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological

monitoring used with CMDC devices for monitoring human heartrate; the

CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that GM is using the CMDC device have at a minimum

directly and/or indirectly infringed the '189 patent and GM is thereby liable for

infringement of the '189 patent pursuant to 35 U.S.C. § 271. GM have caused

damage to Golden, which infringement and damage will continue unless and until GM is enjoined.

295.   The alleged infringement of GM identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

296.   On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Whitaker Chevrolet is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined. **Exhibit S: Claim Chart for Kevin Whitaker Chevrolet**

297.   On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial

district and elsewhere in South Carolina and the United States by, among other

things, *using, with its vehicles at least one of the alleged infringing devices* i.e.

Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone

XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy

S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &

Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35,

V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto

Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone communication devices that includes, without limitation the

CMDC's remote lock/unlock used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for

starting and stopping the vehicle's engine; the CMDC's remote operating systems

controls used with CMDC devices for operating the heating and cooling controls;

the CMDC's global positioning system (GPS) used with CMDC devices for

locating and tracking the vehicle; the CMDC's internet used with CMDC devices

for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC

device; the CMDC's central processing unit used with CMDC devices for mobile

application processing i.e. system-on-a-chip (SoC); the CMDC's chemical /

biological monitoring used with CMDC devices for monitoring human heartrate;

the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Whitaker Chevrolet is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

298.    The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

299.    On information and belief, FCA is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using

communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and FCA is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart for FCA US LLC**

300.    On information and belief, FCA is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the

CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and FCA is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined.

301.   The alleged infringement of FCA identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

302.   On information and belief, Big O is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Big O is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

303.   On information and belief, Big O is jointly, directly and/or indirectly infringing at least claim 1 of the '189 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series,

193

iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's remote lock/unlock used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's chemical / biological monitoring used with CMDC devices for monitoring human heartrate; the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '189 patent and Big O is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined.

304.    The alleged infringement of Big O identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT IV
### (Infringement of the '990 Patent)

305.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-304.

306.    Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132,

134 & 125 of the '990 patent that covers Plaintiff's communication, monitoring,

detecting and controlling (CMDC) device and locking mechanism. **Exhibit W:**

**Claim Chart for the '990 Patent**

307.   On information and belief, Apple is jointly, directly and/or indirectly

infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20,

21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of

the '990 patent in this judicial district and elsewhere in South Carolina and the

United States by, among other things, making, using, offering for sale, selling

and/or importing computerized communications devices (i.e. iPhone 7 series,

iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11

series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's

CMDC devices. As set forth in Golden's preliminary infringement contentions that

Apple is making, using, offering for sale, selling and/or importing of the CMDC

device have at a minimum directly infringed the '990 patent and Apple is thereby

liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Apple have

caused damage to Golden, which infringement and damage will continue unless

and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

308.   On information and belief, Apple is jointly, directly and/or indirectly

infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20,

21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of

the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly

197

infringed the '990 patent and Apple is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined.

309.    The alleged infringement of Apple identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

310.    On information and belief, Samsung is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Samsung is thereby liable for infringement of the '990 patent

pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

**Exhibit M: Claim Chart for Samsung Electronics, USA.**

311.    On information and belief, Samsung is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading

of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Samsung is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

312.    The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

313.    On information and belief, LG is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling

and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and LG is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined. **Exhibit N: Claim Chart for LG Electronics, USA, Inc.**

314.   On information and belief, LG is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with

CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and LG is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

315.    The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

316.   On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Qualcomm is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

317.   On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale,

selling certain processing devices as Central Processing Units (i.e. Qualcomm's

Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip

application processing for at least Apple, Samsung, LG, Motorola, and Panasonic;

included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e.

home security system) used with CMDC devices for home monitoring; the

CMDC's internal or external remote/electrical lock disabler used with CMDC

devices for locking and unlocking home doors; the CMDC's global positioning

system (GPS) used with CMDC devices for locating and tracking; the CMDC's

internet used with CMDC devices for mobile internet to fit the dimensions of a

CMDC device; the CMDC's central processing unit used with CMDC devices for

mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio

frequency near-field communication (NFC) used with CMDC devices for short-

range reading of NFC tags; the CMDC's lock disabling mechanism used with

CMDC devices for locking the CMDC device after several failed attempts to open

the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint,

facial) used with CMDC devices for identifying an authorized user of the CMDC

device. As set forth in Golden's preliminary infringement contentions that

Qualcomm is making, using, offering for sale, selling and/or importing of the

CMDC device have at a minimum directly infringed the '990 patent and

Qualcomm is thereby liable for infringement of the '990 patent pursuant to 35

U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

318.    The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

319.    On information and belief, Motorola is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Motorola is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement

and damage will continue unless and until Motorola is enjoined. **Exhibit P: Claim Chart for Motorola Solutions Inc. (Motorola Inc.)**

320.    On information and belief, Motorola is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the

CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Motorola is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Motorola is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Motorola have caused damage to Golden, which infringement and damage will continue unless and until Motorola is enjoined.

321.    The alleged infringement of Motorola identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

322.    On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least independent claim 125, and dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone)

included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Panasonic is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined. **Exhibit Q: Claim Chart for Panasonic Corporation**

323.    On information and belief, Panasonic is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone) included without limitation Plaintiff's CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the

dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Panasonic is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '990 patent and Panasonic is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Panasonic have caused damage to Golden, which infringement and damage will continue unless and until Panasonic is enjoined.

324.    The alleged infringement of Panasonic identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

325.    On information and belief, AT&T is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20,

21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of

the '990 patent in this judicial district and elsewhere in South Carolina and the

United States by, among other things, using, offering for sale, selling and/or

importing computerized communications devices (i.e. smartphones, laptops,

tablets, smartwatches) including without limitation the CMDC device. As set forth

in Golden's preliminary infringement contentions that AT&T is using, offering for

sale, selling and/or importing of the CMDC device have at a minimum directly

and/or indirectly infringed the '990 patent and AT&T is thereby liable for

infringement of the '990 patent pursuant to 35 U.S.C. § 271. AT&T have caused

damage to Golden, which infringement and damage will continue unless and until

AT&T is enjoined.

326.   On information and belief, AT&T is jointly, directly and/or indirectly

infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20,

21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of

the '990 patent in this judicial district and elsewhere in South Carolina and the

United States by, among other things, *using, offering for sale, or selling* at least

one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series,

iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's

Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S

series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20,

V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7;

Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series;

and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power &
ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's multi-
sensor detection system (i.e. home security system) used with CMDC devices for
home monitoring; the CMDC's internal or external remote/electrical lock disabler
used with CMDC devices for locking and unlocking home doors; the CMDC's
global positioning system (GPS) used with CMDC devices for locating and
tracking; the CMDC's internet used with CMDC devices for mobile internet to fit
the dimensions of a CMDC device; the CMDC's central processing unit used with
CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the
CMDC's radio frequency near-field communication (NFC) used with CMDC
devices for short-range reading of NFC tags; the CMDC's lock disabling
mechanism used with CMDC devices for locking the CMDC device after several
failed attempts to open the CMDC device; and, the CMDC's biometric
identification (i.e. fingerprint, facial) used with CMDC devices for identifying an
authorized user of the CMDC device. As set forth in Golden's preliminary
infringement contentions that AT&T is using, offering for sale, selling and/or
importing of the CMDC device have at a minimum directly and/or indirectly
infringed the '990 patent and AT&T is thereby liable for infringement of the '990

patent pursuant to 35 U.S.C. § 271. AT&T have caused damage to Golden, which infringement and damage will continue unless and until AT&T is enjoined.

327.    The alleged infringement of AT&T identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

328.    On information and belief, Verizon is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Verizon is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Verizon is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which infringement and damage will continue unless and until Verizon is enjoined.

329.    On information and belief, Verizon is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the

CMDC's radio frequency near-field communication (NFC) used with CMDC

devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that Verizon is using, offering for sale, selling and/or

importing of the CMDC device have at a minimum directly and/or indirectly

infringed the '990 patent and Verizon is thereby liable for infringement of the '990

patent pursuant to 35 U.S.C. § 271. Verizon have caused damage to Golden, which

infringement and damage will continue unless and until Verizon is enjoined.

330.    The alleged infringement of Verizon identified in this Count has

caused irreparable injury to Golden for which remedies at law are inadequate.

Considering the balance of the hardships between the parties, a remedy in equity,

such as a permanent injunction is warranted and such a remedy would be in the

public interest.

331.    On information and belief, Sprint is jointly, directly and/or indirectly

infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20,

21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of

the '990 patent in this judicial district and elsewhere in South Carolina and the

United States by, among other things, using, offering for sale, selling and/or

importing computerized communications devices (i.e. smartphones, laptops,

tablets, smartwatches) including without limitation the CMDC device. As set forth

in Golden's preliminary infringement contentions that Sprint is using, offering for

sale, selling and/or importing of the CMDC device have at a minimum directly

and/or indirectly infringed the '990 patent and Sprint is thereby liable for

infringement of the '990 patent pursuant to 35 U.S.C. § 271. Sprint have caused

damage to Golden, which infringement and damage will continue unless and until

Sprint is enjoined.

332.  On information and belief, Sprint is jointly, directly and/or indirectly

infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20,

21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of

the '990 patent in this judicial district and elsewhere in South Carolina and the

United States by, among other things, *using, offering for sale, or selling* at least

one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series,

iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's

Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S

series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20,

V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7;

Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series;

and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Sprint is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Sprint is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Sprint have caused damage to Golden, which infringement and damage will continue unless and until Sprint is enjoined.

216

333.   The alleged infringement of Sprint identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

334.   On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that T-Mobile is using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and T-Mobile is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden, which infringement and damage will continue unless and until T-Mobile is enjoined.

335.   On information and belief, T-Mobile is jointly, directly and/or indirectly infringing at least independent claim 125, and/or dependent claims 12,

16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, *using, offering for sale, or selling* at least one of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphones that includes, without limitation the CMDC's multi-sensor detection system (i.e. home security system) used with CMDC devices for home monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking home doors; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking; the CMDC's internet used with CMDC devices for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling

mechanism used with CMDC devices for locking the CMDC device after several

failed attempts to open the CMDC device; and, the CMDC's biometric

identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that T-Mobile is using, offering for sale, selling and/or

importing of the CMDC device have at a minimum directly and/or indirectly

infringed the '990 patent and T-Mobile is thereby liable for infringement of the

'990 patent pursuant to 35 U.S.C. § 271. T-Mobile have caused damage to Golden,

which infringement and damage will continue unless and until T-Mobile is

enjoined.

336.    The alleged infringement of T-Mobile identified in this Count has

caused irreparable injury to Golden for which remedies at law are inadequate.

Considering the balance of the hardships between the parties, a remedy in equity,

such as a permanent injunction is warranted and such a remedy would be in the

public interest.

337.    On information and belief, Ford is jointly, directly and/or indirectly

infringing at least claim 125 of the '990 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, using

communications devices (i.e. smartphones, laptops, tablets, smartwatches)

including without limitation the CMDC device. As set forth in Golden's

preliminary infringement contentions that Ford is using the CMDC device have at

a minimum directly and/or indirectly infringed the '990 patent and Ford is thereby

liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Ford have

caused damage to Golden, which infringement and damage will continue unless

and until Ford is enjoined. **Exhibit R: Claim Chart for Ford Global**

**Technologies, LLC**

338.    On information and belief, Ford is jointly, directly and/or indirectly

infringing at least claim 125 of the '990 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, *using,*

*with its vehicles at least one of the alleged infringing devices* i.e. Apple's iPhone 7

series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series,

iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series,

Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung

Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG

G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, &

Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone communication devices that includes, without limitation the

CMDC's multi-sensor detection system (i.e. vehicle security system) used with

CMDC devices for vehicle monitoring; the CMDC's internal or external

remote/electrical lock disabler used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Ford is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Ford have caused damage to Golden, which infringement and damage will continue unless and until Ford is enjoined.

339.    The alleged infringement of Ford identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

340.    On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Fairway Ford is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement and damage will continue unless and until Fairway Ford is enjoined. **Exhibit R: Claim Chart for Fairway Ford Lincoln of Greenville**

341.    On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7

222

series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices that includes, without limitation the CMDC's multi-sensor detection system (i.e. vehicle security system) used with CMDC devices for vehicle monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading

of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for

locking the CMDC device after several failed attempts to open the CMDC device;

and, the CMDC's biometric identification (i.e. fingerprint, facial) used with

CMDC devices for identifying an authorized user of the CMDC device. As set

forth in Golden's preliminary infringement contentions that Fairway Ford is using

the CMDC device have at a minimum directly and/or indirectly infringed the '990

patent and Fairway Ford is thereby liable for infringement of the '990 patent

pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which

infringement and damage will continue unless and until Fairway Ford is enjoined.

342.    The alleged infringement of Fairway Ford identified in this Count has

caused irreparable injury to Golden for which remedies at law are inadequate.

Considering the balance of the hardships between the parties, a remedy in equity,

such as a permanent injunction is warranted and such a remedy would be in the

public interest.

343.    On information and belief, GM is jointly, directly and/or indirectly

infringing at least claim 125 of the '990 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, using

communications devices (i.e. smartphones, laptops, tablets, smartwatches)

including without limitation the CMDC device. As set forth in Golden's

preliminary infringement contentions that GM is using of the CMDC device have

at a minimum directly and/or indirectly infringed the '990 patent and GM is

thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. GM

have caused damage to Golden, which infringement and damage will continue

unless and until GM is enjoined. **Exhibit S: Claim Chart for General Motors**

**Company**

344.   On information and belief, GM is jointly, directly and/or indirectly

infringing at least claim 125 of the '990 patent in this judicial district and

elsewhere in South Carolina and the United States by, among other things, _using,_

_with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7

series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series,

iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series,

Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung

Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG

G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, &

Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone communication devices that includes, without limitation the

CMDC's multi-sensor detection system (i.e. vehicle security system) used with

CMDC devices for vehicle monitoring; the CMDC's internal or external

remote/electrical lock disabler used with CMDC devices for locking and unlocking

vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for

starting and stopping the vehicle's engine; the CMDC's remote operating systems

controls used with CMDC devices for operating the heating and cooling controls;

the CMDC's global positioning system (GPS) used with CMDC devices for

locating and tracking the vehicle; the CMDC's internet used with CMDC devices

for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC

device; the CMDC's central processing unit used with CMDC devices for mobile

application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency

near-field communication (NFC) used with CMDC devices for short-range reading

of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for

locking the CMDC device after several failed attempts to open the CMDC device;

and, the CMDC's biometric identification (i.e. fingerprint, facial) used with

CMDC devices for identifying an authorized user of the CMDC device. As set

forth in Golden's preliminary infringement contentions that GM is using the

CMDC device have at a minimum directly and/or indirectly infringed the '990

patent and GM is thereby liable for infringement of the '990 patent pursuant to 35

U.S.C. § 271. GM have caused damage to Golden, which infringement and damage

will continue unless and until GM is enjoined.

345.    The alleged infringement of GM identified in this Count has caused

irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

346.   On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Whitaker Chevrolet is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined. **Exhibit S: Claim Chart for Kevin Whitaker Chevrolet**

347.   On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone

XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy

S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &

Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35,

V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto

Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-

F1 smartphone without limitation the CMDC's multi-sensor detection system (i.e.

vehicle security system) used with CMDC devices for vehicle monitoring; the

CMDC's internal or external remote/electrical lock disabler used with CMDC

devices for locking and unlocking vehicle doors; the CMDC's remote ignition

start/stop used with CMDC devices for starting and stopping the vehicle's engine;

the CMDC's remote operating systems controls used with CMDC devices for

operating the heating and cooling controls; the CMDC's global positioning system

(GPS) used with CMDC devices for locating and tracking the vehicle; the

CMDC's internet used with CMDC devices for mobile internet (i.e. the connected

vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing

unit used with CMDC devices for mobile application processing i.e. system-on-a-

chip (SoC); the CMDC's radio frequency near-field communication (NFC) used

with CMDC devices for short-range reading of NFC tags; the CMDC's lock

disabling mechanism used with CMDC devices for locking the CMDC device after

several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Whitaker Chevrolet is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

348.    The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

349.    On information and belief, FCA is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using the CMDC device have at

a minimum directly and/or indirectly infringed the '990 patent and FCA is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart for FCA US LLC**

350.    On information and belief, FCA is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone without limitation the CMDC's multi-sensor detection system (i.e. vehicle security system) used with CMDC devices for vehicle monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine;

the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an authorized user of the CMDC device. As set forth in Golden's preliminary infringement contentions that FCA is using, the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and FCA is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. FCA have caused damage to Golden, which infringement and damage will continue unless and until FCA is enjoined.

351.    The alleged infringement of FCA identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a

permanent injunction is warranted and such a remedy would be in the public interest.

352.    On information and belief, Big O is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, communications devices (i.e. smartphones, laptops, tablets, smartwatches) including without limitation the CMDC device. As set forth in Golden's preliminary infringement contentions that Big O is using the CMDC device have at a minimum directly and/or indirectly infringed the '990 patent and Big O is thereby liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

353.    On information and belief, Big O is jointly, directly and/or indirectly infringing at least claim 125 of the '990 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, _using, with its vehicles at least one of the alleged infringing devices_ i.e. Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung

Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone, without limitation the CMDC's multi-sensor detection system (i.e. vehicle security system) used with CMDC devices for vehicle monitoring; the CMDC's internal or external remote/electrical lock disabler used with CMDC devices for locking and unlocking vehicle doors; the CMDC's remote ignition start/stop used with CMDC devices for starting and stopping the vehicle's engine; the CMDC's remote operating systems controls used with CMDC devices for operating the heating and cooling controls; the CMDC's global positioning system (GPS) used with CMDC devices for locating and tracking the vehicle; the CMDC's internet used with CMDC devices for mobile internet (i.e. the connected vehicle) to fit the dimensions of a CMDC device; the CMDC's central processing unit used with CMDC devices for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's radio frequency near-field communication (NFC) used with CMDC devices for short-range reading of NFC tags; the CMDC's lock disabling mechanism used with CMDC devices for locking the CMDC device after several failed attempts to open the CMDC device; and, the CMDC's biometric identification (i.e. fingerprint, facial) used with CMDC devices for identifying an

233

authorized user of the CMDC device. As set forth in Golden's preliminary

infringement contentions that Big O is using, the CMDC device have at a

minimum directly and/or indirectly infringed the '990 patent and Big O is thereby

liable for infringement of the '990 patent pursuant to 35 U.S.C. § 271. Big O have

caused damage to Golden, which infringement and damage will continue unless

and until Big O is enjoined.

354.   The alleged infringement of Big O identified in this Count has caused

irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a

permanent injunction is warranted and such a remedy would be in the public

interest.

## COUNT V
### (Infringement of the '891 Patent)

355.   Golden realleges and incorporates herein the allegations set forth in

Paragraphs 1-354.

356.   Plaintiff alleges that at least one of the Defendants named in this

complaint has infringed at least of independent claims 11, 23, & 44, and/or

dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent that covers Plaintiff's

communication, monitoring, detecting and controlling (CMDC) device and

vehicles adapted for and/or equipped with at least one stall, stop, or vehicle slow-

down system (SSVSS). **Exhibit X: Claim Chart for the '891 Patent**

357.    On information and belief, Ford is jointly, directly and/or indirectly

infringing at least one of independent claims 11, 23, & 44 and/or dependent claims

47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in

South Carolina and the United States by, among other things, using, offering for

sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown

systems (PSSVSS)  that includes, without limitation a PSSVSS for an autonomous

or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a

PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane

departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended

acceleration; a PSSVSS for vehicle moved outside a designated perimeter; a

PSSVSS for traffic sign recognition; a PSSVSS for intelligent speed limiter, or, a

PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary

infringement contentions that Ford is using, offering for sale, selling and/or

importing of the hardware and software for the CMDC device have at a minimum

directly and/or indirectly infringed the '891 patent and Ford is thereby liable for

infringement of the '891 patent pursuant to 35 U.S.C. § 271. Ford have caused

damage to Golden, which infringement and damage will continue unless and until

Ford is enjoined. **Exhibit R: Claim Chart for Ford Global Technologies, LLC**

358.    The alleged infringement of Ford identified in this Count has caused

irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

359.   On information and belief, Fairway Ford is jointly, directly and/or indirectly infringing at least one of independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS)  that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary infringement contentions that Fairway Ford is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device have at a minimum directly and/or indirectly infringed the '891 patent and Fairway Ford is thereby liable for infringement of the '891 patent pursuant to 35 U.S.C. § 271. Fairway Ford have caused damage to Golden, which infringement

and damage will continue unless and until Fairway Ford is enjoined. **Exhibit R:**

**Claim Chart for Fairway Ford Lincoln of Greenville**

360.   The alleged infringement of Fairway Ford identified in this Count has

caused irreparable injury to Golden for which remedies at law are inadequate.

Considering the balance of the hardships between the parties, a remedy in equity,

such as a permanent injunction is warranted and such a remedy would be in the

public interest.

361.   On information and belief, GM is jointly, directly and/or indirectly

infringing at least independent claim 11 and/or dependent claims 12, 13, 14, 15,

16, 17, 18 &19 of the '891 patent in this judicial district and elsewhere in South

Carolina and the United States by, among other things, using, offering for sale,

selling and/or importing computerized communications devices (i.e. CMDC

personal computers, desktops interconnected to GM/OnStar's STOLEN VEHICLE

SYSTEM) including without limitation the CMDC device remote means of

stalling, stopping, or slowing a vehicle by way of cellular, satellite, radio-

frequency, internet, electromagnetic pulse, electrostatic discharge, or microwave

beam. As set forth in Golden's preliminary infringement contentions that GM is

using, offering for sale, selling and/or importing of the hardware and software for

the CMDC device interconnected to a vehicle for stalling, stopping, and/or slowing

the vehicle have at a minimum directly and/or indirectly infringed the '891 patent

and GM is thereby liable for infringement of the '891 patent pursuant to 35 U.S.C.

§ 271. GM have caused damage to Golden, which infringement and damage will

continue unless and until GM is enjoined. **Exhibit S: Claim Chart for General**

**Motors Company**

362.    On information and belief, GM is jointly, directly and/or indirectly

infringing at least one of independent claims 11, 23, & 44 and/or dependent claims

47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in

South Carolina and the United States by, among other things, using, offering for

sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown

systems (PSSVSS)  that includes, without limitation a PSSVSS for an autonomous

or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a

PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane

departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended

acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a

PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary

infringement contentions that GM is using, offering for sale, selling and/or

importing of the hardware and software for the CMDC device have at a minimum

directly and/or indirectly infringed the '891 patent and GM is thereby liable for

infringement of the '891 patent pursuant to 35 U.S.C. § 271. GM have caused

damage to Golden, which infringement and damage will continue unless and until GM is enjoined.

363.   The alleged infringement of GM identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

364.   On information and belief, Whitaker Chevrolet is jointly, directly and/or indirectly infringing at least independent claim 11 and/or dependent claims 12, 13, 14, 15, 16, 17, 18 &19 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing computerized communications devices (i.e. CMDC personal computers, desktops interconnected to GM/OnStar's STOLEN VEHICLE SYSTEM) including without limitation the CMDC device remote means of stalling, stopping, or slowing a vehicle by way of cellular, satellite, radio-frequency, internet, electromagnetic pulse, electrostatic discharge, or microwave beam. As set forth in Golden's preliminary infringement contentions that Whitaker Chevrolet is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device interconnected to a vehicle for stalling, stopping, and/or slowing the vehicle have at a minimum directly and/or

indirectly infringed the '891 patent and Whitaker Chevrolet is thereby liable for

infringement of the '891 patent pursuant to 35 U.S.C. § 271. Whitaker Chevrolet

have caused damage to Golden, which infringement and damage will continue

unless and until Whitaker Chevrolet is enjoined. **Exhibit S: Claim Chart for**

**Kevin Whitaker Chevrolet**

365.   On information and belief, Whitaker Chevrolet is jointly, directly

and/or indirectly infringing at least one of independent claims 11, 23, & 44 and/or

dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district

and elsewhere in South Carolina and the United States by, among other things,

using, offering for sale, selling and/or importing pre-programmed stall, stop, or

vehicle slowdown systems (PSSVSS)  that includes, without limitation a PSSVSS

for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward

acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for

vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle

unintended acceleration; a PSSVSS for vehicle moved outside a designated

perimeter; or, a PSSVSS for vehicle adapted cruise control. As set forth in

Golden's preliminary infringement contentions that Whitaker Chevrolet is using,

offering for sale, selling and/or importing of the hardware and software for the

CMDC device have at a minimum directly and/or indirectly infringed the '891

patent and Whitaker Chevrolet is thereby liable for infringement of the '891 patent

pursuant to 35 U.S.C. § 271. Whitaker Chevrolet have caused damage to Golden, which infringement and damage will continue unless and until Whitaker Chevrolet is enjoined.

366.    The alleged infringement of Whitaker Chevrolet identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

367.    On information and belief, FCA is jointly, directly and/or indirectly infringing at least one claim of the '891 patent one of independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, using, offering for sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS)  that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary infringement contentions that FCA is

using, offering for sale, selling and/or importing of the hardware and software for

the CMDC device have at a minimum directly and/or indirectly infringed the '891

patent and FCA is thereby liable for infringement of the '891 patent pursuant to 35

U.S.C. § 271. FCA have caused damage to Golden, which infringement and

damage will continue unless and until FCA is enjoined. **Exhibit T: Claim Chart**

**for FCA US LLC**

368.    The alleged infringement of FCA identified in this Count has caused

irreparable injury to Golden for which remedies at law are inadequate. Considering

the balance of the hardships between the parties, a remedy in equity, such as a

permanent injunction is warranted and such a remedy would be in the public

interest.

369.    On information and belief, Big O is jointly, directly and/or indirectly

infringing at least one of independent claims 11, 23, & 44 and/or dependent claims

47, 48, 49, 50, 51 & 53 of the '891 patent in this judicial district and elsewhere in

South Carolina and the United States by, among other things, using, offering for

sale, selling and/or importing pre-programmed stall, stop, or vehicle slowdown

systems (PSSVSS)  that includes, without limitation a PSSVSS for an autonomous

or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a

PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane

departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended

acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control. As set forth in Golden's preliminary infringement contentions that Big O is using, offering for sale, selling and/or importing of the hardware and software for the CMDC device have at a minimum directly and/or indirectly infringed the '891 patent and Big O is thereby liable for infringement of the '891 patent pursuant to 35 U.S.C. § 271. Big O have caused damage to Golden, which infringement and damage will continue unless and until Big O is enjoined. **Exhibit T: Claim Chart for Big O Dodge Jeep RAM**

370.    The alleged infringement of Big O identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT VI
### (Infringement of the '497 Patent)

371.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-370.

372.    Plaintiff alleges that at least one of the Defendants named in this complaint has infringed at least independent claim 1, and/or dependent claims 2-6 of the '497 patent that covers Plaintiff's monitoring equipment, comprising at least one of disabling lock, detector case, CMDC device (i.e. new and improved cell

phone), biometric fingerprint, GPS connection, internet connection, or central processing unit (CPU). **Exhibit Y: Claim Chart for the '497 Patent**

373.    On information and belief, Apple is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Apple is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and Apple is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Apple have caused damage to Golden, which infringement and damage will continue unless and until Apple is enjoined. **Exhibit L: Claim Chart for Apple Inc.**

374.    On information and belief, Apple is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. iPhone 7 series, iPhone 8

series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, &
Apple Watch series 3, 4, & 5) included without limitation Plaintiff's CMDC as
monitoring equipment that is interconnected to a lock disabler for locking and
unlocking doors; the CMDC's global positioning system (GPS) is used for locating
and tracking; the CMDC's internet is used for mobile internet to fit the dimensions
of a CMDC device; the CMDC's central processing unit is used for mobile
application processing i.e. system-on-a-chip (SoC); the CMDC's fingerprint
biometric lock disabler is used for identification and for disabling a lock after
multiple failed attempts to unlock the CMDC device; and, the CMDC's
interchangeable sensors are used for chemical, biological, and radiological
detection.  As set forth in Golden's preliminary infringement contentions that
Apple is making, using, offering for sale, selling and/or importing of the CMDC
device have at a minimum directly infringed the '497 patent and Apple is thereby
liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Apple have
caused damage to Golden, which infringement and damage will continue unless
and until Apple is enjoined.

