# Exhibit 11

Case 3:22-cv-04152-VC Document 29 Filed 10/20/22 Page 1 of 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LARRY GOLDEN,

Plaintiff,

v.

APPLE, INC.,

Defendant.

Case No. 22-cv-04152-VC

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 12

The motion to dismiss is granted. The claims asserted in the complaint are frivolous. Even if they were not frivolous, Golden's patent infringement claims against Apple are barred by issue preclusion because they have been fully litigated and decided. *See Golden v. United States*, 156 Fed. Cl. 623 (Fed. Cl. 2021), *aff'd*, *Golden v. United States*, No. 13-cv-00307, 2022 WL 4103287 (Fed. Cir. Sept. 8, 2022). And Golden's antitrust allegations fail to state an even remotely plausible claim. Golden does not (and cannot) plausibly allege a conspiracy or an injury "of the type the antitrust laws were intended to prevent." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021).

The complaint is dismissed without leave to amend. Golden has been pressing these frivolous claims (or some variation thereof) for nearly 10 years in multiple jurisdictions. This is the rare case where dismissal without leave to amend is appropriate at the outset.

**IT IS SO ORDERED.**

Dated: October 20, 2022

VINCE CHHABRIA
United States District Judge

# Exhibit 12

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO)

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

FILED
NOV 04 2022
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

APPLE INC.

Defendant.

CASE NO: 3:22-cv-04152-VC

November 1, 2022

**PLAINTIFF'S NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Plaintiff Larry Golden, hereby appeals to the United States Court of Appeals for the Federal Circuit from the October 20, 2022 dated "Order Granting [Apple's] Motion to Dismiss" (Dkt. No. 29) as well as any other orders, rulings, findings, and/or conclusions adverse to Larry Golden.

This notice of appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A) because it is "filed with the district clerk within 30 days after entry of the judgment or order appealed from."

As part of this notice of appeal, Larry Golden submits the required filing fee of $505 and respectfully requests the district clerk to prepare the record on appeal pursuant to Federal Rule of Appellate Procedure 10(a).

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

# Exhibit 13

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN<br>*Pro Se* Plaintiff,<br>V.<br>INTEL CORPORATION.<br>Defendant. | CASE NO: ______<br>**(JURY TRIAL DEMANDED)**<br>**(Sherman Act) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**<br>June 27, 2022 |

## <u>COMPLAINT FOR ANTITRUST LAW VIOLATIONS AND PATENT INFRINGEMENT</u>

This is a civil action brought under Antitrust Law violations commencing from competitor collaborations, conspiracy to restrain trade, and the illegal formation or maintenance of a monopoly, which likely resulted from a secret conspiracy and the anticompetitive practices recognized by this Court.

This action is also brought under Contributory Infringement commencing from the "manufacture, combination or composition; or, a material or an apparatus for use in practicing a patented process, constituting a material part of the invention".

This action is for damages and injunctive relief on behalf of the Plaintiff, against the defendant Intel Corporation. ("Intel"); demanding a trial by jury, complains and alleges as follows:

## NATURE OF THE CASE

1. This enforcement action challenges Intel's unlawful maintenance of a monopoly formed with Intel's alleged infringing central processing units (CPUs) that processes functional and operational instructions for Plaintiff's patented new, useful, and improved upon laptops, desktop PCs, cell phones, and stall, stop, and vehicle slowdown systems.

2. Intel has engaged in exclusionary conduct that reduces competitors' ability and incentive to innovate, and raises prices paid by consumers for Plaintiff's patented new, useful, and improved upon laptops, desktop PCs, cell phones, and stall, stop, and vehicle slowdown systems. Intel is a dominant supplier of central processing units (CPUs) for laptops; desktop PCs.

3. Intel's customers in the CPU product market are OEMs, alias original equipment manufacturers, alias laptop and computer makers. OEMs compete with each other in various downstream markets, such as the laptop or desktop personal computer (or PC), which for present purposes we can assume to be substantially competitive.

4. In order for Intel to produce a valuable end-product for consumers, these OEMs must produce software and machines [laptop or desktop personal computer (or PC)] that integrate with the Intel's CPU technology that they buy.

5. In order to enable OEMs to produce the laptops and PCs in a sufficiently timely manner to be able to compete effectively in the fast-evolving laptop and computer market, and in order to facilitate simultaneous roll-out of new Intel CPU technology by multiple OEMs; Intel's general practice is supply at least major, or "strategic," OEMs with advance technical information and prototype CPUs on a rolling basis.

6. Intel's '*contributory infringement*' commence from the "manufacture ... of the patented CPUs, as an apparatus for use in practicing a patented process of making the patented laptops and desktop PCs; the CPU constitute a material part of the invention"

7. Intel has excluded competitors and harmed competition through interrelated policies and practices.

8. Intel continues to condition benefits to computer makers in exchange for their promise to buy chips from Intel exclusively or to refuse to buy chips from others (*FTC v. Intel*, 2010).

9. Intel continues its retaliation against computer makers if they do business with non-Intel suppliers by withholding benefits from them (*FTC v. Intel*, 2010).

10. Intel has unjustly enriched itself with the unauthorized use of Plaintiff's patented CPU(s), Plaintiff's patented new and improve laptops and desktop PCs; and, Plaintiff's patented stall, stop, and vehicle slowdown systems [driver assistance system for the driverless, self-drive, and autonomous vehicle].

11. Intel's conduct has harmed competition and the competitive process. At a time when computer technologies are expanding to new and varied applications, Intel's practices threaten further consumer harm in an industry in which competition and innovation are vitally important.

## JURISDICTION AND VENUE

12. This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover triple damages, injunctive relief, and costs of suit; for violation of Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2; conspiracy in the restraint of trade and single-firm violations).

13. This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

14. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendant reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

15. For patent litigation cases, the venue statute, 28 U.S.C. §1400(b), provides "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

16. The activities of the Defendant, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

**Intradistrict Assignment**

17. Assignment to the San Jose Division is proper. The actions arose in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Intel has offices in Santa Clara and San Jose. Third parties that have information relevant to this action, including leading laptop and desktop PC manufacturers (also known as

"original equipment manufacturers" or "OEMs") and Intel competitors, also have offices in Santa Clara County.

## RELATED CASES

18. Plaintiff has an Antitrust case pending in the United States District Court for the Northern District of California (Oakland); *Golden v. Qualcomm, Inc.*; Case No.: 4:22-cv-03283-KAW; Kandis A. Westmore is the Presiding Magistrate Judge. The cases are very similar in nature because Intel **(Exhibit A)** and Qualcomm were both notified in 2010 of Plaintiff's offer to license Plaintiff's intellectual property; both have had additional opportunities to enter into licensing agreements; both have formed or maintained a monopoly by either using, making, offering for sale, or selling Plaintiff's patented inventions; both have negotiated agreements with the OEMs to use, make, offer for sale, or sell Plaintiff's patented inventions; both received a benefit from the Plaintiff; and, both were unjustly enriched at the Plaintiff's expense. The term "benefit" means any type of advantage. (*Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 347.) receipt of a benefit and unjust retention of the benefit at the expense of another." (*Lyles v. Sangadeo-Patel* (2014) 225 Cal.App.4th 759, 769.)

## THE PARTIES

19. Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e., Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Central

Processing Units (CPUs) for New and Improved Cell Phones; and, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS). **Exhibits B-H; '497, '752, '189, '439, '287, '619, '891 patents**

20. On information and belief, Intel is a California corporation with a principal place of business at 2200 Mission College Blvd, Santa Clara, CA 95054 and does business in this judicial district. Intel has offices in Santa Clara, CA and San Jose, CA.

21. Intel's unjust enrichment of profits, resulting from a violation of antitrust laws; anticompetitive practices; conspiracy in restraint of trade; direct infringement; and contributory infringement, give rise to this complaint. Intel's monopolization and attempted monopolization violations require no agreement as Section 1 violations do. *E.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993) (explaining that "while § 1 . . . forbids contracts or conspiracies . . ., § 2 addresses the actions of single firms that monopolize or attempt to monopolize"). They are "single-firm" violations.

22. According to Statista, "Intel's net revenue from 2011 to 2021 is $693.07B". https://www.statista.com/statistics/263559/intels-net-revenue-since-1999/. Intel can be served at 2200 Mission College Blvd, Santa Clara, CA 95054.

## STATEMENT OF FACTS:

## INTEL'S KNOWLEDGE OF PLAINTIFF'S CENTRAL PROCESSING UNITS (CPUs) & "UNJUST ENRICHMENT"

23. Plaintiff's claim for unjust enrichment requires the Plaintiff to show that: (1) Plaintiff conferred a benefit onto Intel; (2) Intel had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for Intel to retain the benefit without payment of its value.", *Platz Associates v. Finley*, 973 A.2d 743, 750 (2009). The unjust enrichment occurred when Party A (Plaintiff)

conferred a benefit upon Party B (Intel) without Party A (Plaintiff) receiving the proper restitution required by law.

24. On 12/16/2010: Plaintiff's notice letters and licensing offer was mailed U.S. Postal Service, Certified Mail to Mr. Paul S. Otellini, President & CEO Intel, and Mr. Curt J. Nichols, VP Intel Capital Intel, at Mission College Blvd., Santa Clara, CA 95054-1549. Intel received and signed for the letters 12/20/2010. Phone: 408-765-8080. Tracking Nos: 7010 1870 0002 0193 0360 and 7010 1870 0002 0193 0377. **(Exhibit A)**

25. In Plaintiff's most recent correspondence on June 10, 2022 **(Exhibit I)**, Intel denied having knowledge of the letters, "[r]egarding the certified mail you say Intel received on December 20, 2010, we have searched for the letter but we have not been able to locate it.

26. The US District for the Eastern Court of Texas in *Motiva Patents, LLC v. HTC Corporation,* E.D. Texas, 9:18-cv-00179 (Oct. 2019), ruled that having a policy of ignoring others' patents is sufficient grounds to support claims of willful patent infringement.

27. The Eastern District Court found HTC's policy of ignoring others' patents opened the door for support of Motiva's assertions that HTC willfully infringed upon Motiva's patents. The court stated that intentionally being blind to the facts was essentially the same as knowing about a competitor's patent and infringing on it anyway.

28. The basic principle of "ignorance of the law is no excuse" applies to patent infringement—as the defendant in a Texas patent case discovered.

29. The scope of Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices was challenged in an *Inter Partes Review* (IPR) and was found to be acceptable because "[t]he specific devices [a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for

communication therebetween], such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals."

> *UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner*. IPR Case IPR2014-00714 Patent RE43,990 E Before LORA M. GREEN, JON B. TORNQUIST, and KEVIN W. CHERRY, Administrative Patent Judges. CHERRY, Administrative Patent Judge. FINAL WRITTEN DECISION 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product groupings category of design similarity (e.g., computer terminal, personal computer (PC)) …." Patent Owner contends that this new language is consistent with words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." Id. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." *Id*

<table>
<tr>
<td><br><br>Claim 14 of the '439 Patent: "Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for commu-nication therebetween, the monitoring equipment …</td>
<td>Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., laptop; PC)<br><br>Claim 13 of the '439 Patent: "A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:<br>at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program …<br><br>Specifications: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals…<br><br>Specifications: Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, …, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, … handhelds;</td>
</tr>
</table>

30. Plaintiff believes Intel has unjustly enriched itself [the doctrine of unjust enrichment allows a plaintiff to recover from a defendant, without the benefit of an enforceable contractual obligation, where the defendant has unfairly benefited from the plaintiff's efforts without compensation] by using Plaintiff's patented communication, monitoring, detecting, and controlling (CMDC) devices (i.e., "[a] communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site for monitoring products for communication therebetween, comprising….''; and, Plaintiff's central processing units (CPUs), i.e., the "brains" of the CMDC devices. No CMDC device—laptop or desktop PC—can function without at least one central processing unit (CPU).

31. Plaintiff believes the laptops and desktop PCs Intel has "used without authorization"; and, the central processing units (CPUs) Intel has made, offered for sale, and sold since receiving knowledge of Plaintiff's intellectual property and patents (2010); Intel generated hundreds of billions of dollars in revenue. Plaintiff believes Intel mass marketed Plaintiff's patented inventions of a new and improved laptop, a new and improved desktop PC, and a new and improved CPU made for Plaintiff's CMDC devices, to prevent market entry.

32. Plaintiff believes Intel is in violation of Section 2 of the Sherman Act, because Intel maintained a specific intent to monopolize both current and future generations of laptops, desktop PCs, and CPUs.

|   **Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of … processing instructions … | **Central Processing Units (CPUs) for**<br><br>**Claim 5 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU … such that the communication device is capable of communicating, monitoring, detecting, and controlling.<br><br>The "central processing unit (CPU), [chipset], is a component that controls everything in smartphones [laptops; desktop PCs] and ensures it functions correctly. It can be compared to the human brain. Every action perform goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "… CPU (central processing unit) is the brains of the entire device. Without one, no [laptop; desktop PC] would be able to function" (smartphonedomain.com., 2021). |
|---|---|

33. Intel, a monopolist, has excluded Plaintiff and its competitors, and has established market dominance for CPUs through its anticompetitive practices. Plaintiff is alleging that since Intel was given notice (12/2010) of the operational and functionality of Plaintiff's CPUs, Intel has rushed the OEMs to produce laptops and desktop PCs that integrate with the CPU technology.

**PLAINTIFF OWNS THE RIGHT TO EXCLUDE INTEL FROM USING, MAKING, OFFERING FOR SALE, AND SELLING PLAINTIFF'S PATENTED INVENTIONS TO FORM OR MAINTAIN ITS MONOPOLY**

34. In a related case, *Golden v. US*, COFC case no. 13-307C, Plaintiff demonstrated he owns the rights to the new, useful, and improved upon CMDC devices of a laptop, a desktop (PC), a cell phone, and a central processing unit. Plaintiff was ordered to present preliminary infringement contentions charts for the alleged ten infringing products of Apple; the alleged nine infringing products of Samsung; and, the alleged nine infringing products of LG.

35. Plaintiff presented over 1900 pages of claim charts to show Apple, Samsung, and LG directly infringed, and infringed under the 'doctrine of equivalents', Plaintiff's claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the '287 patent. **(Exhibits B-F)**

36. Plaintiff's twenty-five (25) independent patent claims presented in the *Golden v. US*, COFC case no. 13-307C, were "*comprising*" claims. The patent claims cover what the CMDC device of a laptop, a desktop (PC), a cell phone, and a central processing unit actually does.

37. Plaintiff is including in this complaint claims 1-20 of Plaintiff's '619 patent to demonstrate what the CMDC device of a laptop, a desktop (PC), a cell phone, and a central processing unit is "*capable of*".

38. Where a claim recites that a structure is "capable of" a particular function, the phrase "capable of" encompasses structures that are capable of the function during the course of a *use* that is intended by the patent, as well as structures that are capable of accomplishing tasks through misuse or incidental use.

39. Functional elements using "capable of-type" language include recitations of "wherein the device is capable of," "wherein the device is configured for," and "wherein the device is adapted for."

40. Intel's task is to produce a device(s) that is "capable of" performing the same function as Plaintiff's "capable of" patent claims (claims 1-20 of Plaintiff's '619 patent) for Plaintiff's patented CMDC devices (i.e., laptops, personal computers (PCs)), and Plaintiff's patented Central Processing Units (CPUs); or, produce prior art references that antedates Plaintiff's patents.

41. Claims 1-20 of Plaintiff's '619 patent: **(Exhibit G)**

> 1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), ***capable of***:
>
> processing instructions to lock, unlock, or disable the lock of the communication device;
>
> processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;
>
> processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;
>
> processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;
>
> processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;
>
> processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);
>
> processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;
>
> processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);
>
> processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;
>
> processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a

building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2. The communication device of claim 1, comprising at least a central processing unit (CPU), ***capable of*** processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

3. The communication device of claim 1, comprising at least a central processing unit (CPU), ***capable of*** receiving a signal to lock, unlock, or disable the lock of the communication device.

4. The communication device of claim 1, comprising at least a central processing unit (CPU), ***capable of*** receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5. The communication device of claim 1, comprising at least a central processing unit (CPU), ***capable of*** receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6. The communication device of claim 1, comprising at least a central processing unit (CPU), ***capable of*** receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), ***capable of*** receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8. The communication device of claim 1, comprising at least a central processing unit (CPU), ***capable of*** receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

9. The communication device of claim 1, comprising at least a central processing unit (CPU), ***capable of*** receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

10. The communication device of claim 1, comprising at least a central processing unit (CPU), ***capable of*** receiving a signal of the operational and functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

11. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, ***capable of***:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

12. The central processing unit (CPU) of claim 11, ***capable of*** processing operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

13. The central processing unit (CPU) of claim 11, ***capable of*** processing operational instructions to lock, unlock, or disable the lock of the communication device.

14. The central processing unit (CPU) of claim 11, ***capable of*** processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

15. The central processing unit (CPU) of claim 11, ***capable of*** processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16. The central processing unit (CPU) of claim 11, ***capable of*** processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

17. The central processing unit (CPU) of claim 11, ***capable of*** processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

18. The central processing unit (CPU) of claim 11, ***capable of*** processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

19. The central processing unit (CPU) of claim 11, ***capable of*** processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

20. The central processing unit (CPU) of claim 11, ***capable of*** processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

42. Plaintiff believes Intel has violated Section 2 of the Sherman Act by maintaining a monopoly with the use; the making; the offering for sale; and the sale of Plaintiff's patented new, useful, and improved upon CMDC devices of a laptop, a desktop (PC), and a central processing unit.

## INTEL'S SINGLE-FIRM CONDUCT UNDER SECTION 2 OF THE SHERMAN ACT

43. Plaintiff believes Intel willfully maintained its monopoly power for present and future generations in the [CPU] market with the unauthorized "use" of Plaintiff's patented

CMDC devices (e.g., laptops; desktop PCs), and Plaintiff's patented CPUs designed and made for Plaintiff's patented CMDC devices.

44.     Intel's customers in the CPU product market are OEMs, alias original equipment manufacturers, alias laptop and computer makers. OEMs compete with each other in various downstream markets, such as the laptop or desktop personal computer (or PC), which for present purposes we can assume to be substantially competitive.

45.     In order to produce a valuable end-product for consumers, these OEMs must produce software and machines that integrate with the CPU technology that they buy. In order to enable OEMs to do so in a sufficiently timely manner to be able to compete effectively in the fast-evolving laptop and computer market, and in order to facilitate simultaneous roll-out of new CPU technology by multiple OEMs and thus maximize the value of advertising expenditure at launch, it was Intel's general practice to supply at least major, or "strategic," OEMs with advance technical information and prototype CPUs on a rolling basis.

46.     It did so, however, under contracts that were terminable at will and authorized use of the technical information only for purposes of building Intel-compatible computers.

47.     The FTC's legal argument was a classic Section 2 Sherman Act argument: Intel, a monopolist, had "willfully maintained its monopoly power in the [CPU] market through exclusionary conduct that was not reasonably necessary to serve any legitimate, procompetitive purpose," with the "specific intent to monopolize both the current generation and future generations of [CPUs]," and with a "dangerous probability" of success in doing so. See *In re Intel Corp.*, No. 9288, Complaint (FTC June 8, 1998): </os/1998/06/intelfin.cmp.htm>; Agreement Containing Consent Order (FTC March 17, 1999): </os/1999/9903/d09288 intelagreement.htm>.

48.     Plaintiff believes, Intel is in violation of Section 2 of the Act, 15 U.S.C. 2; which prohibits monopolization, attempts to monopolize, and conspiracies to monopolize "any part of trade or commerce among the several States or with foreign nations." Intel is considered a monopoly because they are the largest chip manufacture and have made deals with computer manufacturers to produce [plaintiff's patented laptops and desktop PCs] computers with only Intel [alleged infringing CPU] chips.

49.     OEMs must produce laptops and desktop PCs that integrate with the CPU technology that they buy. Plaintiff has alleged Intel's '*advanced technical information*' supplied to the OEMs, is the intellectual property of the Plaintiff.

50.     The Clayton Act authorizes Plaintiff to sue for triple damages when Plaintiff have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

## THE U.S. DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS RULES THAT PATENT INFRINGEMENT CAN VIOLATE ANTITRUST LAWS

51.     According the U.S. District Court for the Eastern District of Texas, patent infringement can be considered anticompetitive conduct under federal antitrust law.

52.     This ruling arose out of a dispute between Retractable Technologies, Inc. (Retractable) and Becton, Dickinson and Company (BD), *Retractable Technologies, Inc., et al. v. Becton, Dickinson and Co.*, Case No. 2:08-CV-00016 (E.D. Tex.), in which Retractable alleges that BD's infringement of Retractable's patents foreclosed competition and maintained BD's monopoly power in the hypodermic syringe market, thereby violating Section 2 of the Sherman Act, 15 U.S.C. § 2.

53.     Intel is the leading U.S. manufacturer of central processing units (CPUs) and holds a very large share of the relevant market.  Plaintiff claims Intel took steps to protect its dominant position after Plaintiff provided Intel with the intellectual property subject matter of Plaintiff's patented inventions in 2010.

54.     Plaintiff contends that Intel's actions of using, making, offering for sale, and selling Plaintiff's patented inventions, together with other exclusionary conduct including unlawful bundling and loyalty discounts, impeded the adoption of Plaintiff's new, improved upon, and useful CMDC devices (i.e., laptops, desktop PCs), and central processing units (CPUs).

55.     Plaintiff believes he has alleged enough factual information, that if taken as true, proves Intel has violated Section 2 of the Sherman Act. Plaintiff believes he has demonstrated that Intel (1) possesses monopoly power, and (2) acquired, enhanced, or maintained that power by exclusionary or anticompetitive conduct, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966).

56.     On September 9, 2013, U.S. District Court Judge Leonard Davis adopted the recommendations of U.S. Magistrate Judge Roy S. Payne's August 5 'Report and Recommendation'.  Judge Davis agreed with Judge Payne that the only binding precedent offered by BD in support of its arguments held that patent infringement is not an injury recognized under the Sherman Act, [a plaintiff must prove antitrust injury in order to recover damages] but this has nothing to do with patent infringement as anticompetitive conduct.

57.     Both judges noted the U.S. Supreme Court's statement in *U.S. v. American Tobacco Co.* that the Sherman Act covers "every conceivable act which could possibly come

within the spirit or purpose of the prohibitions of the law, without regard to the garb in which such acts were clothed", 221 U.S. 106, 181 (1911).

## INTEL HAS ENGAGED IN ANTICOMPETITIVE CONDUCT THAT IS LINKED TO THE ANTITRUST INJURY

58. Plaintiff is providing data to support 'upon information and belief' Intel's market share is within Intel's possession. Plaintiff does not simply plead that Intel has control [monopoly control] of the market; Plaintiff specifies the percentage of the market control:

59. Intel's share in laptops grew to 1.2 points to 81 percent against AMD while its desktop share grew 0.8 points to 80.7 percent, according to Mercury Research's report for the fourth quarter of 2020. The result is that Intel grew market share for x86 CPUs overall by 0.7 points, bringing it to 78.3 percent. https://www.crn.com/news/components-peripherals/intel-regains-pc-market-share-against-amd-as-cpu-capacity-expands

60. Intel and AMD PC Notebook market share: As of Q4 2021, Intel mobile CPU units accounted for 77.8% market share whereas AMD's mobile units held a share of 22.2%. https://wccftech.com/intel-regain-significant-market-share-versus-amd-in-client-pc-segment-thanks-to-alder-lake-epyc-knockout-xeon-server-segment/

61. In the second quarter of 2022, 63.55 percent of x86 computer processor or CPU tests recorded were from Intel processors, up from the lower percentage share seen in previous quarters of 2021, while 36.4 percent were AMD processors. When looking solely at laptop CPUs, Intel is the clear winner, accounting for 73.7 percent of laptop CPU test benchmark results in the second quarter of 2022. https://www.statista.com/statistics/735904/worldwide-x86-intel-amd-market-share/

Overall x86 CPU Share - ALL CPUs

| Overall x86 CPU Share Includes IoT and SoC | 2021 Q4 Share | 2021 Q3 Share | 2020 Q4 Share | Change Quarter | Change Year |
|---|---|---|---|---|---|
| Intel | 74.4% | 75.4% | 78.3% | - 1.0 | - 3.9 |
| AMD | 25.6% | 24.6% | 21.7% | + 1.0 | + 3.9 |
| VIA | 0.0% | 0.0% | 0.0% | - 0.0 | - 0.0 |
| Total | 100.0% | 100.0% | 100% | | |

62.    Plaintiff has properly alleged the specific product market - namely, laptops, desktop PCs, and central processing units (CPUs). Further, Plaintiff has properly defined the geographic market by pleading it encompasses the United States. "Intel has directed the design and used the OEMs laptops and desktop PCs; and, sold and/or offered for sale in the United States, the central processing units (CPUs) of Intel.

63.    Plaintiff has sufficiently articulated he has suffered an injury as a result of Intel's alleged conduct that has affected the competitive process of marketing Plaintiff's new, useful, and improved upon laptops, desktop PCs, and CPUs.

64.    Plaintiff has properly pleaded its antitrust claims by alleging sufficient facts to support the plausibility of the necessary elements of those claims.

65.    This Court should recognize that "[b]ecause of the innovation and commercial viability that they encourage, courts have afforded suits to enforce patents a presumption of good faith," and that "[i]t naturally follows that a higher standard of proof is needed to overcome that presumption." *Campbell*, 2020 WL 5049051, at *7

66. The Court of Appeals for the Ninth Circuit has explained, "[t]he road to the Patent Office is so tortuous and patent litigation is usually so complex," that "no less than [c]lear, convincing proof of intentional fraud involving affirmative dishonesty" would suffice in patent cases (citation omitted)).