375.    The alleged infringement of Apple identified in this Count has caused
irreparable injury to Golden for which remedies at law are inadequate. Considering
the balance of the hardships between the parties, a remedy in equity, such as a

permanent injunction is warranted and such a remedy would be in the public interest.

376.    On information and belief, Samsung is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and Samsung is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

**Exhibit M: Claim Chart for Samsung Electronics, USA.**

377.    On information and belief, Samsung is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling

246

and/or importing computerized communications devices (i.e. Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series) included without limitation Plaintiff's the CMDC as monitoring equipment that is interconnected to a lock disabler for locking and unlocking doors; the CMDC's global positioning system (GPS) is used for locating and tracking; the CMDC's internet is used for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit is used for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's fingerprint biometric lock disabler is used for identification and for disabling a lock after multiple failed attempts to unlock the CMDC device; and, the CMDC's interchangeable sensors are used for chemical, biological, and radiological detection. As set forth in Golden's preliminary infringement contentions that Samsung is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and Samsung is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

378.    The alleged infringement of Samsung identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity,

247

such as a permanent injunction is warranted and such a remedy would be in the public interest.

379.    On information and belief, LG is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and LG is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined. **Exhibit N: Claim Chart for LG Electronics, USA, Inc.**

380.    On information and belief, LG is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling and/or importing computerized communications devices (i.e. LG's V20, V30, V35, V50,

LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7)) included without limitation Plaintiff's CMDC as monitoring equipment that is interconnected to a lock disabler for locking and unlocking doors; the CMDC's global positioning system (GPS) is used for locating and tracking; the CMDC's internet is used for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit is used for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's fingerprint biometric lock disabler is used for identification and for disabling a lock after multiple failed attempts to unlock the CMDC device; and, the CMDC's interchangeable sensors are used for chemical, biological, and radiological detection. As set forth in Golden's preliminary infringement contentions that LG is making, using, offering for sale, selling and/or importing of the CMDC device have at a minimum directly infringed the '497 patent and LG is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. LG have caused damage to Golden, which infringement and damage will continue unless and until LG is enjoined.

381.    The alleged infringement of LG identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

382.   On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC devices. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling certain processing devices. The CMDC device have at a minimum directly infringed the '497 patent and Qualcomm is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined. **Exhibit O: Claim Chart for Qualcomm Inc.**

383.   On information and belief, Qualcomm is jointly, directly and/or indirectly infringing at least independent claim 1, and/or dependent claims 2-6 of the '497 patent in this judicial district and elsewhere in South Carolina and the United States by, among other things, making, using, offering for sale, selling certain processing devices as Central Processing Units (i.e. Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) for system-on-a-chip

application processing for at least Apple, Samsung, LG, Motorola, and Panasonic; included without limitation Plaintiff's CMDC as monitoring equipment that is interconnected to a lock disabler for locking and unlocking doors; the CMDC's global positioning system (GPS) is used for locating and tracking; the CMDC's internet is used for mobile internet to fit the dimensions of a CMDC device; the CMDC's central processing unit is used for mobile application processing i.e. system-on-a-chip (SoC); the CMDC's fingerprint biometric lock disabler is used for identification and for disabling a lock after multiple failed attempts to unlock the CMDC device; and, the CMDC's interchangeable sensors are used for chemical, biological, and radiological detection. As set forth in Golden's preliminary infringement contentions that Qualcomm is making, using, offering for sale, selling certain processing devices. The CMDC device have at a minimum directly infringed the '497 patent and Qualcomm is thereby liable for infringement of the '497 patent pursuant to 35 U.S.C. § 271. Qualcomm have caused damage to Golden, which infringement and damage will continue unless and until Qualcomm is enjoined.

384.    The alleged infringement of Qualcomm identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity,

such as a permanent injunction is warranted and such a remedy would be in the public interest.

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.      A judgment in favor of Golden that each defendant has infringed at least one of the '287 Patent, the '439 Patent, the 189 Patent, the '990 Patent, the '891 Patent and the '497 Patent as aforesaid;

B.      A permanent injunction enjoining each defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, '189, '990, '891, and '497 patents as aforesaid pursuant to 35 U.S.C. § 283;

C.      A judgment and order requiring each defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D.      Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38.

Respectfully submitted,

S/ *Larry Golden*     10/14/19

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# Exhibit 7

RECEIVED
USDC CLERK, GREENVILLE, SC

2020 JUN 16  PM 12: 03

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

LARRY GOLDEN, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

**-against-**

SEE ATTACHED LIST

_____

_____

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

**Complaint for a Civil Case**

Case No. _____
*(to be filled in by the Clerk's Office)*

Jury Trial:    ☑ Yes    ☐ No
*(check one)*

**Plaintiff's List of Companies: Federal District Court / Greenville, SC**

Apple Inc.

Attn: Vice President & Chief IP Counsel

1 Infinite Loop

Cupertino, CA 95014

Incorporated Under the Laws of the State of California


Samsung Electronics, USA

Attn: Senior VP & Head of Silicon Valley IP Office, US IP Center

85 Challenger Rd.

Ridgefield Park, New Jersey 07660

Incorporated Under the Laws of the State of New York


LG Electronics, USA, Inc.

Attn: General Counsel (IP) at LG Electronics

1000 Sylvan Avenue

Englewood Cliffs, New Jersey 07632

Foreign corporation organized and existing under the laws of South Korea


Qualcomm Inc.

Attn: Executive VP, General Counsel Intellectual Property

5775 Morehouse Drive

San Diego, CA 92121

Incorporated Under the Laws of the State of Delaware

Ford Global Technologies, LLC

Attn: Edward J. Benz III, Chief Intellectual Property Counsel

Fairlane Plaza South, Suite 800

330 Town Center Drive

Dearborn, Michigan 48126

Incorporated Under the Laws of the State of Delaware


General Motors Company

Attn: Paul Margolis, Counsel, GM Legal Staff

300 Renaissance Center

Detroit, MI 48243

Incorporated Under the Laws of the State of Delaware


FCA US LLC

Attn: Chief Executive Officer – Michael Manley

1000 Chrysler Drive

Auburn Hills, MI 48326-2766

Foreign Corporation incorporated under the laws of the Netherlands

I.   **The Parties to This Complaint**

A.   **The Plaintiff(s)**

Provide the information below for each plaintiff named in the complaint.  Attach
additional pages if needed.

Name             *LARRY GOLDEN*
Street Address   *740 WOODRUFF RD. FF 1102*
City and County  *GREENVILLE, SC (GREENVILLE)*
State and Zip Code *SOUTH CAROLINA, 29607*
Telephone Number *864-288-5605*

B.   **The Defendant(s)**

Provide the information below for each defendant named in the complaint,
whether the defendant is an individual, a government agency, an organization, or
a corporation.  For an individual defendant, include the person's job or title (if
known).  Attach additional pages if needed.

Defendant No. 1

Name                *SEE ATTACHED LIST*
Job or Title
(if known)
Street Address
City and County
State and Zip Code
Telephone Number

Defendant No. 2

Name
Job or Title
(if known)
Street Address
City and County
State and Zip Code
Telephone Number

Defendant No. 3

Name

Job or Title
(if known)                    _____

Street Address                _____

City and County               _____

State and Zip Code            _____

Telephone Number              _____

Defendant No. 4

    Name                          _____

    Job or Title
    (if known)                    _____

    Street Address                _____

    City and County               _____

    State and Zip Code            _____

    Telephone Number              _____

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

    ☑ Federal question          ☑ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.    If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

SECTION 1 SHERMAN ACT  28 U.S.C. 1331 & 1337

SECTIONS 4 & 6 CLAYTON ACT  15 U.S.C. 15 & 26

SOUTH CAROLINA STATE LAW 1367(a) & 1332

**B.    If the Basis for Jurisdiction Is Diversity of Citizenship**

1.    The Plaintiff(s)

    a.    If the plaintiff is an individual

        The plaintiff, *(name)* _LARRY GOLDEN_ , is a citizen of
the State of *(name)* _South Carolina._

    b.    If the plaintiff is a corporation

        The plaintiff, *(name)* _____, is incorporated
under the laws of the State of *(name)* _____,
and has its principal place of business in the State of *(name)*
_____.

    *(If more than one plaintiff is named in the complaint, attach an additional
page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

    a.    If the defendant is an individual

        The defendant, *(name)* _____, is a citizen of
the State of *(name)* _____. *Or* is a citizen of
*(foreign nation)* _____.

    b.    If the defendant is a corporation _SEE ATTACHED LIST_

        The defendant, *(name)* _____, is
incorporated under the laws of the State of *(name)*
_____, and has its principal place of
business in the State of *(name)* _____. *Or* is
incorporated under the laws of *(foreign nation)*
_____, and has its principal place of
business in *(name)* _____.

    *(If more than one defendant is named in the complaint, attach an
additional page providing the same information for each additional
defendant.)*

3.     The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

_IN EXCESS OF #10 BILLION_

## III.     Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

_SHERMAN ACT 1 : MOTIVE TO FORM A CONSPIRACY;_
_CONSPIRACY; UNREASONABLE RESTRAINT ON TRADE;_
_UNFAIR COMPETITION; COMBINATION; UNJUST ENRICHMENT_

## IV.     Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

_DAMAGES TO PLAINTIFF AND TO PLAINTIFF "CLASS"_

## V.    **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    **For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _June 15_ , 20_20_

Signature of Plaintiff      _Larry Golden_

Printed Name of Plaintiff   _Larry Golden_

### B.    **For Attorneys**

Date of signing: _____, 20__.

Signature of Attorney       _____

Printed Name of Attorney    _____

Bar Number                  _____

Name of Law Firm            _____

Address                     _____

Telephone Number            _____

E-mail Address              _____

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF SOUTH CAROLINA - GREENVILLE

RECEIVED
USDC CLERK. GREENVILLE. SC

2020 JUN 16  PM 12: 03

| | |
|---|---|
| LARRY GOLDEN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>V.<br><br>(1) APPLE INC.<br>(2) SAMSUNG ELECTRONICS, USA<br>(3) LG ELECTRONICS, USA, INC.<br>(4) QUALCOMM INC.<br>(5) FORD GLOBAL TECHNOLOGIES, LLC<br>(6) GENERAL MOTORS COMPANY<br>(7) FCA US LLC<br><br>Defendants. | CASE NO: _____<br><br>**(JURY TRIAL DEMANDED)**<br><br>**(The Sherman Act §1: Motive to Form a Conspiracy; Conspiracy; and Unreasonable Restraint on Trade). (Violation of South Carolina Consumer Protection and Unfair Competition Laws; Unjust Enrichment and Disgorgement of Profits)**<br><br>June 15, 2020 |

## COMPLAINT FOR ANTITRUST LAW VIOLATIONS

This is a civil action brought under Antitrust Law violations commencing from

competitor collaborations and teaming agreements that likely resulted in a secret conspiracy.

This action is for damages and injunctive relief on behalf of the Plaintiff and all others similarly

situated, against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG

Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Ford Global Technologies, LLC

("Ford"), General Motors Company ("GM"), and, FCA US LLC ("FCA"); demanding a trial by

jury, complains and alleges as follows:

## JURISDICTION AND VENUE

1.     This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover treble damages, injunctive relief, and costs of suit; recover damages under South Carolina state antitrust and common laws, for violation of Section 1 of the Sherman Act (15 U.S.C. § 1; conspiracy in the restraint of trade illegal).

2.     This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). This Court has jurisdiction under South Carolina law that are cognizable under this Court's supplemental jurisdiction, 28 U.S.C. § 1367(a). This Court also has jurisdiction over the South Carolina state law claims under 28 U.S.C. § 1332 because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the defendants.

3.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

4.     The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States:

      a.   Defendants and their co-conspirators participated in a continuous and uninterrupted flow in interstate commerce to customers located in South Carolina; and/or

b. Defendants and their co-conspirators sold and shipped substantial quantities of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) to customers located in South Carolina.

5.    The Defendants (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority, including each other as co-conspirators) have:

a. Transacted business in South Carolina;

b. Contracted to supply or obtain services or goods in South Carolina;

c. Intentionally availed themselves of the benefits of doing business in South Carolina;

d. Produced, promoted, sold, marketed or distributed their products or services in South Carolina and, thereby, profiting from their access to the markets in South Carolina;

e. Caused tortious damage by act or omission in South Carolina;

f. Caused tortious damage in South Carolina by acts or omissions committed outside of South Carolina while (i) regularly doing or soliciting business in South Carolina, and/or (ii) engaging in other persistent courses of conduct within South Carolina, and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in South Carolina; and,

g. Committed acts and omissions that the Defendants knew or should have known would cause damage (and, in fact, did cause damage) in South

Carolina to Plaintiff and members of the Class while (i) regularly doing or soliciting business in South Carolina, and/or (ii) engaging in other persistent courses of conduct within South Carolina and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in South Carolina.

## TOLLING OF THE STATUTE OF LIMITATIONS

6.    Plaintiff had neither actual nor constructive knowledge of the facts of collusion constituting its claim for relief and did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until at least March 29, 2018, when the Court of Federal Claims in *Larry Golden v. United States;* case no. 13-307C issued its "Opinion Granting the Government's Motion to Dismiss". After five (5) years of discovery to determine jurisdiction, the Trial Court dismissed 64 of the Plaintiff's allegations of infringing his claimed invention of a CMDC device (Case 1:13-cv-00307-SGB Document 130 Filed 03/29/18), for the following reasons:

"Regarding the "first requirement," private conduct incidentally benefitting the Government does not constitute use "for the benefit of the Government" … "The court does not have jurisdiction under 28 U.S.C. § 1498(a) to adjudicate patent infringement allegations concerning NSF and NIH grants and cooperative agreements, because any benefit to the Government, at best, would be incidental"… "determining that the alleged benefit to the Government of economic "stimulus, jobs, and revenue" was "merely an incidental effect of private conduct"… "Complaint contains no factual allegations establishing anything more than "incidental benefit" to the NSF"… *"Incidental benefit to the [G]overnment is insufficient" to satisfy the requirements of 28 U.S.C. § 1498(a)"*…

4

"The Government also argues that the Fifth Amended Complaint's "allegations relating generally to smartphones and other consumer devices should be dismissed" under RCFC 12(b)(1) and 12(b)(6), because they fail to allege "actual 'use' by the [G]overnment of the various combinations of consumer devices, nor would the [G]overnment's use be plausible."… "In addition, the Fifth Amended Complaint "fails to allege that any of these various consumer devices were made for the benefit of the [G]overnment."

7.        Defendants engaged in a secret conspiracy that did not reveal facts to the public that would put Plaintiff on inquiry notice that a conspiracy to conceal and/or hide the fact that the Defendants, Apple, Samsung, LG, and Qualcomm, as private parties, were manufacturing Communicating, Monitoring, Detecting, and Controlling (CMDC) devices. In an announcement found on the Department of Homeland Security's (DHS) website: "S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes" https://www.dhs.gov/science-and-technology/cell-all-super-smartphones-sniff-out-suspicious-substances. (2007- DHS/S&T; *Cell-All* solicitation for a new cell phone, i.e. smartphone). Defendants' agreement and conspiracy was kept secret.

8.        Plaintiff and Class was unaware of Defendants' unlawful conduct alleged herein and did not know the Defendants were manufacturing Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones) as their own private property during the Relevant Period.

9.      Defendants engaged in a secret conspiracy that did not reveal facts to the public

that would put Plaintiff on inquiry notice that a conspiracy to conceal and/or hide the fact that the

Defendants, Ford, General Motors, and, FCA, as parties owned by the Government, were

manufacturing Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems;

and, Network Connected Vehicles (NCV). Discovery revealed the following: "The U.S.

government's $80.7 billion bailout of the auto industry lasted between December 2008 and

December 2014. The U.S. Department of the Treasury used funds from the Troubled Asset

Relief Program (TARP). In the end, taxpayers lost $10.2 billion" https://www.thebalance.com

/auto-industry-bailout-gm-ford-chrysler-3305670.

10.      Plaintiff and Class was unaware of Defendants' unlawful conduct alleged herein

and did not know the Defendants were manufacturing Stall, Stop, and Vehicle Slow-Down

Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) as their

own private property during the Relevant Period.

11.      Thus, Plaintiff, nor the Class, could have had either actual or constructive

knowledge of the "fraudulent concealment" until March 29, 2018 when the Court of Federal

Claims in *Larry Golden v. United States;* case no. 13-307C issued its "Opinion Granting the

Government's Motion to Dismiss". It was on this date that the Plaintiff realized he could not

bring an action of patent infringement, or patent "takings" under the Fifth Amendment Clause,

against the "Government Third Party Contractors" and the "Government Owned Companies"

because their use of the inventions asserted in this complaint was "purely  incidental".

Defendants actively mislead the public about the government contracts to manufacture

Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, and what the

"Bailout" funds was actually used for (i.e. manufacture of Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV)).

12.    Defendants' "fraudulent concealment" means the Defendants Apple, Samsung, LG, Qualcomm, Ford, General Motors, and, FCA deliberately hide and/or suppress, with an intention to deceive or defraud, Plaintiff, and the Class, of material facts and/or circumstances by which the Defendants are legally bound to disclose. "Fraudulent concealment" is a common law doctrine and it can be invoked to toll a statute of limitations. The most liberal test for "fraudulent concealment" only requires a showing that the Defendants' conspiracy was carried out in a manner intended to deceive the Plaintiff, and the Class.

13.    The stature of limitation was tolled because the Plaintiff and Class was under a legal disability—the lack of legal capacity to do an act—at the time the cause of action accrues. The time limit was tolled until March 29, 2018, when the Court of Federal Claims in *Larry Golden v. United States;* case no. 13-307C issued its "Opinion Granting the Government's Motion to Dismiss" stating: "allegations relating generally to smartphones and other consumer devices should be dismissed" under RCFC 12(b)(1) and 12(b)(6), because they fail to allege actual 'use' by the [G]overnment of the various combinations of consumer devices… "incidental benefit to the [G]overnment is insufficient to satisfy the requirements of 28 U.S.C. § 1498(a)", at which time the disability was removed.

## THE PARTIES

14.    Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government

beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e. Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV). The Defendants conspired to develop the intellectual property technology as their own private property without Plaintiff's knowledge. The Plaintiff was deprived of royalty compensation as a result of the Defendants' illegal conduct. Every South Carolina tax paying citizen (the "Class") indirectly suffered as a result of Defendants' illegal conduct. For year 2019, the S.C. taxpayer burden equated to $14,500 for every state taxpayer.

15.    On information and belief, Apple is a California corporation with a principal place of business at 1 Infinite Loop, Cupertino, CA 95014 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Apple's total revenue between the years 2013 and 2019 = $1,130.8B. 25% royalty compensation for Plaintiff = $282.7B. 7.5% S.C. tax rate = $21.20B toward S.C. taxpayer debt. Apple may be served at its principal place of business at 1 Infinite Loop, Cupertino, CA 95014.

16.    On information and belief, Samsung is a New Jersey corporation with a principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey 07660 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this complaint. Samsung's total revenue between the years 2013 and 2019 = $664.1B.

25% royalty compensation for Plaintiff = $166.03B. 7.5% S.C. tax rate = $12.45B toward S.C.

taxpayer debt. Samsung may be served at its principal place of business at 85 Challenger Rd.

Ridgefield Park, New Jersey 07660.

17.    On information and belief, LG is a New Jersey corporation with a principal place

of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632 and does business in

this judicial district by, among other things, committing jointly, directly and/or indirectly:

Improper Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina

Consumer Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving

rise to this complaint. LG's total revenue between the years 2009 and 2019 = $585.87B. 25%

royalty compensation for Plaintiff = $146.47B. 7.5% S.C. tax rate = $10.99B toward S.C.

taxpayer debt. LG may be served at its principal place of business at 1000 Sylvan Avenue,

Englewood Cliffs, New Jersey 07632.

18.    On information and belief, Qualcomm is a California corporation with a principal

place of business at 5775 Morehouse Drive, San Diego, CA 92121 and does business in this

judicial district by, among other things, committing jointly, directly and/or indirectly: Improper

Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer

Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this

complaint. Qualcomm's total revenue between the years 2013 and 2019 = $169.48B. 25%

royalty compensation for Plaintiff = $142.37B. 7.5% S.C. tax rate = $3.18B toward S.C.

taxpayer debt. Qualcomm may be served at its principal place of business at 5775 Morehouse

Drive, San Diego, CA 92121.

19.    On information and belief, Ford is a Michigan corporation with a principal place

of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan

48126 and does business in this judicial district by, among other things, committing jointly,
directly and/or indirectly: Improper Oligopolistic Behaviors under The Sherman Act § 1;
Violation of South Carolina Consumer Protection and Unfair Competition Laws; and, Unjust
Enrichment of Profits giving rise to this complaint. Ford's total revenue between the years 2013
and 2019 = $1,065.4B. 25% royalty compensation for Plaintiff = $266.35B. 7.5% S.C. tax rate =
$19.98B toward S.C. taxpayer debt. Ford may be served at its principal place of business at
Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan 48126.

20.    On information and belief, GM is a Michigan corporation with a principal place
of business at 300 Renaissance Center, Detroit, MI 48243 and does business in this judicial
district by, among other things, committing jointly, directly and/or indirectly: Improper
Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer
Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this
complaint. GM's total revenue between the years 2013 and 2019 = $991.5B. 25% royalty
compensation for Plaintiff = $247.88B. 7.5% S.C. tax rate = $18.59B toward S.C. taxpayer debt.
GM may be served at its principal place of business at 300 Renaissance Center, Detroit, MI
48243.

21.    On information and belief, FCA is a Michigan corporation with a principal place
of business at 1000 Chrysler Drive, Auburn Hills, MI 48326 and does business in this judicial
district by, among other things, committing jointly, directly and/or indirectly: Improper
Oligopolistic Behaviors under The Sherman Act § 1; Violation of South Carolina Consumer
Protection and Unfair Competition Laws; and, Unjust Enrichment of Profits giving rise to this
complaint. FCA's total revenue between the years 2013 and 2019 = $701.15B. 25% royalty
compensation for Plaintiff = $175.29B. 7.5% S.C. tax rate = $13.15B toward S.C. taxpayer debt.

FCA may be served at its principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326.

22.    Defendants' total damages between the years 2013 and 2019, and Qualcomm years 2009 thru 2019 at 25% royalty compensation for Plaintiff = $1,327.09B. 7.5% S.C. tax rate = $99.54B toward S.C. taxpayer debt (the "Class").

## Co-Conspirators

23.    The Defendants conspired with various others "known" who participated as co-conspirators with the Defendants in the violations of law alleged in this complaint and have engaged in conduct and made statements in furtherance thereof.

24.    The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in management of each Defendant's business or affairs.

25.    Each of the Defendants named herein acted as the agent or representative of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this suit as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and a Plaintiff Class (the "Class") composed of and defined as follows:

All persons and entities residing in the United States who, during the Class period, purchased Communicating, Monitoring, Detecting, and Controlling (CMDC) devices,

Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) for their own use and not for resale. Specifically excluded from this class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded are any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

27.     This action has been brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

    a.   The Class is ascertainable and there is a well-defined community of interest among the members of the Class;

    b.   Based on the nature of the trade and commerce involved and the number of purchasers of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV), Plaintiff believe that the members of the Class number in the thousands, and therefore is sufficiently numerous that joinder of all Class members is not practicable;

    c.   Plaintiff claims are typical of the claims of the members of the Class because Plaintiff indirectly purchased Communicating, Monitoring, Detecting, and Controlling (CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV) from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise

12

to the claims of the members of the Class and the relief sought is common to the Class;

d.   The following common questions of law or fact, among others, exist as to the members of the Class:

    i.   whether Defendants formed and operated a combination or conspiracy;

    ii.   whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

    iii.   the appropriate measure of the amount of damages suffered by the Class;

    iv.   the operative time period of Defendants' combination or conspiracy;

    v.   whether Defendants' conduct violates Section 1 of the Sherman Act;

    vi.   whether Defendants conduct violates SC Code § 16-17-410 (2012)

    vii.   whether Defendants conduct violates SC Section 39-5-20

    viii.   whether Defendants' conduct violates South Carolina Consumer Protection and Unfair Competition Laws; Unjust Enrichment; and,

    ix.   the appropriate nature of class-wide equitable relief.

e.   These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class;

f.   After determination of the predominate common issues identified above, if necessary or appropriate, the Class can be divided into logical and manageable subclasses;

13

g.  Plaintiff will fairly and adequately protect the interest of the Class in that

Plaintiff has no interest that are antagonistic to other members of the Class;

h.  A class action is superior to other available methods for the fair and efficient

adjudication of this litigation since individual joinder of all damaged Class

members is impractical. The damages suffered by individual Class members

are relatively small, given the expense and burden of individual prosecution of

the claims asserted in this litigation. Thus, absent the availability of class

action procedures, it would not be feasible for Class members to redress the

wrongs done to them. Even if the Class members could afford individual

litigation, the court system could not. Further, individual litigation presents

the potential for inconsistent or contradictory judgements and would greatly

magnify the delay and expense to all parties and to the court system.

Therefore, the class action device presents far fewer case management

difficulties and will provide the benefits of unitary adjudication, economy of

scale and comprehensive supervision by a single court;

i.  Defendants have acted, and refused to act, on grounds generally applicable to

the Class, thereby making appropriate final injunctive relief with respect to the

Class as a whole; and,

j.  In the absence of a class action, Defendants would be unjustly enriched

because they would be able to retain the benefits and fruits of their wrongful

conduct.

k.  Throughout the period of time covered by this Complaint, Defendants and

their Co-conspirators engaged in the business of marketing and selling

(CMDC) devices, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS);

Lock Disabling Systems; and, Network Connected Vehicles (NCV)

## NATURE OF TRADE AND COMMERCE

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Devices**

28.     The Patent Owner's communicating, monitoring, detecting, and controlling

(CMDC) device is commercialized in the form of an improved cell phone, smartwatch, laptop, or

tablet. The specifications and capabilities of the CMDC device(s) developed, manufactured, and

commercialized by Apple, Samsung, LG, Qualcomm, Panasonic, and Motorola, are significantly

the same as the Patent Owner's CMDC device(s) as illustrated below:

- Communication: at least one of a satellite connection, Bluetooth connection, WiFi
  connection, internet connection, cellular connection, long and/or short-range radio
  frequency (RF) connection, or GPS connection was "taken" for the benefit of the
  Government and for Government "use".
- Monitoring: at least one of a viewing screen for monitoring in real time, viewing screen
  monitoring for CBRNE-H signal alerts, viewing screen monitoring for CBRNE-H color
  coded indicator lights, or viewing screen monitoring for tracking, alerts, and heart rate.
- Detecting: at least one of a chemical sensor, a biological sensor, an explosive sensor, a
  human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless,
  capable of being disposed within, on, upon or adjacent the CMDC device.
- Controlling: at least a fixed, portable or mobile communication device interconnected to
  a fixed, portable or mobile product, capable of wired or wireless communication
  therebetween, for sending signals to at least lock or unlock doors, stall, stop, or slowdown
  vehicles, activate or deactivate security systems, activate or deactivate multi-sensor
  detection systems, or to activate or deactivate cell phone detection systems.
- Central Processing Unit (CPU): is the programmable device capable of general-purpose
  computation. It is the engine of logic, as with the brain, and the core piece of hardware in

the Patent Owner's CMDC device (i.e. communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that executes instructions that make up a computer program.

- Biometrics: that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and or signature or a face recognition to at least gain access to the CMDC device or to prevent unauthorized use of the CMDC device.

- Lock, Unlock, Disabling Lock: the CMDC device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks after a certain number of failed attempts to unlock.