67. Intel's, use of, making, offering for sale, and selling of Plaintiff's intellectual property (new, useful, and improved upon laptops, desktop PCs, and CPUs); and, Intel's exclusionary anticompetitive practices made it possible for Intel to maintain its monopoly.

## INTEL'S INVASION ON PLAINTIFF'S INTELLECTUAL PROPERTY SUBJECT MATTER IS TOO EXPANSIVE TO BE COINCIDENTAL

68. The issue with "intent" is; "did Intel know it was doing something wrong?" Plaintiff believes the antitrust violations alleged in this case are too massive to be unintentional.

69. The legal standards in antitrust law are generally viewed as combinations of conduct and intent standards. Intel's intent is general when Intel simply engaged in conduct that violates the law. Plaintiff alleges Intel's antitrust violations are more specific because Intel engaged in the anticompetitive conduct for particular reasons (e.g., to harm the Plaintiff, competitors, investors, consumers, the SEC, and the USPTO), or with particular knowledge (e.g., Intel was given notice of Plaintiff's intellectual property in 2010 **(Exhibit A)**.

70. Case law suggests that Plaintiff must meet a higher burden with respect to Intel's intent under Section 2 of the Sherman Act than is typically required under Section 1. Under Section 1, Plaintiff generally must demonstrate only that the Intel intended to engage in the conduct that is asserted to violate the law. Under Section 2, Plaintiff must [and have] produce

evidence that is consistent with a specific intent to monopolize, in the sense that the overwhelming—perhaps the sole—purpose of the Intel's conduct is to reduce competition.

71.     The best-known conduct standard in antitrust law is the rule of reason (or reasonableness) test, which requires proof that the competitive harms from the Intel's conduct outweigh any purported benefits to consumers from that conduct. Plaintiff believes the consumers and customers were drawn into a scheme of deceit (e.g., consumers reliance upon false information to cover inflated prices), and fraud (e.g., simply not telling the whole story to the OEMs in order to make a deal happen).

72.     The second type of legal standard, an intent standard, determines liability in part by evidence concerning Intel's state of mind. Plaintiff's claims require proof merely of Intel's intent to carry out the conduct set forth in the complaint; these claims fall under a general intent standard. These claims require only that Intel knew that it was taking a particular action, not that Intel does so with the purpose of bringing about a particular (undesirable) result.

73.     Plaintiff believes Intel's invasion on Plaintiff's intellectual property subject matter is too expansive to be coincidental.

74.     Plaintiff believes Intel produced Plaintiff's patented CPUs as prototypes for the OEMs to test with the laptops and desktop PCs. Plaintiff believes the OEMs design Plaintiff's patented laptops and desktop PCs to function with the CPUs provided them by Intel.

75.     Intel was able to form and maintain its monopoly status by using, making, offering for sale, and selling Plaintiff's patented inventions. Intel's anticompetitive conduct is in violation of Section 2 of the Sherman Act. Intel continues its intentional massive invasion of Plaintiff's patented inventions. Plaintiff believes Intel's conduct is not coincidental. See the following:

**Intel's Loihi Neuromorphic Chip for the Detection of Chemical Agents, Biological Agents, Explosives'; Disease and Narcotics**

| Intel's Loihi Neuromorphic Chip to Learn and Recognize the Scents of 10 Hazardous Chemicals. Below: Intel Labs' Nabil Imam holds a Loihi neuromorphic chip in his Santa Clara, California, neuromorphic computing lab. (Walden Kirsch/Intel Corp.)<br><br><br><br>Neural algorithm derived from the architect-ture of the brain's olfactory circuits, Intel and Cornell trained Intel's Loihi neuromor-phic chip to learn and recognize the scents of 10 hazardous chemicals … the activity of 72 chemical sensors in response to these smells and configured the circuit diagram of biological olfaction on Loihi. The chip quickly learned the neural representation of each of the smells and each odor, demonstrating a promising future for neuroscience and AI.<br><br><br><br>Above: A photo shows Intel's Loihi 2 neuromorphic chip on the tip of a finger | **Plaintiff's Detection System**<br><br>**Claim 4 of the '287 patent.** A communication device comprising:<br>at least one central processing unit (CPU);<br>at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents …<br>at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor … or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.<br><br>***Specifications***: "[T]he detectors 46 are interconnected to the cpu 40 of the detection system … transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound … "a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector … FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 … chemical, biological, and radiological hazard detections …"<br><br>***Intel embedded processor***: The hazardous odors learned and recognized by Loihi pose a danger to public health, serving as precursors in the manufacturing of explosives, narcotics and polymers. The findings demonstrate the promise of neuromorphic chips to recognize these odors under real-world conditions more effectively than conventional solutions and give us a view into potential use cases of neuromorphic technology. Portable "electronic nose systems" with neuromorphic chips could be used by doctors to diagnose diseases, by airport security to detect weapons and explosives, by police and border control to more easily find and seize narcotics, and even to create more effective at-home smoke and carbon monoxide detectors. |
|---|---|

**Intel's Mobileye CPUs are Capable of Processing the Operational and Functional Instructions for Driverless & Autonomous Vehicles**

| **Intel's Mobileye** | **Plaintiff's Stall, Stop, Vehicle Slow-down System** |
| --- | --- |
| Mobileye launched 1st generation EyeQ1 processor in 2008. The technology offered driver assistance including AEB (automatic emergency braking). In 2017, Mobileye unveiled model for safe self-driving cars. Mobileye demonstrated an autonomous car equipped only with cameras on the streets of New York City in January 2020. Mobileye Supervision uses EyeQ5 SoC devices processing data from 11 cameras. Mobileye Level 4 self-driving system full sensor suite includes 13 cameras, 3 long-range LiDARs, 6 short-range LiDARs and 6 radars.<br><br><br><br>In 2021, Intel took Mobileye automotive unit via an IPO of newly issued stock in 2022. Mobileye's vision-based advance driver assistance system (ADAS) is based on the same core technology… systems offer lane departure warning, forward collision warning, headway monitoring and warning<br><br>Intel's Mobileye unit unveiled a supercomputer on a chip for autonomous driving at CES 2022. Called EyeQ Ultra, it features 176 trillion operations per second. The SoC provides four proprietary accelerators that are paired with CPU cores. | **Claim 44 of the '891 patent**. A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising:<br>an electrical system in electrical communication with at least one of a brake, a foot peddle, <u>a radar, a camera</u>, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;<br>a computer system in signal transmission communication with at least one of the brake, the foot peddle, <u>the radar, the camera</u>, the navigational system, the light, the speed control, the ignition system…<br>a receiver in electrical communication with the electrical system and adapted to receive at least one control signal …<br>a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating … and,<br>wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, …<br><br>***Specifications***: "[a]n electronic device such as a laptop computer … for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt … the integration of … electronic communication or telecommunication devices such as … a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188 … the … CPU of the vehicle 192 to initiate or execute any commands that will actuate the stall-to-stop … the CPU … to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's 192 electromotive system 194 for bringing the vehicle 192 to a halt" |

**Intel's Mobileye 'Supercomputer on a Chip' is Used with Plaintiff's Stall, Stop, Vehicle Slow-down System for Driverless & Autonomous Vehicles**

| | |
|---|---|
|  | **Claim 47 of the RE43,891 patent:** Unintended Acceleration<br>**Claim 48 of the RE43,891 patent:** Forward Pre-crash<br>**Claim 49 of the RE43,891 patent:** Reverse Pre-crash<br>**Claim 50 of the RE43,891 patent:** Vehicle Stabilization<br>**Claim 51 of the RE43,891 patent:** Lane Departure<br>**Claim 53 of the RE43,891 patent:** Adapted Cruise Control |
|  | **Claim 55 of the RE43,891 patent:** "The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle for stopping or slowing a vehicle that is in operation with or without a user, driver or operator inside the vehicle." |
|  | **Claim 45 of the RE43,891 patent:** "The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a global positioning system (GPS) receiver adapted for communication with … one satellite."<br><br>**Claim 1 of the 8,334,761 patent:** A vehicle adapted for receipt of a signal from a remote location to remotely control the vehicles' stall-to-stop means or vehicle slowdown means … a user determines that the vehicle has been stolen and in response initiates a distress signal communication … includes … a cell phone tower and a satellite. |
|  | **Claim 46 of the RE43,891 patent:** "The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a cellular communication device adapted for communication with at least one cell phone tower; further including, at least one satellite connection capable of communicating with the pre-programmed automated system; further including, … one modem connection for short and long range radio frequency … to and from the pre-programmed automated system." |
|  | **Claim 52 of the RE43,891 patent:** "The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a remote vehicle slowdown system for stopping or slowing a vehicle by remote means." |

**Intel's CPUs are Capable of Processing the Operational and Functional Instructions of the Intel-based Laptops Equipped with Fingerprint Scanners**

| | **Plaintiff's Biometric Fingerprint** |
|---|---|
| <br><br>HP Envy 13: Integrated UHD Graphics; Intel Core i7-1165G7; 13.3-inch FHD; Touchscreen Display; Fingerprint Scanner<br><br><br><br>Dell Vostro 15 5000 5510; Intel Iris Xe Graphics; 11th Generation Intel Core i7-11370H; 15.6-inch FHD (1920 x 1080); Anti-glare Display; Fingerprint Scanner<br><br><br><br>Lenovo IdeaPad 5; Intel Iris Xe Graphics; 11th Gen Intel Core i5-1135G7; 15.6" FHD WVA 300nits Anti-glare, 10-point Multi-touch Display; Fingerprint Scanner | **Claim 1 of the '189 patent.** A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising …<br>at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program …<br>wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal …<br><br>***Specifications***: "[t]he fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock … [a] match occurs with a known fingerprint stored by the cpu … [p]roduct grouping 6 (biometrics) include, but are not limited to, fingerprint recognition"<br><br>***Defined***: Biometrics is a technology that uses a human's biological features, such as facial charac-teristics, fingerprint patterns, retina, voice and signature, to authenticate a person's identification and authorize specific actions. Of all of them, fingerprint analysis technology is the most mature and has the widest acceptance. Fingerprint biometrics: is legal representation of a person's signature<br><br>When a finger is detected, the auto-finger detection circuit sends an interrupt signal to the host CPU, which wakes the sensor for the finger scan. Once the scan is complete, the CPU tells the sensor to return to sleep mode. The memory holds the image data until the CPU is available. The data is synchronized with the CPU for processing… |

**Intel's CPUs are Capable of Processing the Operational and Functional Instructions of the Intel-based Laptops Enabled Near-Field Communication (NFC) Standards**

Dell systems (laptops; desktop PCs) that incorporate Intel's CPUs and NFC will include this symbol



Ultrabooks and other Intel-based laptops. The companies will bring MasterCard's NFC-powered PayPass to Ultrabooks and other Intel-based laptops. On compatible systems you'll only need to tap your PayPass-enabled credit card or device to your computer — there'll be no need to type out the card number, pesky three-digit code, or expiration date.




**Plaintiff's Near-Field Communication**

**Claim 22 of the '439 patent.** A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising

at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between a host computer and other devices …

the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device;

***Specifications***: "[r]adio frequency (i.e., near-field communication (NFC)) interconnected to a central processing unit (cpu), such as cpu 40 … "[p]roduct grouping 5 (communication methods) include, but are not limited to… Radio Frequency"

***Defined***: Near Field Communication (NFC) is a set of standards for laptops and similar devices to establish radio communication with each other by touching them together, or bringing them in close proximity with each other, usually no more than a few inches/centimeters.

***Intel embedded processor***: Intel says that with its Identity Protection Technology there's no need to worry. IPT features both hardware and software authentication: after you type in a username and password, an embedded processor will generate a one-time authentication code, and then hand off the (encrypted) info. By Dante D'Orazio, Nov 14, 2011, 12:31pm EST

***Example***: Dell - Latitude 9000 15" Laptop; Processor Brand – Intel; Processor Model - Intel 11th Generation Core i7; Intel Core i7 - 16 GB Memory - 512 GB SSD; Operating System - Windows 10 Pro; NFC Enabled $2,569.99

**Intel's CPUs are Capable of Processing the Operational and Functional Instructions of "Intel's Vision" Internet of Things**

"The Internet of Things (IoT) offers tremendous new business opportunities. By leveraging the Intel® family of processors, organizations can integrate ..." https://www.intel.com. "At Intel, we understand the exponential power of data, and we're making it practical and economical to put it to work from edge to cloud. By enabling technology providers to develop solutions that harness the massive flood of data through the combination of IoT, AI, and 5G, we'll accelerate business transformation to a degree never before seen."

"[E]nhanced for IoT, Intel Atom® x6000E processor series and Intel® Pentium® and Celeron® N and J Series processors deliver next-generation CPU [] performance with integrated support for real-time computing … [u]p to 70 percent of enterprises will run varying levels of data processing at the IoT edge by 2023 … [T]o support the next generation of IoT edge devices, Intel has developed a new line of processors enhanced for IoT: The Intel Atom® x6000E processor series and Intel® Pentium® and Intel® Celeron® N and J Series processors. These processors build on new levels of CPU and graphics performance with integrated IoT features, real-time performance, manageability, security, and functional safety." https://www.intel.com/

**Plaintiff's Internet of Things (IoTs)**

**Claim 11 of the '619 patent.** A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of …

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and …

***Specifications***: "[I]nternet and GPS connections and a cpu interconnected with the Internet and GPS connections … the present invention illustrating the GPS, Internet and power source connections … connections or contacts that can include an Internet connection 32, a GPS connection … [p]roduct grouping 5 (communication methods) include, but are not limited to … Internet … Global Positioning System (GPS)"

***Defined***: 12th Gen Intel® Core™ Processors for IoT Applications: These IoT processors combine Performance-cores (P-cores) to enhance single-thread throughput for IoT workloads and Efficient-cores (E-cores) to enhance task management and multithread throughput. Intel® Xeon® D-1700 and D-2700 Processors for IoT Applications: These processors are ideal for video analytics, workload consolidation, and other demanding applications for video analytics, manufacturing, aerospace, and defense.

***Intel IoT and GPS***: When paired with IoT, GPS provides the ability to quantify and record large amounts of data pertaining to time, location, speed and direction. IoT technology enhances GPS devices to transmit data remotely and connect to other systems and sensors. GPS and IoT are complementary to create a more robust, accessible collection of interconnected data.

## INTEL WILLFULLY CONTRIBUTED TO THE INFRINGEMENT OF PLAINTIFF'S CPUs; CMDC DEVICES; STALL, STOP, & VEHICLE SLOWDOWN SYSTEMS

76.     Liability for contributory infringement [1] of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States … a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer."

77.     The threshold requirement for this claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972). Plaintiff has shown throughout this complaint "that the alleged contributory infringer knew of the patent and that his or her [Intel's] actions would lead to infringement of the patent. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

78.     Intel was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices. Plaintiff provided Intel with 'notice letters' in December, 2010.

---

[1] Contributory infringement originated in case law as a way to enable a patentee to enforce a patent when it was being infringed by a large number of persons whom it was impractical to sue together. The doctrine of contributory infringement permitted the patentee to sue an entity that had instigated the collective infringement either by selling a product that had no use other than to infringe the patent, or using other means to encourage infringement, such as providing instructions on how to infringe the patent. Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States … a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, … shall be liable as a contributory infringer."

79.     Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes Intel's actions of supplying the OEMs with Plaintiff's patented CPUs, that contribute (or potentially contribute) to the OEMs infringing Plaintiff's patented laptops and desktop PCs; even if those actions do not directly infringe the patent.

80.     Upon information and belief, Intel has continued to make, offer for sale, and sell Plaintiff's central processing units (CPUs); and, has continued to use Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices i.e., new and improved laptops and desktop PCs, to generate profits, without a license or authorization to do so.

81.     Plaintiff's "anticompetitive" clams involving intellectual property are brought under Section 1 and Section 2 of the Sherman Act, Section 3 of the Clayton Act, and Section 5 of the Federal Trade Commission (FTC) Act.

82.     The CPU is the Central Processing Unit which is responsible for carrying out the instructions of a computer program [operating systems (android), contain and manage all the programs and applications that a computer is able to run, which means managing the device's software and hardware functions], by performing the basic arithmetical, logical, and input/output operations of the system.

83.     After the doctrine of contributory infringement developed in the courts, Intel found ways to use it to extend their patent monopolies beyond the scope of their patents. This was accomplished primarily through contributing to the alleged infringing products of the OEMs.

84.     In *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), the Federal Circuit expressly stated: "'the Federal Rules of Civil Procedure do not require a plaintiff to plead

facts establishing that each element of an asserted claim is met.'" *Id. at 1350* (quoting *In re Bill of Lading,* 681 F.3d 1323, 1339 (Fed. Cir. 2012) (emphasis added). *Nalco* appears to hold that element-by-element allegations are unnecessary.

85. In my e-mail correspondence with Intel on June 16, Plaintiff offered Intel a reasonable settlement **(Exhibit I)**: "I offered you a licensing agreement to ensure you received something in exchange for accepting my offer. The amount I quoted you does not include the potential liability Intel could face for unjustly enriching itself to the tune of hundreds of billions of dollars for using my patented CMDC devices (i.e., laptops; desktop PCs. etc.); and, for offering for sale, and selling my patented CPUs designed for use with my CMDC devices; and, for illegally forming a monopoly with my intellectual property, after receiving [my] first notice in December, 2010." A copy of the related complaint against Qualcomm was attached to the e-mail and is included with this complaint as **(Exhibit J)**

86. In the e-mail Plaintiff informed Intel that according to Statista, "Intel's net revenue from 2011 to 2021 is $693.07B." https://www.statista.com/statistics/263559/intels-net-revenue-since-1999/ Plaintiff included the stats to demonstrate that the $1B Plaintiff was willing to settle for is estimated at 1/7 of 1% of Intel's net revenue from 2011 to 2021 is $693.07B. Less than ½ of a penny on the dollar.

87. In the e-mail Plaintiff also informed Intel of a potential damage estimate. "If I am only awarded $10B in damages. That's 10 times more than the $1B I am asking for. If the damages are triple ($30B), that's 30 times more than what I am asking for. The only reason something like this could happen, is Intel's pride won't allow them to negotiate in good faith with someone like me."

88. The Clayton Act authorizes Plaintiff to sue for triple damages when Plaintiff have been harmed or injured by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

## SUMMARY

| (Exhibit A): Dec. 2010 "Notice" Letter Disclosures | Illustrative Charts | Patent Claims | Written Support - Patent Specifications |
|---|---|---|---|
| Laptops / Desktops | Laptops / Desktops Pgs. 9, 26 of Complaint | Claim(s) 13 of the "439 Patent | Yes |
| CPU | CPU Pgs. 10, 20, 26-28 of Complaint | Claim(s) 5 of the "287 Patent | Yes |
| Stall, Stop, Vehicle Slowdown | Mobileye - ADAS Pgs. 24-25 of Complaint | Claim(s) 44-53, 55 of the "891 Patent | Yes |
| Detection Systems | Detection of 10 hazardous chemicals Pg. 23 of Complaint | Claim(s) 4 of the "287 Patent | Yes |
| Biometric Fingerprint | Biometric Fingerprint Scanners Pg. 26 of Complaint | Claim(s) 1 of the "189 Patent | Yes |
| Radio Frequency Connection | Radio Frequency Near-Field Communication Pg. 27 of Complaint | Claim(s) 22 of the "439 Patent | Yes |
| Internet Connection | Internet of Things (IoTs) Pg. 28 of Complaint | Claim(s) 11 of the "619 Patent | Yes |

# RELIEF

A. Temporary injunctive relief for Intel to discontinue the making, offering for sale, and selling of its central processing units (CPUs) for laptops, desktop PCs, and Advanced Driver Assistance Systems (ADAS) for autonomous and driverless vehicles

B. Temporary injunctive relief for Intel to discontinue the use Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e., new and improved laptops and desktop PCs) that are currently being used, without authorization, by Intel to generate revenues.

C. Summary judgement on the merits of the case for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents.*

D. Damages found or assessed for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents.*

E. Damages up to three times the amount found or assessed for willful contributory infringement.

F. Summary judgement on the merits of the case for Intel's single-firm anticompetitive conduct (under section 2 of the Sherman Act), and unjust enrichment.

G. Damages found or assessed for Intel's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), that has cause Antitrust injury to the Plaintiff, and that harms the competitive process and thereby harms consumers.

H. Trible damages for the Antitrust injury imposed by Intel for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who

shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

I. The Court orders Intel to establish, at minimum, a $20 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Intel if found not liable.

Intel has announced that it plans to acquire the autonomous car hardware firm Mobileye for a cool $15 billion. Intel's $15 Billion Mobileye Buyout Puts It in the Autonomous Car Driver's Seat https://www.technologyreview.com/2017/03/13/106275/intels-15-billion-mobileye-buyout-puts-it-in-the-autonomous-car-drivers-seat/

[T]his is where Intel, the American company that helped build Silicon Valley, is going to build its $20 billion semiconductor mega site. Intel's CEO, Pat Gelsinger, who is here tonight, told me they are ready to increase their investment from $20 billion to $100 billion. *Remarks of President Joe Biden – State of the Union Address as Prepared for Delivery. MARCH 01, 2022*

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

Case 5:22-cv-04839-NC Document 1 Filed 07/28/22 Page 36 of 36

# SERVICE OF PROCESS

Intel Corporation

2200 Mission College Blvd,

Santa Clara, CA 95054

# Exhibit 14

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (SAN JOSE)

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

FILED
DEC 06 2022
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE
Fee Paid

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

INTEL CORPORATION.

Defendant.

CASE NO: 5:22-cv-03828-NC

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

November 30, 2022

## PLAINTIFF'S NOTICE OF APPEAL

PLEASE TAKE NOTICE that Plaintiff Larry Golden, hereby appeals to the United States Court of Appeals for the Federal Circuit from the dated November 22, 2022 "Order Granting [Intel's] Motion to Dismiss" (Dkt. No. 31) as well as any other orders, rulings, findings, and/or conclusions adverse to Larry Golden.

This notice of appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A) because it is "filed with the district clerk within 30 days after entry of the judgment or order appealed from."

As part of this notice of appeal, Larry Golden submits the required filing fee of $505 and respectfully requests the district clerk to prepare the record on appeal pursuant to Federal Rule of Appellate Procedure 10(a).

Sincerely,

Larry Golden

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

# Exhibit 15

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
Phone (864) 288-5605
Email: atpg-tech@charter.net

FILED
SEP 14 2022
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
C 22 05246
HSG

LARRY GOLDEN,

Plaintiff,

V.

GOOGLE LLC

Defendants.

CIVIL CASE NO: ____

**JURY TRIAL DEMANDED**

**(Direct Patent Infringement),**
**(Contributory Patent Infringement),**
**(Joint Patent Infringement)**

September 09, 2022

## COMPLAINT FOR PATENT INFRINGEMENT

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". **Exhibit A**

The Federal Circuit determined the complaint (**Exhibit B - duplicated herein**), "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of

United States Patent Nos. 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit": attached hereto as **Exhibits C-E respectively**) against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of the Communicating, Monitoring, Detecting, and Controlling (CMDC) device(s) i.e., smartphones, laptops, tablets, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past and continues to do so, makes, uses, offer to sell, or sells Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5, that Plaintiff believes infringes at least one of the claims in the patents-in-suit under 35 U.S.C. § 271, "anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent."

Similarly, under 35 U.S.C. § 271, "anyone who offers to sell, sells, or imports a material component of something that is patented, knowing that the component was especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer" Plaintiff is alleging that the defendant Google, has in the past and continues to do so, offer to sell, sells (i.e., to other smartphone and mobile device manufacturers; "Google Search", "Google Fi", "Google Android Operating Systems", "Google Cloud", etc.) or imports a material component of something that is patented (i.e., Plaintiff's CMDC devices). For example, "market.us" has published the following information on Google:

**2018?**

- On January 2018, Alphabet, Inc. acquired Redux – smartphone technology, which is specialized in turning smartphone screens into speakers.

- In October 2018, Google LLC to shut down Google+ after failing to disclose user data leak
- In November 2018, Google LLC acquired Workbench, which is a US-based company, that offers an online library of projects and lessons.
- Under this acquisition, the company focuses on integrating the Workbench tool with Google Classroom. In addition, currently, Google Classroom is one of the most widely used online educational tools, which lets parents, teachers, and students manage class discussions, assignments, and quizzes.
- In 2018, Google Search and Advertising tools helped generating **$335 billion** in economic activity for **more than 1.3 billion millions** of businesses, website publishers, and nonprofits across the United States.
- Many website publishers, non-profit organizations and 40,000 companies in the country benefited from the use of Google Ads and AdSense advertising tools.
- In 2018, Google had sent more than 14 billion dollars to music publishers around the world.
- As of November, 2018, in US, Google connects people to businesses nearby more than **9 billion times**, including over 1 billion phone calls and 3 billion direction requests to stores every month.

**Usage Statistics**

- In a minute on the Internet in 2020, there are **4.1 million search queries, 230 million per hour** and **6 Billion per day** that is **more than 2.5 Trillion searches per year** worldwide.
- Till July 2020, Google has 95.6% share of worldwide mobile search traffic.
- In April 2020, Google processed **12.7 billion** search queries in US, accounting **62.3 percent** of the US total desktop search queries and leading mobile search provider in the US with 95.04% market share
- Daily visitors to Google are **approximately 620 Mn**.
- According to the Datareportal, in June 2020, the top 10 search queries on Google were: Google, Facebook, Youtube, You, Weather, News, Amazon, Coronavirus, Translate and Instagram.
- In July 2019, Google accounted for **95 percent** of US mobile search visits and **93 percent** of overall U.S. organic search engine visits.