- Near-Field Communication: Near Field Communication or NFC is a short-range communication channel. The purposes for this technology is to simplify first-time connections to other wireless technologies, like Wi-Fi and Bluetooth. Near Field Communication in a CMDC device can be used as part of a two-factor access control system for unlocking a door. Biometric Fingerprint recognition is used for authentication and NFC is used to transmit authentication information to a computer controlling the door. NFC is preferred over RFID because RFID has a frequency vulnerable for detonating bombs.

- Location and Tracking: The CMDC tracking is a process for identifying the location of the device, whether stationary or moving. Localization may be affected by a number of technologies, such as using multi literation of radio signals between (several) cell towers of the network and the device, or simply using GPS. Some GPS CMDC devices use wireless-assisted GPS to determine the user's location. In wireless-assisted systems, the device uses the orbiting GPS satellites in conjunction with information about the device's signal. Sometimes called enhanced GPS, wireless-assisted GPS can often get a fix on the user's location faster than a GPS-only receiver. Some wireless-assisted systems can work inside buildings, under dense foliage and in city areas where traditional receivers cannot receive signals. GPS-enabled CMDC devices with view screens can often display turn-by-turn directions as well as announce them through the device's

speaker. A database of maps is used to provide the directions. The CMDC device locator provides GPS coordinates and can dial emergency CMDC device numbers. The Government, parents and caregivers can track the device's location by device or online and can receive notification if it leaves a designated "safe area."

- Example of Patent Owner's claimed invention CMDC device (i.e. smartphone). Below is claim 4 of the issued patent 10,163,287:

4. A communication device comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least

one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

**Similar Claims Covering the CMDC Device (i.e. Smartphone)**

| Pat. # RE43,990* | Pat. # 9,096,189 | Pat. # 9,589,439 | Pat. # 10,163,287 | App. # 16/350,683 | Reissue App. # 16/350,874* |
|---|---|---|---|---|---|
| Claim 11 of the RE43,990 Patent | Claims 1, 2, & 3 of the '189 Patent | Claims 13, 14, 15, 22, & 23 of the '439 Patent | Claims 1, 2, 3, 4, 5, & 6 of the '287 Patent | Claims 1 & 11 of the [683] Patent Application | Claims 13, 14, 15, 22, 23, 64, 74, 75, & 76 of the [874] Reissue Patent Application |

## STALL, STOP, and VEHICLE SLOW-DOWN SYSTEM (SSVSS)

29.    The Patent Owner's stop, stall, or vehicle slowdown mean; and, the CMDC device being interconnected to the vehicle to control certain operating systems, is illustrated below:

- Stall, Stop, Slowdown: the CMDC device being equipped to send signals to vehicles (i.e. driver, driverless, autonomous, unmanned aerial, unmanned land, unmanned sea, boats, trucks, etc.) that engages the computer, electrical, fuel, and/or air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to vehicle brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.
- Preprogrammed Stall, Stop, Slowdown: interconnected to the vehicle operating systems of at least one of, ignition start/stop, door lock/unlock, temperature settings and temperature on/off, vehicle brakes, foot peddle, lights, speed controls, and steering.

18



| GM/OnStar Stolen Vehicle Slow-down System | PO's SSVSS Pat. #: RE43,891; Independent Claim 11 | PO's SSVSS Patent #: 8,334,761; Independent Claim 1 |
|---|---|---|
| A vehicle adapted with Stolen Vehicle Slowdown: Requires paid plan, working electrical system, cell reception, GPS signal, armed GM factory-installed theft-deterrent system, contact method on file and enrollment to receive alerts. https://media.gm.com/media /us/en/gm/news.detail.html/content /Pages/news/us/en/2019/ apr/0404-onstar.html | A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: | A vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Using satellite and cellular technology, OnStar remotely slow the vehicle. OnStar activates a flashing message front of steering wheel, "engine power is reduced." The process affects the accelerator pedal. OnStar's Stolen Vehicle Slowdown System: by Jennifer Geiger; Copyright © 2012; HowStuffWorks.com, Inc. | at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; | at least one of a brake, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |

| | | |
|---|---|---|
| An OnStar Advisor can send a signal to disable the stolen vehicle's engine and gradually slow the vehicle to an idle speed to assist police in recovering the vehicle. https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2019/apr/0404-onstar.html | an electrical system in electrical communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; | an electrical system in electrical communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Some form of electromagnetic pulse is already featured in OnStar-equipped vehicles though the electromagnetic signal used to disable the vehicle is beamed via satellite, and doesn't cripple the in-car computer, but rather puts it into a mode that allows police to easily catch and then stop the fleeing criminal." https://tech.slashdot.org/story/10/01/22/2339204/electromagnetic-pulse-gun-to-help-in-police-chases | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Stolen Vehicle Slowdown: Requires paid plan, working electrical system, cell reception, GPS signal, armed GM factory-installed theft-deterrent system, contact method on file and enrollment to receive alerts. https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2019/apr/0404-onstar.html | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; |
| Some form of electromagnetic pulse is already featured in OnStar-equipped vehicles though the electromagnetic signal used to disable the vehicle is beamed via satellite, and doesn't cripple the in-car computer, but rather puts it into a mode that allows police to easily catch and then stop the fleeing criminal." https://tech.slashdot.org/story/10/01/22/2339204/electromagnetic-pulse-gun-to-help-in-police-chases | a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means to stall or slow down the vehicle; and | a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; and |

| | | |
|---|---|---|
| OnStar, will work with the cops to locate the vehicle using GPS. When the police identify the vehicle by sight, OnStar remotely makes the lights flash to confirm its identity. When conditions are safe to stop the vehicle, OnStar remotely slows it to a crawl. https://www.wired.com/2008/04/onstars-stolen/ | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| After a member has filed a police report and once authorities have confirmed conditions are appropriate, an OnStar Advisor can send a signal to disable the stolen vehicle's engine and gradually slow the vehicle to an idle speed to assist police in recovering the vehicle. https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2019/apr/ 0404-onstar.html | wherein the at least one control signal is sent due to unauthorized use of the vehicle, and wherein an originating first signal that eventually causes the at least one control signal to be sent is generated upon initial verification of the unauthorized use of the vehicle; | X |
| Some form of electromagnetic pulse is already featured in OnStar-equipped vehicles though the electromagnetic signal used to disable the vehicle is beamed via satellite, and doesn't cripple the in-car computer, but rather puts it into a mode that allows police to easily catch and then stop the fleeing criminal." https://tech.slashdot.org/story/10/01/22/2339204/electromagnetic-pulse-gun-to-help-in-police-chases | at least one mobile, portable, or fixed device capable of sending the at least one control signal from the remote location that is of electromagnet pulse, electrostatic discharge, microwave beam or radio frequency, to disable the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and horsepower of the motor. | X |

| | | |
|---|---|---|
| Stolen Vehicle Slowdown: Requires paid plan, working electrical system, cell reception, GPS signal, armed GM factory-installed theft-deterrent system, contact method on file and enrollment to receive alerts. https://media.gm.com/media /us/en/gm/news.detail.html/content /Pages/news/us/en/2019/ apr/0404-onstar.html | X | wherein a user determines that the vehicle has been stolen and in response initiates a distress signal communication over a communication network that causes communication between the vehicle and the remote location and that then causes the at least one control signal to be sent from the remote location via the communication network that includes at least one of a cell phone tower and a satellite. |

30.     **GM:** Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control.

| GM Pre-programmed Stall, Stop, or Vehicle Slow-down System | Patent Owner's CMDC Device Patent #: RES#,891; Independent Claim 44 |
|---|---|
| GM Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Chrysler, Dodge, Jeep, and Ram vehicles | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |

| | |
|---|---|
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |
| **GM Pre-programmed Stall, Stop, or Vehicle Slow-down Systems** | **Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 47, 48, 49, 50, 51, & 53** |
| Enhanced Smart Pedal Technology: Known as brake override, reduces power to the engine in cases where the brake and accelerator pedal are being simultaneously depressed. | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |
| Front Automatic Braking: Helps a driver avoid a forward crash or reduce the severity of crashing into a vehicle in front of it, whether it is moving or has come to a stop. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Rear Automatic Braking: Helps the driver avoid a crash or to mitigate the impact into objects directly behind their vehicle by bringing the vehicle to a stop. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |

| | |
|---|---|
| Electronic Stability Control (ESC): Detects loss of steering control, it automatically applies the brakes to help "steer" the vehicle. Braking is automatically applied. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| Lane Keep Assist: Represents an upgrade of Lane Departure Warning. The feature is listed as "Lane Keep Assist with Lane Departure Warning". | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Adaptive Cruise Control: The technology automatically accelerates and brakes the vehicle up to moderate levels to maintain a driver-selected following gap (distance). | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

31.    **FORD:** Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least, Ford's Evasive Steering Assist; Ford's Pre-Collision Assist; Ford's Reverse Brake Assist; Ford's AdvanceTrac Electronic Stability Control (ESC); Ford's Lane-Keeping system; or, Ford's Adaptive Cruise Control.

| Ford Pre-programmed Stall, Stop, or Vehicle Slow-down System | Patent Owner's CMDC Device Patent #: RES#,891; Independent Claim 44 |
|---|---|
| Ford's Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Explorer, Expedition, F-150, and Mustang vehicles | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |

| | |
|---|---|
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Explorer, Expedition, F-150, and Mustang vehicles equipped with at least Ford's Evasive Steering Assist; Pre-Collision Assist; Reverse Brake Assist; AdvanceTrac Electronic Stability Control (ESC); Lane-Keeping system; or, Adaptive Cruise Control. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |
| **Ford Pre-programmed Stall, Stop, or Vehicle Slow-down Systems** | **Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 48, 48, 49, 50, 51, & 53** |

| | |
|---|---|
| Ford's Evasive Steering Assist comes into play, employing the camera and radar sensor technology of the available Pre-Collision Assist with Automatic Emergency Braking to detect the vehicle ahead and apply active brake | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Ford's Pre-Collision Assist feature uses camera technology to detect a potential collision with a vehicle or pedestrian directly in front of your vehicle. If you don't take corrective action and a collision is imminent, brakes can apply automatically. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Ford's reverse brake assist with automatic emergency brake (AEB) will help prevent drivers from hitting an object while backing up. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |
| Ford's AdvanceTrac Electronic Stability Control automatically detects wheel-slippage, while adjusting torque & braking to gain control & traction. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| Ford's Lane-Keeping system has three modes: Lane-Keeping Aid applies steering torque to direct you back to the center of the lane. Lane-Keeping Alert warns you through steering wheel vibrations. You can set the system to activate either the Alert or Aid mode, or both. And Driver Alert sends out warnings in the message center. | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Ford's Adaptive Cruise Control lets you set a cruising speed and distance from the vehicle in front of you, an especially helpful feature in slow traffic conditions. When traffic ahead slows down, you automatically do too | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

32.    **FCA US LLC:** Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus.

| FCA US LLC Pre-programmed Stall, Stop, or Vehicle Slow-down System | Patent Owner's CMDC Device Patent #: RE$#,891; Independent Claim 44 |
|---|---|
| FCA US LLC Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Chrysler, Dodge, Jeep, and Ram vehicles | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |

| | |
|---|---|
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chrysler, Dodge, Jeep, and Ram vehicles equipped with at least, Brake-throttle override; Forward Collision Warning-Plus; ParkSense rear park assist system; Electronic stability control (ESC); LaneSense Departure Warning-Plus; or, Adaptive Cruise Control-Plus. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |
| **FCA US LLC Pre-programmed Stall, Stop, or Vehicle Slow-down Systems** | **Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 47, 48, 49, 50, 51, & 53** |
| Brake-throttle override: Allows driver to stop the vehicle when throttle and brake inputs occur simultaneously; electronic throttle control reduces engine-power output until vehicle stops or pedal inputs cease | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |
| Forward Collision Warning-Plus: Radar and camera technology combine to determine if frontal impact with another vehicle appears imminent; if so, system pre-fills brakes; no driver response triggers brief brake application; if driver remains unresponsive, brakes are applied to slow vehicle before impact | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| ParkSense rear park assist system: The system utilizes ultrasonic sensors at low speeds in reverse to detect stationary objects. If it is determined that a collision is imminent the system will provide a momentary, autonomous brake apply/brake jerk then release. At speeds below 7 km/h the system will bring the vehicle to a stop before releasing | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |

| | |
|---|---|
| Electronic stability control (ESC): Enhances driver control and helps maintain directional stability under all conditions. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| LaneSense Departure Warning-Plus: Leverages electronic power steering (EPS) to deliver a torque input to alert and assist the driver with corrective action | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Adaptive Cruise Control-Plus: Helps to maintain distance from the vehicle ahead and under certain conditions, can bring the vehicle to a full stop without driver intervention | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

## Lock Disabling Systems

33.    *Claim 1 of Patent No. 10/163,287.* Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising… the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

29

34.    *Claim 2 of Patent No. 10/163,287*. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to at least one of a home lock, a building lock, or a cargo container lock for communication therebetween; the monitoring equipment comprising… the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a home lock, a building lock, or a cargo container lock whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the home lock, building lock, or cargo container lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

35.    *Claim 3 of Patent No. 10/163,287*. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising… the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

**Network Connected Vehicles (NCV): CMDC Device (i.e. Smartphone) & Vehicle's**

**Operating Systems**

36.    The Ford Sync Connect Apps are the "gateways", "integrators", or "interfaces"
for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC
smartphones) to the Explorer, Expedition, F-150, and Mustang vehicles. The Ford Sync Connect
Apps allows the CMDC device user to command the forenamed vehicles to lock and unlock;
remote start, including scheduling a future start; vehicle status, including fuel, oil and battery
levels, along with tire pressure readings; and, vehicle location.

37.    Ford Sync Connect system Android Compatibility: You can utilize Google's
Android Auto to connect your smartphone to the Ford Sync Connect system. Ford Motor
Company's Explorer, Expedition, F-150, and Mustang mobile apps are downloaded from Google
Play for managing Ford's vehicles remotely.

| Ford: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| The Ford Sync Connect Apps are the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Explorer, Expedition, F-150 and Mustang vehicles. | A monitoring device, comprising: |
| The performance of LG's CMDC devices: CPU that's at the core of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); |
| LG's CMDC devices has an internal temperature sensor which monitors the CPU and battery temperature of device | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| LG's CMDC devices, starting with LG G2, you can calibrate the motion sensor by going to Settings > General tab > Motion. | at least one motion sensor in communication with the at least one CPU; |
| LG's CMDC devices: Thin Q has "the brightest" screen of any smartphone, thanks to its Super Bright Display technology. | at least one viewing screen for monitoring in communication with the at least one CPU; |

| | |
|---|---|
| LG's CMDC devices: GPS with A-GPS, GLONASS, and BDS | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| LG's CMDC devices: Wi-Fi, Wi-Fi Direct<br><br>Ford Sync Connect system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| LG's CMDC devices: cellular connection; Bluetooth<br><br>Ford Sync Connect system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| After multiple unsuccessful attempts, LG's CMDC devices will automatically perform a factory data reset and all of the personal files will be erased. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Battery Charging Specification, is power drawn from a USB port for charging. Three different sources of power: Standard downstream port (SDP), charging downstream port (CDP), and dedicated charging port (DCP). Wireless charging | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |
| LG's CMDC devices: features include sensors for face/smile detection, iris scanner, and fingerprint recognition | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| LG's CMDC wireless, wearable, mobile, device detects and identify chemicals in the air and sends detection data to another phone or a computer<br><br>LG Watch Sport Smartwatch wireless, wearable, mobile, electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| LG's CMDC device detects and identify chemicals in the air using a "sample jet" and sends detection data to another device (e.g. LG Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |

| | |
|---|---|
| LG's CMDC device, NFC is a short-range high frequency wireless communication technology; enables the exchange of data between devices; share content between digital devices. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |
| Voice Mate (i.e. Quick Voice; Q Voice) built-in application for various LG CMDC devices (i.e. smartphone); lock and unlock doors, activate and deactivate security systems.<br><br>The Ford Sync Connect Apps allows the LG CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles' doors; remotely start and cancel start the vehicles | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

38.     Fiat Chrysler Automobiles—FCA US LLC, Uconnect Access App is the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Chrysler, Dodge, Jeep, and Ram vehicles. The Uconnect Access App allows the CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles doors; remotely start and cancel start the vehicles; sound the horn of the vehicles; or, flash the lights of the vehicles.

39.     Uconnect® system Android Compatibility: You can utilize Google's Android Auto to connect your smartphone to the Uconnect® system. Android Auto by Google will help you seamlessly integrate your Android smartphone with your vehicle. Seller: FCA US LLC (FIAT CHRYSLER AUTOMOBILES)

| Samsung: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| The FCA US LLC Uconnect Access App is the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Chrysler, Dodge, Jeep, and Ram vehicles. | A monitoring device, comprising: |

| | |
|---|---|
| The performance of Samsung's CMDC devices: CPU that's a part of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); |
| Samsung's CMDC devices has various sensors like the temperature sensor for the battery and the CPU or processor. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| Samsung's CMDC devices accelerometers handle axis-based motion sensing—reason why the smartphone can track steps without a separate wearable. | at least one motion sensor in communication with the at least one CPU; |
| Samsung's CMDC device has set the bar with the highest-rated smartphone displays. With a panel produced by Samsung, and optimized by Apple | at least one viewing screen for monitoring in communication with the at least one CPU; |
| Samsung's CMDC device: GPS with A-GPS, GLONASS, BDS, GALILEO | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| Samsung's CMDC device: Wi-Fi, dual-band, Wi-Fi Direct, hotspot<br><br>Uconnect® system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| Samsung's CMDC device: cellular connection; Bluetooth<br><br>Uconnect® system Android Compatibility: CMDC device must be running Android 5.0 or higher | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Samsung's CMDC device: After several unsuccessful log-in attempts using a passcode or fingerprint, the Samsung CMDC device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Samsung's CMDC devices Fast Charge power bank has a capacity of 5,100mAh and can provide up to 1.5 charges for the majority of smartphones. The power bank has an LED power indicator; comes with a micro USB cable and a micro USB to USB Type-C adapter. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |

| | |
|---|---|
| Samsung's CMDC devices allows fingerprints to set-up the fingerprint scanner for easy log-in and lock-out. Face unlock uses the front-facing camera to identify the user and unlock the device. Iris scanning uses special sensors on front of phone to identify and unlock the device. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| Samsung's CMDC wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Samsung's S3 Classic electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| Samsung's CMDC device detects and identify chemicals in the air using a "sample jet" and sends detection data to another device (e.g. Samsung Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center. | one or more detectors in communication with the least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |
| Samsung's CMDC device, near-field communication (NFC) Ring can unlock the device. The NFC Ring has two NFC tag inlays inside the ring and can be used to unlock & control mobile devices | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |
| Samsung's SmartThings contains: Connects to appliances, lights, locks, cameras, thermostats, sensors. BMW Digital Key to lock/unlock; and start it up with Samsung phones only.<br><br>The FCA US LLC Uconnect Access App allows the Samsung CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles' doors; remotely start and cancel start the vehicles | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

40.    General Motors Company (GM) myChevrolet, myBuick, myGMC and

myCadillac mobile apps are the "gateways", "integrators", or "interfaces" for interconnecting the

Patent Owner's CMDC device (i.e. at least Apple, Samsung, and LG CMDC smartphones) to the

Chevrolet, Buick, GMC and Cadillac vehicles. The GM Remote Access Apps allows the CMDC

35

device user to command the forenamed vehicles to at least lock and unlock the vehicles doors;

remotely start and cancel start the vehicles; sound the horn of the vehicles; or, flash the lights of

the vehicles.

41.    GM Remote Access system Android Compatibility: You can utilize Google's

Android Auto to connect your smartphone to the GM Remote Access system. General Motors

Company (GM) myChevrolet, myBuick, myGMC and myCadillac mobile apps are downloaded

from Google Play for managing GM's vehicles remotely.

| Apple: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| The GM Remote Access Apps is the "gateway", "integrator", or "interface" for interconnecting the Patent Owner's CMDC device (i.e. at least Apple, Samsung, LG CMDC smartphones) to the Chevrolet, Buick, GMC and Cadillac vehicles. | A monitoring device, comprising: |
| The performance of Apple's CMDC devices: CPU that's a part of the chipset is vital for the daily user experience and the general computing performance of the electronic detection devices (i.e. smartphone). | at least one central processing unit (CPU); |
| Apple Files Patent for a new Temperature Sensor tied to a new Interactive Battery Indicator | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| Apple's CMDC devices: Apple M-series coprocessors are motion coprocessors used by Apple Inc. in their mobile devices. | at least one motion sensor in communication with the at least one CPU; |
| Apple's CMDC devices: Highest absolute color accuracy; full screen brightness; full screen contrast; contrast ratio; lowest screen reflectance; smallest brightness variation | at least one viewing screen for monitoring in communication with the at least one CPU; |
| Apple's CMDC device: GPS with A-GPS, GLONASS | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| Apple's CMDC device: Wi-Fi, dual-band, hotspot GM Remote Access system iPhone Compatibility: CMDC device requires iOS 10.0 or later | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |

| | |
|---|---|
| Apple's CMDC device: cellular connection; Bluetooth<br><br>GM Remote Access system iPhone Compatibility: CMDC device requires iOS 10.0 or later | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Apple's CMDC device includes a feature on that disables and erases all of the devices data after 10 failed passcode attempts. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Apple's CMDC device batteries and wall chargers which employ USB PD have the ability to charge devices up to 100W output using a USB-C connector | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |
| Apple's CMDC device features include sensors for face/smile detection, and fingerprint recognition. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| Apple's CMDC wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Apple Watch Series 3 electronic detection device for chem / bio / human heart rate detection and monitoring at rest or active | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| Apple's CMDC device detects and identify chemicals in the air using a "sample jet" and sends detection data to another device (e.g. Apple Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |
| Apple's CMDC device, NFC is a short-range high frequency wireless communication technology; enables the exchange of data between devices; share content between digital devices. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |

| | |
|---|---|
| Apple's Viper SmartStart: Start, locate and control your car with your iPhone, or Apple Watch. Viper system in your car so you can start, lock and unlock your car<br><br>The GM Remote Access Apps allows the Apple CMDC device user to command the forenamed vehicles to at least lock and unlock the vehicles' doors; remotely start and cancel start the vehicles | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or... detect at least one of a chemical biological... agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

42.     Qualcomm's claim on inventing the smartphone (i.e. CMDC Device)

| Qualcomm: CMDC Device | Patent #: 10,163,287; Independent Claim 5 |
|---|---|
| DHS; S&T "Cell-All" initiative. Develop detection device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million electronic devices (i.e. cell phones) | A monitoring device, comprising: |
| The Snapdragon central processing unit (CPU) uses a single SoC that may include multiple CPU cores, a wireless modem, and other software and hardware to support a smartphone's global positioning system (GPS), camera, gesture recognition and video. The Snapdragon system on chip (SoC) was announced in Nov. 2006. | at least one central processing unit (CPU); |
| Qualcomm® Bluetooth® Low Energy Solutions Environmental Sensor Board<br>Sensors: Accelerometer sensor, Temperature sensor, Pressure sensor, Magnetometer sensor, Humidity sensor, Gyro/angular sensor | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| Snapdragon sensor engine supports course motion classification, which determines standing, resting, walking, running, driving, or parking. | at least one motion sensor in communication with the at least one CPU; |
| Qualcomm TruPalette display tech is supported by Qualcomm Snapdragon processors | at least one viewing screen for monitoring in communication with the at least one CPU; |
| The Snapdragon central processing unit (CPU) uses a single SoC that may include multiple CPU cores, a wireless modem, and other software and hardware to support a smartphone's global positioning system (GPS), camera, gesture recognition and video | at least one global positioning system (GPS) connection in communication with the at least one CPU; |

| | |
|---|---|
| Apple iPhone 8; Qualcomm Modem Model A1663; 802.11ac Wi Fi with MIMO; Bluetooth 5.0 wireless technology; NFC with reader mode. | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |
| Apple iPhone 7; Qualcomm Modem Model A1660; 802.11ac Wi Fi with MIMO; Bluetooth 4.2 wireless cellular technology; NFC with reader mode. | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Qualcomm Technologies SafeSwitch is available through its Qualcomm Snapdragon processors. SafeSwitch technology - addresses mobile security threat with a kill switch solution designed to remotely disable the devices in the event they're lost or stolen - then re-enable when found. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; |
| Qualcomm Quick Charge: Qualcomm's Snapdragon SoCs is used in a number of popular smartphones and tablets, has its own fast-charging standard. Quick Charge is a technology found in Qualcomm SoCs, used in devices such as mobile phones, for managing power delivered over USB. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; |
| Authenticating beyond secure fingerprint identification, a Snapdragon 835 Mobile Platform provides safety using Camera Security—a camera-based biometric solution for iris and facial recognition. | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; |
| *Cell-All*: wireless, wearable, mobile, device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone or a computer<br><br>Samsung Gear S2 3G Watch & Samsung Gear S Watch (Qualcomm Snapdragon 400 Processor); LG Watch Sport & LG G Watch R & LG Watch Urban (Qualcomm Snapdragon 400 Processor) for chem / bio / human heart rate detection and monitoring | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| *Cell-All*: The device detects and identify chemicals in the air using a "sample jet" and sends detection data to another phone (e.g. Apple, Samsung, LG, Smartphone) or a computer<br>"How does it work?" Shows indicator lights for the monitoring device; relayed over a cellular network to the monitoring center.<br><br>WMD sensor development for the Cell-All Initiative: Qualcomm, NASA, and Rhevision Technology | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |

| | |
|---|---|
| Qualcomm include NXP's near-field communication (NFC) solution in the Snapdragon processor platform that powers mobile devices (e.g. smartphones), wearables (e.g. smartwatches), and automobiles. | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… |
| Qualcomm Technologies developed the QCA4020 tri-mode connectivity system-on-chip (SoC), the IoT industry's first commercially sampling connectivity solution that integrates three major radios in one low-power, cost-optimized chip. Connecting IoT devices like Refrigerators, TVs, security systems, thermostats, door locks. The Snapdragon 820A enables the driver attention-sensing cameras and autonomous controls to fingerprint-based door locks. *Cell-All:* The device detects and identify chemicals in the air using a "sample jet" sends detection data to another phone | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

43.     All CMDC Devices: DHS; S&T "Cell-All" initiative. Develop CMDC device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million CMDC devices (i.e. smartphones)

| **CMDC** Devices | Patent #: 10,163,287; Independent Claim 4, 5 & 6 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,589,439; Independent Claim 22 | Patent #: 9,096,189; Independent Claim 1 | Patent #: RE43,990; Independent Claim 11 | Patent #: 7,385,497; Independent Claim 1 |
|---|---|---|---|---|---|---|
| DHS; S&T "Cell-All" initiative. Develop CMDC device to detect deadly chemicals". Stephen Dennis; PM: Contracts to Qualcomm, LG, Apple, and Samsung. Sensors will integrate with 261 million CMDC devices (i.e. smartphones) | Claim 4: A communication device, comprising: Claim 5: A monitoring device, comprising: Claim 6: Monitoring equipment, comprising: | Claim 23: A cell phone comprising: *Note: This claim 23 of the '439 patent directly covers the 'new and improved' cell phone the DHS requested in its Cell-All solicitation* | Claim 22: A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising: | Claim 1: A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | Claim 11: A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products, interconnected to a product for communication therebetween, comprising: | Claim 1: A multi sensor detection and lock disabling system for monitoring products and for detecting chemical, biological, and radiological agents and compounds so that terrorist activity can be prevented, comprising: |

40

44.    "Network Connected Vehicles" Patent Claims

**Patent No.: 10,163,287**

3. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or ***smart phone interconnected to a vehicle lock for communication therebetween***; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular

connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and,

the *monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock*, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

**Patent No.: 8,334,761**

1. A *vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means*, comprising:

at least one of a brake, a foot peddle, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

an electrical system in electrical communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a computer system in signal transmission communication with at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means;

a receiver in computer communication with the computer system and adapted to receive at least one control signal from a remote location to activate a stall-to-stop means or vehicle slowdown means; and

wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor;

wherein a user determines that the vehicle has been stolen and in response initiates a distress signal communication over a communication network that causes communication between the vehicle and the remote location and that then causes the at least ***one control signal to be sent from the remote location via the communication network that includes at least one of a cell phone tower and a satellite***.