- As of May 2019, Gmail is a product that **1.5 billion users** rely on, to get things done every day.
- As of September 2019, People have already asked **Google Lens more than a billion questions** about things they see.
- Google sends **10 billion+ clicks per month** to news publishers' websites.
- As of May 2019, **2.5 million** web publishers use AdSense to make money through their content on the web.
- According to a survey, in Europe the news content linked through Google were **clicked more than 8 billion times a month** that is **3,000 clicks per second** to the publishers' websites in Europe resulting to each click between 4–6-euro cents.
- In the US, Google helps drive over **1 billion direct connections**, like calls and online reservations, for businesses nationwide every month.
- Google owns its **own common misspellings domains** such as www.gooogle.com, www.googlr.com, and www.gogle.com
- Google runs **over 1 Mn computer servers** in data centers around the world.
- Last year, Google **rejected more than 10 million ads** that we suspected of copyright infringement.
- Around **35% of clicks** for U.S. businesses, advertising on Google, came from outside the country.
- As of May 2019, about **80% of traffic** from Google's Showcase Shopping ads to retailer sites are from new visitors discovering the brands.
- Till date, Google has over **2 billion store** offers mapped to physical store locations globally, discoverable by their current local ad formats like local inventory ads.
- Google Station serves more than **10 million people in 1,300 locations** across India, Indonesia, Mexico, Nigeria, the Philippines, Thailand, Vietnam and Brazil.
- Google Assistant is now on **more than one billion devices**, available in more than 30 languages across 80 countries.
- As of 2019, **more than 20 million people visit Google Account every day** to review their settings, using Privacy Checkup.
- As of 2019, **90 million** teachers and students are using G Suite for Education worldwide.

- Google has a database of over 4 billion credentials that have been compromised through various data breaches
- According to a 2018 Survey, around **72% of consumers in Indonesia** see Google Search as the online gateway for personal loan information …

## THE PARTIES

1. Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

2. On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3. Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly, jointly, and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones and Google Android Operating Systems.

## STANDARD FOR REVIEW

4. Pursuant to the order of Magistrate Judge Kevin McDonald in United States District Court for the District of South Carolina; filed 12/17/2020; Case No. 6:20-cv-04353-BHH-KFM, Plaintiff was ordered to file "a short and plain statement of the claim showing that the pleader [Plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a).

5. Plaintiff has attached a copy of the asserted patents as **Exhibits C, D, & E**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.,* No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted patent, identified the accused products by name, and generally compared the technology disclosed in the patents to the accused products. The complaint *did not identify any specific asserted claim*, but the court found that: "Plaintiff has stated a plausible claim for direct infringement by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff 's patented system." The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

6. Plaintiff maintains he has additional factual allegations to support his claim in the form claim charts readily available by order of this Court.

## JURISDICTION AND VENUE

7. This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

8. On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit, which had held for 27 years that a domestic corporation can be sued for patent infringement anywhere that corporation was subject to personal jurisdiction.

9.      The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

10.     Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

## RELATED CASES

11.     Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O").

12.     Plaintiff has filed an action of Antitrust Law violations *Larry Golden v. Apple, Inc. et al* on June 16, 2020, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. ("Apple"),

Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Ford Global Technologies, LLC ("Ford"), General Motors Company ("GM"), and, FCA US LLC ("FCA").

## GOOGLE SMARTPHONE SPECIFICATIONS / ANDROID PLATFORM

13.     Upon information and belief, Google is directly infringing Plaintiff's patented CMDC devices by making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents, to unjustly enrich itself.

14.     Upon information and belief, Google is jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Google's smartphones, and other Android smartphone devices i.e., Samsung, LG, Motorola, etc., that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents. Android smartphones have permanent default Google-owned apps like Google search, Google Play, YouTube, Maps etc. The main Android framework is signed in through a Google account too. So, you need to have a Google account to use Android.

15.     The smartphone has come a long way since the first iPhone launched in 2007. While Apple's iOS is arguably the world's first smartphone operating system, Google's Android is by far the most popular. Android has evolved significantly since first being released on an HTC-made T-Mobile device in 2008.

16.     It wasn't until 2005 that Google purchased Android, Inc., and while there wasn't much info about Android at the time, many took it as a signal that Google would use the platform to enter the phone business. Eventually, Google did enter the smartphone business —

but not as a hardware manufacturer. Instead, it marketed Android to other manufacturers, first catching the eye of HTC, which used the platform for the first Android phone, the HTC Dream, in 2008.

17. Upon information and belief, Google has copied the "product grouping" strategy of the Plaintiff (Golden) for a communicating, monitoring, detecting, and controlling (CMDC) device, i.e., Google's smartphone products are grouped together by "common features of design similarities". As illustrated below, Google's smartphones are basically the same.

18. Therefore, when analyzing the specifications, features, and functionality of Google's smartphones as a complete product, and not merely identifying the individual infringing processes; there is a strong likelihood that if one of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device; it can be perceived that all of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device as a 'whole' product.

**GOOGLE PIXEL 5 VS. PIXEL 4A WITH 5G VS. PIXEL 4**

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| Network | 5G | 5G | 4G |
| **Screen** | 6-inch flexible OLED display at 432 ppi | 6.2-inch OLED display at 413 ppi | 5.8-inch OLED display at 443 ppi |
| **Refresh Rate** | 90 Hz | 60 Hz | 60 Hz |
| **Resolution** | 1080 x 2340 | 1080 x 2340 | 1080 x 2340 |
| **Battery** | 4080 mAh | 3885 mAh | 3140 mAh |
| **Front Camera** | 8 megapixels | 8 megapixels | 8 megapixels |
| **Rear Camera** | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel |
| **Camera Features** | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Live HDR+ |

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| **RAM** | 8GB | 6GB | 6GB |
| **Processor** | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 730G |
| **Storage** | 128GB | 128GB | 128GB |
| **Audio** | Stereo speakers, USB-C audio | Stereo speakers, USB-C audio, 3.5mm headphone jack | USB-C audio, 3.5mm headphone jack |
| **Price** | $699 | $499 | $349 |
| **Wireless Charging** | Yes | No | No |
| **Water Resistant** | Yes | No | No |
| **Colors** | Green, Black | White, Black | Black |
| **Operating System** | Pre-loaded with Android 11 | Pre-loaded with Android 11 | Pre-loaded with Android 10 |

**GOOGLE PIXEL 3 SERIES SPEC COMPARISON**

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| **Display** | 5.6 inches | 6.0 inches | 5.5 inches | 6.3 inches |
| **Resolution** | 2220 x 1080 | 2160 x 1080 | 2160 x 1080 | 2960 x 1440 |
| **Processor** | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) |
| **RAM** | 4GB | 4GB | 4GB | 4GB |
| **Storage** | 64GB | 64GB | 64GB, 128GB | 64GB, 128GB |
| **Rear camera** | 12 megapixels | 12 megapixels | 12 megapixels | 12 megapixels |

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| **Front camera** | 8 megapixels | 8 megapixels | 8 megapixels, 8 megapixels(wide) | 8 megapixels, 8 megapixels(wide) |
| **Battery** | 3,000mAh | 3,700mAh | 2,915mAh | 3,430mAh |
| **Water protection** | N/A | N/A | IPX8 | IPX8 |
| **Wireless charging?** | No | No | Yes | Yes |
| **Ports?** | USB-C, 3.5mm headphone jack | USB-C, 3.5mm headphone jack | USB-C | USB-C |
| **Weight** | 0.32 pounds | 0.37 pounds | 0.33 pounds | 0.4 pounds |
| **Dimensions (in.)** | 6.0 x 2.80 x 0.30 | 6.30 x 3.00 x 0.30 | 5.70 x 2.70 x 0.30 | 6.20 x 3.00 x 0.30 |
| **Starting price** | $399.00 | $479.00 | $799.00 | $899.00 |
| **Operating System** | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android |

## SENSOR TYPES SUPPORTED BY THE "*ANDROID*" PLATFORM

| | | | |
|---|---|---|---|
| **Type Accelerometer** | Hardware | Measures the acceleration force in m/s$^2$ that is applied to a device on all three physical axes (x, y, and z), including the force of gravity. | Motion detection (shake, tilt, etc.). |
| **Type Ambient Temperature** | Hardware | Measures the ambient room temperature in degrees Celsius (°C). See note below. | Monitoring air temperatures. |
| **Type Gravity** | Software or Hardware | Measures the force of gravity in m/s$^2$ that is applied to a device on all three physical axes (x, y, z). | Motion detection (shake, tilt, etc.). |
| **Type Gyroscope** | Hardware | Measures a device's rate of rotation in rad/s around each of the three physical axes (x, y, and z). | Rotation detection (spin, turn, etc.). |

| | | | |
|---|---|---|---|
| **Type Light** | Hardware | Measures the ambient light level (illumination) in lx. | Controlling screen brightness. |
| **Type Linear Acceleration** | Software or Hardware | Measures the acceleration force in $m/s^2$ that is applied to a device on all three physical axes (x, y, and z), excluding the force of gravity. | Monitoring acceleration along a single axis. |
| **Type Magnetic Field** | Hardware | Measures the ambient geomagnetic field for all three physical axes (x, y, z) in μT. | Creating a compass. |
| **Type Orientation** | Software | Measures degrees of rotation that a device makes around all three physical axes (x, y, z). As of API level 3 you can obtain the inclination matrix and rotation matrix for a device by using the gravity sensor and the geomagnetic field sensor in conjunction with the get Rotation Matric () method. | Determining device position. |
| **Type Pressure** | Hardware | Measures the ambient air pressure in hPa or mbar. | Monitoring air pressure changes. |
| **Type Proximity** | Hardware | Measures the proximity of an object in cm relative to the view screen of a device. This sensor is typically used to determine whether a handset is being held up to a person's ear. | Phone position during a call. |
| **Type Relative Humidity** | Hardware | Measures the relative ambient humidity in percent (%). | Monitoring dewpoint, absolute, and relative humidity. |
| **Type Rotation Vector** | Software or Hardware | Measures the orientation of a device by providing the three elements of the device's rotation vector. | Motion detection and rotation detection. |
| **Type Temperature** | Hardware | Measures the temperature of the device in degrees Celsius (°C). This sensor implementation varies across devices and this sensor was replaced with the **Type—Ambient Temperature** sensor in API Level 14 | Monitoring temperatures. |

❖ **BIOMETRICS**: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).

- **DISABLING LOCK MECHANISM:** Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. When setting the pattern, you must drag your finger along lines on the screen between different nodes. Afterward, to unlock the phone, you'll need to replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. If you can't log in, you'll have to employ some other methods to restore control of your phone.

- **CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN) DETECTION:** Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK).* ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

- **HEART RATE**: *Android Team Awareness Kit, ATAK* provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

- **NEAR FIELD COMMUNICATION (NFC)**: Pixel™, Phone by Google - Turn NFC on/off. Near Field Communication (NFC) allows the transfer of data between devices that are a few centimeters apart, typically back-to-back. NFC must be turned on for NFC-based apps (e.g., Tap to Pay) to function correctly. NFC is a set of short-range wireless technologies, typically requiring a distance of 4cm or less to initiate a connection. NFC allows you to share small payloads of data between an NFC tag and an Android-powered device, or between two Android-powered devices. Tags can range in complexity.

- **WARFIGHTERS:** The U.S. armed forces and their interagency and coalition partners value *Android Team Awareness Kit, ATAK* and the common operating picture it provides. DTRA continues to develop CBRN-specific plug-in capabilities to support warfighters on the battlefield.

---

## GOOGLE'S JOINT INFRINGEMENT WITH APPLE INC.

19. According to Gurman, 2020, "The U.S. government's antitrust assault against Google reveals new details about a secretive, multibillion-dollar deal between the internet giant and Apple Inc., the world's largest technology company. The Justice Department's lawsuit, filed Tuesday, targets paid deals Google negotiates to get its search engine to be the default on

browsers, phones and other devices. The biggest of these is an agreement that makes Google search the default on iPhones and other Apple devices."

20.     The U.S. government said Apple Chief Executive Officer Tim Cook and Google CEO Sundar Pichai met in 2018 to discuss the deal. After that, an unidentified senior Apple employee wrote to a Google counterpart that "our vision is that we work as if we are one company."

21.     The DOJ also cited internal Google documents that call the Apple search deal a "significant revenue channel" for the search giant and one that, if lost, would result in a "Code Red" scenario. That's because nearly half of Google search traffic in 2019 came from Apple products, according to the lawsuit.

22.     Google pays Apple billions of dollars a year to make its search product the default option, according to analyst estimates. That means when a user buys a new iPhone or other Apple device, the built-in search engine in the Safari browser is Google.

23.     The DOJ suit cited estimates that Apple gets $8 billion to $12 billion annually from Google through the agreement. Apple's income from the search deal is believed to be part of the company's growing Services segment, a key metric Apple has highlighted to investors and analysts in recent years.

> Gurman, Mark (2020, Oct. 20). *Apple, Google worked as 'one company' on search deal, U.S. says*. https://www.bloomberg.com/news/articles/2020-10-20/apple-google-worked-as-one-company-on-search-deal-u-s-says

**Joint Infringement**

24.     Upon information and belief, Google and Apple are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Search for use with Google and Apple smartphones, that have at a minimum,

directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

25.     Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. et al.

26.     Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. et al. for Antitrust Law Violations.

## GOOGLE'S JOINT INFRINGEMENT WITH QUALCOMM INC.

27.     According to a Qualcomm press release (2020), "Qualcomm Technologies, Inc. and Google announced their collaboration to enhance and extend Project Treble with the goal of enabling more devices with Qualcomm® Snapdragon™ mobile platforms to run the latest Android OS.  The enhancements are intended to enable Original Equipment Manufacturers (OEMs) to upgrade their Snapdragon based devices to the latest Android OS without modifying Qualcomm Technologies' chipset-specific software and to use a common Android software branch to upgrade devices based on a wide range of Snapdragon mobile platforms across Qualcomm Technologies' portfolio.  These enhancements are designed to reduce the time and resources required to upgrade Snapdragon based devices to the latest Android OS version."

28.     As part of this collaboration with Google, Qualcomm Technologies will now support four Android OS versions and four years of security updates for all Snapdragon platforms utilizing the Project Treble enhancements, starting with the new Snapdragon 888

Mobile Platform. These initiatives are designed to enable faster Android OS upgrades with fewer resources and a predictable software lifecycle for Snapdragon based devices, which together are expected to result in more consumers with Snapdragon based devices running the latest Android OS version.

29. "Google continues to work closely with our technology partners to increase the freshness of the Android ecosystem. Through this collaboration with Qualcomm Technologies, we expect that Android users will have the latest OS upgrades and greater security on their devices," said David Burke, vice president of Android engineering, Google.

30. "We are excited to work with Google to extend our support for Android OS and security updates on future Snapdragon mobile platforms utilizing the Project Treble enhancements," said Kedar Kondap, vice president, product management, Qualcomm Technologies, Inc.

**Terminology**

- Google's android operating system; same as "operating system".
- Google's android operating system; same as "computer program".
- Google's android operating system; same as "software".
- Qualcomm's chipset; used interchangeably as "processor".
- Qualcomm's chipset; used interchangeably as "central processing unit".
- Qualcomm's chipset; used interchangeably as "wireless technology" (WiFi, 3G, 4G, 5G, LTE, and so on).

31. An operating system is a computer program, works as interface between user and hardware and provides common services for computer programs. The entire process or functionality of computer system depends on the operating system. An operating system is a

computer program that controls the execution of application programs and acts as an interface between the user of a computer and the computer hardware. The purpose of an operating system is to provide an environment in which a user can execute programs in a convenient and efficient manner. https://www.geeksforgeeks.org/introduction-of-operating-system-set-1/

32.     A Central Processing Unit (CPU) is a machine that can execute computer programs. This broad definition can easily be applied to many early computers that existed long before the term "CPU" ever came into widespread usage. The term itself and its initialism have been in use in the computer industry at least since the early 1960s (Weik 1961). The form, design and implementation of CPUs have changed dramatically since the earliest examples, but their fundamental operation has remained much the same.

33.     An Operating System is the core software that allows applications to interface with the hardware. Operating Systems control the specific details of your system, presenting a more manageable interface for applications (and the user) to make use of. To use an analogy, the CPU is the brain, the OS is the mind. The mind cannot exist without a brain to store it, and the brain is just a useless lump without a mind to control it.
https://answers.yahoo.com/question/index?qid= 20090927101607AAiAJ42

34.     An SoC, or system-on-a-chip to give its full name, integrates almost all of these components into a single silicon chip. Along with a CPU, an SoC usually contains a GPU (a graphics processor), memory, USB controller, power management circuits, and wireless radios (WiFi, 3G, 4G LTE, and so on). Whereas a CPU cannot function without dozens of other chips, it's possible to build complete computers with just a single SoC. The number one advantage of an SoC is its size: An SoC is only a little bit larger than a CPU, and yet it contains a lot more functionality. If you use a CPU, it's very hard to make a computer that's smaller than 10cm (4

inches) squared, purely because of the number of individual chips that you need to squeeze in. Using SoCs, we can put complete computers in smartphones and tablets, and still have plenty of space for batteries. https://www.extremetech.com/computing/126235-soc-vs-cpu-the-battle-for-the-future-of-computing.

**Joint Infringement**

35.     Upon information and belief, Google and Qualcomm are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Qualcomm's SoCs, CPUs, etc. for smartphones that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

36.     Google developing its own phone processor would mean dumping the Qualcomm SoCs it usually uses. Of course, you can never truly be rid of Qualcomm: Google would presumably still need to use Qualcomm modems, something that even Apple still needs to do. There are other modem manufacturers out there—Samsung, Huawei, Mediatek—but Qualcomm's combination of patents and strong-arm licensing techniques has effectively locked its competitors out of the US and other markets.

37.     Plaintiff has alleged that Qualcomm is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al.* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, *Apple Inc. et al.*

38. Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, *Apple Inc. et al.* for Antitrust Law Violations.

## CLAIM CONSTRUCTION

"*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015. "In the 'Decision to Institute', we construed certain claim terms. Those constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11-16

39. "No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them… [w]e further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10-11. Based on the record adduces during trial, we see no need to construe any other terms…"

40. "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of *a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site* for

monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product grouping category of design similarity (e.g., computer terminal, personal computer (PC)) …" Patent Owner contends that this new language is consistent with words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." *Id.* Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." *"Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015.

## COUNT I

### (Infringement of the '287 Patent)

41.     Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-40.

42.     On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 4, 5, and 6 of the '287 patent.

The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

43.     As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '287 patent and Google is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

44.     The alleged infringement of Golden identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT II
### (Infringement of the '439 Patent)

45.     Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-44.

46.     On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 13, 14, 15, and 23 of the '439 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

47.     As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '439 patent and Google is thereby liable for infringement of the

'439 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

48. The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT III

### (Infringement of the '189 Patent)

49. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-48.

50. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

51. As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '189 patent and Google is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

52. The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## CLAIM CHART

53. The following Claim Chart is an illustration of literal infringement. At least one of the alleged infringing products of Google (i.e., Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), or 5) is representative of all the alleged infringing products of Google asserted in this complaint. At least one of the alleged infringing products of Google (Google Pixel 5) is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

| **Google Pixel 5 Smartphone** | **Patent #: 10,163,287; Independent Claim 5** | **Patent #: 9,589,439; Independent Claim 23** | **Patent #: 9,096,189; Independent Claim 1** |
|---|---|---|---|
| | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |

| | | | |
|---|---|---|---|
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |

| | | | |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |

| | | | |
|---|---|---|---|
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A. A judgment in favor of Golden that the defendant has infringed at least one or more claims of the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid;

B. A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

C. A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D. As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the

aforementioned alleged infringing devices that have at a minimum, directly infringed the '287, '439, and '189 patents. The Defendant is thereby liable for infringement of the '287, '439, and '189 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

E. Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Respectfully submitted,

S/ Larry Golden Date: 09 /12/2022

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# Exhibit 16

Matthew S. Warren (State Bar No. 230565)
Sachli Balazadeh-Nayeri (State Bar No. 341885)
22-5246@cases.warrenlex.com
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile

*Attorneys for Defendant Google LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LARRY GOLDEN, | Case No. 4:22-cv-05246-HSG |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT BY DEFENDANT GOOGLE LLC** |
| v. | |
| GOOGLE LLC, | Date: December 1, 2022<br>Time: 2:00 p.m. |
| Defendant. | Place: Courtroom 2<br>Judge: Hon. Haywood S. Gilliam, Jr. |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on December 1, 2022, at 2:00 p.m., or as soon thereafter as the matter may be heard before Judge Haywood S. Gilliam, Jr. of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California, 94612, defendant Google LLC will move and hereby does move for an order dismissing plaintiff Larry Golden's complaint for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). This motion is based on this Notice, the attached Memorandum of Points and Authorities, and all matters of record filed with the Court in this case, and such other evidence as may be submitted.

Google seeks an Order dismissing the complaint without leave to amend under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which this Court may grant relief.

Date:   October 26, 2022

Respectfully submitted,

Matthew S. Warren (State Bar No. 230565)
Sachli Balazadeh-Nayeri (State Bar No. 341885)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
22-5246@cases.warrenlex.com

*Attorneys for Defendant Google LLC*

## TABLE OF CONTENTS

Introduction . . . . . . . . . . 1

Background . . . . . . . . . . 1

A. Mr. Golden's Patents . . . . . . . . . . 1

B. Mr. Golden's Litigation Campaign . . . . . . . . . . 1

1. Court of Federal Claims . . . . . . . . . . 1

2. District of South Carolina . . . . . . . . . . 2

3. This Court . . . . . . . . . . 3

C. Mr. Golden's South Carolina Litigation Against Google and Resulting Appeal . . . . . . . . . 4

D. Mr. Golden's Allegations in This Action . . . . . . . . . . 5

Argument . . . . . . . . . . 6

I. The Complaint Fails to Allege Direct Infringement by Google . . . . . . . . . . 6

II. The Complaint Fails to Allege Indirect Infringement . . . . . . . . . . 8

III. The Court Should Deny Leave to Amend . . . . . . . . . . 8

Conclusion . . . . . . . . . . 9

# TABLE OF AUTHORITIES

*Cases* **Pages**

*Alfasigma USA, Inc. v. First Databank, Inc.*,
398 F. Supp. 578 (N.D. Cal. 2019) . . . . . 7

*Anderson v. Google Inc.*,
No. 12-6573, 2013 WL 1285516 (N.D. Cal. Mar. 27, 2013). . . . . 7

*Artrip v. Ball Corp.*
735 Fed. App'x 708 (Fed. Cir. 2018) . . . . . 6

*Arunchalam v. Apple, Inc.,*
No. 18-1250, 2018 WL 5023378 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x 977 (Fed. Cir. 2020) . . . . . 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) . . . . . 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) . . . . . 6

*Bonin v. Calderon*,
59 F.3d 815 (9th Cir. 1995) . . . . . 8

*Bot M8 LLC v. Sony Corp. of Am.*,
4 F.4th 1342 (Fed Cir. 2021) . . . . . 6

*Cyph, Inc. v. Zoom Video Commc'ns, Inc.*,
No. 22-0561, 2022 WL 1556417 (N.D. Cal. May 17, 2022) . . . . . 6

*Davis v. Pinterest, Inc.*,
No. 19-7650, 2020 WL 6342936 (N.D. Cal. Oct. 29, 2020) . . . . . 8

*Demos v. Google*,
No. 19-4433, 2019 WL 6341318 (N.D. Cal. Nov. 27, 2019) . . . . . 6

*Erickson v. Pardus*,
551 U.S. 89 (2007) . . . . . 7

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*,
46 F.3d 1108 (Fed Cir. 2002) . . . . . 7

*Ghazali v. Moran*,
No. 22-0561, 2022 WL 1556417 (N.D. Cal. May 17, 2022) . . . . . 7

*Golden v. Apple Inc.*,
Nos. 22-1229, 22-1267, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022) . . . . . 2, 4, 5, 8

## TABLE OF AUTHORITIES
*(continued)*

*Cases* **Pages**

*Golden v. Apple Inc.*,
No. 21-2160, 2022 WL 986984 (4th Cir. Mar. 31, 2022) . . . . 3

*Golden v. Apple Inc.*,
819 F. App'x 930 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 1067 (2021). . . . . 2

*Golden v. Apple Inc.*,
No. 20-4353, 2021 WL 5074739 (D.S.C. Nov. 2, 2021), *aff'd* Nos. 22-1229, 22-1267, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022) . . . . 2

*Golden v. Apple Inc.*,
No. 20-2270, 2021 WL 4260782 (D.S.C. Sept. 20, 2021), *aff'd* No. 21-2160, 2022 WL 986984 (4th Cir. Mar. 31, 2022). . . . . 3

*Golden v. United States*,
No. 22-1196, 2022 WL 4103287 (Fed. Cir. Sept. 8, 2022) . . . . 2

*Golden v. United States*,
156 Fed. Cl. 623 (Fed. Cl. Nov. 10, 2021) . . . . 2

*Hantz Software, LLC v. Sage Intacct, Inc.*,
576 F. Supp. 3d 677 (N.D. Cal. 2021) . . . . 6

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
49 F. 3d 1551 (Fed. Cir. 1995) . . . . 7

*Ivey v. Bd. of Regents of Univ. of Alaska*,
673 F.2d 266 (9th Cir. 1982) . . . . 7

*Laguna Hermosa Corp. v. United States*,
671 F.3d 1284 (Fed. Cir. 2012) . . . . 6

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
869 F.3d 1372 (Fed. Cir. 2017) . . . . 6

*Lindsay v. United States*,
295 F.3d 1252 (Fed. Cir. 2002) . . . . 6

*Linear Tech Corp. v. Impala Linear Corp.*,
379 F. 3d 1311 (Fed Cir. 2004) . . . . 8

*Mylviya v. City of San Jose*,
No. 5-5427, 2006 WL 2529511 (N.D. Cal. Aug. 31, 2006) . . . . 7

*Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*,
No. 12-4070, 2013 WL 3462078 (N.D. Cal. Jul. 8, 2013) . . . . 8

## TABLE OF AUTHORITIES
*(continued)*

*Cases* **Pages**

*Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F. 3d 1316 (Fed. Cir. 2001) . . . . . 7

*Townsend v. Univ. of Alaska*, 543 F.3d 478 (9th Cir. 2008) . . . . . 8

*Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F. 3d 137 (Fed. Cir. 2011) . . . . . 7

*Weisbuch v. Cty. of Los Angeles,* 119 F.3d 778 (9th Cir. 1997) . . . . . 7

*Zeiny v. United States,* No. 19-5806, 2020 WL 496076 (N.D. Cal. Jan. 30, 2020) . . . . . 7

*Rules*

Fed. R. Civ. P. 12(b)(6) . . . . . 7

Fed. R. Civ. P. 15(a) . . . . . 8

*Other Proceedings*

*Golden v. Apple Inc.,* No. 22-4152 (N.D. Cal. Jul. 15, 2022) . . . . . 3, 4, 9

*Golden v. Apple Inc.,* No. 20-4353 (D.S.C. Jan. 5, 2021) . . . . . 2

*Golden v. Apple Inc.,* No. 20-2270 (D.S.C. Jun. 16, 2020) . . . . . 3

*Golden v. Apple Inc.,* No. 19-2557 (D.S.C. Sept. 11, 2019) . . . . . 2

*Golden v. Google LLC,* No. 21-244 (D.S.C. Jan. 26, 2021) . . . . . 4

*Golden v. Intel Corporation,* No. 22-3828 (N.D. Cal. Jun. 28, 2022) . . . . . 3

*Golden v. Qualcomm Inc.,* No. 22-3283 (N.D. Cal. Jun. 6, 2022) . . . . . 3

**TABLE OF AUTHORITIES**
*(continued)*

*Other Proceedings* **Pages**

*Golden v. United States*,
No. 13-307 (Fed. Cl. May 1, 2013) . . . . . . . . . . . . 1, 2

– v – Case No. 4:22-cv-05246-HSG
MOTION TO DISMISS COMPLAINT BY DEFENDANT GOOGLE LLC

## INTRODUCTION

Plaintiff's complaint accuses Google of patent infringement by making and selling Pixel devices, but admits on its face that the accused Pixel devices cannot infringe without adding an additional application, called Android Team Awareness Kit or "ATAK," that the plaintiff concedes Google does not make or sell. The complaint thus does not actually allege that Google infringes; it claims only that Google makes devices that someone else could modify, by installing additional software, into an allegedly infringing device. But as courts have long held, a device that requires modification to infringe is by definition a non-infringing device. The complaint thus admits that Google makes and sells non-infringing devices, and therefore fails to state a claim on which this Court can grant relief. The Court should therefore dismiss it in its entirety.