**Patent No.: 8,106,752**

1. A stall-to-stop disabling and slowdown system for slowing and stopping a vehicle wherein the vehicle includes a transceiver and a stall-to-stop system that is interconnected to the electromotive system and of the vehicle, comprising:

43

a stall-to-stop disabling and slowdown means that includes:

***monitoring equipment located at a determinate monitoring site;***

at least one Cellular tower and at least one satellite capable of sending and receiving signals to and from the monitoring equipment and the transceiver of the vehicle;

the Cellular tower and the satellite capable of two-way signal communication with the transceiver of the vehicle; and

whereupon a distress signal sent from a portable or fixed telecommunication device to the satellite causes a signal to be sent to the monitoring equipment followed by ***communicating with the transceiver of the vehicle for exchanging information on at least one of a, mechanical problem, electrical problem, computer problem, location, and speed of the vehicle*** resulting in the monitoring equipment transmitting a signal to the Cellular tower and/or satellite and the Cellular tower and/or satellite communicating with the transceiver of the vehicle for executing commands that actuate the stall-to-stop system for slowing and stopping the vehicle.



## RELATED CASES

45.     Plaintiff Larry Golden has filed an action of patent infringement on September 11,

2019, at the United States District Court for the District of South Carolina; Greenville Division

(Case No. 6:19-cv-2557) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA

("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola

Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"),

Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA,

Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of

Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet

("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big

O"). The case is on appeal at the Court of Appeals for the Federal Circuit (CAFC); case no. 20-

1508.

## DEFENDANT'S ILLEGAL CONDUCT

**Sherman Act § 1: "Motive to Form a Conspiracy": (Apple, Samsung, LG, Qualcomm)**

46.     Evidence of the Defendants' (Apple, Samsung, LG, Qualcomm), motive to

conspire means that the relevant market was conducive to "collusion" due to the presence of

oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products.

Concentrated markets are, by nature, more conducive to collusion. The Defendants' (Apple,

Samsung, LG, Qualcomm), as government own or ran companies, and/or third-party government

contractors—under contract to perform work for the Government—was aware that if they form a

conspiracy, while under an agreement or contract with the Government to control the

45

development, manufacture, commercialization, and pricing of product(s), there would not be any

reasonable substitute for their product or service.

47.     The Defendants' "motive to form a conspiracy" accelerated after the decision in

*ZOLTEK CORP. v. UNITED STATES*; 04-5100, -5102 (Fed. Cir. 2006):

> "We conclude that under § 1498, the United States is liable for the use of a method patent
>
> only when it practices every step of the claimed method in the United States. The court
>
> therefore affirms the trial court's conclusion that § 1498 bars Zoltek's claims... The
>
> United States contracted with Lockheed Martin Corporation ("Lockheed") to design and
>
> build the F-22 fighter. *Zoltek*, 51 Fed. Cl. at 831. Lockheed subcontracted for two types
>
> of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material
>
> made from Nicalon silicon carbide fibers. These fibers are partially carbonized and
>
> manufactured into sheets in Japan, which are then imported into the United States. The
>
> second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are
>
> manufactured exclusively in Japan, but they are processed into mats in the United
>
> States. *Zoltek*, 58 Fed. Cl. at 690... Zoltek brought suit in the Court of Federal Claims
>
> under § 1498(a), alleging that the United States and Lockheed used the methods claimed
>
> in the Re '162 patent when Lockheed's subcontractors made the two silicide fiber
>
> products used in the F-22. Zoltek alleges that the mats and sheets were made, for the
>
> United States, using the claimed methods...The government moved for partial summary
>
> judgment that Zoltek's § 1498(a) claims were barred by § 1498(c) because they arose in
>
> Japan. The trial court denied the motion. Although it agreed that § 1498(c) barred
>
> Zoltek's claims under § 1498(a)... The federal government is immune from any legal
>
> action by its sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61

S. Ct. 767, 85 L. Ed. 1058 (1941) (stating that " [t]he United States, as sovereign, is immune from suit save as it consents to be sued"). The waiver of immunity can be limited and conditioned by the Congress. *See United States v. Nordic Village Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992) (stating that the government's consent to be sued must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires). A patentee's judicial recourse against the federal government, or its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C. § 1498.[2] Section 1498(a) provides, in pertinent part: Whenever an invention described in and covered by a patent of the United States *is used. . . by or for the United States* without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture… This court has held that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 768 n. 3 (Fed. Cir. 1984)). We have further held that "a process cannot be used `within' the United States as required by section 271(a) unless each of the steps is performed within this country." *Id.* at 1318. Consequently, where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a). We affirm the trial court's conclusion that § 1498(a) bars Zoltek's claims."

**The Conspiracy: (Apple, Samsung, LG, Qualcomm)**

47

48.      After the events of 9/11 the Plaintiff introduced to the United States

("government") three economic stimulus and terrorism prevention packages: The packages were

titled: the "ATPG" project; the "SafeRack" project; and the "V-Tection" project. The Plaintiff

submitted the packages to President Bush and his administration, the U.S. Senators and U.S.

Congressmen that was in office during the Bush administration beginning in the year 2003.

Beginning in year 2004, the Government began enforcing and administering the Plaintiff's

intellectual property subject matter strategies. The packages outlined how the Government could

stimulate the economy following the 9/11 attacks and provide protection against future terrorist

activities. Because the Plaintiff's residence is in South Carolina, and the Plaintiff's business is in

South Carolina, the stimulus packages would have benefited the Plaintiff and the Plaintiff's Class

through royalty compensation for the Plaintiff, new jobs growth, low unemployment, increase

S.C. tax revenue, and a decrease, if not totally eliminate, South Carolina's debt. The Defendants'

(Apple, Samsung, LG, and Qualcomm) collusion, and conspiracy to hinder trade, destroyed all

possibilities for the Plaintiff to receive royalty compensation and for the Class to eliminate its

South Carolina taxpayer debt.

49.      The Plaintiff's CMDC device is, designed for integration with any of the products

grouped under the "ATPG" project, the "SafeRack" project, and the "V-Tection" project. The

CMDC device was designed to be mass developed, mass manufactured, mass marketed, and

mass commercialized across all industries, agencies, groups, demographics, race, ages, and

gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

The Defendants (Apple, Samsung, LG, and Qualcomm) colluded and conspired under the

protection of a Government contract to develop a "new and improved cell phone" (i.e.

smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and

48

mass commercialized across all industries, agencies, groups, demographics, race, ages, and

gender to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

50.    The US Department of Homeland Security (DHS), NASA's Ames Research

Center, (the United States), entered into cooperative agreements (contracts) with Qualcomm Inc.,

LG Electronics, Apple Inc., and the Samsung Group for the development of a new and improved

cell phone (i.e. smartphone) that is capable of detection for chemical and biological agents. The

agreements were entered into after Defendants' receive notices of the Plaintiff's intent to develop

his own CMDC device for commercialization. The Defendants (Apple, Samsung, LG, and

Qualcomm) colluded and conspired under the protection of a Government contract to develop a

"new and improved cell phone" (i.e. smartphone). The motive to form a conspiracy for the

Defendants, was to avoid being sued for infringement because the Defendants (Apple, Samsung,

LG, and Qualcomm) was performing the work under a Government contract. The Defendants

(Apple, Samsung, LG, and Qualcomm) also conspired not to perform all of the Plaintiff's

patented process within the United States. By not performing all of the Plaintiff's patented

process in the United States, "government liability does not exist pursuant to section 1498(a) for

patent infringement", See *Zoltek,* 2006.

51.    It is the belief of the Plaintiff, that the Defendants (Apple, Samsung, LG, and

Qualcomm) have been unjustly enriched through the non-payment of royalty compensation to

the Plaintiff that should have been paid as a percentage of the Defendants gross annual revenue

for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices. "Verto

Analytics looked at the numbers of Apple, Samsung, and LG (CMDC devices) smartphones

currently owned by U.S. consumers, and the equivalent market share. January 2018, Apple leads

the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung

claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, has 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market."

52. It is the belief of the Plaintiff, that throughout the Relevant Period, Defendants' (Apple, Samsung, LG, and Qualcomm) unlawful activities, as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

53. It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm) are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Communicating, Monitoring, Detecting, and Controlling (CMDC) devices.

54. It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm) act together in ways that limit competition by hindering Plaintiff's businesses from entering the market, while exercising an unreasonable horizontal restraint of trade. The Defendants' (Apple, Samsung, LG, and Qualcomm) agreements are considered unreasonable because the Defendants interact to such a degree that they were no longer acting independently, and the collaboration gave the Defendants the ability to wield market power together.

55. It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and Qualcomm) and their co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices without paying royalty compensation.

56.    It is the belief of the Plaintiff, that the Defendants' (Apple, Samsung, LG, and

Qualcomm), through their officers, directors and employees, effectuated the aforesaid contract,

combination, thrust or conspiracy between themselves and their co-conspirators.

**Sherman Act § 1: "Motive to Form a Conspiracy": (GM, FCA, and Ford)**

57.    Evidence of the Defendants' (GM, FCA, and Ford), motive to conspire means that

the relevant market was conducive to "collusion" due to the presence of oligarchic sellers,

diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are,

by nature, more conducive to collusion. The Defendants' (GM, FCA, and Ford), as government

own or ran companies, and/or third-party government contractors—under contract to perform

work for the Government—was aware that if they form a conspiracy, while under an agreement

or contract with the Government to control the development, manufacture, commercialization,

and pricing of product(s), there would not be any reasonable substitute for their product or

service.

58.    The Defendants' "motive to form a conspiracy" accelerated after the decision in

*ZOLTEK CORP. v. UNITED STATES*; 04-5100, -5102 (Fed. Cir. 2006):

> "We conclude that under § 1498, the United States is liable for the use of a method patent
>
> only when it practices every step of the claimed method in the United States. The court
>
> therefore affirms the trial court's conclusion that § 1498 bars Zoltek's claims… The
>
> United States contracted with Lockheed Martin Corporation ("Lockheed") to design and
>
> build the F-22 fighter. *Zoltek*, 51 Fed. Cl. at 831. Lockheed subcontracted for two types
>
> of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material
>
> made from Nicalon silicon carbide fibers. These fibers are partially carbonized and
>
> manufactured into sheets in Japan, which are then imported into the United States. The

second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are manufactured exclusively in Japan, but they are processed into mats in the United States. *Zoltek*, 58 Fed. Cl. at 690... Zoltek brought suit in the Court of Federal Claims under § 1498(a), alleging that the United States and Lockheed used the methods claimed in the Re '162 patent when Lockheed's subcontractors made the two silicide fiber products used in the F-22. Zoltek alleges that the mats and sheets were made, for the United States, using the claimed methods...The government moved for partial summary judgment that Zoltek's § 1498(a) claims were barred by § 1498(c) because they arose in Japan. The trial court denied the motion. Although it agreed that § 1498(c) barred Zoltek's claims under § 1498(a)... The federal government is immune from any legal action by its sovereign immunity. *See United States v. Sherwood*, 312 U.S. 584, 586, 61 S. Ct. 767, 85 L. Ed. 1058 (1941) (stating that " [t]he United States, as sovereign, is immune from suit save as it consents to be sued"). The waiver of immunity can be limited and conditioned by the Congress. *See United States v. Nordic Village Inc.*, 503 U.S. 30, 34, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992) (stating that the government's consent to be sued must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires). A patentee's judicial recourse against the federal government, or its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C. § 1498.[2] Section 1498(a) provides, in pertinent part: Whenever an invention described in and covered by a patent of the United States *is used. . . by or for the United States* without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for

such use and manufacture... This court has held that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 768 n. 3 (Fed. Cir. 1984)). We have further held that "a process cannot be used `within' the United States as required by section 271(a) unless each of the steps is performed within this country." *Id.* at 1318. Consequently, where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a). We affirm the trial court's conclusion that § 1498(a) bars Zoltek's claims."

**The Conspiracy: (GM, FCA, and Ford)**

59.    Plaintiff first contacted GM/OnStar during the summer months of 2007 to ask if they would like to participate with Plaintiff in responding to a Department of Homeland Security (DHS) solicitation: (Broad Agency Announcement; BAA 07-02A).  The Plaintiff's primary contact person at GM/OnStar was Mr. Jim Culbertson. The Plaintiff asked Mr. Culbertson if GM/OnStar has the capability of bringing a moving vehicle to a stall, stop, or slowdown.  Mr. Culbertson's response to me was, "I need time to find out if we have those capabilities and if there is interest from upper management". After several conversations and several failed attempts to reach Mr. Culbertson, Plaintiff never heard back from GM/OnStar. Plaintiff noticed while watching TV, an announcement made by GM/OnStar on October 9, 2007 of a new, "Stolen vehicle slow down system" that was being offered by GM/OnStar beginning the following year on their 2009 models. GM/OnStar's "Stolen vehicle slow down system" is substantially the same as the Plaintiff's "stall, stop, and vehicle slowdown systems (SSVSS)" that Plaintiff had discussed earlier with GM/OnStar's Mr. Culbertson during the summer months

53

of 2007. Plaintiff called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791.

Mr. Culbertson referred Plaintiff to Angie Miller at 313-665-1485. When Plaintiff dialed Ms.

Miller's number, the answering machine for a Michelle came on; therefore, Plaintiff did not

leave a message. On April 14, 2008, Plaintiff faxed a letter of interest to the General Motors

Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several

members of the General Motors leadership team, to include, Mr. Frederick A. Henderson,

President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief

Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel.

     60.    "The federal government took over GM… in March 2009. The Government fired

GM CEO Rick Wagoner. GM entered bankruptcy on June 1, 2009. By the end of July, GM

emerged from bankruptcy reorganization, became two separate companies and spun off GMAC

into Allied Financial. The Treasury Department began selling off its ownership of GM in 2010.

The Obama administration used the take-over to set new auto efficiency standards design to

improved air quality and forced U.S. automakers to be more competitive against Japanese and

German firms. On December 18, 2014, the Treasury Department ended the bailout. That's when

it sold its last remaining shares of Ally Financial, formerly known as General Motors Acceptance

Corporation. It had bought them for $17.2 billion to infuse cash into the failing GM subsidiary.

The Treasury Department sold the shares for $19.6 billion, making a $2.4 billion profit for

taxpayers. On June 1, 2009, GM entered bankruptcy. It had $82 billion in assets and $172.8

billion in liabilities. That month, sales hit their low point of 9.545 million cars and trucks.

The government lent GM $30.1 billion to fund operations through June and July while it went

through bankruptcy reorganization. It also guaranteed GM's extended warranties. In return, it

bought 60 percent of the company in warrants for common stock and preferred stock.

The Canadian government bought 12 percent. A union health trust received 17.5 percent stock ownership. That was in lieu of the $20 billion needed to cover benefits for 650,000 retirees. Bondholders received 10 percent stock ownership in lieu of $27 billion in bonds. Stockholders lost all their investment. GM promised to repay the $30 billion loan by 2012 when it planned to break even. The company pledged to cut its debt by $30 billion by converting debt ownership for equity. It agreed to pay union health care benefits to retirees by 2010. It promised to sell its Saab, Saturn, and Hummer divisions, reducing the number of models for sale to 40. It shut down 11 factories, closed 40 percent of its 6,000 dealerships, and cut more than 20,000 jobs. Government funding also provided the following incentives for new car buyers: The government backed all new car warranties; the economic stimulus bill allowed new car buyers to deduct all car sales and excise taxes; Congress approved TARP-funded subsidies of zero percent financing for some Chrysler vehicles. The government intended to make GM more efficient. That would allow it to become profitable when sales returned to 10 million vehicles a year. That happened in July 2009, when sales hit 10.758 million. GM emerged from bankruptcy on July 10, 2009, as two separate companies. Old GM held most of the debt. New GM held the assets, $17 billion in debt, the contract with unions, and its underfunded pension funds. This allowed it to move forward as a profitable company. The new company only has four brands: Chevrolet, Cadillac, GMC, and Buick. The company sold Saab and discontinued Saturn and Hummer. In April 2010, New GM repaid its $6.7 billion TARP loan. In November 2010, Treasury revealed it would sell half its ownership of GM. That sale allowed an initial public offering on the stock market of $33 a share. It had already gotten back $37.2 billion by selling its ownership in GM. In November 2013, the Treasury Department announced it would sell its remaining 31.1 million shares in GM. In

December 2014, Treasury sold its remaining shares in Ally Financial."

https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

61.    "The federal government took over Chrysler in March 2009. The Government
required Chrysler to merge with Italy's Fiat S.p.A. Chrysler entered bankruptcy on April 3, 2009.
By the end of July, Chrysler emerged from bankruptcy reorganization and became a brand
owned mostly by Fiat. Chrysler paid off the last of its loans by 2011. On January 16, 2009, the
Treasury Department approved a $1.5 billion loan for Chrysler Financial. The interest rate for the
loans was one point above Libor. In return, Chrysler Financial promised to pay the government
$75 million in notes and reduce executive bonuses by 40 percent. As a result, car buyers got zero
percent financing for five years on some models. Chrysler received $4 billion of the $7 billion
bridge loan it originally requested. In return, its owner Cerberus vowed to convert its debt to
equity. Chrysler had also asked for $6 billion from the Energy Department to retool for more
energy efficient vehicles. Chrysler wanted the Big Three to partner with the federal government
in a joint venture to develop alternative energy vehicles. That didn't happen, and Chrysler didn't
get the loan from the Energy Department. Instead, it pledged to debut an electric vehicle in 2010
and ramp up its production to 500,000 by 2013. On April 30, 2009, Chrysler filed for
bankruptcy. Treasury Secretary Tim Geithner agreed to lend it $6 billion to fund operations
while in bankruptcy. It emerged as a new company; 58.5 percent of which automaker Fiat S.p.A.
of Italy now partly owned. This Fiat-Chrysler merger created the world's sixth largest
automaker. The rest was owned by the United Auto Workers Retiree Medical Benefits
Trust. Chrysler closed underperforming dealerships as part of its bankruptcy proceedings. In
May 2011, Chrysler repaid $11.2 billion of its outstanding $12.5 billion in TARP loans six years
ahead of schedule. Total cost to taxpayers was $1.3 billion. In 2013, Fiat CEO Sergio

Marchionne announced plans to take Chrysler public on the New York Stock Exchange. This allowed Fiat to purchase the rest of the company and merge the two into a more competitive global automaker. In October 2014, it was listed under the ticker symbol "FCAU." The new company was called Fiat Chrysler Auto Company N.V. Its 2017 market capitalization was $17 billion." https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

62.    "Ford Credit received its bailout from the Term Asset-Backed Securities Loan Facility, not TARP. That was a government program for auto, student, and other consumer loans. Although Ford did not receive TARP funds, it did receive government loans. These were critical because banks were not lending during the financial crisis. It requested a $9 billion line-of-credit from the government. In return, it pledged to spend $14 billion on new technologies. On June 23, 2009, Ford received a $5.9 billion loan from the Energy Department's Advanced Technology Vehicles Manufacturing program. In return, it pledged to accelerate development of both hybrid and battery-powered vehicles, close dealerships, and sell Volvo. It upgraded factories in Illinois, Kentucky, Michigan, Missouri, and Ohio to produce hybrid vehicles. Ford used the funds to switch its focus to commercial electric vehicles. In 2016, CEO Mark Fields said, "We want to become a top player in electrified solutions. The company wants to lead…we can win such as with our commercial vehicles." Eighty-one percent of the funds went to create new efficiency technologies for gas-powered vehicles. For example, they helped fund Ford's aluminum bodies in the F-series pickups. The Congressional Research Service estimated the loans saved 33,000 jobs. Ford will repay this loan by 2022. Many argue that Ford needed the funds to sustain its cash flow during the recession. Ford says it was in better shape than the other two (e.g. GM and FCA) because it had mortgaged its assets in 2006 to raise $23.6 billion. It used the loans to retool its product lineup to focus on smaller, energy efficient vehicles. It got the United Automobile

Workers to agree it could finance half of a new retiree health care trust with company stock. By

April 2009, it retired $9.9 billion of the debt it had taken out in 2006."

https://www.thebalance.com/auto-industry-bailout-gm-ford-chrysler-3305670

63.    It is the belief of the Plaintiff, that the Defendants (GM, FCA and Ford) have been

unjustly enriched through the non-payment of royalty compensation to the Plaintiff that should

have been paid as a percentage of the Defendants gross annual revenue for Plaintiff's Stall, Stop,

and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected

Vehicles (NCV). GM's total revenue between the years 2013 and 2019; FCA's total revenue

between the years 2013 and 2019 = $701.15B; and, Ford's total revenue between the years 2013

and 2019 = $1,065.4B.

64.    It is the belief of the Plaintiff, that throughout the Relevant Period, Defendants'

(GM, FCA and Ford) unlawful activities, as described herein, took place within and substantially

affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable

effect upon commerce in the United States.

65.    It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) are in

violation of Section 1 of the Sherman Act, which prohibits every contract, combination or

conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of

competition in a relevant market for the Stall, Stop, and Vehicle Slow-Down Systems (SSVSS);

Lock Disabling Systems; and, Network Connected Vehicles (NCV).

66.    It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) act

together in ways that limit competition by hindering Plaintiff's businesses from entering the

market, while exercising an unreasonable horizontal restraint of trade. The Defendants' (GM,

FCA and Ford) agreements are considered unreasonable because the Defendants interact to such

58

a degree that they were no longer acting independently, and the collaboration gave the

Defendants the ability to wield market power together.

67.     It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford) and their

co-conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which

was to develop, manufacture, and commercialize Plaintiff's Stall, Stop, and Vehicle Slow-Down

Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

68.     It is the belief of the Plaintiff, that the Defendants' (GM, FCA and Ford), through

their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or

conspiracy between themselves and their co-conspirators.


## ACTIVE CONCEALMENT

69.     Throughout and beyond the conspiracy, Defendants and their co-conspirators

affirmatively and actively concealed their unlawful conduct from Plaintiffs. Defendants and their

co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of

their higher-level executives. Defendants and their co-conspirators publicly provided pre-textual

and false justifications regarding the intellectual property rights of the Communicating,

Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and

Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected

Vehicles (NCV). Defendants and their co-conspirators conducted their conspiracy in secret,

concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively

concealed their activities through various other means and methods to avoid detection. Plaintiffs

did not discover, and could not have discovered through the exercise of reasonable diligence, that

Defendants and their co-conspirators were violating the antitrust laws as alleged herein until the

Court of Federal Claims filed on March 29, 2018 its opinion in *Larry Golden v. United States*,

case no. 13-307C. In the opinion, the Judge found that the Government could not be held liability

under §1498(a) for the "use" of private parties' private property, when the "use" was incidental.

70.    As a result of the active concealment of the conspiracy by the Defendants and

their co-conspirators to hide the fact that they were acting independently, apart from the

performing work under contract for the Government, any and all applicable statures of

limitations otherwise applicable to the allegations herein have been tolled.


## VIOLATIONS ALLEGED

### First Claim for Relief

### (Violation of Section 1 of the Sherman Act)

71.    Plaintiffs incorporate and reallege, as through fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

72.    Beginning at a time presently unknown to Plaintiffs, but at least as early as the

year 2008 and continuing through the present, the exact dates being unknown to Plaintiffs,

Defendants and their co-conspirators entered into continuing agreements, and conspiracy in

restraint of trade for the Plaintiff's Communicating, Monitoring, Detecting, and Controlling

(CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS);

Lock Disabling Systems; and, Network Connected Vehicles (NCV), in the United States, in

violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

73.    In formulating and carrying out the alleged agreements, understandings, and

conspiracies, the Defendants and their co-conspirators did those things that they combined and

conspired to do, including but not limited to the acts, practices, and course of conduct set forth

above, and the following, among others:

    a.  To allocate markets for Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV);

    b.  To submit rigged bids for the award and performance of certain Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV); and,

    c.  To allocate among themselves the production of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

74.    Plaintiff and the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## Second Claim for Relief

**(Violation of the South Carolina Consumer Protection and Unfair Competition Laws)**

75.    Plaintiffs incorporate and reallege, as through fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

76.    By reason of the foregoing, Defendants have engaged in unfair competition or unfair and deceptive acts or practices in violation of South Carolina Code Laws §§ 39-5-10 and 39-5-20.

77.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business and property by Defendants' conspiracies, and restraint of trade for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

### Third Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

78.     Plaintiffs incorporate and reallege, as through fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

79.     Defendants have been unjustly enriched through non-payment of royalty compensation for Plaintiff and Class members for: Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

80.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain benefits conferred via non-payment of royalty compensation for Plaintiff and Class members for: Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV).

81.     Plaintiff seek disgorgement of all profits resulting from such non-payment and establishment of a constructive trust from which Plaintiff and Class members may seek restitution. South Carolina should be experiencing a $95B dollar surplus in tax revenue instead of a $21.8B dollar deficit (shortfall to paying off the State's debt), and a "D" grade rating. The State should also be experiencing a 0% unemployment rate.

# SOUTH CAROLINA FINANCIALS

82.    September 2019 (truthinaccounting.org). South Carolina ranks no. 36 for its fiscal health. South Carolina has a debt burden of $21.8B. That burden equates to $14,500 for every state taxpayer. South Carolina's financial problems stem mostly from unfunded retirement obligations that have accumulated over the years. Of the $43B in retirement benefits promised, the state has not funded $14B in pension and $11.1B in retiree health care benefits.



### THE FINANCIAL STATE OF SOUTH CAROLINA

A new analysis of the latest available audited financial reports found South Carolina has a Taxpayer Burden™ of $14,500, earning it a "D" grade from Truth in Accounting. South Carolina's overall financial condition improved by 17 percent from the previous fiscal year.

South Carolina's elected officials have made repeated financial decisions that have left the state with a debt burden of $21.8 billion. That burden equates to $14,500 for every state taxpayer. South Carolina's financial problems stem mostly from unfunded retirement obligations that have accumulated over the years. Of the $43 billion in retirement benefits promised, the state has not funded $14 billion in pension and $11.1 billion in retiree health care benefits.

South Carolina and other states have become more transparent over the last few years, thanks to the Generally Accepted Accounting Principles (GAAP) set by the Governmental Accounting Standards Board (GASB), which now require governments to disclose pension (GASB 68) and other post-employment (GASB 75) benefits on their balance sheets.

### THE TRUTH:



| 36 Rank | -$21.8 billion Money needed to pay bills | -$14,500 Taxpayer Burden | D Financial grade |

Data included in this report is derived from the state of South Carolina's 2018 audited Comprehensive Annual Financial Report and retirement plans' reports.

98

## SOUTH CAROLINA FINANCIAL BREAKDOWN

### FAST FACTS

- South Carolina has $20.4 billion available to pay $42.1 billion worth of bills.
- The outcome is a $21.8 billion shortfall, which breaks down to a burden of $14,500 per taxpayer.
- South Carolina's reported net position is inflated by $1.4 billion, largely because the state defers recognizing losses incurred when the net pension liability increases.

| THE STATE'S BILLS EXCEED ITS ASSETS | |
|---|---|
| Total assets | $61,023,562,000 |
| *Minus:* Capital assets | -$30,095,590,000 |
| Restricted assets | -$10,554,155,000 |
| Assets available to pay bills | $20,373,817,000 |
| *Minus:* Total bills | -$42,134,522,000 |
| Money available (needed) to pay future bills | -$21,760,705,000 |
| Each taxpayer's share of this debt | -$14,500 |

| BILLS THE STATE HAS ACCUMULATED | |
|---|---|
| Bonds | $13,392,509,000 |
| Other liabilities | $12,566,431,000 |
| *Minus:* Debt related to capital assets | -$8,969,765,000 |
| Unfunded pension benefits | $14,011,861,000 |
| Unfunded retiree health care benefits | $11,133,486,000 |
| Total bills | $42,134,522,000 |

### GRADE: D

Bottom line: South Carolina would need $14,500 from each of its taxpayers to pay all of its bills, so it has received a "D" for its finances. According to Truth in Accounting's grading scale, any government with a Taxpayer Burden between $5,000 and $20,000 receives a "D."