## BACKGROUND

### A.     Mr. Golden's Patents

Plaintiff Larry Golden holds at least ten patents including the three at issue here, United States Patent Nos. 9,096,189, 9,589,439, and 10,163,287. The patents-in-suit address "anti-terrorist detection and prevention systems," specifically, "a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons." '189 patent at 1:40-45, 3:16-22; '439 patent at 1:47-52, 3:25-30; '287 patent at 1:57-63, 3:35-41. The patents disclose a "multi sensor detection and disabling lock system" which includes "detectors that sample for chemical, biological and radiological compounds, agents and elements," that can be connected to "surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time." '189 patent at Abstract; '439 patent at Abstract; '287 patent at Abstract.

### B.     Mr. Golden's Litigation Campaign

#### 1.     Court of Federal Claims

Shortly after the Patent and Trademark Office issued the patents-in-suit, Mr. Golden asserted them as part of his long-running litigation campaign against various defendants. First, he filed *Golden v. United States* in the Court of Federal Claims, alleging that the United States infringed the patents-in-suit by

"award[ing] and fund[ing] third-party government contractors for research and development, manufacture, and commercialization of Plaintiff's CMDC devices through various government agencies," including "at least" the Department of Homeland Security and the National Aeronautics and Space Administration. No. 13-307, Docket No. 195 at ¶¶ 2, 7 (Fed. Cl. Nov. 3, 2020). Mr. Golden claimed $90 billion in damages in his original complaint. *Id.*, Docket No. 1 at 10 (Fed. Cl. May 1, 2013). After eight years of litigation and six chances to amend the complaint, the court dismissed the action with prejudice, noting that "[e]nough time and resources have been expended by the court and the Department of Justice dealing with these allegations." *Golden v. United States*, 156 Fed. Cl. 623, 632 (Nov. 10, 2021). Mr. Golden appealed, but the Court of Appeals affirmed. *Golden v. United States*, No. 22-1196, 2022 WL 4103287 at *2 (Fed. Cir. Sept. 8, 2022).

**2. District of South Carolina**

Mr. Golden filed another case, *Golden v. Apple*, in which he alleged that sixteen defendants including Apple, Samsung, General Motors Company, and car dealers including Big 'O' Dodge Chrysler Jeep Ram and Fairway Ford Lincoln of Greenville, each infringed the patents-in-suit. No. 19-2557, Docket No. 16, (D.S.C. Oct. 15, 2019). After allowing two iterations of the complaint, the court dismissed Mr. Golden's case without leave to amend. *Id.*, Docket No. 32 (D.S.C. Jan. 27, 2020). Mr. Golden again appealed; the Federal Circuit again affirmed. *Golden v. Apple Inc*., 819 F. App'x 930, 931 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 1067 (2021).

Shortly thereafter, Mr. Golden filed another infringement complaint, again in the District of South Carolina, again alleging infringement of the patents-in-suit against several tech companies, network providers such as T-Mobile and AT&T, car manufacturers, and three local car dealerships. *Golden v. Apple*, No. 20-4353, Docket No. 10 (D.S.C. Jan. 5, 2021). The Court dismissed the case, noting that "[i]n light of the vague conclusory allegations in the complaint in this action, and Golden's attempt to circumvent the prior dismissals of his patent infringement claims, the instant matter is subject to summary dismissal as frivolous." *Golden v. Apple Inc.*, No. 20-4353, 2021 WL 5074739, at *2 (D.S.C. Nov. 2, 2021). Mr. Golden appealed; the Federal Circuit again affirmed. *Golden v. Apple Inc.*, Nos. 22-1229, 22-1267, 2022 WL 4103285 at *2 (Fed. Cir. Sept. 8, 2022).

In a third action before the District of South Carolina, Mr. Golden brought claims seeking more than $1 trillion against many of the same defendants, claiming that, by using the patents-in-suit, they violated various laws including the Sherman Act and the South Carolina Consumer Protection and Unfair Competition Laws, and were part of a "secret conspiracy" to "develop the intellectual property technology as their own private property," and to "hinder trade," which "destroyed all possibilities for the Plaintiff to receive royalty compensation and for the Class to eliminate its South Carolina taxpayer debt." *Golden v. Apple*, No. 20-2270, Docket No. 1 at 1, ¶¶ 14, 48 (D.S.C. Jun. 16, 2020). The Court found that "the claims appear patently frivolous" and, in any event, "the plaintiff cannot circumvent the court's prior ruling by labeling substantially similar allegations as seeking damages under the Sherman/Clayton Acts instead of for patent infringement." *Id.*, Docket No. 16, slip op. at 7-9 (D.S.C. Sept. 11, 2020). The District Court dismissed the complaint. *Golden v. Apple Inc.,* No. 20-2270, 2021 WL 4260782, at *3 (D.S.C. Sept. 20, 2021), *aff'd*, No. 21-2160, 2022 WL 986984 (4th Cir. Mar. 31, 2022). Mr. Golden appealed; the Fourth Circuit affirmed. *Golden,* 2022 WL 986984 at *1.

**3. This Court**

On June 6, 2022, Mr. Golden sued Qualcomm in this Court, asserting that Qualcomm infringed the patents-in-suit, resulting in violations of the Sherman and Clayton Acts, and that Qualcomm is involved in a "secret conspiracy," "under the protection of a Government contract to develop Plaintiff's 'new and improved cell phone' (i.e., smartphone)." *Golden v. Qualcomm, Inc.*, No. 22-3283, Docket No. 1 at 1, ¶ 28 (N.D. Cal. Jun. 6, 2022). That case remains pending.

On June 28, 2022, Mr. Golden sued Intel in this Court, alleging infringement of the '189 and '287 patents, and asserting that Intel is also involved in a "secret conspiracy." *Golden v. Intel Corp*., No. 22-3828, Docket No. 1 at 1 (N.D. Cal. Jun. 28, 2022). That case remains pending.

On July 15, 2022, Mr. Golden sued Apple in this Court, alleging infringement of the '439 and '287 patents, that Apple had "monopoly power while working for the Government, that likely resulted in secret conspiracies," and that Apple is working to "prevent Plaintiff's market entry." *Golden v. Apple*, No. 22-4152, Docket No. 1 at 1-2, ¶ 83. (N.D. Cal. Jul. 15, 2022). This Court dismissed the complaint without leave to amend, noting "Golden has been pressing these frivolous claims (or some variation

thereof) for nearly 10 years in multiple jurisdictions. This is the rare case where dismissal without leave to amend is appropriate at the outset." *Id.*, Docket No. 29 at 1 (N.D. Cal. Oct. 20, 2022).

**C. Mr. Golden's South Carolina Litigation Against Google and Resulting Appeal**

On January 26, 2021, Mr. Golden sued Google in the District of South Carolina, alleging infringement of the patents-in-suit. *Golden v. Google*, No. 21-244, Docket No. 1 at 1 (D.S.C. Jan. 26, 2021). The District of South Carolina, under "established local procedure" and its "inherent authority to review the *pro se* complaint to ensure that subject matter jurisdiction exists and that a case is not frivolous," undertook a "careful review" of Mr. Golden's complaint, after which the Magistrate Judge recommended dismissal. *Id.*, Docket No. 14, slip op. at 2, 10 (D.S.C. Apr. 9, 2021). Mr. Golden objected to the report and recommendation, but the District Court entered judgment of dismissal without leave to amend. *Id.*, Docket No. 18 (D.S.C. Apr. 22, 2021); Docket No. 21, slip op. at 5 (D.S.C. Nov. 2, 2021).

Mr. Golden appealed. The Court of Appeals vacated the District Court's dismissal, holding that Mr. Golden's complaint was intelligible, if not necessarily meritorious:

> In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,096,189. The district court discounted this claim chart because it 'contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far left column instead of Apple.' But to the extent that the chart includes the 'exact same language' as previously rejected charts, it is simply the language of the independent claims being mapped to. The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner.
>
> We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. Our decision does not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment. We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous.

*Golden*, 2022 WL 4103285 at *2 (citing *Golden*, No. 21-244, Docket No. 21, slip op. at 4 (D.S.C. Nov. 2, 2021)) (alteration in original) (internal citations omitted). Mr. Golden has not effected service in the South Carolina action, evidently electing instead to proceed in this Court.

**D. Mr. Golden's Allegations in This Action**

On September 14, 2022, Mr. Golden filed this action. Compl. at 1. On October 5, 2022, Mr. Golden effected service of this action on Google. His infringement claims echo his South Carolina complaint, alleging that Google infringes U.S. Patent Nos. 9,096,189, 9,589,439, and 10,163,287 because it "makes, uses, offer [sic] to sell, or sells Google Pixel smartphones 3, 3XL, 3aXL, 4a, 4a(5G), and 5." Compl. at 2. But Mr. Golden does not allege that Google Pixel devices themselves infringe—instead he alleges that Google Pixel devices could infringe his patents if a user added another application, "ATAK," made not by Google, but by the U.S. military:

> Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK)*. ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

Compl. ¶ 18 at 13 (emphasis in original). Mr. Golden does not allege that Google makes or sells ATAK, or makes or sells devices with ATAK installed; instead he admits that ATAK comes from the "Defense Threat Reduction Agency," an agency of the U.S. Government; is "available to warfighters throughout the DoD" or Department of Defense; and is merely "[b]uilt on the Android operating system"—as must be all Android applications, whether or not made by Google. *Id.* The claim chart in the complaint—which the Court of Appeals noted "attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner"—identifies the non-Google ATAK application as the sole functionality infringing at least two elements of each asserted claim, thus admitting that infringement requires the non-Google ATAK application and cannot occur without it. *Golden*, 2022 WL 4103285 at *2; *see* Compl. ¶ 53 at 26 ('189, '439, '287 patents), at 27 ('189, '439, '287 patents), at 28 ('189 and '439 patents), and at 29 ('439 patent). Each time the chart references ATAK, it states again that ATAK is "built on the Android Operating System," not shipped with any Google Pixel device. *See id.* The complaint thus repeatedly and consistently alleges that infringement cannot occur without ATAK, that ATAK does not come from Google, and that Google does not ship any devices (Pixel or otherwise) including ATAK.

## ARGUMENT

### I. The Complaint Fails to Allege Direct Infringement by Google

A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see, e.g., Hantz Software, LLC v. Sage Intacct, Inc.*, 576 F. Supp. 3d 677, 682 (N.D. Cal. 2021). The "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Demos v. Google*, No. 19-4433, 2019 WL 6341318 at *1 (N.D. Cal. Nov. 27, 2019) (alterations in original) (citing *Twombly*, 550 U.S. at 555). Under this standard, courts dismiss claims "when the facts asserted do not give rise to a legal remedy," or "do not elevate a claim for relief to the realm of plausibility." *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (citing *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)). The *Twombly/Iqbal* "plausibility standard applies to direct infringement claims." *Artrip v. Ball Corp.*, 735 Fed. App'x 708, 715 n.4 (Fed. Cir. 2018) (citing *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1376-77 (Fed. Cir. 2017)). In pleading direct patent infringement, a plaintiff cannot satisfy "the pleading standards set forth in *Twombly* and *Iqbal* 'by reciting the claim elements and merely concluding that the accused protect [sic] has those elements. There must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim.'" *Cyph, Inc. v. Zoom Video Commc'ns, Inc.*, No. 22-0561, 2022 WL 1556417, at *2 (N.D. Cal. May 17, 2022) (quoting *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021)); *see also Artrip*, 735 Fed. App'x at 715 n.4; *Lifetime Indus., Inc.*, 869 F.3d at 1376-77.

Mr. Golden's allegations fail to clear the *Twombly/Iqbal* bar; instead, they confirm that Google's products do not infringe any asserted claim. Mr. Golden alleges that some Google Pixel devices *could* infringe his asserted patents *if* a user were to add an additional application, ATAK, which Mr. Golden admits that Google does not make or sell. Mr. Golden thus alleges not that Google sells infringing Pixel devices, but that *someone else* could modify Google's Pixel devices, by adding non-Google software, to make them allegedly infringing. But, as courts have repeatedly found, alleging "that a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of

infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F. 3d 1316, 1330 (Fed. Cir. 2001) (citation omitted); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F. 3d 1376, 1380 (Fed. Cir. 2011) (rejecting infringement claim where accused product is "merely capable of being modified in a manner that infringes the claims of a patent"); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F. 3d 1108, 1117-18 (Fed. Cir. 2002); *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F. 3d 1551, 1555 (Fed. Cir. 1995) ("[A] device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim.").

Although Mr. Golden has elected to proceed *pro se*, his decision to do so does not change the result this Court should reach. "[P]ro se litigants are bound by the rules of procedure," which "require a short and plain statement of the claim showing that the pleader is entitled to relief." *Zeiny v. United States*, No. 19-5806, 2020 WL 496076, at *2 (N.D. Cal. Jan. 30, 2020) (quoting *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995)). "Complaints by *pro se* plaintiffs must be 'liberally construed,'" but a *pro se* plaintiff "must still allege facts sufficient to allow a reviewing court to determine that a claim has been stated." *Anderson v. Google Inc.*, No. 12-6573, 2013 WL 1285516, at *1 (N.D. Cal. Mar. 27, 2013) (citing *Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982)). "Although complaints filed by a *pro se* plaintiff are held to less stringent standards than formal pleadings drafted by lawyers, Plaintiff is not excused from alleging sufficient facts on which a recognized legal claim could be based." *Arunachalam v. Apple, Inc.,* No. 18-1250, 2018 WL 5023378, at *2 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x 977 (Fed. Cir. 2020) (citing *Mylviya v. City of San Jose*, No. 5-5427, 2006 WL 2529511, at *2 (N.D. Cal. Aug. 31, 2006)). Even when read in the light most favorable to Mr. Golden—and with the understanding that a "*pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers"—the complaint itself confirms that Google's accused products do not infringe, and thus fails to state a claim on which this Court can grant relief. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also* Fed. R. Civ. P. 12(b)(6). A plaintiff "'may plead [him]self out of court' if he 'plead[s] facts which establish that he cannot prevail on his . . . claim.'" *Alfasigma USA, Inc. v. First Databank, Inc.*, 398 F. Supp. 3d 578, 589 (N.D. Cal. 2019) (alterations in original) (quoting *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997)). That is precisely what happened here.

## II. The Complaint Fails to Allege Indirect Infringement

"There can be no inducement or contributory infringement without an underlying act of direct infringement." *Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*, No. 12-4070, 2013 WL 3462078, at *4 (N.D. Cal. Jul. 8, 2013) (quoting *Linear Tech Corp. v. Impala Linear Corp.*, 379 F. 3d 1311, 1326 (Fed Cir. 2004)). Because Mr. Golden has failed to allege direct infringement of the patents-in-suit, he has also failed to allege indirect infringement. *See Redd Grp.,* 2013 WL 3462078, at *4. The Court should therefore dismiss the complaint in its entirety.

## III. The Court Should Deny Leave to Amend

Although Google recognizes that this is an unusual request, and particularly so against a *pro se* plaintiff, Google respectfully submits that under the circumstances of this case, the Court should deny leave to amend, because Mr. Golden's infringement theory confirms that amendment would be futile. As this Court has explained:

> Under Federal Rule of Procedure 15(a)(2), "leave to amend shall be freely granted when justice so requires." Despite the liberality with which Rule 15(a) is applied, the Court may exercise its discretion to deny leave to amend due to factors such as (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) previous amendments.

*Davis v. Pinterest, Inc.*, No. 19-7650, 2020 WL 6342936, at *2 (N.D. Cal. Oct. 29, 2020) (quoting *Townsend v. Univ. of Alaska*, 543 F.3d 478, 485 (9th Cir. 2008)). As the complaint admits in detail, Mr. Golden's infringement theory makes any amendment futile. The complaint alleges that Google's Pixel devices, *when modified by installing ATAK*, infringe the patents-in-suit—thus necessarily admitting that *unmodified* Pixel devices do not infringe those patents. *See supra* § I. As the Court of Appeals noted, the complaint "attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner." *Golden*, 2022 WL 4103285 at *2. The complaint does not suffer from a drafting deficiency; instead, its theory of infringement contains the seeds of its own demise, a problem no amount of amendment can cure.

"Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). Mr. Golden has litigated these patents for almost a decade, *see supra* § B; he has had time to develop his best theory of infringement, and even that best theory falls well short. As a result, as this Court recently decided in other litigation brought by Mr. Golden, "[t]his is

the rare case where dismissal without leave to amend is appropriate at the outset." *Golden*, No. 22-4152, Docket No. 29 at 1 (N.D. Cal. Oct. 20, 2022). Google respectfully requests the Court reach the same result here.

**CONCLUSION**

For the reasons set forth above, the Court should dismiss the complaint in its entirety without leave to amend.

Date: October 26, 2022

Respectfully submitted,

Matthew S. Warren (State Bar No. 230565)
Sachli Balazadeh-Nayeri (State Bar No. 341885)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
22-5246@cases.warrenlex.com

*Attorneys for Defendant Google LLC*

# Exhibit 17

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

FEES Paid NO Process
FILED
JUN 06 2022
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE
KAW
C 22 03283

LARRY GOLDEN

*Pro Se* Plaintiff,

V.

QUALCOMM INC.

Defendant.

CASE NO: ____________________

**(JURY TRIAL DEMANDED)**

**(Sherman Act) (Motive to Form a Conspiracy) (Conspiracy) (Unreasonable Restraint on Trade) (The Clayton Act) (Unjust Enrichment) (Contributory Infringement).**

June 03, 2022

## COMPLAINT FOR ANTITRUST LAW VIOLATIONS AND PATENT INFRINGEMENT

This is a civil action brought under Antitrust Law violations commencing from competitor collaborations, conspiracy to restrain trade, and "tying" teaming agreements that likely resulted in a secret conspiracy and the anticompetitive practices recognized by this Court in *Federal Trade Commission v. Qualcomm Inc*. **Exhibit A: "Finding of Fact…"**

This action is also brought under Contributory Infringement commencing from the "manufacture, combination or composition; or, a material or an apparatus for use in practicing a

patented process, constituting a material part of the invention". This action is for damages and injunctive relief on behalf of the Plaintiff, against the defendant Qualcomm Inc. ("Qualcomm"); demanding a trial by jury, complains and alleges as follows:

## NATURE OF THE CASE

1. This enforcement action challenges Qualcomm's unlawful maintenance of a monopoly in Qualcomm's Snapdragon chipsets that processes functional and operational instructions; and, enable cellular communications in new and improved cell phones and other products.

2. Qualcomm has engaged in exclusionary conduct that reduces competitors' ability and incentive to innovate, and raises prices paid by consumers for the new and improved cell phones. Qualcomm is both a dominant supplier of Snapdragon chipsets (processors) and a licensor of patents that Qualcomm has declared essential to widely adopted cellular standards.

3. The new and improved cell phones sold by Qualcomm's customers must comply with these standards, even when they incorporate processors supplied by Qualcomm's competitors.

4. Qualcomm has excluded competitors and harmed competition through interrelated policies and practices that includes withholding its Snapdragon chipsets (processors) unless a customer accepts a license to standard-essential patents on terms preferred by Qualcomm.

5. Qualcomm elevates royalties that the customer must pay when using competitors' processors ("no license-no chips"); and, without a patent(s) for the new and improved cell

phones, or a licensing agreement for the new and improved cell phones, collects a royalty on each new and improved cell phones (handset) sold.

6. Qualcomm's behavior is especially problematic when it comes to bargaining over licenses for patents recognized as a "standard" or deemed to be "essential" to a particular industry. "No license, No chip" policy.

7. Qualcomm is being hypocritical in that regard, because of Qualcomm's unauthorized use of a patented CPU(s) that the company "ties" to its cellular modems; the unauthorized use of a patented new and improve cell phone(s) that the company collects a royalty on the sale of each handset; and, the unauthorized use of a patented driver assistance system for the driverless, self-drive, and autonomous vehicle.

8. Qualcomm's conduct has harmed competition and the competitive process. At a time when cellular technologies are expanding to new and varied applications, Qualcomm's practices threaten further consumer harm in an industry in which competition and innovation are vitally important.

## JURISDICTION AND VENUE

9. This complaint is filed under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover triple damages, injunctive relief, and costs of suit; for violation of Section 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2; conspiracy in the restraint of trade and single-firm violations).

10. This Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

11. Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

12. For patent litigation cases, the venue statute, 28 U.S.C. §1400(b), provides "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."

13. The activities of the Defendant, as described herein, were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

**Intradistrict Assignment**

14. Assignment to the San Jose Division is proper. The actions arose in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Qualcomm has offices in Santa Clara and San Jose. Third parties that have information relevant to this action, including leading cell phone manufacturers (also known as "original equipment manufacturers" or "OEMs") and Qualcomm competitors, also have offices in Santa Clara County.

**Related Case Dismissed "Without Prejudice"—Antitrust Law Violations**

15. UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT No. 21-2160 *Larry Golden*, on behalf of himself and all others similarly situated, Plaintiff - Appellant, *v. Apple, Inc.; Samsung Electronics USA; Lg Electronics USA, Inc.; Qualcomm Inc.; Ford Global Technologies LLC; General Motors Company; FCA US, LLC*, Defendants - Appellees. USCA4 Appeal: 21-2160 Doc: 7 Filed: 03/31/2022

16. "PER CURIAM: Larry Golden appeals the district court's order accepting the recommendation of the magistrate judge and dismissing without prejudice Golden's civil complaint. We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's order." *Golden v. Apple, Inc.*, No. 6:20-cv-02270-JD (D.S.C. Sept. 20, 2021) ...

**Related Case Dismissed "Without Prejudice"—Patent Infringement**

17. IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA GREENVILLE DIVISION *Larry Golden, Plaintiff, vs. Apple Inc.; Samsung Electronics USA; LG Electronics USA, Inc.; Qualcomm Inc., Motorola Solutions, Inc.; Panasonic Corporation; AT&T Inc.; Verizon Corporation Service Group; Sprint Corporation; T-Mobile USA, Inc.; Ford Global Technologies, LLC; Fairway Ford Lincoln of Greenville; General Motors Company; Kevin Whitaker Chevrolet; FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram, Defendants*. Case No.: 6:20-cv-04353-JD-KFM Date Filed 11/02/21 Entry No. 26.

18. "Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein. IT IS, THEREFORE, ORDERED that Plaintiff's Complaint is dismissed without prejudice and without the issuance of service of process."

**Dismissal "Without Prejudice"**

19. When a court dismisses a claim but leaves the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim. *In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the main features of dismissal without prejudice is that it does not prevent refiling of the claim… "a case that is dismissed "without prejudice" is only dismissed temporarily. This temporary dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to another court."