Truth in Accounting is a 501(c)(3) committed to educating and empowering citizens with understandable, reliable and transparent government financial information. To be knowledgeable participants in their government and its budget process, citizens need truthful and transparent financial information.

99

63

**Damage to Class: "Every South Carolina State Taxpayer and Unemployed**



Collusion and conspiracy (chart above illustrate the integration of technology) in violation of the

Sherman Act; Section 1. Agreements made in restraint of trade between the defendants: Apple,

Samsung, Lg, Qualcomm, Gm, Ford, and FCA US LLC. The conspirators "had a conscious

commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v.*

*Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)

## DAMAGE ESTIMATES: CMDC DEVICE

Apple sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $125.9B

Year 2014 - $148.5B

Year 2015 - $176.8B

Year 2016 - $158.5B

Year 2017 - $167.5B

Year 2018 - $176.8B

Year 2019 - $176.8B (est.)

TOTAL -- $1,130.8B X 25% = **$282.7B** X 7.5% = **$21.20B**


Samsung's sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $128.2B

Year 2014 - $98.4B

Year 2015 - $85.4B

Year 2016 - $80.9B

Year 2017 - $97.4B

Year 2018 - $86.9B

Year 2019 - $86.9B (est.)

TOTAL -- $664.1B X 25% = **$166.03B** X 7.5% = **$12.45B**


LG Electronics total worldwide revenue 2009 to 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2009 - $52.16B

Year 2010 - $52.41B

Year 2011 - $51B

Year 2012 - $47.9B

Year 2013 - $53.37B

Year 2014 - $55.5B

Year 2015 - $53.12B

Year 2016 - $52.04B

Year 2017 - $57.71B

Year 2018 - $54.9B

Year 2019 - $55.76B

TOTAL -- $585.87B X 25% = **$146.47B** X 7.5% = **$10.99B**

Qualcomm's sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)
Revenue in billion U.S. dollars

Year 2013 - $24.866B

Year 2014 - $26.487B

Year 2015 - $25.281B

Year 2016 - $23.554B

Year 2017 - $22.291B

Year 2018 - $22.732B

Year 2019 - $24.273B

TOTAL -- $169.484B X 25% = **$42.37B** X 7.5% = **$3.18B**

*Total sales/revenue for the above Companies was retrieved from **STATISTA.COM***

Apple, Samsung, LG, and Qualcomm conspired and colluded under a cooperative agreement to develop and commercialize a new and improve cell phone (i.e. CMDC device, smartphone). The laws of South Carolina prohibit contracts or agreements in restraint of trade (S.C. Code Ann. §§ 39-3-10, et seq.) and unfair trade practices (S.C. Code Ann. §§ 39-5-10, et seq.).

*Verto Analytics* looked at the numbers of Apple, Samsung, and LG smartphones currently owned by U.S. consumers, and the equivalent market share. January 2018, Apple leads the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, has 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market.



Source: Verto Watch (U.S. adults 18+), January 2018

## DAMAGE ESTIMATES: CMDC DEVICE/STALL, STOP, VEHICLE SLOWDOWN SYSTEM

General Motors Company sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $138.79B

Year 2014 - $137.96B

Year 2015 - $135.73B

Year 2016 - $149.18B

Year 2017 - $145.59B

Year 2018 - $147.05B

Year 2019 - $137.2B

TOTAL -- $991.5B X 25% = **$247.88B** X 7.5% = **$18.59B**

Ford's sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $146.9B

Year 2014 - $144.1B

Year 2015 - $149.6B

Year 2016 - $151.8B

Year 2017 - $156.8B

Year 2018 - $160.3B

Year 2019 - $155.9B

TOTAL -- $1,065.4B X 25% = **$266.35B** X 7.5% = **$19.98B**

Fiat Chrysler Automobiles (FCA)'s sales and revenue streams between FY 2013 and FY 2019 (in billion U.S. dollars)

Revenue in billion U.S. dollars

Year 2013 - $72.14B

Year 2014 - $83.06B

Year 2015 - $110.60B

Year 2016 - $111.02B

Year 2017 - $105.73B

Year 2018 - $110.41B

Year 2019 - $108.19B

TOTAL -- $701.15B X 25% = **$175.29B** X 7.5% = **$13.15B**

*Total sales/revenue for the above Companies was retrieved from **STATISTA.COM***

### *Estimated South Carolina Tax Revenue (Class Damage)*

Apple ($21.20B) + Samsung ($12.45B) + LG ($10.99B) + Qualcomm ($3.18B) + GM ($18.59B) + Ford ($19.98B) + FCA ($13.15B) = **$99.54B**

*Estimated Damage to Private Litigant*

Apple ($282.7B) + Samsung ($166.03B) + LG ($146.47B) + Qualcomm ($42.37B) + GM ($247.88B) + Ford ($266.35B) + FCA ($175.29B) = **$1,327.09B**

In *Apani Southwest, Inc. v. Coca-Cola Enterprises*, the Fifth Circuit explained the Supreme Court's analysis in *Tampa*:

> "When assessing whether an exclusive-dealing arrangement has the probable effect of substantially lessening competition, the Supreme Court has identified a three-part inquiry. *Tampa Elec*. First, the relevant product market must be identified by considering interchangeability and cross-elasticity of demand. Second, the relevant geographic market must be identified, "by careful selection of the market area in which the seller operates and to which the purchaser can practicably turn for supplies." Id. Finally, a plaintiff must show that the "competition foreclosed by the arrangement constitutes a 'substantial share of the relevant market.'" Id. That is, 'the opportunities for other traders to enter into or remain in that market must be significantly limited'."

It is the belief of the Plaintiff, that the exclusive-dealing agreement occurred when the seller (Qualcomm) agreed to sell all or substantially all of its output of a particular product (CPUs, modems, chipsets) to a particular buyer (Apple, Samsung, LG); or, when the buyer (Apple, Samsung, LG) agreed to buy all or substantially all of its needs (CPUs, modems, chipsets) for a particular product (CMDC device, smartphone) from a particular seller (Qualcomm).

Competitor collaborations facilitates explicit or tacit collusion through facilitating practices such as the exchange or disclosure of competitively sensitive information (the consumer device manufactures of Apple, Samsung, Qualcomm and LG, and the automobile manufactures of GM, Ford and FCA US, was at least informed by the Government and/or the Plaintiff of the competitively sensitive information that is the subject matter of Plaintiff's claimed inventions), or through increased market concentration. Such collusion may involve the relevant market in which the collaboration operates or another market in which the participants in the collaboration are actual or potential competitors.

## DAMAGE ESTIMATES: LOSS OF S.C. MANUFACTURING and DISTRIBUTION FACILITIES; LOSS OF WAGES; and, LOSS OF TAXABLE REVENUE FOR EVERY S.C. TAXPAYER (the "CLASS")

*Horizontal Conduct:* "It is illegal for businesses to act together in ways that can limit competition, lead to higher prices, or hinder other businesses from entering the market. The FTC challenges unreasonable horizontal restraints of trade. Such agreements may be considered unreasonable when competitors interact to such a degree that they are no longer acting independently, or when collaborating gives competitors, the ability to wield market power together. Certain acts are considered so harmful to competition that they are almost always illegal. These include arrangements to fix prices, divide markets, or rig bids."

It is the belief of the Plaintiff that Apple, Samsung, Qualcomm, LG, GM, Ford, and FCA US agreements with the Government and among themselves are considered unreasonable because their interaction has risen to such a degree that they are no longer acting independently, and has given rise to Apple, Samsung, Qualcomm, LG, GM, Ford, and FCA US's ability to manipulate market power together.

It is further the belief of the Plaintiff that because Apple, Samsung, Qualcomm, LG, GM, Ford, and FCA US refused to license the Plaintiff's CMDC Device/Stall, Stop, Vehicle Slowdown System patents; the results are dramatic to the "Class" (i.e. recognized here to include South Carolina's unemployed), in loss job opportunities and wages. S. C. statistics for 2010 – 2020:



**employment**



**unemployment**



**unemployment rate**



*Estimated Labor Force Damages to the "Class": South Carolina*

Apple: 2019 (Worldwide) total number of employees – 137,000 rounded

Samsung: 2019 (Worldwide) total number of employees – 310,000 rounded

LG: 2019 (Worldwide) total number of employees – 72,000 rounded

Qualcomm: 2019 (Worldwide) total number of employees – 37,000 rounded

GM: 2019 (Worldwide) total number of employees – 164,000 rounded

Ford: 2019 (Worldwide) total number of employees – 190,000 rounded

FCA US: 2019 (Worldwide) total number of employees – 199,000 rounded

Total Number of worldwide employees combined – 1,109,000 rounded

9.02% of 1,109,000 employees = 100,000 unemployed in the state of South Carolina

100,000 unemployed @ $40,000/yr = $4B in taxable revenue, (gross, not net)

7.5% is South Carolina income tax rate

7.5% of $4B = $300M; cumulative over a 10-year period = $3B dollars

Estimated South Carolina Tax Revenue (Class Damage) = **$3B dollars\***

***Estimated Damage to Private Litigant***

Example: (Revenue vs. Income). Apple Inc. posted a top-line revenue number of $260,174 billion for 2019.  Apple posted $55.26 billion in net income for the same period. Calculated: $55.26 is what percent of $260,174 = 21.24%

Therefore, 21.24% of what number = $4B dollars, (employee's salaries)

      21.24% of $18.8B = $4B dollars

7.5% of $18.8B = $1.4B; cumulative over a 10-year period = $14B dollars

Estimated South Carolina Tax Revenue = **$14B dollars\***

\* South Carolina should be experiencing a $95B dollar surplus in tax revenue instead of a $21.8B dollar deficit (shortfall to paying off the State's debt), and a "D" grade rating. The State should also be experiencing a 0% unemployment rate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

A.    That the Court determine that the Sherman Act, state antitrust law, and common law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.    That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be:

   a.   A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief);

   b.   A violation of the South Carolina state consumer protection law identified in the Second Claim for Relief herein; and,

   c.   Acts of unjust enrichment as set forth in the Third Claim for Relief herein.

C.    That Plaintiffs and the Class recover damages, as provided by federal and state Antitrust laws, and that a joint and severe judgement in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

D.    That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or devices having a similar purpose or effect; and ; (2) communicating or causing to be communicated to any other person engaged in the sale of Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e. smartphones), Stall, Stop, and Vehicle Slow-Down Systems (SSVSS); Lock Disabling Systems; and, Network Connected Vehicles (NCV), information concerning bids of competitors;

E.    That Plaintiffs be awarded restitution, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

F.    That Plaintiffs and members of the Class be awarded pre- and post-judgement interest, and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.    That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) and 38(b) of the Federal Rules of Civil Procedure; Plaintiff's right of trial by jury as declared by the Seventh Amendment to the Constitution and Plaintiff's demand a trial by jury for issues so triable.

Respectfully submitted,

S/ _Larry Golden_              Date: 06 /15 /2020

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# Exhibit 8

RECEIVED
USDC CLERK. GREENVILLE. SC

IN THE UNITED STATES DISTRICT COURT 2021 JAN -5 PM 1: 47
FOR THE DISTRICT OF SOUTH CAROLINA

_LARRY GOLDEN_

_____

_____

*(Write the full name of each plaintiff who is filing
this complaint. If the names of all the plaintiffs
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names.)*

**-against-**

_APPLE INC., et al_

_____

_SEE ATTACHED LIST_

*(Write the full name of each defendant who is
being sued. If the names of all the defendants
cannot fit in the space above, please write "see
attached" in the space and attach an additional
page with the full list of names. Do not include
addresses here.)*

**Complaint for Violation of Civil
Rights**
(Non-Prisoner Complaint)

Case No. ___6:20-cv-04353-BHH-KFM___
*(to be filled in by the Clerk's Office)*

Jury Trial:    ☑ Yes    ☐ No
*(check one)*

---

NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting
from public access to electronic court files. Under this rule, papers filed with the court should
*not* contain: an individual's full social security number or full birth date; the full name of a
person known to be a minor; or a complete financial account number. A filing may include
*only*: the last four digits of a social security number; the year of an individual's birth; a
minor's initials; and the last four digits of a financial account number.

Plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other
materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an
application to proceed in *forma pauperis*.

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | *LARRY GOLDEN* |
| Street Address | *740 WOODRUFF RD. #1102* |
| City and County | *GREENVILLE, (SC) / GREENVILLE* |
| State and Zip Code | *SOUTH CAROLINA    29607* |
| Telephone Number | *864-288-5605* |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | *SEE ATTACHED LIST* |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |

☐    Individual capacity            ☐    Official capacity

Defendant No. 2

| | |
|---|---|
| Name | *SEE ATTACHED LIST* |
| Job or Title (if known) | |
| Street Address | |
| City and County | |
| State and Zip Code | |

Telephone Number _____

☐  Individual capacity              ☐  Official capacity

Defendant No. 3

Name                    _*SEE ATTACHED LIST*_

Job or Title            _____
(if known)

Street Address          _____

City and County         _____

State and Zip Code      _____

Telephone Number        _____

☐  Individual capacity              ☐  Official capacity

Defendant No. 4

Name                    _*SEE ATTACHED LIST*_

Job or Title            _____
(if known)

Street Address          _____

City and County         _____

State and Zip Code      _____

Telephone Number        _____

☐  Individual capacity              ☐  Official capacity

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

☐    Federal officials (a *Bivens* claim)

☐    State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If

3

you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

_____
_____
_____

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights.  If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

_____
_____
_____

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983.  If you are suing under section 1983, explain how each defendant acted under color of state or local law.  If you are suing under *Bivens*, explain how each defendant acted under color of federal law.  Attach additional pages if needed.

_____
_____
_____

## III.   Statement of Claim

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   Where did the events giving rise to your claim(s) occur?

SOUTH CAROLINA AND THROUGHOUT THE TERRITORIES OF THE UNITED STATES OF AMERICA, TO INCLUDE THE DISTRICT OF COLUMBIA.

B.   What date and approximate time did the events giving rise to your claim(s) occur?

THE STATUE OF LIMITATIONS FOR CALCULATING DAMAGES FOR PATENT INFRINGEMENT GOES BACK SEVEN YEARS.

C.   What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what?  Was anyone else involved?  Who else saw what happened?)*

THE NAMED DEFENDANTS IN THIS CASE HAS ALLEGEDLY USED, SOLD AND/OR OFFERED PRODUCTS COVERED IN A VALID PATENT(S) WITHOUT LICENSE OR AUTHORIZATION OF THE PATENT OWNER (PLAINTIFF)

## IV.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

DAMAGES FROM THE DIRECT, INDIRECT, AND/OR JOINT INFRINGEMENT OF PLAINTIFF'S '287, '439, '189, '990, '891, AND '497 PATENTS.

THE DEFENDANTS ARE THEREBY LIABLE FOR INFRINGMENT OF THE '287, '439, '189, '990, '891, AND '497 PATENTS.

## V.    Relief

State briefly what you want the court to do for you.   Make no legal arguments. Do not
cite any cases or statutes.   If requesting money damages, include the amounts of any
actual damages and/or punitive damages claimed for the acts alleged.   Explain the basis
for these claims.

1- A PERMANENT INJUNCTION ENJOINING EACH DEFENDANT, ITS OFFICERS,
DIRECTORS, AGENTS, SERVANTS, AFFILIATES, EMPLOYEES, DIVISIONS,
BRANCHES, SUBSIDIARIES, AND ALL OTHERS ACTING IN ACTIVE CONCERT
OR PRIVITY THERE WITH FROM DIRECT, INDIRECT, AND/OR JOINT INFRINGEMENT
OF PLAINTIFF'S PATENTS AS AFORESAID PURSUANT TO 35 U.S.C. § 283.
2- ACTUAL AND PUNITIVE DAMAGES DETERMINED BY A JURY IF WE PROCEED TO
TRIAL
3- PLAINTIFF IS WILLING TO DISCUSS "REASONABLE ROYALTIES" BEFORE PROCEEDING
TO TRIAL

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my
knowledge, information, and belief that this complaint: (1) is not being presented for an
improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the
cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for
extending, modifying, or reversing existing law; (3) the factual contentions have
evidentiary support or, if specifically so identified, will likely have evidentiary support
after a reasonable opportunity for further investigation or discovery; and (4) the
complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-
related papers may be served.   I understand that my failure to keep a current
address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: Jan. 1 , 2021.

Signature of Plaintiff    Larry Golden

Printed Name of Plaintiff    LARRY GOLDEN

**B.**     **For Attorneys**     *N/A*

Date of signing: _____, 20___.

Signature of Attorney _____

Printed Name of Attorney _____
Bar Number _____
Name of Law Firm _____
Address _____
Telephone Number _____
E-mail Address _____

**Plaintiff's List of Companies: <u>Case # 6:20-cv-04353-BHH-KFM</u>**

Apple Inc.
Attn: Vice President & Chief IP Counsel
1 Infinite Loop
Cupertino, CA 95014
Incorporated Under the Laws of the State of California

Samsung Electronics, USA
Attn: Senior VP & Head of Silicon Valley IP Office, US IP Center
85 Challenger Rd.
Ridgefield Park, New Jersey 07660
Incorporated Under the Laws of the State of New York

LG Electronics, USA, Inc.
Attn: General Counsel (*IP*) at *LG Electronics*
1000 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Foreign corporation organized and existing under the laws of South Korea

Qualcomm Inc.
Attn: Executive VP, General Counsel Intellectual Property
5775 Morehouse Drive
San Diego, CA 92121
Incorporated Under the Laws of the State of Delaware

Motorola Solutions Inc.
Attn: Lead IP Counsel Motorola Solutions
500 W. Monroe Street, Suite 4400
Chicago, Il 60661-3781
Incorporated Under the Laws of the State of Delaware

Panasonic Corporation
Attn: Chief Intellectual Property Counsel
Two Riverfront Plaza
828 McCarter Hwy
Newark, NJ 07102
Incorporated Under the Laws of the State of Delaware

AT&T Inc.
Attn: Chief Intellectual Property Counsel at AT&T
208 S. Akard St.
Dallas, TX 75202
Incorporated Under the Laws of the State of Delaware

Verizon Corporation Service Group
Attn: SVP & Counsel for Verizon Corporation Service Group
295 N. Maple Ave.
Basking Ridge, NJ 07920
Incorporated Under the Laws of the State of Delaware

Sprint Corporation
Attn: Senior Intellectual Property Counsel at Sprint Corporation
6200 Sprint Parkway
Overland Park, KS
Incorporated Under the Laws of the State of Kansas

T-Mobile USA, Inc.
Attn: Principal Corporation Counsel, IP & Commercial Litigation
12920 SE 38th Street
Bellevue, WA 98006
Incorporated Under the Laws of the State of Delaware

Ford Global Technologies, LLC
Attn: Edward J. Benz III, Chief Intellectual Property Counsel
Fairlane Plaza South, Suite 800
330 Town Center Drive
Dearborn, Michigan 48126
Incorporated Under the Laws of the State of Delaware

Fairway Ford Lincoln of Greenville
Attn: Owner, President and CEO; Intellectual Property
2323 Laurens Road
Greenville, SC 29607
Incorporated Under the Laws of the State of South Carolina

General Motors Company
Attn: Paul Margolis, Counsel, GM Legal Staff
300 Renaissance Center
Detroit, MI 48243
Incorporated Under the Laws of the State of Delaware

Kevin Whitaker Chevrolet
Attn: Owner, President and CEO; Intellectual Property
2320 Laurens Road
Greenville, SC 29607
Incorporated Under the Laws of the State of South Carolina

FCA US LLC
Attn: Chief Executive Officer – Michael Manley
1000 Chrysler Drive
Auburn Hills, MI 48326-2766
Foreign Corporation incorporated under the laws of the Netherlands

Big 'O' Dodge Chrysler Jeep Ram
Attn: Owner, President and CEO; Intellectual Property
2645 Laurens Road
Greenville, SC 29607
Incorporated Under the Laws of the State of South Carolina

## STANDARD FOR REVIEW

1.      Pursuant to the order of Magistrate Judge Kevin McDonald in United States District Court for the District of South Carolina; filed 12/17/2020; Case No. 6:20-cv-04353-BHH-KFM, Plaintiff is ordered to file "a short and plain statement of the claim showing that the pleader [Plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a).

2.      Plaintiff has attached a copy of the asserted patents as **Exhibits A, B, C, D, E, & F**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.,* No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted patent, identified the accused products by name, and generally compared the technology disclosed in the patents to the accused products. The complaint *did not identify any specific asserted claim*, but the court found that: "Plaintiff has stated a plausible claim for direct infringement by specifically identifying Defendants' products and alleging that they perform the same unique function as Plaintiff's patented system." Defendants in this case are liable for infringement of the asserted patents in this case pursuant to 35 U.S.C. § 271.

3.      Plaintiff maintains he has additional factual allegations to support his claim in the form of a factual complaint and claim charts that was returned to Plaintiff by order of the Magistrate Judge McDonald for violation of the page limit. Defendants in this case are liable for infringement of the asserted patents in this case pursuant to 35 U.S.C. § 271.


## JURISDICTION AND VENUE

4.      This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). On information and belief, each defendant has purposely transacted business in this judicial district and has committed acts of joint, direct and/or indirect infringement in this judicial district.

6.      On information and belief, each defendant is subject to this Court's specific and general personal jurisdiction, due at least to their substantial business in this forum, including: (A) at least part of their infringing activities alleged herein, and (B) regularly doing or soliciting

business, engaging in others persistent causes of conduct, and/or deriving substantial revenue from goods and services provided to persons and other entities in South Carolina and this judicial district. Each defendant has allegedly used, sold, and/or offered products for sale in South Carolina and is licensed to do business in this state.

7.     This Court has specific jurisdiction over each defendant because each has committed acts giving rise to this action and has established minimum contacts within this judicial district such that the exercise of jurisdiction over each defendant would not offend traditional notions of fair play and justice.

## RELATED CASES

8.     Plaintiff Larry Golden has filed an action of Antitrust Law violations on June 16, 2020, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Ford Global Technologies, LLC ("Ford"), General Motors Company ("GM"), and, FCA US LLC ("FCA").

9.     Plaintiff Larry Golden has filed an action of patent infringement on September 11, 2019, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:19-cv-2557) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O").

## THE PARTIES

10.     Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

11.     On information and belief, Apple is a California corporation with a principal place of business at 1 Infinite Loop, Cupertino, CA 95014 and does business in this judicial

district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Apple may be served at its principal place of business at 1 Infinite Loop, Cupertino, CA 95014.

12.    On information and belief, Samsung is a New Jersey corporation with a principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey 07660 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Samsung may be served at its principal place of business at 85 Challenger Rd. Ridgefield Park, New Jersey 07660.

13.    On information and belief, LG is a New Jersey corporation with a principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. LG may be served at its principal place of business at 1000 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

14.    On information and belief, Qualcomm is a California corporation with a principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Qualcomm may be served at its principal place of business at 5775 Morehouse Drive, San Diego, CA 92121.

15.    On information and belief, Motorola is an Illinois corporation with a principal place of business at 500 W Monroe Street, Suite 4400, Chicago, IL 60661 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Motorola may be served at its principal place of business at 500 W Monroe Street, Suite 4400, Chicago, IL 60661.

16.    On information and belief, Panasonic is a New Jersey corporation with a principal place of business at Two Riverfront Plaza, 828 McCarter Hwy, Newark, NJ 07102 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Panasonic may be served at its principal place of business at Two Riverfront Plaza, 828 McCarter Hwy, Newark, NJ 07102.

17.    On information and belief, AT&T is a Texas corporation with a principal place of business at 208 S. Akard St. Dallas, TX 75202 and does business in this judicial district by,

6

among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. AT&T may be served at its principal place of business at 208 S. Akard St. Dallas, TX 75202.

18.    On information and belief, Verizon is a New Jersey corporation with a principal place of business at 295 N. Maple Ave. Basking Ridge, NJ 07920 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Verizon may be served at its principal place of business at 295 N. Maple Ave. Basking Ridge, NJ 07920.

19.    On information and belief, Sprint is a Kansas corporation with a principal place of business at 6200 Sprint Pkwy. Overland Park, KS 66251 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Sprint may be served at its principal place of business at 6200 Sprint Pkwy. Overland Park, KS 66251.

20.    On information and belief, T-Mobile is a Washington corporation with a principal place of business at 12920 SE 38th St. Bellevue, WA 98006 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. T-Mobile may be served at its principal place of business at 12920 SE 38th St. Bellevue, WA 98006.

21.    On information and belief, Ford is a Michigan corporation with a principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan 48126 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Ford may be served at its principal place of business at Fairlane Plaza South, Suite 800, 330 Town Center Drive, Dearborn, Michigan 48126.

22.    On information and belief, Fairway Ford is a South Carolina corporation with a principal place of business at 2323 Laurens Road, Greenville, SC 29607and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Fairway Ford may be served at its principal place of business at 2323 Laurens Road, Greenville, SC.

23.    On information and belief, GM is a Michigan corporation with a principal place of business at 300 Renaissance Center, Detroit, MI 48243 and does business in this judicial

district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. GM may be served at its principal place of business at 300 Renaissance Center, Detroit, MI 48243.

24.    On information and belief, Whitaker Chevrolet is a South Carolina corporation with a principal place of business at 2320 Laurens Rd. Greenville, SC 29607 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Whitaker Chevrolet may be served at its principal place of business at 2320 Laurens Rd. Greenville, SC 29607.

25.    On information and belief, FCA is a Michigan corporation with a principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. FCA may be served at its principal place of business at 1000 Chrysler Drive, Auburn Hills, MI 48326.

26.    On information and belief, Big O is a South Carolina corporation with a principal place of business at 2645 Laurens Rd. Greenville, SC 29607 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint. Big O may be served at its principal place of business at 2645 Laurens Rd. Greenville, SC 29607.

## COUNT I

### (Infringement of the '287 Patent)

27.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-26.

28.    On information and belief, Apple is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 5 of the '287 patent. The alleged infringing products are: iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, iPhone 12 series and Apple Watch series 3, 4, & 5.

29.    On information and belief, Samsung is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 5 of the '287 patent. The alleged infringing products are: Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, Galaxy S20 series & Samsung Gear S3 classic and Galaxy Watch Active2 series.

30.    On information and belief, LG is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 5 of the '287 patent. The alleged infringing products are: LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, V60, Velvet 5 & LG Watch Sport, LG Watch 7.

31.    On information and belief, Qualcomm is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claims 4 & 5 of the '287 patent. The alleged infringing products are: Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series, Snapdragon 888 Mobile Platform, Snapdragon 865+5G Mobile Platform.

32.    On information and belief, Motorola is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 5 of the '287 patent. The alleged infringing products are: Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series.

33.    On information and belief, Panasonic is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 5 of the '287 patent. The alleged infringing products are: TOUGHBOOK 31 Laptop, ELUGA series, Panasonic Power & ToughPad FZ-F1 smartphone.

34.    On information and belief, AT&T is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 4 & 5 of the '287 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

35.    On information and belief, Verizon is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 4 & 5 of the '287 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

36.    On information and belief, Sprint is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 4 & 5 of the '287 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

37.     On information and belief, T-Mobile is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 4 & 5 of the '287 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

38.     On information and belief, Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 1 & 5 of the '287 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

39.     On information and belief, Fairway Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 1 & 5 of the '287 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

40.     On information and belief, GM is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least claim 1 & 5 of the '287 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2

series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7;
Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's
TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone
communication devices.

      41.     On information and belief, Whitaker Chevrolet is jointly, directly, indirectly
and/or under the 'doctrine of equivalents', infringing at least claim 1 & 5 of the '287 patent. The
alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's
iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11
series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10
series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch
Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG
Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and,
Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1
smartphone communication devices.

      42.     On information and belief, FCA US LLC is jointly, directly, indirectly and/or
under the 'doctrine of equivalents', infringing at least claim 1 & 5 of the '287 patent. The alleged
infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone
7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series,
& Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series,
Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2
series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7;
Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's
TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone
communication devices.