## THE PARTIES

20. Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business (ATPG Technology, LLC), and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607. Plaintiff is the author of three economic stimulus packages submitted to Government beginning in year 2003. The success of the packages was dependent on the development of certain intellectual property technology that is owned by the Plaintiff, and is asserted in this case (i.e., Communicating, Monitoring, Detecting, and Controlling (CMDC) devices; Central Processing Units (CPUs) for New and Improved Cell Phones; and, Stall, Stop, and Vehicle Slow-Down Systems (SSVSS). **Exhibits B-H; '497, '752, '189, '439, '287, '619, '891 patents**

21. On information and belief, Qualcomm is a California corporation with a principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 and does business in this judicial district. Qualcomm has offices in Santa Clara, CA and San Jose, CA. Qualcomm's unjust enrichment of profits, resulting from a violation of antitrust laws; anticompetitive practices; conspiracy in restraint of trade; direct infringement; and contributory infringement, give rise to this complaint. Qualcomm's monopolization and attempted monopolization violations require no agreement as Section 1 violations do. *E.g., Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993) (explaining that "while § 1 . . . forbids contracts or conspiracies . . ., § 2 addresses the actions of single firms that monopolize or attempt to monopolize"). They are "single-firm" violations.

22. Qualcomm's total revenue between the years 2013 and 2021 = $226.56B. Qualcomm may be served at its principal place of business at 5775 Morehouse Drive, San Diego, CA 92121 [or] Qualcomm, Inc., c/o Prentice-Hall, Corporation System, Inc., 251 Little Falls Drive, Wilmington, DE 19808 (302)-636-5400.

## STATEMENT OF FACTS:

## QUALCOMM'S MOTIVE TO FORM A CONSPIRACY, AND CONSPIRACY IN RESTRAINT OF TRADE

23. Qualcomm's motive to conspire means that the relevant market was conducive to "collusion" due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products. Concentrated markets are, by nature, more conducive to collusion.

24. Upon information and belief, Qualcomm has conspired with Apple, Samsung, & LG; who participated as co-conspirators with Qualcomm in violating certain antitrust laws, and laws governing the unauthorized use of Plaintiff's patented inventions.

25. While performing work for the government, Qualcomm has engaged in assembling Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device [new and improved cell phone; handset], and has managed to avoid prosecution by shielding itself under the protection of the Government.

26. Plaintiff has alleged, Qualcomm and its co-conspirators (Apple, Samsung, & LG), was aware that if they form a conspiracy, while under an agreement or contract with the Government to control the development, manufacture, commercialization, and pricing of Plaintiff's alleged infringing product(s), there would not be any reasonable substitute for the alleged infringing product or service.

27. The acts charged in this complaint were done by Qualcomm and its co-conspirators, or were authorized, ordered or done by their respective officers, employees, representatives, or agents while actively engaged in management of Qualcomm and its co-conspirators business or affairs. Each of the co-conspirators named herein acted as the agent or representative of, or for Qualcomm with respect to the acts, violations and common course of conduct alleged herein.

28. Upon information and belief, Qualcomm colluded and conspired under the protection of a Government [1] contract to develop Plaintiff's "new and improved cell phone" (i.e., smartphone) that is designed to be mass developed, mass manufactured, mass marketed, and mass commercialized across multiple industries, agencies, groups, demographics, races, ages, and genders to form a ubiquitous communicating, monitoring, detecting, and controlling environment.

29. In 2007, Qualcomm and the Plaintiff was competing for the same government contract. The Department of Homeland Security (DHS) issued a 'request for proposal' [DHS S&T BAA07-10, *Cell-All Ubiquitous Biological and Chemical Sensing*]. DHS was seeking proposals for a new and improved cell phone capable of biological and chemical sensing.

30. Qualcomm's collusion, and conspiracy to hinder trade, has destroyed all possibilities for the Plaintiff to receive royalty compensation for Plaintiff's patented CMDC (handset) devices and Plaintiff's patented CPUs. The OEMs are already paying royalties to Qualcomm on every handset sold; and, the OEMs are already paying an increased royalty rate for Qualcomm's chipsets that include Plaintiff's patented CPUs.

---

[1] In the United States Court of Appeals for the Ninth Circuit, *Federal Trade Commission, Plaintiff-Appellee, V. Qualcomm Incorporated, Defendant-Appellant.* Case No. 19-16122. [Declaration of Under Secretary of Defense for Acquisition and Sustainment]; Ellen M. Lord writes, "Qualcomm is a global leader in the development and commercialization of foundational technologies and products used in mobile devices and other wireless products, including network equipment, broadband gateway equipment, and consumer electronic devices" … "DoD firmly believes that any measure that inappropriately limits Qualcomm's technological leadership, ability to invest in research and development (R&D), and market competitiveness, even in the short-term, could harm national security. The risks to national security include the disruption of DoD's supply chain and unsure U.S. leadership in 5G" …

31. For the program's initial phase in 2007, DHS released a call for proposals inviting the private sector to develop a proof of concept for the "*Cell-All Ubiquitous Biological and Chemical Sensing*" project (U.S. Department of Homeland Security, 2007). Cell-All Ubiquitous Biological and Chemical Sensing. <https://http://www.fbo.gov/index?s=opportunity&mode= form&id =f292c1fdbd46777a3ff8ca64ef96658f&tab=core&_cview=1> (accessed 17.09.12).

32. DHS S&T secured Cooperative Research and Development Agreements with four primary cell phone manufacturers—Qualcomm, LG, Apple, and Samsung— **Exhibit I** with the objective of accelerating the "commercialization of technology developed for government purposes" (U.S. Department of Homeland Security, 2010, Cell-All: Super Smartphones Sniff Out Suspicious Substances <http://www.dhs.gov/cell-all-super-smartphones-sniff-out-suspicious-substances> (accessed 17.09.12)).

33. Upon information and belief, it has always been Qualcomm's goal to monopolized the smartphone industry. According to Mr. Hoffman, "[e]nrolling members of the public could be seen as an entrepreneurial move on the part of DHS to exploit existing public resources, in the form of people with smartphones, to meet its narrowly defined public-safety objectives; as a Qualcomm representative argued: ***'Let's take advantage of the 300 million cell phones that are out there today***. They're always with us'" (Hoffman, D., 2011. Qualcomm Project Presentation. Cell-All Live Demonstration for Environmental Sensing (Webcast), September 28 <http://cellall.webcaston.tv/ home/homepage.php> (accessed 17.09.12)).

34. It is the belief of the Plaintiff, that throughout the relevant period, Qualcomm and its co-conspirators Apple, Samsung, & LG, unlawful activities as described herein, took place within and substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States.

35. It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Central Processing units (CPUs) and the Communicating, Monitoring, Detecting, and Controlling (CMDC) devices.

36. It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, act together in ways that limit competition by hindering Plaintiff's patented products from entering the market, while exercising an unreasonable horizontal restraint of trade.

37. Qualcomm and its co-conspirators Apple, Samsung, & LG, agreements are considered unreasonable because their interaction is to such a degree that they were no longer acting independently, and the collaboration gave them the ability to wield market power together.

38. It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, have engaged in a contract, combination, trust or conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiff's Central Processing units (CPUs) and Communicating, Monitoring, Detecting, and Controlling (CMDC) devices without paying royalty compensation.

39. It is the belief of the Plaintiff, that Qualcomm and its co-conspirators Apple, Samsung, & LG, through their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or conspiracy between themselves and their co-conspirators.

40. In a related COFC case no 13-307C, *Larry Golden v. The United States*, Qualcomm [2019] and its co-conspirators Apple, Samsung, & LG [2021 respectfully], were all summoned to appear to protect any interested they may have had in the case.

41. Qualcomm and its co-conspirators Apple, Samsung, & LG, made the decisions not to appear. **Exhibit J**. By default, Qualcomm is barred from entering a defense in this Court for non-infringement or that any of the following patent claims are invalided: Claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the '287 patent.

42. After a 10 year "teaming arrangement" [2] to commercialize the Plaintiff's new and improved cell phones, and Plaintiff's new and improved CPUs developed and assembled under the *Cell-All* initiative, Verto Analytics looked at the numbers. "Apple, Samsung, and LG (CMDC devices) smartphones owned by U.S. consumers, is equivalent to 88% market share.

43. January 2018, Apple led the pack, with 45% market share (representing nearly 84 million smartphones), while Samsung claims 33% of the market (61.5 million smartphones). These two manufacturers dominate the U.S. smartphone market; LG, the third-place contender, had 10% market share, while all other brands combined account for 12% of the devices on the U.S. smartphone market."

---

[2] "On October 13, 2021, the American Bar Association's Section of Public Contract Law held its annual public procurement symposium to discuss important issues related to federal, state, and local government contracting. Daniel Glad, Director of the Department of Justice ("DOJ") Antitrust Division's Procurement Collusion Strike Force ("PCSF"), delivered the keynote address outlining the growing importance of PCSF's work ... PCSF will scrutinize joint ventures, teaming arrangements, and other competitor collaborations to ensure that such agreements are not shams for collusive conduct ... PCSF's mission is to deter and prevent collusion before it takes place. To that end, the PCSF has trained over 17,000 special agents, attorneys and prosecutors, investigators, analysts, auditors, data scientists, and procurement officials across more than 500 agencies regarding how to spot red flags of potential procurement collusion..." https://www.jdsupra.com/legalnews/procurement-collusion-strike-force-4152293/

## QUALCOMM'S KNOWLEDGE OF PLAINTIFF'S CENTRAL PROCESSING UNITS (CPUs)

44. Qualcomm fail to disclose to the OEMs (the handset and smartphone manufactures); its knowledge of Plaintiff's patented central processing unit (CPU) designed for Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device (i.e., handset; new and improved cell phone; smartphone).

45. Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices.

46. On November 4, 2010, Plaintiff emailed Kate Lane, Strategic IP, Qualcomm Incorporated (E-mail: clane@qualcomm.com); Direct: (858-658-2047)), to inform Ms. Lane of certain patented technology (i.e., CMDC—Smartphone—device; central processing unit (CPU); and, a Stall, Stop, and Vehicle Slowdown System for manned and unmanned electric, autonomous, and driverless vehicles).

47. Plaintiff asked if Qualcomm would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff). Subject: "Patented Technology for Qualcomm's Review (copy available upon request).

48. Plaintiff mailed out letters dated December 7, 2010 addressed to the attention of Qualcomm's Chairman & CEO Dr. Paul E. Jacobs and Qualcomm's EVP & President Derek Aberle, (copies of the letters and return receipts are available upon request) informing the Executives of the Patent Owner's (Plaintiff) patented technology and asked if they would be interested in entering into a licensing agreement with the Patent Owner (Plaintiff).

49. After 10 months, Ms. Lane responded back via e-mail on September 29, 2011 with, "Hi Larry, I'm just checking in to see if this portfolio is still available for purchase. Please let me know. Thank you, Kate".

50. On October 5, 2011, Ms. Lane responded via e-mail, "Thanks Larry, [c]an you please take a few moments to fill out the attached Patent Information Request form for this? Please let me know if you have any questions. Best regards, Kate" (copy available upon request).

51. On October 11, 2011, the Patent Owner (Plaintiff) returned via e-mail, the answered Patent Information Request form to Ms. Lane. The Patent Owner (Plaintiff) made several attempts to contact Ms. Lane via e-mail and by phone after that, but never heard back from Ms. Lane.

52. Upon information and belief, Plaintiff believes Qualcomm has formed or created its monopoly for chipsets by "tying" Plaintiff's CPUs to its wireless cellular modems. A "tying," "tie-in," or "tied sale" arrangement has been defined as "an agreement by a party to sell one product . . . on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that [tied] product from any other supplier." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992).

53. Conditioning the ability of a licensee to license one or more items of intellectual property on the licensee's purchase of another item of intellectual property or a good or a service has been held in some cases to constitute illegal tying. See, e.g., *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156-58 (1948) (copyrights); *Int'l Salt Co. v. United States*, 332 U.S. 392 (1947) (patent and related product), abrogated in part by *Ill. Tool Works, Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).

54. Qualcomm's anticompetitive practices of its cellular-modem patents harm competitors. Qualcomm's "hold out" strategy of "no license, no chip", was used to force the co-conspirators OEMs to purchase Plaintiff's patented CPU that Qualcomm "tied" to its modem. "Tying" under U.S. law is defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product."

55. Plaintiff also believes the OEMs were misled and misinformed into believing the CPUs tied to Qualcomm's chipsets [3] was not a patented product Qualcomm had received prior knowledge on. Plaintiff believes Qualcomm threaten the OEMs to purchase what was marketed as an unpatented product [CPU], tied to Qualcomm's patented product (wireless cellular modem), in a "no license, no chip[set]", policy contract.

56. According to Doug Hoffman, program manager at Qualcomm, the [network] gateway authenticates the sensor and phone to determine whether they are authorized to be on the network ... (Hoffman, D., 2011. Qualcomm Project Presentation. *Cell-All Live Demonstration for Environmental Sensing (Webcast)*, September 28 <http://cellall.webcaston.tv/home/homepage.php> (accessed 17.09.12)).

---

[3] The Snapdragon® 8+ Gen 1 Mobile Platform is our latest premium-tier powerhouse … while the Qualcomm® Kryo™ CPU provides 10% better CPU performance and 30% CPU improved power efficiency. The Snapdragon® 888+ 5G Mobile Platform—is a 4nm chipset that features a beefy octa-core CPU—boasts improvements in both processing and AI since the predecessor*, with our 6th gen Qualcomm® Artificial Intelligence (AI) Engine and Qualcomm® Kryo™ 680 CPU… The octa-core Qualcomm® Kryo™ 490 CPU provides up to 25% faster single- and multi-threaded performance … Revealed in early 2021, the Snapdragon 870 is literally a tiny upgrade over 2020's Snapdragon 865 and 865 Plus flagship processors. All three of these chipsets sport a tri-cluster CPU arrangement, featuring one powerful Cortex-A77 core … Retrieved from Qualcomm's websites.

57.     Plaintiff is challenging the tying arrangement because: (1) Qualcomm has market power in the tying product, *Cf.* 35 U.S.C. § 271(d) (2012) (requiring market power in patent misuse cases involving tying). (2) the arrangement has an adverse effect on competition in the relevant market for the tying product or the tied product, and (3) efficiency justifications for the arrangement do not outweigh the anticompetitive effects.

58.     "Qualcomm's Snapdragon CPU [*added*: that copies the functions of Plaintiff's CPU] is the 'brain' of your smartphone. The CPU receives commands, makes instant calculations, and sends signals throughout your device. There are multiple ways to gauge the performance of a CPU besides checking the Gigahertz (GHz) speed or the number of CPU cores (aka dual-core and quad-core). https://www.qualcomm.com/news/onq/2013/06/13/mobile-processors-101-why-smartphones-are-smarter-all-one-processor

59.     In 2014, Qualcomm's licensing practice of "No License, No Chips" was attacked by the antitrust authorities in China. This matter resulted in a settlement in which Qualcomm reduced its royalty rates charged for cellphones made and sold in China by 35%. Qualcomm was able to avoid deeper cuts by making a contribution of $150 million to the Chinese government. Antitrust investigations and penalties against Qualcomm have also occurred in Japan, Korea, Taiwan and Europe.

60.     Qualcomm, has a 90% share in the market for chipsets, and by withholding knowledge of "tying" a Plaintiff's patented CPU, coerced cellular telephone manufacturers (OEMs) to purchase only Qualcomm-manufactured chipsets. These actions are alleged to be part of Qualcomm's strategy to maintain a monopoly in the chipset market.

61.     The Federal Trade Commission began an investigation of Qualcomm in 2014, leading to its 2017 suit against Qualcomm for violations of section 5 of the Federal Trade

Commission Act, and sections 1 and 2 of the Sherman Act, the general antitrust laws of the United States.

62. In the opinion of the U. S. District Court for the District of Northern California; "Qualcomm leveraged its monopoly position in chips to secure unreasonably high rates for its SEPs. Qualcomm, for example, refused to provide must-have chips unless customers took the unreasonable IP licenses—the "no license, no chip" model.

63. Judge Koh, *in FTC v. Qualcomm Inc.*, reasoned that, "set against the backdrop of this illegal refusal to deal, the cost-raising "no license, no chip" policy hindered rivals, leading to anticompetitive harm in modem chips. Here, Judge Koh, quoting the D.C. Circuit's decision in *United States v. Microsoft Corp*., held it sufficient that Qualcomm engaged in "anticompetitive conduct that reasonably appear[s] capable of making significant contribution to . . . maintaining monopoly power." *Qualcomm*, No. 17-CV-00220-LHK, slip op. at 42-43 (citations and internal quotation marks omitted)."

64. As noted above, Qualcomm's, licensing practice of "No License, No Chips" was attacked by the antitrust authorities in China, Japan, Korea, Taiwan and Europe, that created penalties against Qualcomm.

65. Qualcomm's anticompetitive practices violations intensifies when we add Qualcomm's failure to alert its OEM customers and the Securities Exchange Commission responsible for protecting investors; that for years, Qualcomm has sold a patented product (CPU), that Qualcomm "tied" to its chipsets (Snapdragon); with the knowledge that the CPUs for the new and improved cell phones (i.e., handsets) are the patented products of the Plaintiff.

66. In the related case no. 13-307C, *Larry Golden v. The United States*, Qualcomm was summoned to show non-infringement of Plaintiff's patented CPUs for CMDC devices.

67. Qualcomm had an opportunity to show at least independent claims 4-6 of Plaintiff's '287 patent [**Exhibit K: Samsung chart: pgs. 191-219; pgs. 409-437; and, pgs. 627-655**] were invalided. Qualcomm fail to appear. Claims 4-6 of the '287 patent. [4]

---

[4] 4. A communication device comprising:

at least one central processing unit (*CPU*) …

at least one or more detectors in communication with the art least one ***CPU*** for detecting at least one of a chemical, biological, radiological, or explosive agents …

at least one of a transmitter or a transceiver in communication with the at least one ***CPU*** configured to send signals … to detect at least one of a chemical biological, radiological, or explosive agent such that ***the communication device is capable of communicating, monitoring, detecting, and controlling.***

5. A monitoring device, comprising:

at least one central processing unit (***CPU***) …

at least one sensor for chemical, biological, or human detection in communication with the at least one ***CPU*** …

one or more detectors in communication with the at least one ***CPU*** for detecting at least one of chemical, biological, radiological, or explosive agents …

at least one of a transmitter or a transceiver in communication with the at least one ***CPU*** configured to send signals … to detect at least one of a chemical biological, radiological, …

6. A monitoring equipment, comprising:

at least one central processing unit (***CPU***) …

at least one or more detectors in communication with the art least one ***CPU*** for detecting at least one of a chemical, biological, radiological, or explosive agents; …

at least one of a transmitter or a transceiver in communication with the at least one ***CPU*** configured to send signals … to detect at least one of a chemical biological, radiological, …

68. Plaintiff has two more independent claims 1 & 11 of Plaintiff's 619 patent [5] for the central processing unit that was not included in the related case no. 13-307C, *Golden v. US*

---

[5] 1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least ***a central processing unit (CPU)***, capable of …

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent … (WMDs) …

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission …

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, …

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory …

11. A ***central processing unit (CPU)*** of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs) …

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission …

whereupon, ***the central processing unit (CPU)*** of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

## QUALCOMM'S KNOWLEDGE OF PLAINTIFF'S COMMUNICATING, MONITORING, DETECTING, & CONTROLLING (CMDC) DEVICES

69. As stated earlier in this document, Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices [see ¶¶ 45-51]. Paragraph 45 states, "Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices."

70. Upon information and belief, Qualcomm is being unjustly enriched for charging a 5% royalty rate per the price of the phone, i.e., handset; smartphone, etc. The elements of unjust enrichment exist because: 1) Plaintiff provided something of value to the defendant Qualcomm; 2) Qualcomm acknowledged, accepted and benefitted from what Plaintiff provided; and, 3) it would be inequitable for Qualcomm to enjoy the benefit Plaintiff provided without compensating Plaintiff.

71. Upon information retrieved from this Court: The United States District Court Northern District of California; *Federal Trade Commission v. Qualcomm Incorporated*, "FINDINGS OF FACT AND CONCLUSIONS OF LAW" Case 5:17-cv-00220-LHK; Document 1490 Filed 05/21/19; Presiding United States District Judge Lucy H. Koh has concluded Qualcomm is being unjustly enriched from its anticompetitive practices:

72. "Qualcomm stopped licensing rival modem chip suppliers and instead started licensing only OEMs at a ***5% running royalty on the price of each handset sold***. These licenses are called Subscriber Unit License Agreements ("SULA") …"

73. "Specifically, Qualcomm charges a 5% running royalty on handset sales for a license to Qualcomm's CDMA patent portfolio… LG Electronics (LGE) paid Qualcomm a 5%

running royalty on handsets containing Qualcomm modem chips and a 5.75% running royalty on handsets containing non-Qualcomm [] chips… "

74.     "Qualcomm and LG signed … Subscriber Unit License … Steve Altman (Qualcomm President) sent to Irwin Jacobs (Qualcomm Co-Founder and former CEO): "They currently pay 5% when they use our chip and 5.75% when they don't. We have agreed to take their rate to 5% regardless of whose chip they use."

75.     Plaintiff believes Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition.  The Federal Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or practices." The Supreme Court has said all violations of the Sherman Act also violate the FTC Act.

76.     Judge Lucy Koh issued her decision in *FTC v Qualcomm*. The facts that were key in the Judge's analysis included the following:

- Qualcomm employed a business model where it sold chips to handset makers under a supply agreement, while simultaneously licensing its SEPs to them under what it called a 'subscriber unit license agreement' (SULA). Under the SULA, the handset makers pay royalties of 5% on the price of each phone sold…

- [O]n May 3, 2012, Sony and Qualcomm entered into a Subscriber Unit Patent License Agreement, effective February 16, 2012 through September 30, 2012 ("May 2012 Sony Interim License"). ECF No. 1326 at 9. Under the May 2012 Sony Interim License, Sony agreed to provisionally pay Qualcomm a 5% royalty on CDMA handsets."

- Under the [] SULA amendment, Samsung paid a 5% running royalty rate on CDMA handsets containing Qualcomm chips, subject to a $20 royalty cap."

- BenQ and Qualcomm signed a new patent license agreement. JX0030. Under the license agreement, BenQ owed Qualcomm's standard 5% running royalty rate, with the handset as royalty base. See JX0030-007 (defining the royalty base as "the Selling Price charged by LICENSEE for Subscriber Units Sold to such Purchaser."
- Apple does not manufacture handsets itself but instead uses contract manufacturers, including Pegatron and Wistron, to manufacture handsets. ECF No. 1326 at 4. These contract manufacturers pay Qualcomm a 5% running royalty rate on the manufacturers' handset selling price.

77. Judge Koh determined, "Qualcomm's anticompetitive conduct is conduct that 'harms the competitive process and thereby harms consumers.'" 6ER1208 (quoting *Microsoft*, 253 F.3d at 58) … "[A]pplying that standard, the district court agreed with the FTC that Qualcomm's practices were anticompetitive."

78. The Judge's decision severely chastised Qualcomm for basing its royalty on the price of the device (e.g., a handset). Significantly, the Judge framed this criticism based on principles of ***competition law and patent law***, not contract law. Judge Lucy Koh of the US District Court of the Northern District of California in her decision in *Federal Trade Commission v Qualcomm Incorporated* (5:17-cv-0220); determined that charging royalties based on the price of a handset was unreasonable and contrary to US law.

79. If Qualcomm loses this case, Qualcomm will have to license its patent to competitors and renegotiate its licensing agreements with all its customers. No longer will Qualcomm be able to charge the 5% royalty rate per the price of the phone.

80.     Plaintiff believes his patents grant him the right to charge a royalty on the price of each phone sold, and is asking this Court to order Qualcomm to pay Plaintiff all royalties Qualcomm has received that was based on the sale of each handset (CMDC device).

81.     Plaintiff claims that Qualcomm's wrongdoing caused the OEMs to pay inflated prices for cellular modems, and that it would be unjust for Qualcomm to be permitted to retain the profits gained from its unfair and deceptive practices.

82.     Plaintiff has the right to exclude Qualcomm from "using" Plaintiff's CMDC devices—handsets to unjustly enrich itself.

83.     Plaintiff is entitled to stop Qualcomm's use of the Plaintiff's inventions to generate profits by seeking a legal injunction in Federal court. Qualcomm's anticompetitive practices has restrained Plaintiff from entering the market to collect royalties on his patented inventions. Plaintiff is entitled to collect damages for any unlicensed use of his inventions. Damages are generally calculated based on lost profits Plaintiff suffered as a result of the use.

84.     In the related COFC case no. 13-307C, *Larry Golden v. The United States*, Qualcomm was summoned [2019] to show non-infringement of Plaintiff's patented CMDC devices. **Exhibit K: Samsung chart; 9 alleged infringing products; 25 Ind. patent claims**

85.     Qualcomm had an opportunity to show at least independent claim 1 of Plaintiff's '497 patent; claim 10 of Plaintiff's '752 patent; claims 1-9 of Plaintiff's '189 patent; claims 13-23 of Plaintiff's '439 patent; and, claims 4-6 of Plaintiff's '287 patent [25 independent patent claims asserted in the case no. 13-307C, *Larry Golden v. The United States* for the CMDC device; new and improved cell phone; smartphone], were invalided. Qualcomm fail to appear.

86.     Plaintiff will illustrate only 2 of the 25 independent patent claims asserted in the related COFC case no. 13-307C, *Larry Golden v. The United States*.

87. Claim 22 of Plaintiff's '439 patent is an illustration of how Plaintiff's cell phone, smartphone, and handheld [handset] are grouped together by design similarities. Claim 23 of Plaintiff's '439 patent is an illustration of Plaintiff's new and improved cell phone.

Claim 22. ***A communication device*** of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising:

***at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;*** that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

***at least one of a central processing unit (CPU), a network processor,*** or a front-end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, ***cellular connection***, long and/or short-range radio frequency (RF) connection, or GPS connection;

the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans;

the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks;

the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use;

the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device;

whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, ***a cellular connection***, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; and

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, ***cellular connection***, long range radio frequency (RF) connection, or short-range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, ***or the central processing unit (CPU)***.