      43.     On information and belief, Big 'O' Dodge is jointly, directly, indirectly and/or
under the 'doctrine of equivalents', infringing at least claim 1 & 5 of the '287 patent. The alleged
infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone
7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series,
& Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series,
Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2
series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7;

Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

## COUNT II

### (Infringement of the '439 Patent)

44.     Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-43.

45.     On information and belief, Apple is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, iPhone 12 series and Apple Watch series 3, 4, & 5.

46.     On information and belief, Samsung is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, Galaxy S20 series & Samsung Gear S3 classic and Galaxy Watch Active2 series.

47.     On information and belief, LG is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, V60, Velvet 5 & LG Watch Sport, LG Watch 7.

48.     On information and belief, Qualcomm is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series, Snapdragon 888 Mobile Platform, Snapdragon 865+5G Mobile Platform.

49.     On information and belief, Motorola is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series.

50.     On information and belief, Panasonic is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged

infringing products are: TOUGHBOOK 31 Laptop, ELUGA series, Panasonic Power & ToughPad FZ-F1 smartphone.

51.    On information and belief, AT&T is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

52.    On information and belief, Verizon is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

53.    On information and belief, Sprint is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

54.    On information and belief, T-Mobile is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

55.    On information and belief, Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's

TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

56.    On information and belief, Fairway Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

57.    On information and belief, GM is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

58.    On information and belief, Whitaker Chevrolet is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series;

and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

59.    On information and belief, FCA US LLC is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

60.    On information and belief, Big 'O' Dodge is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 13-15, 22 & 23 of the '439 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

## COUNT III

### (Infringement of the '189 Patent)

61.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-60.

62.    On information and belief, Apple is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, iPhone 12 series and Apple Watch series 3, 4, & 5.

63.    On information and belief, Samsung is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, Galaxy S20 series & Samsung Gear S3 classic and Galaxy Watch Active2 series.

64.    On information and belief, LG is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, V60, Velvet 5 & LG Watch Sport, LG Watch 7.

65.    On information and belief, Qualcomm is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series, Snapdragon 888 Mobile Platform, Snapdragon 865+5G Mobile Platform.

66.    On information and belief, Motorola is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series.

67.    On information and belief, Panasonic is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: TOUGHBOOK 31 Laptop, ELUGA series, Panasonic Power & ToughPad FZ-F1 smartphone.

68.    On information and belief, AT&T is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

69.    On information and belief, Verizon is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

70.    On information and belief, Sprint is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing

products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

71.    On information and belief, T-Mobile is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

72.    On information and belief, Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

73.    On information and belief, Fairway Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

74.    On information and belief, GM is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series,

iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

75.     On information and belief, Whitaker Chevrolet is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

76.     On information and belief, FCA US LLC is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

77.     On information and belief, Big 'O' Dodge is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series,

& Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

## COUNT IV

### (Infringement of the '990 Patent)

78.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-77.

79.    On information and belief, Apple is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990 patent. The alleged infringing products are: iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, iPhone 12 series and Apple Watch series 3, 4, & 5.

80.    On information and belief, Samsung is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990 patent. The alleged infringing products are: Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, Galaxy S20 series & Samsung Gear S3 classic and Galaxy Watch Active2 series.

81.    On information and belief, LG is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990 patent. The alleged infringing products are: LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, V60, Velvet 5 & LG Watch Sport, LG Watch 7.

82.    On information and belief, Qualcomm is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990

patent. The alleged infringing products are: Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series, Snapdragon 888 Mobile Platform, Snapdragon 865+5G Mobile Platform.

83.    On information and belief, Motorola is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990 patent. The alleged infringing products are: Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series.

84.    On information and belief, Panasonic is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990 patent. The alleged infringing products are: TOUGHBOOK 31 Laptop, ELUGA series, Panasonic Power & ToughPad FZ-F1 smartphone.

85.    On information and belief, AT&T is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

86.    On information and belief, Verizon is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

87.    On information and belief, Sprint is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

88.    On information and belief, T-Mobile is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125, and/or dependent claims 12, 16, 18, 20, 21, 22, 25, 28, 30, 39, 41, 55, 78, 79, 104, 108, 113, 118, 126, 132, 134 & 135 of the '990 patent. The alleged infringing products are: *using to generate a profit for service, offering for sale, selling, and/or importing* the computerized communications devices of Apple, Samsung, LG, Motorola, or Panasonic's locked/unlocked smartphones, laptops, tablets, or smartwatches.

89.    On information and belief, Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125 of the '990 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

90.    On information and belief, Fairway Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125 of the '990 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, &  Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

91.    On information and belief, GM is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125 of the '990 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series,

Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

92.    On information and belief, Whitaker Chevrolet is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125 of the '990 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

93.    On information and belief, FCA US LLC is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125 of the '990 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

94.    On information and belief, Big 'O' Dodge is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 125 of the '990 patent. The alleged infringing products are: *using, with its vehicles the alleged infringing devices* of Apple's iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, & Apple Watch series 3, 4, & 5; Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, & Samsung Gear S3 classic and Galaxy Watch

Active2 series; LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, LG & Watch Sport, LG Watch 7; Motorola's Moto Z2, Z3, & Z4 series, Motorola One series, & Moto G7 series; and, Panasonic's TOUGHBOOK 31 Laptop, ELUGA C series, Panasonic Power & ToughPad FZ-F1 smartphone communication devices.

## COUNT V

### (Infringement of the '891 Patent)

95.     Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-94.

96.     On information and belief, Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent. The alleged infringing products are: pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; a PSSVSS for traffic sign recognition; a PSSVSS for intelligent speed limiter, or, a PSSVSS for vehicle adapted cruise control.

97.     On information and belief, Fairway Ford is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent. The alleged infringing products are: pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; a PSSVSS for traffic sign recognition; a PSSVSS for intelligent speed limiter, or, a PSSVSS for vehicle adapted cruise control.

98.     On information and belief, GM is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent. The alleged infringing products are: pre-programmed

stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control.

99.     On information and belief, GM is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 11 and/or dependent claims 12, 13, 14, 15, 16, 17, 18 & 19 of the '891 patent. The alleged infringing products are: GM/OnStar's STOLEN VEHICLE SYSTEM) including without limitation the CMDC device remote means of stalling, stopping, or slowing a vehicle by way of cellular, satellite, radio-frequency, internet, electromagnetic pulse, electrostatic discharge, or microwave beam.

100.     On information and belief, Whitaker Chevrolet is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent. The alleged infringing products are: pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; or, a PSSVSS for vehicle adapted cruise control.

101.     On information and belief, Whitaker Chevrolet is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 11 and/or dependent claims 12, 13, 14, 15, 16, 17, 18 & 19 of the '891 patent. The alleged infringing products are: GM/OnStar's STOLEN VEHICLE SYSTEM) including without limitation the CMDC device remote means of stalling, stopping, or slowing a vehicle by way of cellular, satellite, radio-frequency, internet, electromagnetic pulse, electrostatic discharge, or microwave beam.

102.     On information and belief, FCA US LLC is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent. The alleged infringing products are: pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash

24

forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; a PSSVSS for traffic sign recognition; a PSSVSS for intelligent speed limiter, or, a PSSVSS for vehicle adapted cruise control.

103.    On information and belief, Big 'O' Dodge is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claims 11, 23, & 44 and/or dependent claims 47, 48, 49, 50, 51 & 53 of the '891 patent. The alleged infringing products are: pre-programmed stall, stop, or vehicle slowdown systems (PSSVSS) that includes, without limitation a PSSVSS for an autonomous or driverless vehicle; a PSSVSS for vehicle pre-crash forward acceleration; a PSSVSS for vehicle pre-crash reverse acceleration; a PSSVSS for vehicle lane departure; a PSSVSS for vehicle stabilization; a PSSVSS for vehicle unintended acceleration; a PSSVSS for vehicle moved outside a designated perimeter; a PSSVSS for traffic sign recognition; a PSSVSS for intelligent speed limiter, or, a PSSVSS for vehicle adapted cruise control.

## COUNT VI

### (Infringement of the '497 Patent)

104.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-103.

105.    On information and belief, Apple is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 1, and/or dependent claims 2-6 of the '497 patent. The alleged infringing products are: iPhone 7 series, iPhone 8 series, iPhone X series, iPhone XS series, iPhone XR series, iPhone 11 series, iPhone 12 series and Apple Watch series 3, 4, & 5.

106.    On information and belief, Samsung is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 1, and/or dependent claims 2-6 of the '497 patent. The alleged infringing products are: Samsung's Galaxy S10 series, Galaxy Note 8, 9, & 10 series, Galaxy Note 8S, 9S, & 10S series, Galaxy S20 series & Samsung Gear S3 classic and Galaxy Watch Active2 series.

107.    On information and belief, LG is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 1, and/or dependent claims 2-6 of the '497 patent. The alleged infringing products are: LG's V20, V30, V35, V50, LG G6, LG G7, LG G8, V60, Velvet 5 & LG Watch Sport, LG Watch 7.

108.    On information and belief, Qualcomm is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing independent claim 1, and/or dependent claims 2-6 of the '497 patent. The alleged infringing products are: Qualcomm's Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series, Snapdragon 888 Mobile Platform, Snapdragon 865+5G Mobile Platform.

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.    A judgment in favor of Golden that each defendant has infringed at least one claim of the '287 Patent, the '439 Patent, the 189 Patent, the '990 Patent, the '891 Patent and the '497 Patent as aforesaid;

B.    A permanent injunction enjoining each defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, '189, '990, '891, and '497 patents as aforesaid pursuant to 35 U.S.C. § 283;

C.    A judgment and order requiring each defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D.    As set forth in Golden's preliminary infringement contentions that the Defendants in this case are making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly infringed the '287, '439, '189, '990, '891, and '497 patents. The Defendants are thereby liable for infringement of the '287, '439, '189, '990, '891, and '497 patents pursuant to 35 U.S.C. § 271. The Defendants have caused damage to Golden, which infringement and damage will continue unless and until the Defendants are enjoined.

E.    Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Respectfully submitted,

S/ *Larry Golden* ____ Date: 01 /04 /2021

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# Exhibit 9

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF SOUTH CAROLINA – GREENVILLE

RECEIVED
USDC CLERK, GREENVILLE, SC
2021 JAN 26  AM 10: 13

LARRY GOLDEN,

        Plaintiff,

        V.

GOOGLE LLC

        Defendants.

CIVIL CASE NO: _____

**JURY TRIAL DEMANDED**

January 25, 2021

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit": attached hereto as Exhibits A-C respectively) against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, "[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. 35 U.S. Code § 282 - Presumption of validity; (a)

In General" is Plaintiff's evidence that the Plaintiff is the inventor of the Communicating,

Monitoring, Detecting, and Controlling (CMDC) device(s) i.e., products grouped and

commercialized today as smartphones, laptops, tablets, smartwatches, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past

and continues to do so, makes, uses, offer to sell, or sells Google Pixel smartphones 3, 3XL, 3a,

3aXL, 4a, 4a(5G), and 5, that Plaintiff believes infringes at least one of the claims in the patents-

in-suit under 35 U.S.C. § 271, "anyone who makes, uses, offers to sell, or sells any patented

invention domestically, or imports a patented invention into the United States during the term of

the patent, is infringing the patent. Anyone who actively induces someone else

to infringe the patent is also liable as an infringer."

Similarly, under 35 U.S.C. § 271, "anyone who offers to sell, sells, or imports a material

component of something that is patented, knowing that the component was especially made for

use in an infringement and is not a commodity suitable for a substantial non-infringing use, is

also liable as a contributory infringer" Plaintiff is alleging that the defendant Google, has in the

past and continues to do so, offer to sell, sells (i.e., to other smartphone and mobile device

manufacturers; "Google Search", "Google Fi", "Google Android Operating Systems", "Google

Cloud", etc.)  or imports a material component of something that is patented (i.e., Plaintiff's

CMDC devices). For example, "market.us" has published the following information on Google:

**2018?**
- On January 2018, Alphabet, Inc. acquired Redux – smartphone technology, which is
  specialized in turning smartphone screens into speakers.
- In October 2018, Google LLC to shut down Google+ after failing to disclose user data
  leak
- In November 2018, Google LLC acquired Workbench, which is a US-based company,
  that offers an online library of projects and lessons.

- Under this acquisition, the company focuses on integrating the Workbench tool with Google Classroom. In addition, currently, Google Classroom is one of the most widely used online educational tools, which lets parents, teachers, and students manage class discussions, assignments, and quizzes.

- In 2018, Google Search and Advertising tools helped generating **$335 billion** in economic activity for **more than 1.3 billion millions** of businesses, website publishers, and nonprofits across the United States.

- Many website publishers, non-profit organizations and 40,000 companies in the country benefited from the use of Google Ads and AdSense advertising tools.

- In 2018, Google had sent more than 14 billion dollars to music publishers around the world.

- As of November, 2018, in US, Google connects people to businesses nearby more than **9 billion times**, including over 1 billion phone calls and 3 billion direction requests to stores every month.

**Usage Statistics**

- In a minute on the Internet in 2020, there are **4.1 million search queries**, **230 million per hour** and **6 Billion per day** that is **more than 2.5 Trillion searches per year** worldwide.

- Till July 2020, Google has 95.6% share of worldwide mobile search traffic.

- In April 2020, Google processed **12.7 billion** search queries in US, accounting **62.3 percent** of the US total desktop search queries and leading mobile search provider in the US with 95.04% market share

- Daily visitors to Google are **approximately 620 Mn**.

- According to the Datareportal, in June 2020, the top 10 search queries on Google were: Google, Facebook, Youtube, You, Weather, News, Amazon, Coronavirus, Translate and Instagram.

- In July 2019, Google accounted for **95 percent** of US mobile search visits and **93 percent** of overall U.S. organic search engine visits.

- As of May 2019, Gmail is a product that **1.5 billion users** rely on, to get things done every day.

- As of September 2019, People have already asked **Google Lens more than a billion questions** about things they see.

3

- Google sends **10 billion+ clicks per month** to news publishers' websites.
- As of May 2019, **2.5 million** web publishers use AdSense to make money through their content on the web.
- According to a survey, in Europe the news content linked through Google were **clicked more than 8 billion times a month** that is **3,000 clicks per second** to the publishers' websites in Europe resulting to each click between 4-6 euro cents.
- In the US, Google helps drive over **1 billion direct connections**, like calls and online reservations, for businesses nationwide every month.
- Google owns its **own common misspellings domains** such as www.gooogle.com, www.googlr.com, and www.gogle.com
- Google runs **over 1 Mn computer servers** in data centers around the world.
- Last year, Google **rejected more than 10 million ads** that we suspected of copyright infringement.
- Around **35% of clicks** for U.S. businesses, advertising on Google, came from outside the country.
- As of May 2019, about **80% of traffic** from Google's Showcase Shopping ads to retailer sites are from new visitors discovering the brands.
- Till date, Google has over **2 billion store** offers mapped to physical store locations globally, discoverable by their current local ad formats like local inventory ads.
- Google Station serves more than **10 million people in 1,300 locations** across India, Indonesia, Mexico, Nigeria, the Philippines, Thailand, Vietnam and Brazil.
- Google Assistant is now on **more than one billion devices**, available in more than 30 languages across 80 countries.
- As of 2019, **more than 20 million people visit Google Account every day** to review their settings, using Privacy Checkup.
- As of 2019, **90 million** teachers and students are using G Suite for Education worldwide.
- Google has a database of over 4 billion credentials that have been compromised through various data breaches
- According to a 2018 Survey, around **72% of consumers in Indonesia** see Google Search as the online gateway for personal loan information and the second most helpful source for Financial Services information, after the bank branches

4

## THE PARTIES

1.      Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

2.      On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3.      Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones and Google Android Operating Systems.

## STANDARD FOR REVIEW

4.      Pursuant to the order of Magistrate Judge Kevin McDonald in United States District Court for the District of South Carolina; filed 12/17/2020; Case No. 6:20-cv-04353-BHH-KFM, Plaintiff was ordered to file "a short and plain statement of the claim showing that the pleader [Plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a).

5.      Plaintiff has attached a copy of the asserted patents as **Exhibits A, B, & C**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.,* No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted

patent, identified the accused products by name, and generally compared the technology

disclosed in the patents to the accused products. The complaint *did not identify any specific*

*asserted claim*, but the court found that: "Plaintiff has stated a plausible claim for direct

infringement by specifically identifying the Defendant's products and alleging that they perform

the same unique function as Plaintiff's patented system." The Defendant in this case is allegedly

liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

6.     Plaintiff maintains he has additional factual allegations to support his claim in the

form claim charts readily available by order of this Court.


## JURISDICTION AND VENUE

7.     This is a civil action for patent infringement arising under the patent laws of the

United States, Title 35 of the United States Code. This Court has subject matter jurisdiction

pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and

1400(b). On information and belief, the defendant has purposely transacted business in this

judicial district and has committed acts of joint, direct and/or indirect infringement in this

judicial district.

9.     On information and belief, the defendant is subject to this Court's specific and

general personal jurisdiction, due at least to the defendant's substantial business in this forum,

including: (A) at least part of the defendant's infringing activities alleged herein, and (B)

regularly doing or soliciting business, engaging in others persistent causes of conduct, and/or

deriving substantial revenue from goods and services provided to persons and other entities in

South Carolina and this judicial district. The defendant has allegedly used, sold, and/or offered products for sale in South Carolina and is licensed to do business in this state.

10.     This Court has specific jurisdiction over the defendant because the defendant has committed acts giving rise to this action and has established minimum contacts within this judicial district such that the exercise of jurisdiction over the defendant would not offend traditional notions of fair play and justice.

## RELATED CASES

11.     Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O").

12.     Plaintiff has filed an action of Antitrust Law violations *Larry Golden v. Apple, Inc. et al* on June 16, 2020, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc.

("Qualcomm"), Ford Global Technologies, LLC ("Ford"), General Motors Company ("GM"),
and, FCA US LLC ("FCA").

## GOOGLE SMARTPHONE SPECIFICATIONS / ANDROID PLATFORM

13.    Upon information and belief, Google is directly infringing Plaintiff's patented
CMDC devices by making, using, offering for sale, selling and/or importing the aforementioned
alleged infringing devices that have at a minimum, directly infringed Plaintiff's '287, '439, and
'189 patents. to unjustly enrich itself.

14.    Upon information and belief, Google is jointly infringing Plaintiff's patented
CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential,
Google's Android platform for use with Google's smartphones, and other Android smartphone
devices i.e., Samsung, LG, Motorola, etc., that have at a minimum, directly infringed Plaintiff's
'287, '439, and '189 patents. Android smartphones have permanent default Google-owned apps
like Google search, Google Play, YouTube, Maps etc. The main Android framework is signed in
through a Google account too. So, you need to have a Google account to use Android.

15.    The smartphone has come a long way since the first iPhone launched in 2007.
While Apple's iOS is arguably the world's first smartphone operating system, Google's Android
is by far the most popular. Android has evolved significantly since first being released on an
HTC-made T-Mobile device in 2008.

16.    It wasn't until 2005 that Google purchased Android, Inc., and while there wasn't
much info about Android at the time, many took it as a signal that Google would use the
platform to enter the phone business. Eventually, Google did enter the smartphone business —
but not as a hardware manufacturer. Instead, it marketed Android to other manufacturers, first

catching the eye of HTC, which used the platform for the first Android phone, the HTC Dream, in 2008.

17.    Upon information and belief, Google has copied the "product grouping" strategy of the Plaintiff (Golden) for a communicating, monitoring, detecting, and controlling (CMDC) device, i.e., Google's smartphone products are grouped together by "common features of design similarities". As illustrated below, Google's smartphones are basically the same.

18.    Therefore, when analyzing the specifications, features, and functionality of Google's smartphones as a complete product, and not merely identifying the individual infringing processes; there is a strong likelihood that if one of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device; it can be perceived that all of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device as a 'whole' product.

**GOOGLE PIXEL 5 VS. PIXEL 4A WITH 5G VS. PIXEL 4**

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| Network | 5G | 5G | 4G |
| Screen | 6-inch flexible OLED display at 432 ppi | 6.2-inch OLED display at 413 ppi | 5.8-inch OLED display at 443 ppi |
| Refresh Rate | 90 Hz | 60 Hz | 60 Hz |
| Resolution | 1080 x 2340 | 1080 x 2340 | 1080 x 2340 |
| Battery | 4080 mAh | 3885 mAh | 3140 mAh |
| Front Camera | 8 megapixels | 8 megapixels | 8 megapixels |
| Rear Camera | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel |
| Camera Features | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Live HDR+ |
| RAM | 8GB | 6GB | 6GB |

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| Processor | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 730G |
| Storage | 128GB | 128GB | 128GB |
| Audio | Stereo speakers, USB-C audio | Stereo speakers, USB-C audio, 3.5mm headphone jack | USB-C audio, 3.5mm headphone jack |
| Price | $699 | $499 | $349 |
| Wireless Charging | Yes | No | No |
| Water Resistant | Yes | No | No |
| Colors | Green, Black | White, Black | Black |
| Operating System | Pre-loaded with Android 11 | Pre-loaded with Android 11 | Pre-loaded with Android 10 |

**GOOGLE PIXEL 3 SERIES SPEC COMPARISON**

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| Display | 5.6 inches | 6.0 inches | 5.5 inches | 6.3 inches |
| Resolution | 2220 x 1080 | 2160 x 1080 | 2160 x 1080 | 2960 x 1440 |
| Processor | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) |
| RAM | 4GB | 4GB | 4GB | 4GB |
| Storage | 64GB | 64GB | 64GB, 128GB | 64GB, 128GB |
| Rear camera | 12 megapixels | 12 megapixels | 12 megapixels | 12 megapixels |
| Front camera | 8 megapixels | 8 megapixels | 8 megapixels, 8 megapixels(wide) | 8 megapixels, 8 megapixels(wide) |

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| Battery | 3,000mAh | 3,700mAh | 2,915mAh | 3,430mAh |
| Water protection | N/A | N/A | IPX8 | IPX8 |
| Wireless charging? | No | No | Yes | Yes |
| Ports? | USB-C, 3.5mm headphone jack | USB-C, 3.5mm headphone jack | USB-C | USB-C |
| Weight | 0.32 pounds | 0.37 pounds | 0.33 pounds | 0.4 pounds |
| Dimensions (in.) | 6.0 x 2.80 x 0.30 | 6.30 x 3.00 x 0.30 | 5.70 x 2.70 x 0.30 | 6.20 x 3.00 x 0.30 |
| Starting price | $399.00 | $479.00 | $799.00 | $899.00 |
| Operating System | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android |

## SENSOR TYPES SUPPORTED BY THE "*ANDROID*" PLATFORM

| Type | | | |
|---|---|---|---|
| **Accelerometer** | Hardware | Measures the acceleration force in m/s$^2$ that is applied to a device on all three physical axes (x, y, and z), including the force of gravity. | Motion detection (shake, tilt, etc.). |
| **Ambient Temperature** | Hardware | Measures the ambient room temperature in degrees Celsius (°C). See note below. | Monitoring air temperatures. |
| **Gravity** | Software or Hardware | Measures the force of gravity in m/s$^2$ that is applied to a device on all three physical axes (x, y, z). | Motion detection (shake, tilt, etc.). |
| **Gyroscope** | Hardware | Measures a device's rate of rotation in rad/s around each of the three physical axes (x, y, and z). | Rotation detection (spin, turn, etc.). |
| **Light** | Hardware | Measures the ambient light level (illumination) in lx. | Controlling screen brightness. |

| Type<br>Linear Acceleration | Software or Hardware | Measures the acceleration force in m/s² that is applied to a device on all three physical axes (x, y, and z), excluding the force of gravity. | Monitoring acceleration along a single axis. |
|---|---|---|---|
| Type<br>Magnetic Field | Hardware | Measures the ambient geomagnetic field for all three physical axes (x, y, z) in µT. | Creating a compass. |
| Type<br>Orientation | Software | Measures degrees of rotation that a device makes around all three physical axes (x, y, z). As of API level 3 you can obtain the inclination matrix and rotation matrix for a device by using the gravity sensor and the geomagnetic field sensor in conjunction with the get Rotation Matric () method. | Determining device position. |
| Type<br>Pressure | Hardware | Measures the ambient air pressure in hPa or mbar. | Monitoring air pressure changes. |
| Type<br>Proximity | Hardware | Measures the proximity of an object in cm relative to the view screen of a device. This sensor is typically used to determine whether a handset is being held up to a person's ear. | Phone position during a call. |
| Type<br>Relative Humidity | Hardware | Measures the relative ambient humidity in percent (%). | Monitoring dewpoint, absolute, and relative humidity. |
| Type<br>Rotation Vector | Software or Hardware | Measures the orientation of a device by providing the three elements of the device's rotation vector. | Motion detection and rotation detection. |
| Type<br>Temperature | Hardware | Measures the temperature of the device in degrees Celsius (°C). This sensor implementation varies across devices and this sensor was replaced with the **Type—Ambient Temperature** sensor in API Level 14 | Monitoring temperatures. |

❖ **BIOMETRICS**: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).

❖ **DISABLING LOCK MECHANISM:** Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. When setting the pattern, you must drag your finger along lines on the screen between different nodes. Afterward, to unlock the phone, you'll need to replicate the pattern drawn. If you fail to solve the

pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. If you can't log in, you'll have to employ some other methods to restore control of your phone.

❖ **CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN) DETECTION:** Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK)*. ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

❖ **HEART RATE**: *Android Team Awareness Kit, ATAK* provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

❖ **NEAR FIELD COMMUNICATION (NFC)**: Pixel™, Phone by Google - Turn NFC on/off. Near Field Communication (NFC) allows the transfer of data between devices that are a few centimeters apart, typically back-to-back. NFC must be turned on for NFC-based apps (e.g., Tap to Pay) to function correctly. NFC is a set of short-range wireless technologies, typically requiring a distance of 4cm or less to initiate a connection. NFC allows you to share small payloads of data between an NFC tag and an Android-powered device, or between two Android-powered devices. Tags can range in complexity.

❖ **WARFIGHTERS:** The U.S. armed forces and their interagency and coalition partners value *Android Team Awareness Kit, ATAK* and the common operating picture it provides. DTRA continues to develop CBRN-specific plug-in capabilities to support warfighters on the battlefield.

---

## GOOGLE'S JOINT INFRINGEMENT WITH APPLE INC.

19.      According to Gurman, 2020, "The U.S. government's antitrust assault against Google reveals new details about a secretive, multibillion-dollar deal between the internet giant and Apple Inc., the world's largest technology company. The Justice Department's lawsuit, filed Tuesday, targets paid deals Google negotiates to get its search engine to be the default on browsers, phones and other devices. The biggest of these is an agreement that makes Google search the default on iPhones and other Apple devices."

20.     The U.S. government said Apple Chief Executive Officer Tim Cook and Google CEO Sundar Pichai met in 2018 to discuss the deal. After that, an unidentified senior Apple employee wrote to a Google counterpart that "our vision is that we work as if we are one company."

21.     The DOJ also cited internal Google documents that call the Apple search deal a "significant revenue channel" for the search giant and one that, if lost, would result in a "Code Red" scenario. That's because nearly half of Google search traffic in 2019 came from Apple products, according to the lawsuit.

22.     Google pays Apple billions of dollars a year to make its search product the default option, according to analyst estimates. That means when a user buys a new iPhone or other Apple device, the built-in search engine in the Safari browser is Google.

23.     The DOJ suit cited estimates that Apple gets $8 billion to $12 billion annually from Google through the agreement. Apple's income from the search deal is believed to be part of the company's growing Services segment, a key metric Apple has highlighted to investors and analysts in recent years.

Gurman, Mark (2020, Oct. 20). *Apple, Google worked as 'one company' on search deal, U.S. says*. https://www.bloomberg.com/news/articles/2020-10-20/apple-google-worked-as-one-company-on-search-deal-u-s-says

**Joint Infringement**

24.     Upon information and belief, Google and Apple are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Search for use with Google and Apple smartphones, that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

25.    Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. et al.

26.    Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. et al. for Antitrust Law Violations.