Claim 23. ***A cell phone comprising***:

***a central processing unit (CPU)*** for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, ***cellular connection***, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed

within, on, upon or adjacent the cell phone;

wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, ***cellular connection***, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

whereupon a signal sent to the receiver of ***the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor***, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

88. Qualcomm, and its co-conspirators waived their rights for later argument on patent invalidity and noninfringement for not participating in the § 1498 litigation, "[w]hile a contractor need not participate in the § 1498 litigation, contractors should be aware that failure to appear in response to a notice under Rule 14(b) acts as a waiver of any later argument that the contractor should not indemnify the government on grounds that the USCFC incorrectly decided the patent was valid and infringed." As the USCFC held in *Bowser, Inc. v. United States*:

> We think there is implicit in the whole plan and purpose of Subsection 14(b) a congressional intent that the issues of fact and law decided in a suit against the United States in the Court of Claims may not be retried in another court at the insistence of a third party, who had a "possible" interest in the case in this court but who failed to appear and protect his interest after timely notice or summons had been served upon him. 420 F.2d 1057, 1060 (Ct. Cl. 1970). **Exhibit L**

## QUALCOMM WILLFULLY CONTRIBUTED TO THE INFRINGEMENT OF PLAINTIFF'S CPUs; CMDC DEVICES; STALL, STOP, & VEHICLE SLOWDOWN SYSTEMS

89. Qualcomm and ASUS made a phone for Snapdragon Insiders. ASUS and Qualcomm have teamed up to make a smartphone. The "Smartphone for Snapdragon Insiders" harnesses Qualcomm's Snapdragon 888 5G chipset. https://www.engadget.com/ qualcomm-asus-smartphone-snapdragon-insiders-150023369.html?guccounter...

90. Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States ... a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, ... shall be liable as a contributory infringer."

91. The threshold requirement for a claim of contributory infringement is the existence of direct infringement. *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518 (1972). There must also be a showing that the alleged contributory infringer knew of the patent and that his or her actions would lead to infringement of the patent. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964).

92. Qualcomm was knowledgeable of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices [see ¶¶ 45-51]. Paragraph 45 states, "Upon information and belief, Plaintiff is alleging facts that supports Plaintiff's claim that Qualcomm had prior knowledge of Plaintiff's patented CPUs designed for Plaintiff's CMDC [handset] devices."

93. Contributory infringement – otherwise known as 'indirect infringement' or 'infringement by supply' includes actions that contribute (or potentially contribute) to someone

else infringing a patent, even if those actions do not directly infringe the patent. An example of contributory infringement include:

The supply of Component A (i.e., Qualcomm's Snapdragon chipset that includes Plaintiff's central processing unit (CPU), with instructions to connect it to an available Component B (i.e., Qualcomm/Asus smartphone that Plaintiff claims as his patented CMDC device; smartphone); where A+B (Plaintiff's patented CPU (Qualcomm's Snapdragon) + Plaintiff's CMDC device (Qualcomm/Asus smartphone is a patented product. *See Ind. claims 4-6 of Plaintiff's '287 patent. See also Ind. claims 1 & 11, Dep. claims 2-10 & 12-20 of Plaintiff's '619 patent that covers Plaintiff's CPU. See Ind. claims 1-9 of Plaintiff's '189 patent; and, Ind. claims 13-23 of Plaintiff's '439 patent that covers Plaintiff's CMDC device.*

94. Upon information and belief, Qualcomm continues to "tie" Plaintiff's central processing units (CPUs) to its system-on-a chip (Snapdragon by Qualcomm); and, continues to use Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices i.e., handsets, new and improved cell phones, smartphones, to generate profits, without a license or authorization to do so.

95. Plaintiff's "tying" clams involving intellectual property are brought under Section 1 and Section 2 of the Sherman Act, Section 3 of the Clayton Act, and Section 5 of the Federal Trade Commission (FTC) Act.

96. A chipset is the motherboard in a phone that is designed to accept all the components to sit upon it, and connect with each other. It is made of ICs (integrated circuits) and provides all the inter communication channels (buses) to connect for e.g., camera, Bluetooth, Wi-Fi, touch screen with CPU/Flash storage/Ram.

97.     The CPU is the Central Processing Unit which is responsible for carrying out the instructions of a computer program [operating systems (android), contain and manage all the programs and applications that a computer or mobile device is able to run, which means managing the device's software and hardware functions], by performing the basic arithmetical, logical, and input/output operations of the system.

98.     In a mobile phone, combination of chipset and CPU is called a SoC (System on Chip) which integrates all the components on a single chip. Unlike in computers, CPU is soldered on the chipset inside a mobile device which tends to improve the performance, and saves lot of space. The most popular SoCs (also referred to as processors, chipsets, CPUs), are Snapdragons by Qualcomm.

99.     GM completely redesigned the compute architecture that powers its "hands-free" driving system that is integrated with the "Snapdragon Ride Platform" of Qualcomm. GM has the first advanced driver assist system (ADAS) to use Qualcomm's new Snapdragon Ride Platform. https://www. theverge.com/2022/1/6/22870416/gm-ultra-cruise-qualcomm-snapdragon-compute-adas

100.     The Snapdragon Ride Platform is built on scalable and modular heterogenous high-performance multi-core CPUs. It is intended to address the needs of complex self-driving technology and Advanced Driver Assistance Systems (ADAS) with high performance and power efficiency.

101.     Genaral Motors had prior knowledge of Plaintiff's Stall, Stop, and Vehicle Slowdown System before conspiring with Qualcomm to combine the two alleged infringing products—GM's ADAS system and Qualcomm's Snapdragon Ride.

102. Plaintiff first contacted GM/OnStar during the summer months of 2007 to ask if they would like to participate with Plaintiff in responding to a Department of Homeland Security (DHS) solicitation: (Broad Agency Announcement; BAA 07-02A).

103. Plaintiff's primary contact person at GM/OnStar was Mr. Jim Culbertson. The Plaintiff asked Mr. Culbertson if GM/OnStar has the capability of bringing a moving vehicle to a stall, stop, or slowdown. Mr. Culbertson's response to me was, "I need time to find out if we have those capabilities and if there is interest from upper management".

104. After several conversations and several failed attempts to reach Mr. Culbertson, Plaintiff never heard back from GM/OnStar. Plaintiff noticed while watching TV, an announcement made by GM/OnStar on October 9, 2007 of a new, "Stolen vehicle slow down system" that was being offered by GM/OnStar beginning the following year on the 2009 models.

105. GM/OnStar's "Stolen vehicle slow down system" is substantially the same as the Plaintiff's "stall, stop, and vehicle slowdown systems (SSVSS)" that Plaintiff had discussed earlier with GM/OnStar's Mr. Culbertson during the summer months of 2007. Plaintiff called Mr. Jim Culbertson on March 27, 2008 at 11:20 a.m. at 313-665-2791. Mr. Culbertson referred Plaintiff to Angie Miller at 313-665-1485. When Plaintiff dialed Ms. Miller's number, the answering machine for a Michelle came on; therefore, Plaintiff did not leave a message.

106. On April 14, 2008, Plaintiff faxed a letter of interest to the General Motors Corporation, to the attention of Mr. G. Richard Wagoner, Jr., Chairman & CEO and to several members of the General Motors leadership team, to include, Mr. Frederick A. Henderson, President and Chief Operating Officer, Mr. Ray G. Young, Executive Vice President and Chief Financial Officer, and Mr. Robert S. Osborn, Group Vice President and General Counsel.

107. Below are illustrative charts to show GM's Advanced Driver Assistance System (ADAS)) reads on Ind. claim 44, and Dep. claims 47, 48, 49, 50, 51, & 53 of the '891 patent:

| GM's Advanced Driver Assistance System (ADAS) | Patent Owner's CMDC Device Patent #: RE$#,891; Independent Claim 44 |
|---|---|
| GM Pre-programmed Stall, Stop, or Vehicle Slow-down Systems for at least Chrysler, Dodge, Jeep, and Ram vehicles (i.e., Advanced Driver Assistance System (ADAS)) | A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means, comprising: |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | an electrical system in electrical communication with at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a computer system in signal transmission communication with at least one of the brake, the foot peddle, the radar, the camera, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor; |
| Preprogrammed interactive electrical system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in electrical communication with the electrical system and adapted to receive at least one control signal from a pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means; |
| Preprogrammed interactive computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | a receiver in computer communication with the computer system and adapted to receive at least one control signal in response to one of the vehicle's operating systems for monitoring the vehicle's condition upon exceeding a pre-programmed vehicle operating system parameter from the pre-programmed automated system to activate a stall-to-stop means or vehicle slowdown means such that the speed of the vehicle is initially decreased immediately after activation of the means upon initial receipt of the at least one control signal; and |
| Preprogrammed interactive electrical system or computer system for stalling, stopping, or slowing down at least Chevrolet, Buick, GMC and Cadillac vehicles equipped with at least, Brake-throttle override; Forward Collision braking; Rear Collision braking; Electronic stability control (ESC); Lane Keep Assist; or, Adaptive Cruise Control. | wherein the at least one control signal is communicated from the receiver to the electrical system or the computer system to control at least one of the brake, the foot peddle, the radar, the navigational system, the light, the speed control, the ignition system, the steering wheel, the transmission, the fuel system, and the motor. |

| GM's Advanced Driver Assistance System (ADAS) | Patent Owner's CMDC Device Patent #: RE43,891; Dependent Claim 47, 48, 49, 50, 51, & 53 |
|---|---|
| Enhanced Smart Pedal Technology: Known as brake override, reduces power to the engine in cases where the brake and accelerator pedal are being simultaneously depressed. | 47. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a brake override system for stopping or slowing a vehicle experiencing unintended acceleration. |
| Front Automatic Braking: Helps a driver avoid a forward crash or reduce the severity of crashing into a vehicle in front of it, whether it is moving or has come to a stop. | 48. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a pre-crash system for stopping or slowing a vehicle to prevent a crash. |
| Rear Automatic Braking: Helps the driver avoid a crash or to mitigate the impact into objects directly behind their vehicle by bringing the vehicle to a stop. | 49. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a reverse acceleration slow-down system for stopping or slowing a vehicle traveling in reverse. |
| Electronic Stability Control (ESC): Detects loss of steering control, it automatically applies the brakes to help "steer" the vehicle. Braking is automatically applied. | 50. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a stabilization system for stopping or slowing a vehicle to prevent a vehicle turnover. |
| Lane Keep Assist: Represents an upgrade of Lane Departure Warning. The feature is listed as "Lane Keep Assist with Lane Departure Warning". | 51. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as a lane departure system for stopping or slowing a vehicle to prevent or minimize accidents when the vehicle begins to move out of its lane. |
| Adaptive Cruise Control: The technology automatically accelerates and brakes the vehicle up to moderate levels to maintain a driver-selected following gap (distance). | 53. The vehicles' stall-to-stop means or the vehicles' slowdown means of claim 44, further can be adapted, modified or designed to include a vehicle system designed to perform as an adjusted cruise control system for stopping or slowing a vehicle to prevent a crash. |

108. After the doctrine of contributory infringement developed in the courts, Qualcomm found ways to use it to extend their patent monopolies beyond the scope of their

patents. This was accomplished primarily through the use of "tying arrangements", which required purchasers of patented products to also purchase unpatented goods.

109. Congress responded by enacting a special antitrust law, the Clayton Act, which included prohibiting the use of "tying arrangements" to create a monopoly in unpatented goods, 15 U.S.C. § 14 (2000). In addition, the Supreme Court developed the doctrine of patent misuse to bar a patentee from extending a patent monopoly beyond the scope of the patent, See *Carbice Corp. of Am. v. American Patents Dev. Corp.*, 283 U.S. 27 (1931).

110. Upon information and belief, Qualcomm misled the public by marketing Plaintiff's CPUs (tied to its cellular modems—SoC) as an unpatented product, and GM misled the public by marketing Plaintiff's Stall, Stop, and Vehicle Slowdown Systems (tied to its autonomous, driverless, self-drive vehicles) as an unpatented product. [6]

111. American courts first encountered "tying arrangements" in the course of patent infringement litigation. *See, e.g., Heaton-Peninsular Button-Fastening Co. v. Eureka Specialty Co.*, 77 F. 288 (CA6 1896). Such a case came before the Supreme Court in *Henry v. A. B. Dick Co.*, 224 U. S. 1 (1912).

---

[6] Contributory infringement originated in case law as a way to enable a patentee to enforce a patent when it was being infringed by a large number of persons whom it was impractical to sue together. The doctrine of contributory infringement permitted the patentee to sue an entity that had instigated the collective infringement either by selling a product that had no use other than to infringe the patent, or using other means to encourage infringement, such as providing instructions on how to infringe the patent. Liability for contributory infringement of a patent is defined by 35 U.S.C. § 271(c): "Whoever offers to sell or sells within the United States ... a material or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, ... shall be liable as a contributory infringer."

112. Although not required, Plaintiff included the above illustrative charts to ensure Plaintiff is providing "enough factual allegations, accepted as true, to "state a claim to relief that is plausible on its face".

113. In *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), the Federal Circuit expressly stated: "'the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met.'" *Id. at 1350* (quoting *In re Bill of Lading,* 681 F.3d 1323, 1339 (Fed. Cir. 2012) (emphasis added). *Nalco* appears to hold that element-by-element allegations are unnecessary.

114. Plaintiff reserves the right to enter claim 1 of Plaintiff's pending patent application [17/300230]. The claim is in furtherance of Plaintiff's right to exclude Qualcomm from making or using, selling or offering to sell, Plaintiff's CPUs for carrying out the operational and functional instructions for at least that of the driverless vehicle.

115. Claim 1 of the 17/300230 patent claims a "stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of … processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle …"

116. To date, the only outstanding office action requirement before allowance is the "terminal disclaimer". What is claimed in claim 1 of Plaintiff's 17/300230 patent application:

> 1. A pre-programmed stall, stop, vehicle slow-down system, that comprises at least one central processing unit (CPU), capable of:
>
> processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, a tablet, a PDA, or a handheld;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle receives a signal from at least one of cellular, satellite, or radio-frequency (RF);

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing unintended acceleration;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is experiencing lane departure;

processing instructions to stall, stop, or slow-down a vehicle when a collision or crash is detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has been reported as stolen;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle has moved outside a pre-programmed designated perimeter;

processing instructions to stall, stop, or slow-down a vehicle when at least one of a chemical hazard, a biological hazard, a radiological hazard; a nuclear hazard; or explosives have been detected;

processing instructions to stall, stop, or slow-down a vehicle when the vehicle is at least a driverless vehicle; a self-drive vehicle; an autonomous vehicle; a human controlled vehicle; a manned or unmanned convoy vehicle, or a manned or unmanned aerial, land, or sea vehicle; and,

Wherein, when the central processing unit (CPU) processes instructions to stall, stop, or slow-down a vehicle, a distress signal is sent to at least one of a monitoring site, a control center, or is recorded for storage.

117. The DOJ intervene in the appealed case to the Nineth Circuit in *FTC v. Qualcomm*, declaring Qualcomm should not be penalized for its anticompetitive because of their work for the Gov't in providing national security.

118. Plaintiff's patented technology was conceived in the wake of 9/11 that includes technology to mitigate terrorist attacks. Plaintiff's inventions are the "technical rational" for the three economic stimulus packages Plaintiff submitting to members of Congress shortly after 9/11

119. The Clayton Act also authorizes private parties to sue for triple damages when they have been harmed by conduct that violates either the Sherman or Clayton Act and to obtain a court order prohibiting the anticompetitive practice in the future.

# Relief

A. Temporary injunctive relief for Qualcomm to discontinue the sale of all Snapdragon processors where Plaintiff's patented CPUs (i.e., chipsets; systems-on-a-chip) are "tied" to Qualcomm's wireless cellular modems.

B. Temporary injunctive relief for Qualcomm to discontinue the sale of all Snapdragon "Ride" processors where Plaintiff's patented Stall, Stop, and Vehicle Slowdown Systems (i.e., Advanced Driver Assistance Systems (ADAS)) are "tied" to Qualcomm's Snapdragon "Ride" processors for autonomous and driverless vehicles.

C. Temporary injunctive relief for Qualcomm to discontinue the sale of all Snapdragon processors where Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) devices (i.e., new and improved cell phones; smartphones) are being used, without authorization, by Qualcomm and Asus (i.e., Smartphone for Snapdragon Insiders) to generate revenues.

D. Temporary injunctive relief for Qualcomm to discontinue charging a royalty on the entire handset. First, the handsets (i.e., Smartphones) are the patented inventions of Plaintiff; and second, the CPUs that are tied to Qualcomm's Snapdragon processors, for the unjust enrichment of Qualcomm, are the patented inventions of Plaintiff.

E. Summary judgement on the merits of the case for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents.*

F. Damages found or assessed for willful infringement; direct infringement; induced infringement; contributory infringement; divided infringement; and, infringement under the *doctrine of equivalents.*

G. Damages up to three times the amount found or assessed for willful infringement.

H. Summary judgement on the merits of the case for Qualcomm's single-firm anticompetitive conduct (under section 2 of the Sherman Act), and unjust enrichment (charging a 5% royalty rate per the price of the patented phone(s) for which Qualcomm has no authorization to receive), that 'harms the competitive process and thereby harms consumers.

I. Damages found or assessed for Qualcomm's single-firm anticompetitive conduct (under Section 2 of the Sherman Act), and unjust enrichment (charging a 5% royalty rate per the price of Plaintiff's patented phone(s) for which Qualcomm has no authorization to receive), that harms the competitive process and thereby harms consumers.

J. Trible damages for the injury imposed by Qualcomm for violating Federal Antitrust Laws (Section 4 of the Clayton Act, 15 U.S.C.S. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue" for treble damages, prejudgment interest, and costs of suit, including attorney fees.

K. The Court orders Qualcomm to establish, at minimum, a $20 billion dollar reserve with the SEC for "Probability of the Incurrence of a Loss". The reserve is returned to Qualcomm if found not liable.

**Qualcomm Inc.**

As of May 2022, **QUALCOMM** has a market cap of **$156.45 Billion**. This makes QUALCOMM the world's **69th** most valuable company by market cap according to our data. https://companiesmarketcap.com/qualcomm/marketcap/

| Year | Market cap | Change |
|---|---|---|
| 2022 | $156.45 B | -23.95% |
| 2021 | $205.72 B | 19.4% |
| 2020 | $172.29 B | 70.85% |

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

# SERVICE OF PROCESS

Qualcomm Inc.,

5775 Morehouse Drive,

San Diego, CA 92121


Qualcomm, Inc.,

c/o Prentice-Hall,

Corporation System, Inc.,

251 Little Falls Drive,

Wilmington, DE 19808

(302)-636-5400

# Exhibit 18

Joseph John Stevens (CA Bar No. 242495)
jstevens@pattersonsheridan.com
50 W. San Fernando Street, Suite 250
San Jose, CA 95113
Tel: 650-384-4418
Fax: 650-330-2314

B. Todd Patterson (*pro hac vice* forthcoming)
tpatterson@pattersonsheridan.com
John A. Yates (*pro hac vice* forthcoming)
jyates@pattersonsheridan.com
Kyrie K. Cameron (*pro hac vice* forthcoming)
kcameron@pattersonsheridan.com
24 Greenway Plaza, Suite 1600
Houston, Texas 77030
713-623-4844 | 713-623-4846
*Attorneys for Defendant*
*Qualcomm Incorporated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

LARRY GOLDEN,

*Pro Se* Plaintiff,

vs.

QUALCOMM INC.,

Defendant.

Case No.: 4:22-cv-03283-KAW

**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS**

[Filed concurrently: Memorandum of Points and Authorities in Support; Proposed Order; Proof of Service]

Date: October 6, 2022
Time: 1:30pm
Courtroom: TBD
Judge: Honorable Kandis A. Westmore

## NOTICE OF MOTION

**PLEASE TAKE NOTICE THAT** on October 6, 2022 at 1:30pm, or as soon thereafter as the matter may be heard by Zoom or teleconference before Judge Kandis A. Westmore of the United States District Court for the Northern District of California, located at 1301 Clay Street,

Oakland, CA 94612, Defendant Qualcomm Incorporated ("Qualcomm") will move for an order dismissing Plaintiff's Complaint with prejudice for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted. This motion is based on this notice, the attached memorandum of points and authorities, the accompanying Declaration of Elizabeth Ann Crowe, the accompanying Declaration of Joseph John Stevens and exhibits, all matters of record filed with the Court in this case, Plaintiff's previous frivolous litigation against Qualcomm and others, and such other evidence as may be submitted.

**RELIEF SOUGHT**

Qualcomm seeks an order dismissing Plaintiff's claims against Qualcomm under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction because the claims are frivolous, collateral estoppel applies to the lack of subject matter jurisdiction over these frivolous claims, and the Plaintiff lacks standing to bring the antitrust claims. Qualcomm also seeks an order dismissing Plaintiff's claims against Qualcomm under Fed. R. Civ. P. 12(b)(6) for failing to state a claim upon which relief may be granted.

DATED: July 22, 2022

Respectfully submitted,
PATTERSON + SHERIDAN, LLP

By: /s/ _Joseph John Stevens_______________

Joseph John Stevens (CA Bar No. 242495)
jstevens@pattersonsheridan.com

50 W. San Fernando Street, Suite 250
San Jose, CA 95113
Tel: 650-384-4418
Fax: 650-330-2314

B. Todd Patterson (*pro hac vice* forthcoming)
tpatterson@pattersonsheridan.com
John A. Yates (*pro hac vice* forthcoming)
jyates@pattersonsheridan.com
Kyrie K. Cameron (*pro hac vice* forthcoming)
kcameron@pattersonsheridan.com

24 Greenway Plaza, Suite 1600

Houston, Texas 77030
713-623-4844 | 713-623-4846

*Attorneys for Defendant Qualcomm Incorporated*

3

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

Joseph John Stevens (CA Bar No. 242495)
jstevens@pattersonsheridan.com
50 W. San Fernando Street, Suite 250
San Jose, CA 95113
Tel: 650-384-4418
Fax: 650-330-2314

B. Todd Patterson (*pro hac vice* forthcoming)
tpatterson@pattersonsheridan.com
John A. Yates (*pro hac vice* forthcoming)
jyates@pattersonsheridan.com
Kyrie K. Cameron (*pro hac vice* forthcoming)
kcameron@pattersonsheridan.com
24 Greenway Plaza, Suite 1600
Houston, Texas 77030
713-623-4844 | 713-623-4846
*Attorneys for Defendant*
*Qualcomm Incorporated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

LARRY GOLDEN,

*Pro Se* Plaintiff,

vs.

QUALCOMM INC.,

Defendant.