## GOOGLE'S JOINT INFRINGEMENT WITH QUALCOMM INC.

27.    According to a Qualcomm press release (2020), "Qualcomm Technologies, Inc. and Google announced their collaboration to enhance and extend Project Treble with the goal of enabling more devices with Qualcomm® Snapdragon™ mobile platforms to run the latest Android OS.  The enhancements are intended to enable Original Equipment Manufacturers (OEMs) to upgrade their Snapdragon based devices to the latest Android OS without modifying Qualcomm Technologies' chipset-specific software and to use a common Android software branch to upgrade devices based on a wide range of Snapdragon mobile platforms across Qualcomm Technologies' portfolio.  These enhancements are designed to reduce the time and resources required to upgrade Snapdragon based devices to the latest Android OS version."

28.    As part of this collaboration with Google, Qualcomm Technologies will now support four Android OS versions and four years of security updates for all Snapdragon platforms utilizing the Project Treble enhancements, starting with the new Snapdragon 888 Mobile Platform. These initiatives are designed to enable faster Android OS upgrades with fewer resources and a predictable software lifecycle for Snapdragon based devices, which together are

expected to result in more consumers with Snapdragon based devices running the latest Android OS version.

29.     "Google continues to work closely with our technology partners to increase the freshness of the Android ecosystem. Through this collaboration with Qualcomm Technologies, we expect that Android users will have the latest OS upgrades and greater security on their devices," said David Burke, vice president of Android engineering, Google.

30.     "We are excited to work with Google to extend our support for Android OS and security updates on future Snapdragon mobile platforms utilizing the Project Treble enhancements," said Kedar Kondap, vice president, product management, Qualcomm Technologies, Inc.

**Terminology**

- Google's android operating system; same as "operating system".

- Google's android operating system; same as "computer program".

- Google's android operating system; same as "software".

- Qualcomm's chipset; used interchangeably as "processor".

- Qualcomm's chipset; used interchangeably as "central processing unit".

- Qualcomm's chipset; used interchangeably as "wireless technology" (WiFi, 3G, 4G, 5G, LTE, and so on).

31.     An operating system is a computer program, works as interface between user and hardware and provides common services for computer programs. The entire process or functionality of computer system depends on the operating system. An operating system is a computer program that controls the execution of application programs and acts as an interface between the user of a computer and the computer hardware. The purpose of an operating system

is to provide an environment in which a user can execute programs in a convenient and efficient manner. https://www.geeksforgeeks.org/introduction-of-operating-system-set-1/

32.    A Central Processing Unit (CPU) is a machine that can execute computer programs. This broad definition can easily be applied to many early computers that existed long before the term "CPU" ever came into widespread usage. The term itself and its initialism have been in use in the computer industry at least since the early 1960s (Weik 1961). The form, design and implementation of CPUs have changed dramatically since the earliest examples, but their fundamental operation has remained much the same.

33.    An Operating System is the core software that allows applications to interface with the hardware. Operating Systems control the specific details of your system, presenting a more manageable interface for applications (and the user) to make use of. To use an analogy, the CPU is the brain, the OS is the mind. The mind cannot exist without a brain to store it, and the brain is just a useless lump without a mind to control it. https://answers.yahoo.com/question/index?qid= 20090927101607AAiAJ42

34.    An SoC, or system-on-a-chip to give its full name, integrates almost all of these components into a single silicon chip. Along a CPU, an SoC usually contains a GPU (a graphics processor), memory, USB controller, power management circuits, and wireless radios (WiFi, 3G, 4G LTE, and so on). Whereas a CPU cannot function without dozens of other chips, it's possible to build complete computers with just a single SoC. The number one advantage of an SoC is its size: An SoC is only a little bit larger than a CPU, and yet it contains a lot more functionality. If you use a CPU, it's very hard to make a computer that's smaller than 10cm (4 inches) squared, purely because of the number of individual chips that you need to squeeze in. Using SoCs, we can put complete computers in smartphones and tablets, and still have plenty of

space for batteries. https://www.extremetech.com/computing/126235-soc-vs-cpu-the-battle-for-the-future-of-computing.

**Joint Infringement**

35.    Upon information and belief, Google and Qualcomm are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Qualcomm's SoCs, CPUs, etc. for smartphones that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

36.    Google developing its own phone processor would mean dumping the Qualcomm SoCs it usually uses. Of course, you can never truly be rid of Qualcomm: Google would presumably still need to use Qualcomm modems, something that even Apple still needs to do. There are other modem manufacturers out there—Samsung, Huawei, Mediatek—but Qualcomm's combination of patents and strong-arm licensing techniques has effectively locked its competitors out of the US and other markets.

37.    Plaintiff has alleged that Qualcomm is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al.* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, *Apple Inc. et al.*

38.    Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, *Apple Inc. et al.* for Antitrust Law Violations.

# CLAIM CONSTRUCTION

"*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015. "In the 'Decision to Institute', we construed certain claim terms. Those constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11-16

39.    "No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them… [w]e further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10-11. Based on the record adduces during trial, we see no need to construe any other terms…"

40.    "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of *a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site* for monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product grouping category of design similarity (e.g., computer terminal, personal computer (PC)) …" Patent Owner contends that this new language is consistent with

words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further

contends that this new language is broad enough to include the removed items, such as cell

phones and smart phones, because those items are "species terms" that are "included in the genus

'monitoring equipment' and 'communication device' when the clause 'products grouped together

by common features in the product groupings category of design similarity' is included." *Id.*

Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart

phones would be recognized by one of ordinary skill in the art as a type of communication

device or monitoring equipment because cell phones and smartphones are devices that are

capable of communication and are capable of receiving signals." *"Inter Partes Review* (IPR):

*Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent

RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015.


# COUNT I

## (Infringement of the '287 Patent)

41.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-

40.

42.    On information and belief, Google is jointly, directly, indirectly and/or under the

'doctrine of equivalents', infringing at least independent claims 4, 5, and 6 of the '287 patent.

The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G),

and 5.

43.    As set forth in Golden's preliminary infringement contentions that Google is

making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a

minimum directly infringed the '287 patent and Google is thereby liable for infringement of the

'287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

44.     The alleged infringement of Golden identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT II

### (Infringement of the '439 Patent)

45.     Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-44.

46.     On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 13, 14, 15, and 23 of the '439 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

47.     As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '439 patent and Google is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

48.     The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT III

### (Infringement of the '189 Patent)

49.    Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-48.

50.    On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

51.    As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '189 patent and Google is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

52.    The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## CLAIM CHART

53.    The following Claim Chart is an illustration of literal infringement. At least one of the alleged infringing products of Google (i.e., Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), or 5) is representative of all the alleged infringing products of Google asserted in this complaint. At least one of the alleged infringing products of Google (Google Pixel 5) is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

22

| **Google Pixel 5 Smartphone** | **Patent #: 10,163,287; Independent Claim 5** | **Patent #: 9,589,439; Independent Claim 23** | **Patent #: 9,096,189; Independent Claim 1** |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |

| | | | |
|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |

| | | | |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |

| | | | |
|---|---|---|---|
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.      A judgment in favor of Golden that the defendant has infringed at least one or more claims of the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid;

B.      A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

C.      A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D.      As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned

alleged infringing devices that have at a minimum, directly infringed the '287, '439, and '189 patents. The Defendant is thereby liable for infringement of the '287, '439, and '189 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

E.       Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Respectfully submitted,

S/ _Larry Golden_____     Date: 01 /25 /2021

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# Exhibit 10

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**F I L E D**

JUL 15 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

APPLE INC.

Defendant.

**VKD**

CASE NO: **22 04152**

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Willful Patent Infringement).**

July 12, 2022

---

## COMPLAINT FOR ANTITRUST LAW VIOLATIONS AND PATENT INFRINGEMENT

This is a civil action brought under Antitrust Law violations commencing from competitor collaborations while performing work for the Government; conspiracy to restrain trade while performing work for the Government; exclusive dealings arrangements while performing work for the Government; unreasonably restraining competition by creating and

2

maintaining monopoly power while performing work for the Government, that likely resulted in
secret conspiracies and the anticompetitive practices alleged in this complaint.

This action is also brought under direct infringement; infringement under the "doctrine of
equivalents; indirect infringement; and contributory infringement commencing from 35 U.S.C. §
271 (a) … "whoever without authority makes, uses, offers to sell, or sells any patented invention,
within the United States or imports into the United States any patented invention during the term
of the patent therefor, infringes the patent. (b) [w]hoever actively induces infringement of a
patent shall be liable as an infringer. (c) [w]hoever offers to sell or sells within the United States
or imports into the United States a component of a patented machine, manufacture, combination
or composition, or a material or apparatus for use in practicing a patented process, constituting a
material part of the invention, knowing the same to be especially made or especially adapted for
use in an infringement of such patent, and not a staple article or commodity of commerce
suitable for substantial noninfringing use, shall be liable as a contributory infringer."

This action is for damages and injunctive relief on behalf of the Plaintiff, against the
defendant Apple Inc. ("Apple"); demanding a trial by jury, complains and alleges as follows:

## NATURE OF THE CASE

1.      This enforcement action challenges Apple's unlawful maintenance of a
monopoly. Apple has engaged in exclusionary conduct that reduces competitors' ability and
incentive to innovate, and raises prices paid by consumers for the new and improved cell phones,
smartphones, laptops, tablets (iPads), and smartwatches. Apple is a dominant supplier of new
and improved cell phones, smartphones, laptops, tablets (iPads), and smartwatches.

2.      Apple has excluded competitors and harmed competition through interrelated policies and practices that includes conspiracy to restrain trade, exclusive dealing agreements, and attempted monopolization.

3.      Apple's conduct has harmed competition and the competitive process. At a time when mobile technologies are expanding to new and varied applications, Apple's practices threaten further consumer harm in an industry in which competition is vitally important.

4.      The most egregious infringer is the willful infringer. The Circuit Court has identified two prongs to determine willful infringement: 1) "clear and convincing evidence that the infringer [Apple Inc.] acted despite an objectively high likelihood that its actions constituted infringement of a valid patent(s)," and 2) a subjective prong that the infringer [Apple Inc.] knew or should have known it was acting recklessly.  Apple should be required to compensate the patentee [Plaintiff] and suffer punitive damages. Under this proposed model for relief, the patentee [Plaintiff] would recover actual damages (lost profit and transaction costs), restitution for the unjust enrichment Apple gained by unfairly using the patents, and, under the court's discretion, treble damages as currently authorized by statute.

5.      The Clayton Act authorizes Plaintiff to sue for triple damages when Plaintiff have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

## JURISDICTION AND VENUE

6.      This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover triple damages, injunctive relief, and costs of suit; for violation of Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2; conspiracy in the restraint of trade and single-firm violations).

7.     This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

8.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendant reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

9.     For patent litigation cases, the venue statute, 28 U.S.C. §1400(b), provides "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

10.     The activities of the Defendant, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

**Intradistrict Assignment**

11.     Assignment to the San Jose Division is proper. The actions arose in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Apple has offices in Santa Clara and San Jose. Third parties that have information relevant to this action, including leading cell phone manufacturers (also known as "original equipment manufacturers" or "OEMs") and Apple's competitors, also have offices in Santa Clara County.

**Related Case Dismissed "Without Prejudice"—Antitrust Law Violations**

12.     UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT No. 21-2160 *Larry Golden*, on behalf of himself and all others similarly situated, Plaintiff -

Appellant, *v. Apple, Inc.; Samsung Electronics USA; Lg Electronics USA, Inc.; Qualcomm Inc.; Ford Global Technologies LLC; General Motors Company; FCA US, LLC*, Defendants - Appellees. USCA4 Appeal: 21-2160 Doc: 7 Filed: 03/31/2022

13.     "PER CURIAM: Larry Golden appeals the district court's order accepting the recommendation of the magistrate judge and <u>dismissing without prejudice</u> Golden's civil complaint. We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's order." *Golden v. Apple, Inc.*, No. 6:20-cv-02270-JD (D.S.C. Sept. 20, 2021) ...

### Related Case Dismissed "Without Prejudice"—Patent Infringement

14.     IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA GREENVILLE DIVISION *Larry Golden, Plaintiff, vs. Apple Inc.; Samsung Electronics USA; LG Electronics USA, Inc.; Qualcomm Inc., Motorola Solutions, Inc.; Panasonic Corporation; AT&T Inc.; Verizon Corporation Service Group; Sprint Corporation; T-Mobile USA, Inc.; Ford Global Technologies, LLC; Fairway Ford Lincoln of Greenville; General Motors Company; Kevin Whitaker Chevrolet; FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram, Defendants.* Case No.: 6:20-cv-04353-JD-KFM Date Filed 11/02/21 Entry No. 26.

15.     "Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein. IT IS, THEREFORE, ORDERED that Plaintiff's Complaint is <u>dismissed without prejudice</u> and without the issuance of service of process."

### Dismissal "Without Prejudice"

16.     When a court dismisses a claim but leaves the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim. *In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the main features of dismissal without

prejudice is that it does not prevent refiling of the claim… "a case that is dismissed "without prejudice" is only dismissed temporarily. This temporary dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to another court."

## **RELATED CASE**

17.    Plaintiff has an Antitrust case pending in the United States District Court for the Northern District of California (Oakland); *Golden v. Qualcomm, Inc.*; Case No.: 4:22-cv-03283-KAW; Kandis A. Westmore is the Presiding Magistrate Judge. The cases are very similar in nature because Apple and Qualcomm were both notified in 2010 of Plaintiff's offer to license Plaintiff's intellectual property; both have had additional opportunities to enter into licensing agreements; both have formed or maintained a monopoly by either using, making, offering for sale, or selling Plaintiff's patented inventions; both have negotiated exclusive agreements; both received a benefit from the Plaintiff; and, both were unjustly enriched at the Plaintiff's expense. The term "benefit" means any type of advantage. (*Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 347.) receipt of a benefit and unjust retention of the benefit at the expense of another." (*Lyles v. Sangadeo-Patel* (2014) 225 Cal.App.4th 759, 769.)

## **THE PARTIES**

18.    Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e., Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Central

Processing Units (CPUs) for New and Improved Cell Phones; and, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS).

19.     On information and belief, Apple is a California corporation with a principal place of business at One Apple Park Way, Cupertino, CA 95014 and does business in this judicial district by, among other things, committing jointly, directly and/or indirectly the tort of patent infringement giving rise to this complaint.

20.     Apple's unjust enrichment of profits, resulting from a violation of antitrust laws; anticompetitive practices; conspiracy in restraint of trade; direct infringement; and contributory infringement, give rise to this complaint. Apple's monopolization and attempted monopolization violations require no agreement as Section 1 violations do. *E.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993) (explaining that "while § 1 . . . forbids contracts or conspiracies . . ., § 2 addresses the actions of single firms that monopolize or attempt to monopolize"). They are "single-firm" violations.

21.     Apple's total revenue between the years 2011 and 2021: https://www.macrotrends.net/stocks/charts/AAPL/apple/revenue

### Apple Annual Revenue

| | |
|---|---|
| 2021 | $365.8B |
| 2020 | $274.5B |
| 2019 | $260.2B |
| 2018 | $265.6B |
| 2017 | $229.2B |
| 2016 | $215.6B |
| 2015 | $233.7B |
| 2014 | $182.8B |

COMPLAINT

| Apple Annual Revenue | |
|---|---|
| 2013 | $170.9B |
| 2012 | $156.5B |
| 2011 | $108.2B |

22.     Apple may be served at its principal place of business at One Apple Park Way, Cupertino, CA 95014.

## STATEMENT OF FACTS:

## RELEVANT HISTORICAL FACTUAL ALLEGATIONS TO SUPPORT PLAINTIFF'S CLAIM OF APPLE'S ANTICOMPETITIVE CONDUCT

23.     "Months after the company fought a tense legal battle with the FBI over iPhone security, the Democratic leader in the U.S. House of Representatives is questioning how much credit Apple should get for creating the iPhone. In comments this week [June 10, 2016], Rep. Nancy Pelosi (D-Calif.) said "federal research" -- not Steve Jobs or Apple -- invented the iPhone ... Pelosi said: '[a]nybody here have a smartphone? In this smartphone, almost everything came from federal investments and research. GPS, created by the military, flatscreens, LLD [sic], digital camera, wireless data compression, research into metal alloys for strength and lightweight, voice recognition -- the list goes on and on' ... What Pelosi seems to be saying was that federal funding and research played a key role in many of the underlying technologies within the iPhone, which is true. As just one example, the U.S. military developed GPS technology [the first iPhone was released on June 29, 2007; the first GPS chip was added to the iPhone 3G in 2008], which powers much of the location-based data that's fundamental to smartphones today" https://mashable.com/article/nancy-pelosi-iphone-invent

24.     "Today, chances are your cell phone is called a "smartphone" and came with a three-to-five-megapixel lens built-in [the built-in camera lens are used for detecting C/B/R agents] says Stephen Dennis, Cell-All's program manager ... **(Exhibit A)**. In 2007, S&T called upon the private sector to develop concepts of operations ... three teams from Qualcomm, NASA, and Rhevision Technology [Rhevision: developed the built-in megapixel camera lens for detecting C/B/R agents] are perfecting their specific area of expertise. Qualcomm engineers specialize in miniaturization and know how to shepherd a product to market ... S&T is pursuing what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes" Cell-*All: Super Smartphones Sniff Out Suspicious Substances*. https://www.dhs.gov/ science-and-technology/cell-all-super-smartphones-sniff-out-suspicious-substances

25.     Under the DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing* initiative, the third-party contractors were given "consent and authorization" to private parties' infringement, *Sheridan v. United States*, 120 Fed. CL at 131, to develop and assemble under the *Cell-All* initiative, Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device (i.e., new and improved cell phone), according to the following:

❖ Plaintiff's patented chemical, biological, explosive, or radiological sensors and detectors [contractors: Qualcomm; Rhevision; Seacoast Science; NASA—Genel; Synkera]

❖ Plaintiff's patented new and improved cell phones [contractors: Qualcomm; Apple; Samsung; LG]

❖ Plaintiff's patented central processing units (CPUs) [contractor: Qualcomm]

❖ Qualcomm's patented wireless cellular modems [contractor: Qualcomm]

COMPLAINT

❖ AT&T's communication systems concept for large scale ubiquitous networks [subcontractor to Apple: AT&T] 28 U.S.C. § 1498(a) … "[f]or the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."

❖ Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) device (i.e., new and improved cell phone; smartphone, developed and assembled under the *Cell-All* initiative) include certain safety features to protect the public. These features are: biometric authentication, disabling lock after multiple fail attempts to unlock, radio-frequency near-field communication, and location tracking [contractors and subcontractor: Apple, Qualcomm, and AT&T]

26.    Apple and Qualcomm conspired to monopolized the smartphone industry. According to Mr. Hoffman, "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: 'Let's take advantage of the 300 million cell phones that are out there today. They're always with us'" (Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28 <http://cellall. webcaston.tv/ home/homepage.php> (accessed 17.09.12))

27.    "Apple has been indirectly paying Qualcomm licensing fees since 2007, when it released the iPhone. Qualcomm required licensing fees for using its chipsets. Rather than grant Apple a direct license on FRAND terms, Qualcomm has instead entered into confidential licenses with specific Apple contract manufacturers ("CMs"), the third-party manufacturers who make and assemble Apple products. The CMs pay the exorbitant royalties Qualcomm demands and pass the costs along to Apple in full … Since at least 2007, Qualcomm has engaged in

systematic, continuous conduct to exclude competition in the relevant chipset markets.

https://www.fool. com/investing/2017/01/28/the-chronological-history-of-how-qualcomm-

became-t.aspx

28.    2011: Apple launches the iPhone on Verizon, and Qualcomm's exclusivity

begins. This was the year that Apple fully got into bed with Qualcomm, largely because

Verizon's 3G network uses CDMA instead of GSM. As the largest U.S. carrier, it was an

important strategic move for Apple ahead of the scheduled end of AT&T exclusivity. Fully

aware of this, Qualcomm flexed its licensing muscles … Apple became even more reliant on

Qualcomm in 2011 due to Apple's desire to release an iPhone that could connect to CDMA

networks, such as Verizon's … Since 2011, when Apple introduced the first CDMA version of

its products, Qualcomm has charged Apple a monopolistic premium for access to CDMA

chipsets". The Northern District of California in *Federal Trade Commission v. Qualcomm Inc.*

29.    Apple and AT&T conspired to monopolized the smartphone industry. "Apple, in

a court filing (Northern District of California) in October 2008, admitted that AT&T had

*exclusive distribution* rights in the U.S. for the iPhone. Apple specifically admitted to reports

from *USA Today* in 2007, in which the newspaper said that the two companies had agreed to a

deal through 2012 … a class-action lawsuit filed in 2007, accusing both the iPhone maker and

AT&T of illegally exerting a monopoly over iPhone customers" https://appleinsider.com/

articles/10/05/10/apple_att_originally_agreed_to_ iphone_exclusivity_until_2012

30.    "Apple wanted a partner that would be ready to give it a percentage of the annual

service bill for iPhone users and at the same time, Apple didn't want to provide long term

exclusivity to any one carrier. AT&T, automatically, became the prime candidate since it had the

largest wireless data network available at that time which reached 270 million people worldwide.

On the other side, AT&T was looking for a competitive advantage in the wireless market and to
fully transition its brand into that of a wireless company. The details of the Apple and AT&T
deal was a very secret affair but a number of them were released publicly. Main points of the
deal are summarized below:

- ❖ AT&T would be the exclusive carrier of the iPhone for 5 years while Apple would get
  millions of dollars from AT&T to support the development of the iPhone.
- ❖ AT&T would get 10% of iPhone sales in AT&T stores while Apple would get $10 a
  month of AT&T iPhone subscriber's bill.
- ❖ AT&T would get a thin slice of iTunes revenues while Apple would get control of
  design, manufacturing, marketing.

It was predicted by the Analyst that the iPhone would sell about 8 million units by the
end of 2008, but in reality, the number was much larger. The actual sale was 1.4 million units
globally in 2007 and from 2008-2011 the number of units sold increased from 11.6 to 72.3
million. Apple's sales jumped from $19 billion to $156 billion in just six years from 2006 to
2012 and its market value skyrocketed from $56 billion to $494 billion during that same period.
https://blog.ipleaders.in/key-features-apples-deal-att-selling-iphones/

31.     "On December 14, 2015 Judge Yvonne Gonzalez Rogers heard oral argument on
a motion to dismiss filed by Apple in an antitrust action brought against the company in
connection with its 2007 deal to sell iPhones exclusively to AT&T Mobility.  The next day,
Judge Rogers denied Apple's motion.  The lawsuit, one of several arising from the Apple-AT&T
agreement, raises interesting questions about how to define a relevant product market using an
"aftermarket" theory. *Ward v. Apple, Inc.* was first filed in the Northern District of California in
2012.  The plaintiffs sought to represent a putative class of consumers who bought iPhones while
the exclusivity agreement between Apple and AT&T was in effect.  This exclusivity agreement

made AT&T the only authorized provider of voice and data services for the iPhone, and was enforced through the installation of a "software lock" that made it impossible for consumers to use their iPhones on a different network. The agreement, entered into shortly before the iPhone's debut in 2007, was set to last for five years, meaning the first purchasers of iPhones had unwittingly (according to the plaintiffs) agreed to use only AT&T's voice and data services for the next five years if they wished to use their iPhones. Crucially, Apple and AT&T shared the profits from the services contracts, a novel arrangement between a services provider and a phone manufacturer. Plaintiffs allege that this agreement allowed Apple and AT&T to dominate the "iPhone Voice and Data Services Aftermarket" and charge supercompetitive prices in that market." https://www.pbwt.com/antitrust-update-blog/second-bite-at-the-apple-in-at-t-aftermarket-case

32.    As demonstrated in this section, Plaintiff believes Apple is in violation of Section 1 of the Sherman Act whereby Apple's conspiracy comprised of agreements, and an understanding or meeting of the minds between at least the two competitors named in the *Cell-All* initiative [Samsung and LG], or potential competitor named in the *Cell-All* initiative [Qualcomm], for the purpose of conspiring or with the effect of unreasonably restraining trade.

33.    Also, as demonstrated in this section, Plaintiff believes Apple is in violation of Section 2 of the Sherman Act whereby Apple has attempted to monopolize; and, combined or conspired with Qualcomm [attempted target is 300 million people with smartphones] and AT&T [network of 270 million people worldwide] to monopolize the smartphone industry among the several States, and with foreign nations. . . 15 U.S.C. § 2 (2000). Section 2 proscribes "attempt[s] to monopolize": [a]ttempted monopolization requires (1) anticompetitive conduct, (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power 15 U.S.C. §

2 (2000). Section 2 prohibits maintaining monopoly power only through improper means [making, using, offering for sale, or selling the patented products of the Plaintiff without a license or authorization] *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *United States v. Grinnell*, 384 U.S. 563, 57071 (1966).

## APPLE'S MOTIVE TO FORM A CONSPIRACY, AND APPLE'S CONSPIRACY IN RESTRAINT OF TRADE

34. Apple's motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion.

35. Upon information and belief, Apple has conspired with Qualcomm, Samsung, & LG; who participated as co-conspirators with Apple in violating certain antitrust laws, and laws governing the unauthorized use of Plaintiff's patented inventions.

36. After the 9/11 bombings and beginning in year 2003, Plaintiff submitted to all 50 U.S. Senators three "Economic Stimulus and Terrorism Prevention Packages" [The "SafeRack" Stimulus Package; the "ATPG" Stimulus Package; and, the "V-Tection" Stimulus Package]. Each package described specific technology needed to institute or set in motion the strategies for restoring our Nation's economy.

37. The "product grouping" strategy for the "Anti-Terrorism Product Groupings (ATPG) Package, is to design a device(s) that is capable of communicating with the detection and monitoring devices of the "SafeRack Package"; and, capable of controlling the activation and deactivation of certain products of the "V-Tection Package" (e.g., locks, vehicles, etc.).

38. The technical rational for the "ATPG" Stimulus Package is to design a device that is capable of communicating, monitoring, detecting, and controlling (CMDC). Plaintiff has in the

past, and will throughout this document show Apple's smartphones, tablets, laptops, and smartwatches are designed after Plaintiff's CMDC devices.

39.     Plaintiff's stimulus packages were sent to two offices of the executive branch of Government; the Office of the President (Bush), and the Office of the Vice-President (Cheney), that included the technical rational for a communicating, monitoring, detecting, and controlling (CMDC) device. They sent the packages to the Department of Homeland Security (DHS).

40.     Three United States Senators for the State of South Carolina (Graham, Holland, and DeMint), were sent Plaintiff's stimulus packages that included the technical rational for a communicating, monitoring, detecting, and controlling (CMDC) device.  They sent the packages to the Department of Homeland Security (DHS).

41.     Plaintiff received two invites from the Department of Homeland Security. DHS invited Plaintiff to the Department to discuss Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices.

42.     In 2007, Apple and the Plaintiff was competing for the same government contract. The Department of Homeland Security (DHS) issued a 'request for proposal' [DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing*]. DHS was seeking proposals for a new and improved cell phone capable of biological and chemical sensing.

43.     For the program's initial phase in 2007, DHS released a call for proposals inviting the private sector to develop a proof of concept for the "*Cell-All Ubiquitous Biological and Chemical Sensing*" project (U.S. Department of Homeland Security, 2007). Cell-All Ubiquitous Biological and Chemical Sensing. <https://http://www.fbo.gov/index?s=opportunity&mode=form&id =f292c1fdbd46777a3ff8ca64ef96658f&tab=core&_cview=1> (accessed 17.09.12).

44.     DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung—with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010, Cell-All: Super Smartphones Sniff Out Suspicious Substances <http://www.dhs.gov/cell-all-super-smartphones-sniff-out-suspicious-substances> (accessed 17.09.12)).