Case No.: 4:22-cv-03283-KAW

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS**

[Filed concurrently: Memorandum of Points and Authorities in Support; Proposed Order; Proof of Service]

Date: October 6, 2022
Time: 1:30pm
Courtroom: TBD
Judge: Honorable Kandis A. Westmore

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....................................................................................................1

II. STATEMENT OF THE ISSUES ................................................................................1

III. FACTUAL BACKGROUND: PLAINTIFF'S HISTORY OF FRIVOLOUS LITIGATION ....................................................................................................2

IV. LEGAL STANDARD ....................................................................................................6

V. ARGUMENT ....................................................................................................8

A. THE COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION ..........8

1. Federal Courts Do Not Have Subject Matter Jurisdiction Over Frivolous Claims ....................................................................................................8

2. Issue Preclusion Bars Plaintiff From Litigating Subject Matter Jurisdiction ....................................................................................................15

3. Plaintiff Lacks Standing to Bring Antitrust Claims ..........................................15

B. THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED ....................................................................................................16

1. Plaintiff Failed to State a Claim of Direct Infringement ..................................16

2. The Complaint Fails to Plead Enough Facts to Support the Claim of Indirect Infringement ....................................................................................................19

3. Plaintiff Fails to State a Claim for Antitrust Violation ....................................21

4. The Non-Patent Claims Should be Dismissed Because They Are Wholly Dependent Upon Defective Patent Infringement Claims ....................21

5. Plaintiff's Claims are Time Barred ....................................................................................................22

VI. CONCLUSION ....................................................................................................22

**TABLE OF AUTHORITIES**

Page

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006)....................7, 14

*Arnold v. United States*, No. 19-cv-4223, 2020 U.S. Dist. LEXIS 25392 (N.D. Cal. Feb 13, 2020)....................7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....................7, 8, 17, 21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....................7, 8, 21

*Bell v. Hood*, 327 U.S. 678 (1946)....................7

*Bender v. LG Elecs. U.S.A.*, Inc., 2010 U.S. Dist. LEXIS 33075 (N.D. Cal. March 11, 2010)....................16

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986)....................6

*Bird v. United States*, 51 Fed. Cl. 536 (C. Cl. 2002)....................18

*Bowser, Inc. v. United States*. 420 F.2d 1057 (C. Cl. 1970)....................18

*Creagri, Inc. v. Pinnaclife Inc.*, 2013 U.S. Dist. LEXIS 427 (N.D. Cal. January 1, 2013)....................20

*Deutsch v. Flannery*, 823 F.2d 1361 (9th Cir. 1987)....................15

*First Data Corp. v. Inselberg*, 870 F.3d 1367 (Fed. Cir. 2017)....................7

*Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010)....................20

*FTC v. Qualcomm*, 411 F. Supp. 3d 658 (N.D. Cal. May 21, 2019)....................13

*FTC v. Qualcomm Inc.*, 969 F.3d 974, 982 (9th Cir. 2020)....................13-14, 21

*Golden v. Apple Inc.*, et al., No 6:19-cv-02557-DCC, 2020 U.S. Dist. LEXIS 12940 (D.S.C. 2020)....................3-4

*Golden v. Apple Inc.*, 819 Fed. Appx. 930 (Fed. Cir. 2020), *cert. denied* 141 S. Ct. 1067....................4, 10, 17-19

*Golden v. Apple Inc. et al.*, No.: 6:20-cv-02270-JD-KFM, 2021 U.S. Dist. LEXIS 178626, at *7 (D.S.C Sept. 20, 2021) *aff'd Golden v. Apple, Inc. et al.*, No. 21-2160, 2022 U.S. App. LEXIS 8656 (4th Cir. Mar. 31, 2022)....................4-5, 12

*Golden v. Apple Inc. et al.*, 6:20-cv-04353-JD-KFM, 2021 U.S. Dist. LEXIS 211540 (D.S.C. Nov. 2, 2021) *appeal docketed* Fed. Cir. No. 22-1229........................5, 11

*Golden v. Apple Inc.*, Case 5:22-cv-04152-VKD (July 15, 2022)..............................................6

*Golden v. Google, LLC*, No. 6:21-cv-00244-JD-KFM, 2021 U.S. Dist. LEXIS 210872 (D.S.C. Nov. 2, 2021) ..........................................................................6

*Golden v. Intel Corp.*, No. 5:22-cv-03828-NC (June 8, 2022) ....................................................6

*Golden v. United States*, 156 Fed. Cl. 623 (C. Cl. 2021) *appeal pending* Fed. Cir. No. 2022-1196 ..........................................................................2, 18, 22

*Golden v. United States*, 955 F.3d 981 (Fed. Cir. 2020)..............................................................2

*Golden v. United States*, 137 Fed. Cl. 155 (C. Cl. 2018)............................................................3

*Hagans v. Lavine*, 415 U.S. 528 (1974)........................................................................................7

*Hitachi Kokusai Elec. Inc. v. ASM Int'l, N.V.*, 2018 U.S. Dist. LEXIS 122967 (N.D. Cal. July 23, 2018)...........................................................................20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...............................................................16

*Kamilche Co. v. United States*, 53 F.3d 1059 (9th Cir. 1995) ...................................................15

*Mast v. Long*, 84 F. Appx. 786 (9th Cir. 2003)..........................................................................15

*Nalco Company v. Chem-Mod, LLC*, 883 F.3d 1337 (2018)...............................................16, 20

*Reddy v. Litton Indus.*, 912 F.2d 291 (9th Cir. 1990) ..................................................................8

*Rivera v. Patel*, No. 16-cv-304, 2016 U.S. Dist. LEXIS 150682 (N.D. Cal. Oct. 31, 2016)............................................................................6

*Sapphire Crossing LLC v. Abbyy USA Software House, Inc.*, 497 F. Supp. 3d 762 (N.D. Cal. Oct. 28, 2020)..........................................................................19

*Sentius Int'l, LLC v. Apple Inc.*, 2020 U.S. Dist. LEXIS 192203, at *5 (N.D. Cal. Oct. 15, 2020)..........................................................................19

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)...................................................7, 15

*The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22 (1913)......................................................7

*Uniloc U.S.A., Inc. v. Logitech, Inc.*, No. 18-CV-01304, 2018 U.S. Dist. 197194 (N.D. Cal. Nov. 17, 2018)....................20

*U.S. Dep't of Homeland Sec. v. Golden*, No. IPR2014-00714 ....................2

**Statutes**

Fed. R. Civ. P. 12(b)(1)....................1, 22

Fed. R. Civ. P. 12(b)(6).................... *passim*

15 U.S.C. §15(b) ....................22

35 U.S.C. §286....................22

iv

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**

Defendant Qualcomm Incorporated ("Qualcomm") hereby moves pursuant to Fed. R. Civ. P. 12(b)(1) and (6) to dismiss Plaintiff's Original Complaint for Antitrust Law Violations and Patent Infringement. Dkt. 1.

## I. INTRODUCTION

Plaintiff is a serial filer of frivolous complaints relating to his patent portfolio. Plaintiff now brings patent infringement, antitrust, and unjust enrichment claims, which were already dismissed as frivolous in the District of South Carolina against Qualcomm. Plaintiff has filed, and will likely continue to file, additional frivolous suits before this Court now that he has worn out his welcome in South Carolina.

The egregiousness of Plaintiff's litigation behavior is further evidenced by Plaintiff's delay in filing its certificate of service and returning the executed summons. On July 19, 2022, Plaintiff filed a certificate of service and executed summons indicating Qualcomm was served on June 28, 2022—21 days earlier (Dkt. 5), which, if true, would render Plaintiff's answer due the very same day Plaintiff filed the executed summons—July 19, 2022. But, the June 28, 2022 date of service upon a "Jane Doe" is not correct. As set forth in the declaration of Elizabeth Ann Crowe submitted herewith. Qualcomm was not served until July 7, 2022—nine days after the date alleged in Plaintiff's certificate of service—rendering Qualcomm's response due July 28, 2022.

Qualcomm respectfully requests that the Court put a stop to Plaintiff's behavior, specifically by dismissing Plaintiff's Complaint in its entirety **with prejudice** and sanctioning Plaintiff for his baseless, vexatious litigation.

## II. STATEMENT OF THE ISSUES

1. Whether the court has subject matter jurisdiction over Plaintiff's claims pursuant to Rule 12(b)(1) due to the frivolity of the Complaint and his lack of standing to bring antitrust claims?

2. Whether Plaintiff is collaterally estopped from arguing subject matter jurisdiction

based on the frivolity of his claims?

3. Whether Plaintiff fails to state a claim for direct infringement, divided infringement, indirect infringement pursuant, or antitrust violation pursuant to Rule 12(b)(6)?

## III. FACTUAL BACKGROUND: PLAINTIFF'S HISTORY OF FRIVOLOUS LITIGATION

Plaintiff has a long history of filing frivolous complaints that never pass the pleading stage. This case is no different.

In 2013, Plaintiff sued the United States Government, alleging "the United States, through the Department of Homeland Security, has caused cell phone manufacturers to produce devices that infringe on one or more of his patents." *Golden v. United States*, 156 Fed. Cl. 623, 625 (C. Cl. 2021) *appeal pending* Fed. Cir. No. 2022-1196 (Case 1). One of these entities was Qualcomm. The case was dismissed *with prejudice* after **six** amended complaints, and Plaintiff never came up with "a plausible theory of infringement against the United States and the third parties whose products he alleges were made at the behest of the government." *Id.* at 632. ("Enough time and resources have been expended by the court and the Department of Justice dealing with these allegations. Because plaintiff has failed to conform his preliminary infringement contentions with Patent Rule 4 and has failed to follow a court order in that regard, the case must be dismissed.").

Before Case 1 was decided, Plaintiff filed a second complaint with the Court of Federal Claims "seeking 'reasonable and entire compensation for the unlicensed use and manufacture' of his 'inventions described in and covered by' various patents." *Golden v. United States*, 955 F.3d 981, 983 (Fed. Cir. 2020) (Case 2). His complaint was dismissed by the Federal Court of Claims, and the decision was affirmed by the Federal Circuit. *Id.* at 983.

After years of litigation, including the institution of an *inter partes* review of the U.S. Pat. No. Re 43,990 by the DHS,[1] Plaintiff sent the following in an email to the Department of Justice on August 24, 2017 in the midst of his litigation of Case 1:

> As you know my strategy was to continue submitting claims of "takings" and "infringement" for as long as the Government

[1] *See U.S. Dep't of Homeland Sec. v. Golden*, No. IPR2014-00714 (P.T.A.B. filed April 30, 2014) (resulting in the cancellation of claims 11, 74, and 81 of U.S. Patent No. RE43,990).

> continued to prolong this case. (*Larry Golden v. The United States*: Case # 13-307 C). With that said, of course you know the claims ha[ve] moved from twelve (12) claims of "takings" and "infringement" that began in the year 2013, to seventy-two (72) claims of "takings" and "infringement" as of this year 2017.
>
> The Judge has ordered a final complaint and a final claim chart that was due on August 15. 2017. **Because of the Judge order I can no longer continue my strategy of introducing new "takings" and "infringement" claims or new patents and patent claims.**
>
> **Therefore, I have changed my strategy. My new strategy is to file a complaint(s) in Federal District Court against Apple, Samsung, LG, Panasonic, and Motorola for Patent infringement on March 1, 2018**. The strategy here is to force Apple, Samsung, and LG to decide between one or two choices: (1) In an effort to avoid any responsibility for infringement or liability of paying hundreds of billions of dollars in damages, the companies cho[o]se to throw the Government under the bus by presenting evidence that they were under contract to develop and manufacture devices that infringes my communication/monitoring device. If they cho[o]se this option it makes them a witness for me in my current case (*Larry Golden v. The United States*; Case # 13-307 C). (2) Deny the allegations of infringement. In this case I will present evidence to support the fact that the companies were under contract with the Government to develop and manufacture devices that infringe[] my communication/monitoring device, but that the companies decided to continue to develop and manufacture my communication/monitoring device beyond the specifications agreed upon with the Government, even after I notified the companies in 2010 to stop their manufacturing. If they chos[o]e this option it opens the companies up to willful infringement and the possibility of a temporary injunction to stop the manufacturing and development of my communication/monitoring device. If you were Apple, Samsung, and LG which option would you cho[o]se.

*Golden v. United States*, 137 Fed. Cl. 155, 167-168 (C. Cl. 2018) (Memorandum Opinion And Order Granting-in-Part and Denying-in-Part the Government's Motion for Partial Dismissal of Case 1) (alterations in original).

Plaintiff made good on his word, and has filed several additional suits relating to the infringement of his patents. On September 11, 2019, Plaintiff filed his third case (Case 3) in this saga: a patent infringement lawsuit against Qualcomm and fifteen other companies (including those referenced in the email to the DOJ) in the District of South Carolina. *Golden v. Apple Inc.*,

et al., No 6:19-cv-02557-DCC, 2020 U.S. Dist. LEXIS 12940, *1 (D.S.C. 2020). The court's local practice is to have a magistrate judge screen all cases filed by a *pro se* plaintiff before the clerk of court is permitted to issue the summons.[2] Unamused, the Magistrate recommended that the complaint is subject to dismissal because the "claims appear patently frivolous." Report and Recommendation, *Golden v. Apple Inc.*, *et al*., No. 6:19-cv-2557, ECF No. 12, at 3 (D.S.C. Oct. 1, 2019). The Magistrate recommended that the complaint be dismissed for failure to state a claim for relief and also warned Golden of possible Rule 11 sanctions—citing his email to the DOJ. *Id.* at 4-6. The Plaintiff amended his complaint, but failed to cure the defects. *See* Exhibit 1[3] (Case 3 amended complaint). The Magistrate recommended that the amended complaint be dismissed as being duplicative with Case 1. Report and Recommendation, *Golden v. Apple Inc., et al.*, No. 6:19-cv-2557, ECF No. 27, 2020 U.S. Dist. LEXIS 26613, at *8-9 (D.S.C. January 9, 2020). The District Court dismissed Plaintiff's case without prejudice as duplicative in view of his pending case in the Court of Federal Claims. *Golden v. Apple Inc.*, 819 Fed. Appx. 930, 930 (Fed. Cir. 2020), *cert. denied* 141 S. Ct. 1067. Plaintiff appealed to the Federal Circuit, which affirmed the decision to dismiss without prejudice on the basis of **frivolousness**—rather than duplicity. *Id.* at 931 ("[W]e agree with the magistrate judge's conclusion that 'the plaintiff's vague and conclusory allegations fail to state a claim for relief.'").

Six months after the District of South Carolina dismissed his first case, Golden filed his fourth suit (Case 4) against similar defendants, including Qualcomm, alleging various violations of state and federal antitrust law. *Golden v. Apple Inc. et al.*, No.: 6:20-cv-02270-JD-KFM, 2021 U.S. Dist. LEXIS 178626, at *7 (D.S.C Sept. 20, 2021) *aff'd Golden v. Apple, Inc. et al.*, No. 21-2160, 2022 U.S. App. LEXIS 8656 (4th Cir. Mar. 31, 2022). *See* Exhibit 2 (Case 4 complaint). The Magistrate recommended dismissal as frivolous, noting that:

> On June 16, 2020, the plaintiff filed the instant action, seeking

---

[2] *Information on Representing Yourself in a Civil Action*, U.S. DIST. CT. DIST. S.C. at 11 (Aug. 17, 2021), http://www.scd.uscourts.gov/DOCS/PROSE.pdf; *see also* Local Civ. Rule 73.02(B)(2)(e) (D.S.C.).

[3] Three of Plaintiff's prior complaints for his frivolous claims are attached as Exhibits 1-3 of the Declaration of Joseph John Stevens in Support of Defendant's Motion to Dismiss.

> damages against many of the same defendants as named in [Case 3]. Having unsuccessfully sought patent infringement damages against these defendants in [Case 3], the instant matter seeks relief for patent infringement and failure to pay royalties, although **the plaintiff has attempted to circumvent the court's prior ruling by asserting that the defendants' actions have violated the Sherman Act, the Clayton Act, and various South Carolina Laws** .... Nevertheless, ... the instant matter is subject to summary dismissal because the claims appear patently frivolous.

Report and Recommendation, *Golden v. Apple, et. al.*, No. 6:20-cv-2270, ECF No. 16, 2020 U.S. Dist. LEXIS 258437 at *10, 11-14, 16 (D.S.C. Sep. 11, 2020) (emphasis added). The court adopted Magistrate's recommendation and dismissed the case without prejudice. *Golden*, 2021 U.S. Dist. LEXIS 178626 at *7.

Approximately six months after filing Case 4, Golden filed yet another lawsuit (Case 5) in the District of South Carolina. *Golden v. Apple Inc. et al.*, 6:20-cv-04353-JD-KFM, 2021 U.S. Dist. LEXIS 211540, *5 (D.S.C. Nov. 2, 2021) *appeal docketed* Fed. Cir. No. 22-1229. *See* Exhibit 3 (Case 5 complaint). According to the Magistrate, "this action represents the plaintiff's attempt to re-litigate the claims from [Case 3] because although [that case] was dismissed as frivolous it was dismissed without prejudice." Report and Recommendation, *Golden v. Apple, Inc., et al.*, No. 6:20-cv-4353, ECF No. 20, 2021 U.S. Dist. LEXIS 212549, at *14-15 (D.S.C. Feb. 5, 2021). He again recommended dismissal of the case as frivolous. *Id.* at *10-14. ("In light of the vague conclusory allegations in the complaint in this action, and the plaintiff's attempt to circumvent the prior dismissals of his patent infringement claims, the instant matter is subject to summary dismissal as frivolous."). The Magistrate recommended that the court dismiss the action *with* prejudice, and that the court sanction Golden $400 for continuing to file frivolous lawsuits before it. *Id.* at*14-15. The District Court agreed with the Magistrate that the complaint should be dismissed as frivolous; however, it declined to dismiss the case with prejudice or impose sanctions. *Golden*, 2021 U.S. Dist. LEXIS 211540, at *8. Plaintiff was warned that if he "attempts to file another frivolous action in this Court, the Court will consider the imposition of sanctions as warranted." *Id.* at 3, n. 2.

Within a month of filing Case 5, Golden filed another lawsuit (Case 6) in the District of

South Carolina naming Google as the sole defendant. *Golden v. Google, LLC*, No. 6:21-cv-00244-JD-KFM, 2021 U.S. Dist. LEXIS 210872 (D.S.C. Nov. 2, 2021), *appeal dismissed*. Plaintiff alleged that Google jointly infringed his patents with both Apple and Qualcomm. Report and Recommendation, *Golden v. Google*, No. 6:21-cv-00244-JD-KFM, ECF No. 14, 2021 U.S. Dist. LEXIS 211502, at *1-2 (D.S.C. April 9, 2021). The Magistrate again recommended dismissal: "[A]lthough the plaintiff has made allegations against a new alleged infringer, Google, his allegations are still frivolous and thus subject to summary dismissal." *Id.* at *12-16. He also noted that "to the extent the plaintiff alleges joint infringement by Google and Apple and/or Qualcomm, such allegations may not be used in this action to circumvent prior rulings by this court that infringement allegations against Apple/Qualcomm are frivolous." *Id.* at *12. He recommended dismissal *with* prejudice and that the court sanction Golden $400. *Id.* at *16-17. The court adopted the Magistrate's recommendation and "dismissed the case with prejudice because it is frivolous" and without service of process, but declined to impose sanctions. *Golden*, 2021 U.S. Dist. LEXIS 210872 at *7-8.

Plaintiff then proceeded to file this suit. Plaintiff continues to advance his frivolous claims of patent infringement, antitrust violations, and unjust enrichment that were rejected as frivolous in South Carolina. All of his claims hinge on his unfounded belief that Qualcomm infringes his patents as part of a conspiracy against him. Plaintiff has also filed suit against Intel[4] and Apple[5] individually in this district for antitrust, patent infringement, and unjust enrichment claims. Qualcomm expects more frivolous suits to follow.

## IV. LEGAL STANDARD

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Article III of the United States Constitution and statutes enacted by Congress pursuant thereto." *Rivera v. Patel*, No. 16-cv-304, 2016 U.S. Dist. LEXIS 150682, at *8 (N.D. Cal. Oct. 31, 2016) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)). When a claim is "so

---

[4] *Golden v. Intel Corp.*, No. 5:22-cv-03828-NC (June 8, 2022).

[5] *Golden v. Apple Inc.*, Case 5:22-cv-04152-VKD (July 15, 2022).

insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy," dismissal on the basis of lack of federal subject-matter jurisdiction is proper. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 n.10 (2006) (citing *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)); *First Data Corp. v. Inselberg*, 870 F.3d 1367, 1373 (Fed. Cir. 2017) (quoting *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913)) ("No doubt if it should appear that the plaintiff was not really relying upon the patent law for his alleged rights, or if the claim of right were frivolous, the case might be dismissed."); *Arnold v. United States*, No. 19-cv-4223, 2020 U.S. Dist. LEXIS 25392, at *4-5 (N.D. Cal. Feb 13, 2020) (quoting *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974)) ("[F]ederal courts lack subject matter jurisdiction over claims that are 'essentially fictitious,' 'wholly insubstantial,' 'obviously frivolous,' or 'obviously without merit.'").

To survive a motion to dismiss, Plaintiff must allege facts sufficient to state a claim that is facially plausible. The Federal Rules require a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must be dismissed when it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If the factual allegations "do not permit the court to infer more than the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679, then the pleader has "not nudged [its] claims… across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Accordingly, a claim has facial plausibility when the pleader "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79 (emphasis added).

Although a court must assume that the facts alleged by a plaintiff are true in determining whether a complaint has alleged sufficient facts to state a plausible claim for relief, the Court should not credit conclusory allegations or allegations that merely restate the legal elements of a claim. *Iqbal*, 556 U.S. at 678. Thus, a complaint is insufficient if it only offers "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Id*. If a complaint's

well-pled allegations do not show "more than a sheer possibility that a defendant has acted unlawfully," or does not identify a violation of any law at all, the complaint must be dismissed. *Id*. Moreover, it is insufficient for a complaint to "plead facts that are merely consistent with a defendant's liability[.]" *Twombly*, 550 U.S. at 557. The pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A court may grant a motion to dismiss and dismiss a claim with prejudice where amendment would be futile. *Reddy v. Litton Indus.*, 912 F.2d 291, 296 (9th Cir. 1990).

## V. ARGUMENT

In this lawsuit, Plaintiff alleges the infringement of unspecified patents that rises to the level of antitrust violation and unjust enrichment. Plaintiff has yet to make it past the pleading stage in his multiple litigations against the government and others that he believes are engaging in a conspiracy to infringe his patents without paying him a royalty. Plaintiff has time and again demonstrated his inability to plead his claims in a non-frivolous way to state a claim for which relief can be granted. This case is no different.

### A. The Court Does Not Have Subject Matter Jurisdiction

Plaintiff continues to advance claims that have been dismissed as frivolous. This Court does not have subject matter jurisdiction over these frivolous claims. Further, Plaintiff is collaterally estopped from contesting subject matter jurisdiction because of the frivolity of his recycled claims. Nor does Plaintiff have standing to assert his antitrust claims.

#### 1. Federal Courts Do Not Have Subject Matter Jurisdiction Over Frivolous Claims

The Court should dismiss Plaintiff's claims for lack of subject matter jurisdiction because the claims are patently frivolous. The Complaint includes rambling and incoherent paragraphs, consists of vague and conclusory allegations of infringement and conspiracy, and formulaic recitations of the elements of various causes of action. Plaintiff has attached the following patents to his Complaint: U.S. Pat. No. 7,385,497 ("the '497 Patent"), U.S. Pat. No. 8,106,752 ("the '752 Patent), U.S. Pat. No. 9,096,189 ("the '189 Patent"), U.S. Pat. No. 9,589,439 ("the '439 Patent"), U.S. Pat. No. 10,163,287 ("the '287 Patent"), U.S. Pat. No. 10,984,619 ("the '619 Patent"), and

U.S. Pat. No. RE 43,891[6] ("the '891 Patent"). The backbone of his claims, that Qualcomm is infringing his patents, is wholly unsupported. Not only does the Complaint not identify what patent Qualcomm is allegedly infringing, it fails to even put Qualcomm on notice of any patent infringement as explained in Section V.B. The below chart shows the claims of Plaintiff's patents that are referenced in the Complaint. No patent claims are specifically asserted.

| Patent Referenced in Complaint | Claim Referenced in Complaint |
|---|---|
| '497 Patent | 1 |
| '189 Patent | 1-9 |
| '439 Patent | 13-23 |
| '287 Patent | 4-6 |
| '619 Patent | 1, 11 (1-20) |
| '891 Patent | 44, 47, 48, 49, 50, 51, 53 |
| '752 Patent | 10 |

Plaintiff continues to make deficient pleadings despite his three previous complaints against Qualcomm, and others, for claims of patent infringement, antitrust, and unjust enrichment being dismissed with prejudice as frivolous in South Carolina. As will be shown below, Plaintiff is recycling his frivolous claims in the Northern District of California expecting a different result.

In Case 3 and Case 4, Plaintiff alleged that Qualcomm and others infringed the '287 Patent, the '439 Patent, the '189 Patent, the '497 Patent, and the '891 Patent. The below chart is included to show the previous allegations of patent infringement made by Plaintiff against Qualcomm in Case 3 and 5.

[6] Plaintiff only references the '891 Patent in the Complaint with respect to General Motors—not Qualcomm. *See* Dkt. 1, ¶¶ 170,

| Prior Case | Asserted Patents and Claims |
|---|---|
| Case 3 | Plaintiff asserted that Qualcomm jointly, directly, and/or indirectly infringed the following patents by "selling certain processing devices as Central Processing Units (i.e. Qualcomms' Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series) … included without limitation to Plaintiff's CMDC devices[.]" *See* Ex. 1, ¶¶166.<br><br>'287 Patent: At least claims 4 and 5. Ex. 1 at ¶¶166-168.<br>'439 Patent: At least claim 22. *Id.* at ¶¶216-218.<br>'189 Patent: At least claims 1-5, 7, 8. *Id.* at ¶¶266-268.<br>'497 Patent: At least claims 1-6. *Id.* at ¶¶382-384. |
| | "Plaintiff alleges that at least one of the Defendants named in this complaint" infringes at least claims 11, 23, 44, 47-51, 53 of the '891 Patent. *Id.* at ¶356. Qualcomm and General Motors were both named defendant. |
| Case 5: | Plaintiff again asserted that Qualcomm jointly, directly, indirectly and/or under the doctrine of equivalents for each of the following Patents. Plaintiff asserted that the following Qualcomm products infringed the below patents: Snapdragon 5 Series, 6 Series, 7 Series, & 8 Series, Snapdragon 888 Mobile Platform, Snapdragon 865 + 5G Mobile Platform.<br><br>'287 Patent: At least claims 4-5. Ex. 3, at ¶31.<br>'439 Patent: At least claims 13-15, 22-23. *Id*. at ¶48.<br>'189 Patent: At least claims 1-3. *Id.* at ¶65.<br>'497 Patent: At least claims 1-6. *Id*. at ¶108. |

In Case 3, Plaintiff alleged that Qualcomm, and others, had infringed his patents. The District Court adopted the Magistrate's recommendation to dismiss the complaint without prejudice as frivolous and duplicative of his parallel proceedings against the United States Government. *Golden*, 819 Fed. Appx. at 930. The Federal Circuit affirmed the dismissal "not on the basis of duplicity, **but on the ground of frivolousness**." *Id.* at 931 ("The complaint itself offers only vague generalities and block quotes of statutes, cases and treatises, but nowhere points us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant.").

In Case 5, Plaintiff made an additional attempt to sue Qualcomm, and others, for infringing the '287 Patent, the '439 Patent, the '189 Patent, the '497 Patent, and the '891 Patent. According to Plaintiff, this Complaint was filed to correct his previous deficiencies. *Golden*, 2021 U.S. Dist.

LEXIS 211540, *5. The District Court determined that Plaintiff had "not cured the frivolousness of his allegations" and continues to run afoul of the same issues that doomed his previous complaints. *Id.* at *5-7. The District Court adopted[7] the Magistrate's recommendation to dismiss, but without prejudice. *Id.* at 7-8 ("this Court agrees … that Plaintiff's amended complaint should be dismissed because it is frivolous").

In the instant case, Plaintiff relies on the same threadbare and conclusory allegations of infringement that got his previous cases dismissed as frivolous. Like in Cases 3 and 5, Plaintiff is relying on Qualcomm's Snapdragon. More specifically, the Snapdragon Chipset and Snapdragon Ride Share Platform. As explained in Section V.B, Plaintiff falls well short of the standard to plead a claim of patent infringement. Plaintiff again makes the same mistakes that resulted in dismissal of his complaints in South Carolina because the Complaint once again offers vague generalities, block quotes of statutes and cases without pointing to any nonfrivolous allegation of infringement by a Qualcomm product. In fact, Plaintiff makes no attempt to map any claim of any patent to a Qualcomm product.