45.     Plaintiff believes there were three motives for Apple and its co-conspirators Qualcomm, Samsung, & LG to conspire to keep Plaintiff's entrance into the market restrained. First, Apple and its co-conspirators knew the Department of Homeland Security had issued a solicitation for a new, useful, and improved upon cell phone. According to the USPTO, a new, useful, and improved upon product (i.e., cell phone) is patentable. Neither Apple or any of its co-conspirators held the patent for a new and improved cell phone. Plaintiff believes Apple and its co-conspirators Qualcomm, Samsung, & LG agreed to develop the new, useful, and improved upon cell phone, under the premise that none of the conspirators would ever file for a patent for the new and improved cell phone; none would market themselves as the inventor of the new and improved cell phone; and, none would accept a license from the Plaintiff for the new and improved cell phone.

46.     Second motive to conspire: Apple and its co-conspirators Qualcomm, Samsung, & LG knew they were free from liability of infringement if they performed the work under a government contract. Plaintiff believe Apple and its co-conspirators Qualcomm, Samsung, & LG knew that with "authorization and consent" from the government, they were immune from the liability of infringing Plaintiff's inventions. They also knew that if Plaintiff decides to bring an action, it must be brought against the government in the Court of Federal Claims.

47.     Third motive to conspire: Apple and its co-conspirators Qualcomm, Samsung, & LG knew that if Plaintiff were to bring an action of infringement against government, all that was needed at the time (2007), was for Apple and its co-conspirators Qualcomm, Samsung, & LG to make at least one part of the inventive process abroad, and the government cannot be held liable for infringement (*Zoltek III*). This provision was not overturned until *Zoltek V* (2012).

48.     Upon information and belief, it has always been Apple and Qualcomm's goal to monopolized the smartphone industry. According to Mr. Hoffman, "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: 'Let's take advantage of the 300 million cell phones that are out there today. They're always with us'" (Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28 <http://cellall.webcaston.tv/ home/homepage.php> (accessed 17.09.12)).

49.     Apple's collusion, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC devices. While performing work for the government, Apple has engaged in assembling Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device [new and improved cell phone], and has managed to avoid prosecution by shielding itself under the protection of the Government.

50.     The acts charged in this complaint were done by Apple and its co-conspirators, or were authorized, ordered or done by their respective officers, employees, representatives, or agents while actively engaged in management of Apple and its co-conspirators business or

affairs. Each of the co-conspirators named herein acted as the agent or representative of, or for Apple with respect to the acts, violations and common course of conduct alleged herein.

51.     Upon information and belief, Apple colluded and conspired under the protection of a Government contract to develop Plaintiff's "new and improved cell phone" (i.e., smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across multiple industries, agencies, groups, and demographics to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

52.     It is the belief of the Plaintiff, that throughout the relevant period, Apple and its co-conspirators Qualcomm, Samsung, & LG, unlawful activities as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

53.     It is the belief of the Plaintiff, that Apple and its co-conspirators Qualcomm, Samsung, & LG, are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices.

54.     In a related COFC case no 13-307C, *Larry Golden v. The United States*, Qualcomm [2019], and Apple, Samsung, & LG [2021 respectfully], were all summoned to appear to protect any interested they may have had in the case. They all fail to appear.

55.     Apple and its co-conspirators Qualcomm, Samsung, & LG, made the decisions not to appear. **Exhibit B**. By default, Apple is barred from entering a defense in this Court for non-infringement or that any of the following patent claims are invalided: Claim 1 of the '497

patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the '287 patent.

56.    After a 15 year "teaming arrangement" to commercialize Plaintiff's new and improved cell phones assembled under the *Cell-All* initiative, Verto Analytics looked at the numbers. "Apple, Samsung, and LG (CMDC devices) smartphones owned by U.S. consumers, is equivalent to 88% market share. January 2018, Apple led the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, had 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market."

57.    Below is a claim chart outline of various governmental projects that include the integration of at least an Apple iPad tablet; an Apple laptop; or, an Apple smartphone. The government initiatives were submitted in the related case, *Larry Golden vs. The United States*; Case number: 13-307C) as allegedly infringing Plaintiff's patents [Ind. claims 13, 16, 17, 19, & 20 of Plaintiff's '439 patent; and Ind. claim 44 of Plaintiff's '891 patent].

58.    When the United States served a summon on Apple Inc. to appear in the above referenced related case *Golden v. US*, Apple fail to appear to protect any interest Apple may have in the case. Therefore, Apple waived its right to defend against allegations that Apple and its co-conspirators [Qualcomm, Samsung, & LG] entered into an agreement to develop products and devices under the protection of government contracts, that Plaintiff allege infringes his patents.

59.    Below are twenty-nine (29) government initiatives that Apple clearly has an interest in. In Plaintiff's "ATPG" Stimulus Package, the strategy was for Government to create a World demand for the technology covered in Plaintiff's stimulus packages and patents.

### Patent #: 9,589,439; Independent Claim 13

| Boeing MH-6 Little Bird Helicopter<br>Apple iPad Tablet | Patent #: 9,589,439; Independent Claim 13 |
|---|---|
| Navy Marine Corps Intranet (NMCI) Network – Apple iPad | Patent #: 9,589,439; Independent Claim 13 |
| Variable's "NODE+Oxa" for the Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 13 |

### Patent #: 9,589,439; Independent Claim 16

| iPhone "Biodetector" Smartphone | Patent #: 9,589,439; Independent Claim 16 |
|---|---|

### Patent #: 9,589,439; Independent Claim 17

| "VOCket System" / "Nett Warrior" Smartphone System | Patent #: 9,589,439; Independent Claim 17 |
|---|---|
| "Biotouch System" / "Nett Warrior" Smartphone System | Patent #: 9,589,439; Independent Claim 17 |

### Patent #: 9,589,439; Independent Claim 19

| EAGER: Mobile-Phone Based Single Molecule Imaging for DNA | Patent #: 9,589,439; Independent Claim 19 |
|---|---|
| INSPIRE Track 2: Public Health Nanotechnology and Mobility (PHeNoM) | Patent #: 9,589,439; Independent Claim 19 |
| PFI:BIC Human-Centered Smart-Integration of Mobile Imaging and Sensing | Patent #: 9,589,439; Independent Claim 19 |
| EFRI-BioFlex: Cellphone-Based Digital Immunoassay Platform | Patent #: 9,589,439; Independent Claim 19 |
| "Multimode Smartphone Biosensor" | Patent #: 9,589,439; Independent Claim 19 |

COMPLAINT

| EAGER: Lab-in-a-Smartphone | Patent #: 9,589,439; Independent Claim 19 |
| --- | --- |
| PFI-BIC "Pathtracker: Smartphone-based for Mobile Infectious Disease Detection" | Patent #: 9,589,439; Independent Claim 19 |
| I-Corps: Ultra-Sensitive Lateral Flow Reporters / Lab-on-Phone Platform | Patent #: 9,589,439; Independent Claim 19 |
| Smartphone (iPhone) Microscope | Patent #: 9,589,439; Independent Claim 19 |
| Smartphone (iPhone) Biosensor "Cradle" | Patent #: 9,589,439; Independent Claim 19 |
| AOptix Stratus MX Peripheral for the Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 19 |
| PositiveID - Boeing / M-Band Apple (iPhone) Smartphone | Patent #: 9,589,439; Independent Claim 19 |

**Patent #: 9,589,439; Independent Claim 20**

| "Cell-All": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| --- | --- |
| "Kromek D3S-NET": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| Biomeme "two3" Mobile Thermocycler: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| Smartphone-operated "LAMP box": Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| Alluviam LLC HazMasterG3: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
| FePhone Point-of-Care: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |

| NutriPhone Lab-on-a-Chip: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
|---|---|

| FeverPhone: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
|---|---|

| Solar Thermal PCR Test: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
|---|---|

| Lab-on-a-Drone: Apple iPhone | Patent #: 9,589,439; Independent Claim 20 |
|---|---|

**Patent #: RE 43,891; Independent Claim 44**

| Dream Hammer's "Ballista" Software for Computer, Tablet or Smartphone | Patent #: RE 43,891; Independent Claim 44 |
|---|---|

60. Apple, and its co-conspirators waived their rights for later argument on patent invalidity and noninfringement for not participating in the § 1498 litigation, "[w]hile a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed." As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970).

61. Section 2 of the Sherman Antitrust Act not only prohibits the abuse of monopoly power but also any "attempt to monopolize ... any part of the trade or commerce among the

several States." 15 U.S.C. § 2. Plaintiff believes he has prevailed on his attempted monopolization claim, because Plaintiff has shown: "(1) that Apple has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993).

62.     Plaintiff's antitrust injury is the type the antitrust laws were intended to prevent. Apple and its co-conspirators' anticompetitive conduct to produce and commercialize a new and improved cell phone/smartphone under the protection of the government to avoid any infringement liability, was clearly competition-reducing. Apple's secret conspiracy excluded and foreclosed the market for mobile phone manufacturers such as HTC, T-Mobile, Palm, BlackBerry, AT&T, Qwest, T-Mobile, Nokia, Panasonic, and Motorola.

63.     Apple's antitrust violations proximately caused the Plaintiff's injury. This is basic causation. Plaintiff believes Apple's secret conspiracy reduced competition by excluding and foreclosing the mobile phone market for OEMs such as HTC, T-Mobile, Palm, BlackBerry, AT&T, Qwest, T-Mobile, Nokia, Panasonic, and Motorola. Plaintiff's antitrust injury resulted from Plaintiff's inability to 1) enter into a licensing agreement with Apple and its co-conspirators (Qualcomm, Samsung, & LG), 2) enter into a licensing agreement with the OEMs (HTC, T-Mobile, Palm, BlackBerry, AT&T, Qwest, T-Mobile, Nokia, Panasonic, and Motorola) because of Apple and its co-conspirators' anticompetitive conduct, and 3) bring an action of direct infringement (before 2012) against Apple and its co-conspirators for patent infringement.

## APPLE'S KNOWLEDGE OF PLAINTIFF'S CMDC DEVICES & APPLE'S "UNJUST ENRICHMENT"

COMPLAINT

64.     Plaintiff believes Apple has unjustly enriched itself [*the doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation*] by using Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices (i.e., a communication device of at least one of a cell phone, a smart phone, a laptop, a tablet or smartwatch), and Plaintiff's central processing units (CPUs), i.e., the "brains" of the CMDC devices. No CMDC device— cell phone, a smart phone, a laptop, a tablet or smartwatch—can function without at least one central processing unit (CPU).

65.     Plaintiff's claim for unjust enrichment requires the Plaintiff to show that: (1) Plaintiff conferred a benefit onto Apple; (2) Apple had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for Apple to retain the benefit without payment of its value.", *Platz Associates v. Finley*, 973 A.2d 743, 750 (2009). The unjust enrichment occurred when Party A (Plaintiff) conferred a benefit upon Party B (Apple) without Party A (Plaintiff) receiving the proper restitution required by law.

66.     On 11/19/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Tim Cook, Chief Operating Officer (COO) of Apple, and Mr. Bruce Sewell, SVP & General Counsel; to 1 Infinite Loop, Cupertino, CA 95014. Apple received and signed for the letters 11/16/2010. Tracking Nos: 7009 2250 0001 0170 9861 and 7009 2250 0001 0170 9854. **(Exhibit C)**

67.     In Plaintiff's notice letters; Plaintiff is quoted as saying "[m]y technology covers electronic devices, mobile devices, authentication (biometrics) technology; mobile devices lock and unlock features, RFID reader technology for mobile devices, embedded sensors in electronic

devices, embedded sensors in mobile and portable devices, mobile phones as readers, embedded sensors in cell phone cases; mobile, electronic and portable devices used as monitoring equipment for locating, tracking, navigating and status of sensors."

68.   On 07/01/2019, Plaintiff responded back to Apple's Krista Grewal, Counsel IP Transactions, on Plaintiff's "Cease and Desist" request. **(Exhibit D)** Plaintiff is quoted as saying:

69.   Certain Apple Inc.'s smartphones, laptops, tablets, and smartwatches are infringing at least one patent claim of PO's following patents: [7,385,497]; [7,636,033]; [8,106,752]; [8,334,761]; [8,531,280]; [RE43,891]; [RE43,990]; [9,096,189]; [9,589,439]; and, [10,163,287].

70.   Certainly, I appreciate the comment you made in defense of Apple's infringing activities in your last correspondence via email dated June 27, 2019: "As an example, no Apple product includes detectors or indicator lights for detecting "at least one of chemical, biological, radiological, or explosive" agents and compounds as required by the asserted patents."

71.   To address your comments above. Apple's smartphones; Apple's smartwatches; or Apple's smartphones interconnected to Apple's smartwatches; all, infringes at least one patent claim for a CMDC device(s) of the PO's patents listed above for chemical, biological, radiological, or explosive" agents and compounds. (Exhibit 1 for Chart Outline of Patent Claims)

72.   Apple has applied for patents for its smartphones and smartwatches that covers chemical and biological detection; biometric fingerprint and signature; motion sensors; and, the detection of humans. I expect Apple to submit to the USPTO an IDS to disclose my patents as prior art references for continued prosecution. If you fail to do so, I will seek to have the issued patents invalidated.

73.   Because Apple's smartphones; Apple's smartwatches; or Apple's smartphones interconnected to Apple's smartwatches infringes my CMDC device(s), I am demanding Apple "cease and desist" the manufacture, offer for sell, the sell, and the inducement of others to infringe my patented invention(s) (i.e. the government, the automobile industry, the medical industry, the home security industry, etc.)

74.    On 03/31/2021; in the related case, COFC 13-307C, *Golden v. US*, Apple was issued a "NOTICE" by the Court to appear to defend its interest in the case. **(Exhibit E)**

75.    Plaintiff, in the related case, COFC 13-307C, *Golden v. US*, identified ten alleged infringing products that Plaintiff believes infringes at least 25 independent claims of Plaintiff's patents asserted in the case [claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the '287 patent]. An example of Apple's alleged infringement of at least 25 independent claims of Plaintiff's patents is attached. **Exhibits F**

76.    When the United States served a summon on Apple Inc. to appear in the above referenced related case *Golden v. US*, Apple fail to appear to protect any interest Apple may have in the case.

77.    Apple, and its co-conspirators waived their rights for later argument on patent invalidity and noninfringement for not participating in the § 1498 litigation, "[w]hile a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed." As the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him." 420 F.2d 1057, 1060 (Ct. Cl. 1970)

78.     The US District for the Eastern Court of Texas in *Motiva Patents, LLC v. HTC Corporation,* E.D. Texas, 9:18-cv-00179 (Oct. 2019), ruled that having a policy of ignoring others' patents is sufficient grounds to support claims of willful patent infringement.

79.     The Eastern District Court found HTC's policy of ignoring others' patents opened the door for support of Motiva's assertions that HTC willfully infringed upon Motiva's patents. The court stated that intentionally being blind to the facts was essentially the same as knowing about a competitor's patent and infringing on it anyway.

80.     The basic principle of "ignorance of the law is no excuse" applies to patent infringement—as the defendant in a Texas patent case discovered.

## THE SCOPE OF PLAINTIFF'S CMDC DEVICES

81.     The scope of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices was challenged in an *Inter Partes Review* (IPR) and was found to be acceptable because "[t]he specific devices [a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for communication therebetween], such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."

> *UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner.* IPR Case IPR2014-00714 Patent RE43,990 E Before LORA M. GREEN, JON B. TORNQUIST, and KEVIN W. CHERRY, Administrative Patent Judges. CHERRY, Administrative Patent Judge. FINAL WRITTEN DECISION 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 "Beginning with the claim preamble amendment, the

preamble of claim 11 originally read: "A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product groupings category of design similarity (e.g., computer terminal, personal computer (PC)) …." Patent Owner contends that this new language is consistent with words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." Id. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." *Id*

82.     Plaintiff believes the new and improved cell phones, smartphones, laptops, tablets, and smartwatches Apple has "used without authorization"; and, the central processing units (CPUs) Apple has made for the new and improved cell phones, smartphones, laptops, tablets, and smartwatches; offered for sale, and sold since receiving knowledge of Plaintiff's intellectual property and patents (2010); Apple has generated hundreds of billions in revenue.

83.     Plaintiff believes Apple mass produced and rushed to market Plaintiff's patented inventions of new and improved cell phones, smartphones, laptops, tablets, and smartwatches; and; new and improved CPUs made for Plaintiff's CMDC devices, to prevent Plaintiff's market entry, and restrained competition.

COMPLAINT

84.    Plaintiff believes Apple is in violation of Section 2 of the Sherman Act, because Apple maintained a specific intent to monopolize both current and future generations of cell phones, smartphones, smartwatches, laptops, tablets, and CPUs. Apple, a monopolist, has excluded Plaintiff and its competitors, and has established market dominance for Plaintiff's patented inventions through its anticompetitive practices.

## WILLFUL PATENT INFRINGEMENT

85.    Apple, Samsung, LG, and Qualcomm assembled the CMDC device while under Government contract. Plaintiff believes Apple, Samsung, LG, and Qualcomm was guided by Plaintiff's "product grouping" strategies. Plaintiff's CMDC [smartphone] device is Plaintiff's invention, of inventions. See below: **Exhibits G-M; '497, '752, '189, '439, '287, '619, '891 patents**

I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent

II. Central Processing Units for CMDC Device – Claim 5 of the '287 Patent

III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent

IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent

V. Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent

VI. Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent

VII. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent

VIII. Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent

IX. Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent

X. Fingerprint / Face Recognition for CMDC Device – Claim 1 of the '619 Patent

XI. Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '891 Patent

XII. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent

XIII. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent

XIV. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent

## I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent

| | |
|---|---|
| <br><br>**Claim 14 of the '439 Patent** "Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween … | **Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**<br><br>**Claim 23 of the '439 Patent:** "A cell phone comprising: a central processing unit (CPU) for executing and carrying out the instructions; … whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems … multi-sensor detection systems, or to activate or deactivate the cell phone detection device;<br><br>"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals<br><br>Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, …, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, … handhelds; |

## II. Central Processing Units (CPUs) for CMDC Device – Claim 5 of the '287 Patent

| | |
|---|---|
| <br><br>Example: Apple's A13 Bionic Chip contains 8.5 billion transistors and six CPU cores. "For instance, the CPU team will study how applications are being used on iOS and then use the data to optimize future CPU designs." https://www.wired.com/story/apple-a13-bionic-chip-iphone/ | **Central Processing Units (CPUs) for Smartphone**<br><br>**Claim 5 of the '287 Patent:** A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to control components of a vehicle, … or send signals to detect … chemical, biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. **[See also claims 4 & 6 of the '287 patent; and, claims 1 & 11 of the '619 patent].**<br><br>The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "[T]oday's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021). |

## III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent







### Camera CBR Sensor(s) for Smartphone

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor **Rhevision** and UC San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can detect them; the phone's camera watches the chip for color changes.

**Claim 4 of the '189 Patent**: A built-in, embedded multi sensor detection system … sensor array or fixed detection device into the product that detects agents …

## IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent



Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/ homeland-security -smartwatch-detect-nuclear-bombs/

### Smartwatch CBR Detector for Smartphone

**Claim 19 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a multi-sensor detection device.

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www. defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/ 202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

COMPLAINT

## V. Embedded CBRN Nanosensors for CMDC Device – Claim 16 of the '439 Patent



**Embedded CBRN Sensors for Smartphone (NASA)**

**Claim 16 of the '439 Patent**: A built-in, embedded multi sensor detection system … a cell phone, a smart phone

A silicon-based sensing chip, which consists of 64 nanosensors can turn a cell phone into a *portable poison detector*. (NASA). "can turn your cellphone into a *portable "silent killer" detector* https://www. foxnews.com/tech/smartphones-take-on-silent-killers-as-portable-danger-detectors & Nuclear Radiation Nanosensors and Nanosensory Systems https://link.springer. com/book/10.1007/978-94-017-7468-0

## VI. Interchangeable Sensor Device for CMDC Device – Claim 20 of the '439 Patent



**Plurality of Interchangeable Sensor Device for Smartphone: (NASA & Subtractor George Yu)**

**Claim 20 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents…

The system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform. A cylinder that transmits data from sensors to smart-phone. The NODE+ is compatible with Android and Apple smart devices.

## VII. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent



MIT-- wirelessly detect hazardous gases by using a simple sensor made from near-field communication (NFC) tags that can be read by a smartphone… detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, and other gases… Sensors. Retrieved from: https://phys.org/news/ 2014-12-cheap-sensor-transmit-hazardous-chemicals.html

**Near-Field Communication (NFC) CBR Tag for Smartphone (Safer than RFID tag)**

**Claim 21 of the '439 Patent**: A multi-sensor detection system … at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication

In November 2007, two Defense Department contractors, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to … detonated a simple amount of explosives in a container a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department and DHS observed the demonstration. https://www.nationaldefense-magazine.org/articles/2011 /2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

COMPLAINT

## VIII. Remote/Electrical Lock Disabler for CMDC Device – Claim 125 of the '990 Patent



**Remote/Electrical Lock Disabler for Smartphone (Gov. Contractor iControl's MATTs & mLOCK)**

**Claim 125 of the '990 Patent**: A multi-sensor detection system ... whereupon detection causes a signal to be sent to the at least one communication device followed by communicating with the internal or external remote/electrical lock disabler.

Marine Asset Tag Tracking System (MATTS) is a DHS initiative for "Smart Container". MATTS "gateway": a wireless electronic device that communicates with a sensor array; the communication device; and locking mechanism for locking status and GPS location. Internal /external sensors are interconnected to operate with the MATTS device and can detect gas concentrations, radiation, humidity and moisture, atmospheric pressure, etc. The mLOCK communicates bi-directionally using encrypted messages between the lock and the MATTs readers or mobile devices (i.e., smartphone)

## IX. Pre-Programmed Lock Disabler for CMDC Device – Claim 1 of the '287 Patent





"Monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock…"

**Pre-Programmed Lock Disabler for Smartphone**

Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android or iOS device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Account Login. On an Android or Apple Phone, multiple attempts (usually five attempts or more) with an unknown or a wrong pin will go either into a delay before further attempts are allowed ...

FBI Failed Attempts to Unlock Phone: The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22. The two attackers died four hours after the attack in a shootout with police ... Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-theft measure on smartphones).

**Claim 1 of the '287 Patent**: Monitoring equipment that is at least one ... a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

COMPLAINT

## X. Fingerprint and Face Recognition for CMDC Device – Claim 1 of the '619 Patent



**Fingerprint and Face Recognition for Smartphone**

**Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition

## XI. Stall, Stop, or Vehicle Slowdown for CMDC Device – Claim 11 of the '891 Patent



Driverless car smartphones, authorizes the phone to control functions. Smartphones and driverless technology: instant braking for autonomous cars; sensors detect interference, obstacles and oncoming cars; instant breaks to avoid collisions.

**Stall, Stop, or Vehicle Slowdown for Smartphone**

**Claim 11 of the '891 Patent**: A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

Remote Vehicle Shutdown is a system of remotely shutting down the connected vehicle, using radio pulses; intended for police, military and security use. Remotely find and disable stolen vehicles; ability to prevent engine start; prevent movement of a vehicle; stop or slow an operating vehicle; gradually decelerate a vehicle by downshifting, limiting the throttle capability; and, improve security of carriers of high-risk cargo, like hazardous materials. Security features that Remote Vehicle Shutdown provides. https://www.globenewswire.com/en/news-release/2019/12/17/1961557/0/en/Remote-Vehicle-Shutdown

## XII. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent



**Autonomous and Driverless Vehicle Monitoring with Smartphone**

**Claim 44 of the '891 Patent**: A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means … (Dep. 55) … 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle … in operation with or without a user, driver or operator inside the vehicle.

COMPLAINT

## XIII. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent



**Connect Vehicle with Smartphone**

**Claim 4 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

CarLink™ is a Smartphone interface that allows you to start your vehicle, unlock your doors or pop the trunk from virtually any distance, or help you find your car in a large garage after a sporting event or a trip to the mall. *Compatible with iPhone, BlackBerry and Android *Remote Start Compatible *Door lock and unlock *Car find feature (horn honk and/or flashing lights) *Control trunk release or sliding door open)

## XIV. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent



The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring apps. Also, identity verification, GPS based guidance, position/orientation awareness apps for smartphone-based implementation.

**Internet-of-Things (IoTs) with Smartphone**

**Claim 11 of the '619 Patent**: A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device

The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:
Accelerometer, GPS, Gyroscope, Magnetometer, Biometrics, Camera, Barometer, Proximity Sensors, Bluetooth connectivity, Barcode readers, Touchscreen sensors, Heart rate monitor, ECG, Haptic feedback sensors

The IoTs contain computing hardware, including processors with embedded programming telling them what to do, sensors that gather various sorts of readings (such as temperature, motion, chemical levels, heart rate and body movement) and communication hardware that can send and receive signals.

# APPLE'S INVASION ON PLAINTIFF'S INTELLECTUAL PROPERTY SUBJECT MATTER IS TOO EXPANSIVE TO BE COINCIDENTAL

COMPLAINT

86.     The issue with "intent" is; "did Apple know it was doing something wrong?" Plaintiff believes the antitrust violations alleged in this case are too massive to be unintentional.

87.     The legal standards in antitrust law are generally viewed as combinations of conduct and intent standards. Apple's intent is general when Apple simply engaged in conduct that violates the law. Plaintiff alleges Apple's antitrust violations are more specific because Apple engaged in the anticompetitive conduct for particular reasons (e.g., to harm the Plaintiff, competitors, investors, consumers, the SEC, and the USPTO), or with particular knowledge.

88.     Case law suggests that Plaintiff must meet a higher burden with respect to Apple's intent under Section 2 of the Sherman Act than is typically required under Section 1. Under Section 1, Plaintiff demonstrated that Apple intended to engage in conduct that is asserted to violate the law. Under Section 2, Plaintiff produced evidence that is consistent with a specific intent to monopolize, in the sense that the overwhelming—perhaps the sole—purpose of the Apple's conduct is to reduce competition and restrict market entry.

89.     The conduct standard in antitrust law is the rule of reason test, which requires proof that the competitive harms from Apple's conduct outweigh any purported benefits to consumers from that conduct. Plaintiff believes the consumers and customers were drawn into a scheme of deceit (e.g., consumers reliance upon false information to cover inflated prices), and fraud (e.g., simply not telling the whole story to the OEMs in order to make a deal happen).

90.     The second type of legal standard, an intent standard, determines liability in part by evidence concerning Apple's state of mind. Plaintiff's claims require proof merely of Apple's intent to carry out the conduct set forth in the complaint; these claims fall under a general intent standard. These claims require only that Apple knew that it was taking a particular action, not that Apple does so with the purpose of bringing about a particular (undesirable) result.

91.     Plaintiff believes Apple's invasion on Plaintiff's intellectual property subject matter is too expansive to be coincidental. Plaintiff believes Apple produced Plaintiff's patented CPUs as prototypes for the OEMs to test with their products. Plaintiff believe Apple design Plaintiff's patented CMDC devices to function with the CPUs designed for them by Apple.

92.     Apple was able to form and maintain its monopoly status by using, making, offering for sale, and selling Plaintiff's patented inventions.

# **RELIEF**

A.  Temporary injunctive relief for Apple to discontinue the making, offering for sale, and selling of its central processing units (CPUs) for smartphones, tablets, and smartwatches.

B.  Temporary injunctive relief for Apple to discontinue the use Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e., new and improved cell phones, smartphones, tablets, laptops, and smartwatches) that are currently being made and sold, by Apple without authorization to generate billions in revenues.

C.  Summary judgement on the merits of the case for willful infringement; direct infringement; and, infringement under the *doctrine of equivalents*.

D.  Damages found or assessed for willful infringement; direct infringement; and, infringement under the *doctrine of equivalents*.

E.  Damages up to three times the amount found or assessed for willful infringement.

F.  Summary judgement on the merits of the case for Apple's single-firm anticompetitive conduct (under sections 1 & 2 of the Sherman Act), and unjust enrichment.

G. Damages found or assessed for Apple's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), that has cause Antitrust injury to the Plaintiff, and that harms the competitive process and thereby harms consumers.

H. Trible damages for the Antitrust injury imposed by Apple for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

I. The Court orders Apple to establish, at minimum, a $30 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Apple if found not liable in this case.


Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net


COMPLAINT

# SERVICE OF PROCESS

Apple Inc.

One Apple Park Way,

Cupertino, CA 95014