In Case 4, Plaintiff dressed up vague assertions of infringement of the '287 Patent, the '439 Patent, the '752 Patent, the '189 Patent, the '497 Patent, and the '891 Patent by Qualcomm and others in antitrust and unjust enrichment claims. Plaintiff did not assert any claim of any of these patents specifically like in the instant Complaint. The Magistrate saw through this ploy, noting that Plaintiff "unsuccessfully sought damages against many of the defendants in the court for patent infringement in [Case 3], here, appears to seek relief for the same infringing actions by dressing the case as asserting violations of the Sherman Act, the Clayton Act, and various South Carolina Laws …. Upon review, however, the claims appear patently frivolous." Report and Recommendation, *Golden*, 2020 U.S. Dist. LEXIS 258437, at *10.

The Magistrate also noted that "plaintiff's patent infringement claims are subject to dismissal because the plaintiff has failed to include factual allegations beyond the identities of the defendants, reference to the CMDC device, and the alleged infringed-upon patents[.]" *Id.* at *13.

[7] The Report was modified to lift a 35-page limit restriction for an amended complaint. *Id.* at 7, n. 4.

Plaintiff's antitrust claims were predicated on his prior frivolous patent infringement claims. *Id.* at *13-14 ("antitrust allegations, in essence, are that he has been prevented from accessing the market for CMDC devices because the defendants have refused to pay him licensing royalties."). The Magistrate made clear that Plaintiff cannot "circumvent the court's prior ruling by labeling substantially similar allegations as seeking damages under the Sherman/Clayton Acts instead of for patent infringement" and that the Complaint did not point to any no frivolous allegation of any claim. *Id.* As a result, the Magistrate recommended that the complaint be dismissed with prejudice. *Id.* at *16-17. The District Court adopted the Magistrate's report that found the claims to be frivolous, and dismissed the Complaint without prejudice. *Golden*, 2021 U.S. Dist. LEXIS 178626, at *7 (disagreeing with Magistrate's change to change cause of action from antitrust to patent infringement).

Nevertheless, Plaintiff attempts to make the same and similar frivolous allegations of infringement, antitrust, and unjust enrichment made in Case 4—with Qualcomm now as the main character of the conspiracy against him. For example, Plaintiff continues to allege that Qualcomm, Apple, Samsung, and LG are conspiring together to violate antitrust laws. *Compare* Dkt. 1, ¶¶23-43, 119 *with* Ex. 2, ¶¶ 46-56, 71-74. Below are additional examples of the Plaintiff recycling his frivolous claims:

- The conspirators are allegedly conspiring to avoid prosecution by hiding behind the government. *Compare* Dkt. 1, at ¶¶ 25, 28 *with* Ex. 2, ¶¶ 48.

- The conspiracy has prevented Plaintiff from receiving royalties. *Compare* Dkt. 1, at ¶ 30 *with* Ex. 2, ¶¶ 54-55.

- The conspiracy took place within the United States and "substantially affected the flow of interstate commerce and had a direct, substantial, and reasonably foreseeable effect upon commerce in the United States." *Compare* Dkt. 1, at ¶ 34 *with* Ex. 2, ¶ 52.

- "It is the belief of the Plaintiff, that [Qualcomm, Apple, Samsung, and LG] are in violation of Section 1 of the Sherman Act, which prohibits every contract, combination or conspiracy that restrains interstate trade; because the restraints are unreasonably restrictive of competition in a relevant market for the Central Processing units (CPUs) and the

Communicating, Monitoring, Detecting, and Controlling (CMDC) devices." *Compare* Dkt. 1, at ¶ 35 *with* Ex. 2, ¶ 53.

- "It is the belief of the Plaintiff, that [Qualcomm, Apple, Samsung, and LG] act together in ways that limit competition by hindering Plaintiff's patented products from entering the market, while exercising an unreasonable horizontal restraint of trade." *Compare* Dkt. 1, at ¶ 36 *with* Ex. 2, ¶ 54 (using same language but for substituting "patented products" for "businesses").
- Qualcomm, Apple, LG and Samsung's "agreements are considered unreasonable because their interaction is to such a degree that they were no longer acting independently, and the collaboration gave them the ability to wield market power." *Compare* Dkt. 1, at ¶ 37 *with* Ex. 2, ¶ 55 (using same language but for typo correction).
- "It is the belief of the Plaintiff, that [Qualcomm, Apple, Samsung, and LG] have engaged in a contract, combination, trust or conspiracy, the effect of which was to develop, manufacture, and commercialize Plaintiffs … Communicating, Monitoring, Detecting, and Controlling (CMDC) devices without paying royalty compensation." *Compare* Dkt. 1, at ¶ 38 *with* Ex. 2, ¶ 55.
- "It is the belief of the Plaintiff, that [Qualcomm, Apple, Samsung, and LG], through their officers, directors and employees, effectuated the aforesaid contract, combination, thrust or conspiracy between themselves and their co-conspirators." *Compare* Dkt. 1, at ¶ 39 *with* Ex. 2, ¶ 56.
- Plaintiff repeats old data about market share. *Compare* Dkt. 1, at ¶¶ 42-43 *with* Ex. 2, ¶ 51.
- Plaintiff again asserts that Qualcomm has been unjustly enriched by not paying Plaintiff a royalty. *Compare* Dkt. 1, at ¶¶ 70, *with* Ex. 2, ¶ 51.

Plaintiff's antitrust and unjust enrichment claims are based on Qualcomm's business practices and *FTC v. Qualcomm*, 411 F. Supp. 3d 658 (N.D. Cal. May 21, 2019). *See* Dkt. 1, ¶¶59-64, 71-79. Plaintiff relied on this judgment despite the fact that it was reversed and the injunction was vacated. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 982, 1005 (9th Cir. 2020) ("We now hold that

the district court went beyond the scope of the Sherman Act, and we reverse.”). The 9th Circuit made clear that hypercompetitive behavior does not violate antitrust law. *Id.* at 105. As explained by the 9th Circuit:

> *First*, Qualcomm’s practice of licensing its SEPs exclusively at the [original equipment manufactures (“OEM”)] level does not amount to anticompetitive conduct in violation of § 2 [of the Sherman Act], as Qualcomm is under no antitrust duty to license rival chip suppliers. To the extent Qualcomm has breached any of its [fair, reasonable, and nondiscriminatory] commitments, a conclusion we need not and do not reach, the remedy for such a breach lies in contract and patent law. *Second*, Qualcomm’s patent-licensing royalties and “no license, no chips” policy do not impose an anticompetitive surcharge on rivals’ modem chip sales. Instead, these aspects of Qualcomm's business model are “chip-supplier neutral” and do not undermine competition in the relevant antitrust markets. *Third*, Qualcomm’s 2011 and 2013 agreements with Apple have not had the actual or practical effect of substantially foreclosing competition in the [code division multiple access] modem chip market.

*Id.* (emphasis in original) The facts alleged by Plaintiff cannot plausibly establish a claim for antitrust violation based on the reversal by the 9th Circuit. Plaintiff’s reliance on a now-reversed decision to establish his antitrust claims illustrates the frivolousness of his claims.

While the ’619 Patent was not asserted against Qualcomm in Cases 3, 4, and 5, Plaintiff makes no attempt to separately plead the ’619 Patent in a non-frivolous way. In other words, his allegations of infringement against the ’619 Patent are inextricably linked to his frivolous allegations of infringement of his other patents. Adding a new patent does not cure their frivolity. The cure for frivolity would instead be complying with the appropriate pleading standard that Plaintiff cannot seem to meet despite numerous attempts. As a result, the Court also fails to have subject matter jurisdiction over these frivolous claims relating to the ’619 Patent.

Plaintiff has yet to file a complaint that was not dismissed as frivolous despite **six** lawsuits. Plaintiff’s claims against Qualcomm are just as frivolous in California as they are in South Carolina. This Court should find that it does not have subject matter jurisdiction over these patently frivolous claims. And, if the Court finds it lacks subject matter jurisdiction on the ground of frivolousness, then the Court should also dismiss Plaintiff’s complaint in its entirety, including any supplemental state law claims. *See Arbaugh*, 546 U.S. at 514.

**2. Issue Preclusion Bars Plaintiff From Litigating Subject Matter Jurisdiction**

The frivolity of Plaintiff's claims against Qualcomm is decided. Plaintiff is barred from litigating subject matter jurisdiction of his claims on the issue of frivolity. The Ninth Circuit has held that "a district court's decision that it lacks subject matter jurisdiction over a plaintiff's claim precludes the plaintiff from relitigating the issue of jurisdiction in a later action." *Mast v. Long*, 84 F. Appx. 786 (9th Cir. 2003). Unlike claim preclusion, "it matters not that the prior action resulted in a dismissal without prejudice, so long as the determination being accorded [issue] preclusive effect was essential to the dismissal." *Deutsch v. Flannery*, 823 F.2d 1361 (9th Cir. 1987). "The party asserting [issue preclusion] must first show that the estopped issue is identical to an issue litigated in a previous action." *Kamilche Co. v. United States*, 53 F.3d 1059, 1062 (9th Cir. 1995).

Here, the core issue is whether or not Plaintiff's claims are frivolous. Plaintiff is once again asserting the same frivolous claims of infringement of the '497 Patent, the '189 Patent, the '439 Patent, the '287 Patent, the '752 Patent, and the '891 Patent dressed up as unfounded antitrust and unjust enrichment claims. Plaintiff continues to make deficient pleadings in this Court despite his many attempts in the Court of Federal Claims and the District of South Carolina. The Court does not have subject matter jurisdiction over frivolous claims. *See e.g., Steel Co.*, 523 U.S. at 89. The issue of frivolity of the claims against Qualcomm is decided, and Plaintiff should be estopped from asserting otherwise. *See Mast*, 84 at 786.

Plaintiff should also be estopped from litigating the issue of frivolity of the '619 Patent if Plaintiff is actually asserting the '619 Patent against Qualcomm. Plaintiff makes no attempt to separately plead the '619 Patent. For this reason, Plaintiff should be estopped from asserting that the underlying allegations supporting his claim of infringement of the '619 Patent are not frivolous and thus the court has subject matter jurisdiction.

**3. Plaintiff Lacks Standing to Bring Antitrust Claims**

Plaintiff must have standing to pursue his antitrust claims under the Sherman and Clayton Acts. For a dispute to fall within the subject-matter jurisdiction of a federal court, the plaintiff

must allege, at a minimum: (1) the plaintiff has suffered a concrete injury, (2) that injury is fairly traceable to actions of the defendant, and (3) it must be likely—not merely speculative—that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). To establish constitutional standing at the pleading stage, the plaintiff must set forth at least "general factual allegations of injury resulting from the defendant's conduct." *Id.* at 561. Plaintiff fails to meet this standard.

Plaintiff alleges that Qualcomm has "coerced cellular telephone makers (OEMs) to purchase only Qualcomm-manufactured chipsets." Dkt. 1, ¶ 60. Plaintiff also references several prior and ongoing antitrust investigations involving Qualcomm. *Id.* at ¶¶ 59, 61-65, 76-78. And Plaintiff "believes Qualcomm's 5% royalty rate on the price of each phone sold is a species of unfair competition." *Id.* at ¶ 75. In each of these allegations, Plaintiff fails to allege how he has suffered any concrete injury as the result of Qualcomm's alleged anticompetitive practices. The only injury Plaintiff claims as a result of Qualcomm's alleged anticompetitive practices is the infringement of his patents. *Id.* at ¶ 94. Plaintiff has failed to establish constitutional standing to bring the antitrust claims because a favorable decision on Plaintiff's antitrust claims would not redress his alleged injury—patent infringement.

### B. The Complaint Fails to State A Claim Upon Which Relief May be Granted

Plaintiff's patent infringement claims should be dismissed under Rule 12(b)(6) because Plaintiff has failed to state a claim for direct or indirect infringement. Plaintiff's antitrust and unjust enrichment claims should also be dismissed because they are predicated on his deficient patent infringement claims.

#### 1. Plaintiff Failed to State a Claim of Direct Infringement

A complaint must, at a minimum, "place the potential infringer ... on notice of what activity ... is being accused of infringement." *Nalco Company v. Chem-Mod, LLC,* 883 F.3d 1337, 1350 (2018). Where a patent infringement claim fails to provide "enough specificity to give the defendant notice of what products or aspects of products allegedly infringe" upon the plaintiff's rights, the claim must be dismissed." *Bender v. LG Elecs. U.S.A.*, Inc., 2010 U.S. Dist. LEXIS

33075, *15 (N.D. Cal. March 11, 2010). "Sufficient allegations would include, at a minimum, a brief description of what the patent at issue does, and an allegation that certain named and specifically identified products or product components also do what the patent does, thereby raising a plausible claim that the named products are infringing." *Id.* at 19-20. Nor is "pointing to broad categories of products" sufficient to establish a plausible claim of infringement. *Id.* at 10. Plaintiff falls remarkably short of this standard.

At no point does the Complaint explain which of Plaintiff's patents, or the claims thereof, are actually being asserted against Qualcomm. While the Complaint reproduces claims of several patents, the Complaint does not specify which claims are allegedly being infringed. The Complaint fails to provide a brief description of what the asserted patents claim. The Complaint vaguely asserts that Qualcomm is infringing the Plaintiff's patented central processing units ("CPUs") and communicating, monitoring, detecting, and controlling ("CMDC") devices. The Plaintiff makes no attempt to explain how any product made, used, or sold by Qualcomm infringes any claim of the Plaintiff's patents. While the Complaint mentions Snapdragon chipsets and the Snapdragon Ride Platform, the Complaint fails to provide any explanation as to how any of the products in these categories infringe. Instead, Plaintiff simply concludes, without more, that Qualcomm is infringing unidentified patents. *See Iqbal* at 678 (pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.").

Nor can Plaintiff rely on the two claim charts on the face of the Complaint to "provid[e] 'enough factual allegations, accepted as true, to 'state a claim to relief that is plausible on its face.'" Dkt. 1, at 33. These two claim charts[8] map General Motors'—**not Qualcomm's**—Advanced Driver Assistance System to claims of the '891 Patent. He also cites Exhibit K, a chart of Samsung's—**not Qualcomm's**—alleged infringement. Consequently, these charts cannot put Qualcomm on notice of how an identified product made, used, or sold **by Qualcomm** infringes any claim. And, Plaintiff has a habit of providing claim charts that "present a dizzying array of disorganized assertions over several hundred pages, disingenuously using the words of the claims

[8] These Charts are recycled from the Complaint in Case 4. *See* Ex. 2, at ¶30.

to generally describe cryptically identified structures." *Golden*, 819 Fed. Appx. at 931.

One of Plaintiff's theories is that Qualcomm waived its right to argue patent infringement and patent invalidity against select patents[9] the Plaintiff asserted against the United States based on a fundamental misunderstanding of *Bowser, Inc. v. United States*. 420 F.2d 1057, 1060 (C. Cl. 1970). Dkt. 1, ¶¶41, 88. Plaintiff relies on a quote from *Bowser* that the Court of Federal Claims confirmed "must be read in the context of the narrow holding in that case: 'If the third party indemnitor fails to appear in response to the summons or notice, it may not, in later litigation for the enforcement of the indemnity against it, assert that this court incorrectly decided that plaintiff's patent is valid and was infringed by the apparatus furnished by the third party.'" *Bird v. United States*, 51 Fed. Cl. 536, 543 (C. Cl. 2002) (superseded by statute) (quoting *Bowser*, 420 F.2d at 1060).

Plaintiff's theory fails because his litigation with the United States is not an action by the government for the enforcement of indemnity against Qualcomm. As a result, *Bowser* is inapplicable. Nor does the Complaint demonstrate that Qualcomm manufactured infringing devices under contract with the United States Government, or agreed to indemnify the United States Government. Plaintiff also fails to inform the Court that the Court of Federal Claims has not ruled in his favor, or that his suit against the government never made it past the pleading stage despite eight years of litigation and six amended complaints. *Golden*, 156 Fed. Cl. at 625-26. In fact, his complaint was dismissed *with* prejudice, and he never came up with a "a plausible theory of infringement against the United States and the third parties whose products he alleges were made at the behest of the government" despite the court allowing six amended complaints. *Id*. at 632. Plaintiff is appealing this decision. Even if *Bowser* was not limited to government indemnitors, Plaintiff cannot establish issue preclusion since his complaint was dismissed for his failure to state a claim or comply with a court order. No decision was made regarding validity, invalidity, or infringement of his patents.

[9] "By default, Qualcomm is barred from entering a defense in this Court for non-infringement or that any of the following patent claims are invalided: Claim 1 of the '497 patent; claim 10 of the '752 patent; claims 1-9 of the '189 patent; claims 13-23 of the '439 patent; and, claims 4-6 of the '287 patent." Dkt. 1 at ¶41.

As a result, Qualcomm is not on notice as to (1) which patents or claims are being asserted, and (2) is not on notice as to what products allegedly infringe. Nor can Plaintiff rely on Qualcomm's lack of response to a Rule 14(b) Notice to establish any waiver of patent infringement or patent validity defenses to avoid giving the requisite notice and complying with the pleading standard.

The Complaint mentions divided infringement twice in the request for relief. Divided infringement is a species of direct infringement. *Sentius Int'l, LLC v. Apple Inc.*, 2020 U.S. Dist. LEXIS 192203, at *5, n.2 (N.D. Cal. Oct. 15, 2020). Stating a claim for divided infringement requires alleging facts "sufficient to allow a reasonable inference that all steps of the claimed method are performed and either (1) one party exercises the requisite 'direction or control' over the others performance or (2) the actors form a joint enterprise such that performance of every step is attributable to the controlling party." *Sapphire Crossing LLC v. Abbyy USA Software House, Inc.*, 497 F. Supp. 3d 762, 766 (N.D. Cal. Oct. 28, 2020) (citations omitted). Despite Plaintiff's vague allegations of Qualcomm conspiring with its competitors, Plaintiff has not alleged that Qualcomm controls or directs others or that Qualcomm and other entities have formed a joint enterprise to infringe the patents beyond conclusory allegations. Consequently, Plaintiff has failed to state a claim for divided infringement.

The Complaint is consistent with Plaintiff's previous frivolous complaints that have been dismissed in South Carolina. *See Golden*, 819 Fed. Appx. at 931 ("complaint itself offers only vague generalities and block quotes of statutes, cases and treatises, but nowhere points us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant"). This Court should similarly dismiss Plaintiff's grossly inadequate infringement allegations under Fed. R. Civ. P. 12(b)(6).

### 2. The Complaint Fails to Plead Enough Facts to Support The Claim of Indirect Infringement

Plaintiff asserts that Qualcomm is liable for contributory infringement and induced infringement. Plaintiff's indirect infringement claims appear to be directed to an unidentified smartphone for "Snapdragon Insiders" made by Qualcomm and Asus and GM's driving system

that is "integrated with the 'Snapdragon Ride Platform" of Qualcomm." Dkt. 1, ¶¶89, 99. The Complaint's main focus is on contributory infringement, with all mentions of induced infringement being found in the request for relief.

Contributory and induced infringement requires direct infringement by another. *Creagri, Inc. v. Pinnaclife Inc.*, 2013 U.S. Dist. LEXIS 427, at *8 (N.D. Cal. January 1, 2013). In order to establish contributory infringement, the Federal Circuit has held that a patent owner must show: "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010). To survive a motion to dismiss on induced infringement, the "complaint must plead facts plausibly showing that the accused infringer 'specifically intended [another party] to infringe [the patent] and knew that the [other party]'s acts constituted infringement."' *Nalco*, 883 F.3d at 1355.

With respect to contributory infringement, Plaintiff fails to establish that the Snapdragon chipsets or Snapdragon Ride Platform do not have substantial noninfringing uses, *i.e.*, that they are not staple articles or commodities of commerce. As a result, Plaintiff has failed to state a claim of contributory infringement. *See Uniloc U.S.A., Inc. v. Logitech, Inc.*, No. 18-CV-01304, 2018 U.S. Dist. 197194, at *9 (N.D. Cal. Nov. 17, 2018) (granting defendants motion to dismiss contributory infringement claims where the plaintiff did not "provide factual underpinnings for its allegations that there are no substantial noninfringing uses of the accused devices.").

With respect to induced infringement, Plaintiff has alleged no facts that Qualcomm specifically intended another party to infringe any patent or that the other party's acts constituted infringement. As a result, Plaintiff has failed to state a claim for induced infringement. *See Hitachi Kokusai Elec. Inc. v. ASM Int'l, N.V.*, 2018 U.S. Dist. LEXIS 122967, *13 (N.D. Cal. July 23, 2018) (dismissing claim of induced infringement "because the general allegations regarding Defendants' customer-related activities are not sufficiently related to infringement of the claimed methods").

In any case, Plaintiff has failed to establish a claim of direct infringement, which is fatal to his indirect infringement claims. The Court should dismiss these deficient indirect infringement

claims under Rule 12(b)(6).

**3. Plaintiff Fails to State a Claim for Antitrust Violation**

Plaintiff's antitrust claims are based on his frivolous patent infringement claims and a now overturned Northern District of California judgment. Plaintiff cannot plausibly state a claim for anti-trust violations when the 9th Circuit has held otherwise. *See FTC*, 969 F.3d at 1005 ("Qualcomm's patent-licensing royalties and 'no license, no chips' policy do not impose an anticompetitive surcharge on rivals' modem chip sales."). Plaintiff's assertions, in addition to being frivolous, simply fail to establish a plausible claim of antitrust violations. *Iqbal*, 556 U.S. at, 697; *Twombly*, 550 U.S. at 570.

**4. The Non-Patent Claims Should be Dismissed Because They are Wholly Dependent Upon Defective Patent Infringement Claims**

Plaintiff's antitrust and unjust enrichment claims should be dismissed because they are derivative of and seek the same relief as his defective patent infringement claims. Plaintiff's antitrust allegations are, in essence, that he being prevent from accessing the market because Qualcomm is not paying him royalties. *See* Dkt. 1, ¶¶ 35, 38, 83, 94-95, 110. This injury is similar to the harm he alleged in Case 4. Report and Recommendation, 2020 U.S. Dist. LEXIS 258437 at *13-14 (Alleged harm is "that he has been prevented from accessing the market for CMDC devices because the defendants have refused to pay him licensing royalties."). Similarly, Plaintiff's unjust enrichment claim alleges that Qualcomm has been unjustly enriched by infringing his patents. *Id.* at ¶ 70, D, H, I. In other words, Plaintiff's antitrust and unjust enrichment claims are predicated on his deficient patent infringement claims. Plaintiff is again attempting disguise his patent infringement claims as antitrust and unjust enrichment claims to avoid having the patent infringement claims dismissed. Plaintiff's previous attempts at this ploy was ineffectual in South Carolina. Report and Recommendation, 2020 U.S. Dist. LEXIS 258437 at *11-12, *14 (Mr. Golden cannot "circumvent the dismissal of his patent infringement claims" by "dressing the case as asserting violations of the Sherman Act, the Clayton Act.") This Court should similarly not be fooled.

#### 5. Plaintiff's Claims are Time Barred

Plaintiff alleges that the conspiracy began in 2007. Dkt. 1, ¶¶28-29, 31, 102-105. Plaintiff brought Case 1 against the Government for this conspiracy in 2013, alleging infringement by the government. *See Golden*, 156 Fed. Cl., at 625-26 ("He alleges generally that the United States, through the Department of Homeland Security, has caused cell phone manufacturers to produce devices that infringe on one or more of his patents."). There, Plaintiff mentioned Qualcomm was a third party. *Id.* at 628. Plaintiff has made the frivolous claim that Qualcomm is collaterally estopped from asserting invalidity and non-infringement based on a notice issued in this case. Plaintiff never got past the pleading stage. Plaintiff was aware of this alleged conspiracy to infringe his patents in at least 2013 when he filed suit. The statute of limitations for the Sherman Act is four years. *See* 15 U.S.C. §15(b). The year is now 2022. As a result, plaintiff's Sherman Act claims are time barred.

Based on Plaintiff's assertion that Qualcomm was in a conspiracy to infringe his patents in 2007, Plaintiff's patent infringement claims are barred to the extent they are more than six years prior to the filing of the Complaint. *See* 35 U.S.C. §286.

## VI. CONCLUSION

Pleading standards are in place for a reason—to prevent frivolous litigation and the unwarranted burdens it imposes on the courts and parties. This case is a prime example of impermissible frivolity. Plaintiff has made repeated frivolous claims against Qualcomm and others in South Carolina and is now bringing his frivolous claims to the Northern District of California. For the foregoing reasons, Qualcomm respectfully requests the Court dismiss the Complaint without amendment under Fed. R. Civ. P. 12(b)(1) and (6), and exercise its inherent power to enter appropriate sanctions to deter Plaintiff from continuing to attempt to engage in baseless, vexatious litigation against Qualcomm and others.

DATED: July 22, 2022

Respectfully submitted,

PATTERSON + SHERIDAN, LLP

By: /s/ Joseph John Stevens

Joseph John Stevens (CA Bar No. 242495)
jstevens@pattersonsheridan.com

50 W. San Fernando Street, Suite 250
San Jose, CA 95113
Tel: 650-384-4418
Fax: 650-330-2314

B. Todd Patterson (*pro hac vice* forthcoming*)*
tpatterson@pattersonsheridan.com
John A. Yates (*pro hac vice* forthcoming)
jyates@pattersonsheridan.com
Kyrie K. Cameron (*pro hac vice* forthcoming)
kcameron@pattersonsheridan.com

24 Greenway Plaza, Suite 1600
Houston, Texas 77030
713-623-4844 | 713-623-4846

*Attorneys for Defendant Qualcomm Incorporated*

23

DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
Case No.: 4:22-CV-03283-KAW