# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

**FILED**

FEB 28 2023

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LARRY GOLDEN,<br><br>       Plaintiff,<br><br>       V.<br><br>SAMSUNG ELECTRONICS<br>AMERICA, INC.<br><br>       Defendants. | CIVIL CASE NO: <u>3:23-cv-00048-WHO</u><br><br>**JURY TRIAL DEMANDED**<br><br>**(Direct Patent Infringement), (Induced<br>and Contributory Patent Infringement),<br>(Joint Patent Infringement)**<br><br>February 27, 2023 |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
## AND CROSS-MOTION FOR SUMMARY JUDGEMENT

This case, not Plaintiff's previous CFC Case *Golden v. US* No. 13-307C, is

re-filed in this Court because it was affirmed and dismissed *without prejudice* at

the Federal Circuit in *Golden v. Apple, Inc. et al* [Samsung Electronics America,

Inc.] CAFC Case 22-1229, for "not pleading enough factual allegations for relief

that is plausible on its face". This case has never been litigated before on the

merits. *Golden v. US* Case No. 13-307C, was a case against the Government.

28 U.S.C. § 1498. Federal government contractors [Samsung Electronics America, Inc. **Exhibit A**] are immune from liability for patent infringement: "[W]henever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license … the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture" … "[F]or the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States." 28 U.S.C. § 1498.

In *Golden v. US* CFC Case No. 13-307C, the Trial Court narrowed the contractors, subcontractors, etc. of the DHS S&T (BAA07-10) *Cell-All* initiative from that of Seacoast, Rhevision, NASA, Synkera, General Systems, Qualcomm, Apple, Samsung, and LG, to only include Apple and Samsung. **Exhibit A**

Before the Federal Circuit in *FastShip, LLC v. U.S*., the court made the seemingly straightforward determination that a product is not "manufactured" until it is made suitable for use. According to the court, the term should be seen as synonymous with the word "make[]" as found in the ordinary infringement provision of the Patent Act.

*[W]e interpret "manufactured" in § 1498 in accordance with its plain meaning, such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore suitable for use.*

The Trial Court never recognized the sensors/detectors of Rhevision, NASA, Synkera, General Systems, and Qualcomm; the CPUs and wireless modems of Qualcomm; and the mobile device of Qualcomm **Exhibit A**. Qualcomm was the only company positioned to single-handedly manufacture the product until it was made "suitable for use" because Qualcomm was the only contractor tasked with providing four components of the thing to invent—sensor/detector, CPU, wireless modem, and mobile device—but was never considered by the Trial Court. "A product is 'manufactured' [for purposes of section 1498] when it is made to include each limitation of the thing invented **Exhibit A** and is therefore suitable for use." *Fastship* (Fed. Cir. 06/05/18).

Therefore, Plaintiff is not barred by issue preclusion. If the Trial Court had considered the sensors/detectors of Rhevision, NASA, Synkera, General Systems, and Qualcomm; the CPUs and wireless modems of Qualcomm; and the mobile device of Qualcomm, there's a strong likelihood the Government would have been found liable for infringing twenty-five of Plaintiff's patented claims. **Exhibit A**

**Exhibit A** illustrates the difference between infringement under Section 1498(a), to that of Section 271(a). The Gov't allegedly infringe 25 patent claims.

**Samsung Waived Its Right to Challenge the Decisions of the Federal Circuit**

Samsung waived its right to challenge the "*without prejudice*" decision of

the Three-Judge Panel at the Federal Circuit in *Golden v. Apple, Inc. et al*

[Samsung Electronics America, Inc.] CAFC Case 22-1229; and the "*not facially*

*frivolous*" decision in *Larry Golden v. Google LLC;* Case No. 22-1267 when

Samsung failed to petition the Supreme Court to grant a writ of certiorari. Samsung

devices mirrors Google devices; all, allegedly infringes Plaintiff's patents claims:

> "[I]n the Google case, the district court again concluded that Mr. Golden's
> complaint was frivolous. Here, however, Mr. Golden's complaint includes a
> detailed claim chart mapping features of an accused product, the Google
> Pixel 5 Smartphone, to independent claims from U.S. Patent Nos.
> 10,163,287, 9,589,439, and 9,096,189. The district court discounted this
> claim chart because it 'contains the exact same language as the claim charts
> previously rejected by the Federal Circuit [in the 2019 case], although
> Google Pixel 5 Smartphone appears in the far-left column instead of Apple.'
> But to the extent that the chart includes the 'exact same language' as
> previously rejected charts, ***it is simply the language of the independent
> claims being mapped to***. The key column describing the infringing nature of
> the accused products is not the same as the complaint held frivolous in the
> 2019 case. ***It attempts—whether successfully or not—to map claim
> limitations to infringing product features, and it does so in a relatively
> straightforward manner*** …"

> "We conclude that ***the district court's decision in the Google case is not
> correct*** with respect to at least the three claims mapped out in the claim
> chart. ***Mr. Golden has made efforts to identify exactly how the accused
> products meet the limitations of his claims in this chart***. On remand, the
> district court should allow the complaint to be filed and request service of
> process. Our decision does not preclude subsequent motions to dismiss by
> the defendant for failure to state a claim or for summary judgment. We
> express no opinion as to the adequacy of ***the complaint or claim chart
> except that it is not facially frivolous***."

**Samsung's Motion to Dismiss (Dkt. 7) is Samsung's First Drastic Attempt at Overturning the Federal Circuit's Decision in *Larry Golden v. Google LLC;* Case No. 22-1267 at the District Court Level**

Plaintiff has provided this Court and Samsung with a copy of the Federal

Circuit's Decision in *Larry Golden v. Google LLC;* Case No. 22-1267, Filed

09/08/2022. In the *OPINION*, the three-judge panel expressed clearly the standard

the Federal Circuit used in deciding the Case. The panel's "DISCUSSION in

*Golden v. Google LLC*; CAFC Case No. 22-1267 states:

> "Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead 'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

Samsung is quoted in this current case as saying in its Motion to Dismiss (Dkt. 7):

> "Golden admits that ATAK (1) was created by the Air Force Research Laboratory and the "Defense Threat Reduction Agency," an agency of the U.S. Government; (2) is available to "military and civilian users"; and (3) is "[b]uilt on the Android operating system"—as all Android applications are, whether or not made by Samsung. *Id*. … the claim chart in Golden's Complaint points to a non-Samsung feature (here, the ATAK application) as the sole functionality allegedly satisfying several limitations of the Patents-in-Suit." "For example, the Complaint's claim chart identifies the ATAK application for the following limitations of the Asserted Patents: Compl. at 23; see also *id*. at 25 ('189 and '439 patents), 26 ('439 patent)."

"Each time the claim chart references ATAK, it repeats that ATAK is "built on the Android operating system," and thus not provided with any Samsung Galaxy device. See id. Golden's Complaint itself alleges that infringement requires the addition of the ATAK application to Samsung's accused Galaxy devices, and concedes that Samsung neither makes or sells ATAK nor any Galaxy devices equipped with ATAK."

Plaintiff is especially taken in by the "lie" Samsung is making about Plaintiff's complaint, "Golden's Complaint itself alleges that infringement requires the addition of the ATAK application to Samsung's accused Galaxy devices, and concedes that Samsung neither makes or sells ATAK nor any Galaxy devices equipped with ATAK." Later in this document, Plaintiff will show how Samsung infringes Plaintiff's patent claims without the ATAK.

Samsung cause the alleged infringement of Plaintiff's patents and bears the responsibility for doing so. When Google published its Google Android Open-Source Architecture, Google open the flood gates for companies, developers, scientist, engineers, inventors, programmers, architects, etc. to integrate whatever software or hardware they so desire with the mobile devices. Samsung and Google use the same Android Operating System.

"In the U.S., there are two smartphone brands that most people seem to go with—Google Pixel and Samsung Galaxy. Both run on the same Android operating system" Samsung Galaxy vs. Google Pixel https://www.howto geek.com/810583/samsung-galaxy-vs-google-pixel-which-should-you-buy/

"Google & Samsung are definitely rivals but why does it seem like with every upgrade Samsung just seems to rely more & more on Google for functionality … Google owns Android that Samsung uses as its mobile

> operating system. All OEMs have to abide by Google's rules to use Android … Google owns Android Operating System which all Android phones use, including Samsung … Samsung is the biggest Android OEM in the business, it stands to reason that both Google and Samsung are in partnership" Does Google own Samsung Mobile? https://us.community.samsung.com/t5/Galaxy-S-Phones/Does-Google-own-Samsung-Mobile/td-p/2464436

The Android operating system was developed by Google (GOOGL) for use in all of its touchscreen devices, tablets, and cell phones. This operating system was first developed by Android Inc., a software company located in Silicon Valley before it was acquired by Google in 2005.

Google announced the impending rollout of its first commercially available Android-powered device in 2007, although that product actually hit the marketplace in 2008. The Android source code is released in an open-source format to help advance open standards across mobile devices.

Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK).

ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

7

*Figure 1* shows the integration requirement of the three patent claims [5, 23, & 1] of the three patents ['287, '439, & '189] asserted in this case.

| Claim 5 of the 10,163,287 Patent | Claim 23 of the 9,589,439 Patent | Claim 1 of the 9,096,189 Patent |
|---|---|---|
| A monitoring device, comprising:<br><br>at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;<br><br>one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents | A cell phone comprising:<br><br>at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;<br><br>… the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes [] location data [] sent to the cell phone. | A communication device of [] a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal [] comprising:<br><br>a transmitter for transmitting signals and messages to at least one of [] a multi-sensor detection device, [] a cell phone detection device…;<br><br>a receiver for receiving signals, data or messages from at least one of [] a multi-sensor detection device, [] a cell phone detection device…; |

*Figure 1*

The patents' written support can be found in Plaintiff's patent specifications.

Detector case is considered the "genus" to a group of products that represent the "species". Included in the group are CBRNE-H sensors.

> … detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, [] cell phones, [] personal digital assistants (PDAs), [], handhelds.

*Figure 2* shows how the smartphone cameras satisfies the requirements of the three patent claims [5, 23, & 1]. The camera is an addition or an alternative to the ATAK, Samsung claims infringement cannot occur without.

| Google Pixel 5 Smartphone | Samsung Gal. S21 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|---|
| *Google Pixel 5: Dual - 12.2 MP (megapixel), OIS 16 MP (megapixel)* Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A *megapixel* camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https://www.understanding nano.com/cell-phone-sensors-toxins.html | *Samsung Gal. S21: Triple - 12 MP (megapixel); 64 MP; & 12 MP f 2.2* Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A *megapixel* camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https://www.understanding nano.com/cell-phone-sensors-toxins.html | *Claim 5 limitation of the '287 Patent* one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | *Claim 23 limitation of the '439 Patent* at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | *Claim 1 limitation of the '189 Patent* a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection device … a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection device |

*Figure 2*

*Figure 3* outline different ways the smartphone camera can be used for detecting Chem/Bio agents. For each different way used it qualifies as an alternative to the ATAK, Samsung claims infringement cannot occur without.



*Figure 3*

The camera captures the image from the array of nanopores that uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the resolution phone camera. The resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https:// www.understanding nano.com/cell-phone-sensors-toxins.html

Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-could-tell-you-what-an-object-is-made-of

*Figure 4* describes how at least nine (9) standard sensors for the smartphone can be used as "biosensors". For each different way used it qualifies as an alternative to the ATAK, Samsung claims infringement cannot occur without.



*Figure 4*

The Smartphones Biosensors:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens

2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols

3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers

4. Microfluidic cassette: Interchangeable cassettes with varying assays

5. VIS-NIR spectrometer: Food freshness; Melanoma

6. NNAP Electrodes: Toxic metals and Organic pollutants in water

7. Optical Waveguide: Pathogens in water and food

8. Back and front camera: Colorimetric analysis; Image analysis

9. Microphone: Voice recording stress levels

*Figure 5* features the same standard sensors illustrated in Figure 4. We're only interested in the port on the smartphone that allow for *plug-ins*.



*Figure 5*

ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) *plug-ins*.

Just having a plug-in is not all that's involved. There has to be an app specific software to sync the chemical, biological, radiological, and nuclear sensors to the smartphone plus the Samsung Android Operating System.

**SAMSUNG'S ALLEGED INFRINGEMENT WAS NEVER DECIDED IN**
***GOLDEN v. THE UNITED STATES* CFC CASE NO. 13-307C UNDER 35**
**U.S.C. § 271(a); NOR, DID SAMSUNG APPEAR IN *GOLDEN v. THE***
***UNITED STATES* CFC CASE NO. 13-307C UNDER 28 U.S.C. § 1498(a) TO**
**PROTECT ANY INTEREST SAMSUNG MAY HAVE HAD IN PROVING**
**NON-INFRINGEMENT BY THE GOVERNMENT**

Plaintiff has attached a copy of the claim chart presented in *Golden v. The*

*United States* CFC Case No. 13-307C as **Exhibit A** to illustrate the difference

between an element-by-element infringement claim under Section 271(a), to that of

an element-by-element infringement claim under Section 1498(a).

Section 271(a) covers infringement claims between private entities, and

Section 1498(a) covers infringement claims made against the Government.

For illustrative purposes the Samsung Galaxy S21 Smartphone is the alleged

infringing product of Samsung that allegedly infringes independent claim 23 of

Plaintiff's '439 patent under Section 271(a).

Also, for illustrative purposes the Samsung Galaxy Note 8 & Galaxy S8

Series and Samsung Gear S3 Classic Series; Samsung Galaxy S9 & Galaxy S10

Series and Samsung Galaxy Watch Active 2 Series; and, Samsung Galaxy S20 &

Galaxy S21 Series and Samsung Galaxy Watch 3 Series; where the integration of a

cell phone [smartphone] and a detection means [smartwatch] for detecting C/B

agents are assembled by Samsung, per the Government's requirements described in

DHS S&T BAA(07-10) *Cell-All Ubiquitous Chemical and Biological Sensing.*

Under Section 271(a): Illustrated below is the preamble of independent claim 23 of Plaintiff's '439 patent ["A cell phone comprising"], and a photo of the Samsung Galaxy S21 Smartphone. In *Disc Disease Solutions*, "despite the plaintiff only alleging that the accused devices met "each and every element of at least one claim" of the relevant patents, the Federal Circuit determined that identifying and naming the three accused devices, including attaching photos of the devices, provided fair notice of infringement (even with minimal factual allegations as to the patents' claims), due to the simplicity of the technology at issue." 888 F.3d at 1260.

Samsung's preamble limitation "mirrors" Google's preamble limitation that was found to be acceptable by the Federal Circuit, "Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart." *Larry Golden v. Google LLC;* CAFC Case No. 22-1267

| Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | Claim 5 of the '287 Patent | Claim 23 of the '439 Patent | Claim 1 of the '189 Patent |
|---|---|---|---|---|
|  |  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |

On a motion to dismiss, Plaintiff need not prove its case or even plead its claim of infringement element-by-element. *Bot M8*, 4 F.4th at 1352; *see Henke*, 60 F.3d at797 (courts "assume all factual allegations to be true and . . . draw all reasonable inferences in plaintiff's favor" in deciding a Rule 12(b) motion.

Under Section 1498(a): Illustrated below is the preamble of independent claim 23 of Plaintiff's '439 patent ["A cell phone comprising"], and a detailed description of the Government's requirements described in DHS S&T BAA(07-10) *Cell-All Ubiquitous Chemical and Biological Sensing*. **Exhibit A**

The preamble describes how the *Cell-All* sensing devices assemble by Samsung for the Government literally infringes Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) devices; how the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU); how the communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device; how the eventual goal of the [DHS] project is to embed multiple nanoscale sensors (for environmental

chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones; how the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones; for chemical detection Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone and both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones; a camera sensor for biological detection; Geiger counter for radiological detection; the smartwatch as a stand-alone detection device; how the Central Processing Unit (CPU) is the programmable device capable of general-purpose computation and is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment); and, patent specifications that describes how the cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158.

Everything needed to satisfy the requirements of the *Cell-All* initiative of a Cell Phone capable of CBR detection is included in the preamble limitation.

| Patent #: 9,589,439; Independent Claim 23 | Samsung Galaxy S20 & Galaxy S21 Series and Samsung Galaxy Watch 3 Series |
|---|---|
| A cell phone comprising: | **Plaintiff believes the Defendant and third-party contractor; Samsung Electronics' is literally infringing Plaintiff's claim limitation for Plaintiff's CMDC device(s).**<br><br>**Samsung Galaxy S20 & Galaxy S21 Series** are believed to be communicating, monitoring, detecting, and controlling (CMDC) devices of at least one of the *new and improved* products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone); that comprises, are interconnected to, or integrated with, at least a Central Processing Unit (CPU), that is vital for processing instructions; an Operating System (OS); mobile apps developed for the CMDC devices operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile; wireless protocol of Cellular, Bluetooth, Wi-Fi, etc., and CBRNE-H sensors that are placed in, on, upon, or adjacent the *new and improved* CMDC devices; interconnected to the CMDC devices for communication therebetween.<br><br>**IPR Final Written Decision**. "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced… "communication device" is construed to mean "monitoring equipment"; and, "built in, embedded" is construed to include ""something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device". Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "As Patent Owner explains, the added language is broad enough to include the removed items, and is intended to reflect the entire genus of "monitoring equipment" and "communications devices" that "are capable of communication and capable of receiving signals." Mot. to Amend 4, 5. Thus, the claim has been broadened to not only include the listed species that have been removed, but anything falling within the claimed genus." UNITED STATES DEPARTMENT OF HOMELAND SECURITY, Petitioner, v. LARRY GOLDEN, Patent Owner. Case IPR2014-00714. Entered: October 1, 2015<br><br>**The Department of Homeland Security's Cell-All project**. "Cell-All is a program managed by DHS to develop software and hardware that enables smartphones to function as handheld, pervasive environmental sensors. In the initial research and development phase, engineers miniaturized sensors to detect abnormal levels of potentially dangerous chemicals in the surrounding environment. When dangerous levels are detected, an application on the cell phone should automatically send sensor and location data over the network to a centralized server, which will then contact appropriate agencies and first responders. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones…" "During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones (U.S. Department of Homeland Security, 2011a). This use of third-party accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications |

with their current phones before integrated sensors are fully operational and readily available." Retrieved from: Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks. Torin Monahan & Jennifer T. Mokos: A Department of Communication Studies, The University of North Carolina at Chapel Hill, CB# 3285, 115 Bingham Hall, Chapel Hill, NC 27599-3285, USA; and, a Department of Human & Organizational Development, Vanderbilt University, Peabody #90, 230 Appleton Place, Nashville, TN 37203-5721, USA

**DHS Cell-All Chemical Sensors**: Qualcomm first introduced a "built-in, embedded" chemical sensor for the smartphone (picture below). Both Synkera and NASA are independently producing sensors—with Synkera developing a stand-alone sensing card and NASA creating a nanosensor-embedded ''sleeve'' for phones (picture below); that will detect chemicals in the immediate environment and communicate those readings via Bluetooth, or other protocols, to phones (Li, 2011; Synkera Technologies, 2011)."



**CMDC Device Camera Sensor for Biological Detection:** "In the diagnostic test (below), a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. When coronavirus RNA is present in the sample, it prompts the CRISPR proteins to snip the molecular probes, causing the whole sample to emit light. This fluorescence can be detected with a cell phone camera." (*Image courtesy Science at Cal*). The COVID-19 virus is perceived as a biological weapon of mass destruction (BWMD).



**CMDC Device Geiger Counter for Radiological Detection:** Below is a picture of a "Smart Geiger Counter Nuclear Radiation Dosimeter "X-Ray" and "Gamma" Detector Smartphone Android iOS with App". Real-time display of measurement results. Ultra-low power consumption. World smallest Geiger Counter (30mm). Compatible with Android and iOS.



**Smartwatch**: To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear (Wear OS— operating system from Samsung's Tizen software) or Watch from Apple (i.e., watch OS/7---operating system). By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

**Central Processing Unit (CPU)**: The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the brain, and the core piece of hardware in the Patent Owner's CMDC device (i.e., communication devices, monitoring device; monitoring equipment). The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential processes and executes program instructions.

**Patent Specifications**: "In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween… or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted… The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174…

Everything that gives the Cell Phone capable of CBR detection "*utility*" is included and described in the preamble limitation (cell phones, CPUs, operating systems, and CBR sensors/detectors that are embedded and remote the cell phone).

**The Department of Homeland Security (DHS); The Department of Justice (DOJ); and The Court of Federal Claims Would Rather _Take_ from an African-American Negro and _Give_ to a Foreign Company [Samsung Electronics America, Inc.]**

The COFC under Section 1498: In _JG Technologies, LLC v The United States_; COFC Case No. 20-455C, filed October 29, 2021, the Court found, "'reciting the claim elements and merely concluding that the accused product has those elements' would be sufficient ..." **Exhibit A** https://www.crowell.com/News Events/AlertsNewsletters/all/COFC-Dismissal-Order-Highlights-the-Pre-Litigation-Traps-and-Timeliness-Bars-of-Section-1498-Claims

Plaintiff identified and described the remaining patent claims limitations in each of the patent claims asserted in _Golden v. The United States_ CFC Case No. 13-307C as **Exhibit A**. The preamble limitation is described in the same way for all of Plaintiff's twenty-five (25) patent claims asserted in _Golden v. The United States_ CFC Case No. 13-307C as **Exhibit A**. Plaintiff alleged in _Golden v. The United States_ CFC Case No. 13-307C that nine (9) of Samsung's products allegedly infringe twenty-five (25) of Plaintiff's patent claims **Exhibit A**.

The DHS, DOJ, and Trial Court lied, in order to dismiss Plaintiff's _Golden v. The United States_ CFC Case No. 13-307C, just to send out a message to all African-American Negro Inventors, "things have not change; you are still less than a human being; stay in your place; property can't own property; a foreigner will always be able to enjoy privileges you will never see".

20

- DHS, DOJ, and Trial Court lied, in order to dismiss Plaintiff's case when they said, "Plaintiff did not identify any sensors and detectors". See the example preamble above and all the preambles for each of the twenty-five (25) patent claims asserted in *Golden v. The United States* CFC Case No. 13-307C as **Exhibit A**.

- DHS, DOJ, and Trial Court lied, in order to dismiss Plaintiff's case when they said, "the sensors must be native to the manufacture of the Samsung device". See the example preamble above and all the preambles for each of the twenty-five (25) patent claims asserted in *Golden v. The United States* CFC Case No. 13-307C as **Exhibit A**.

- DHS, DOJ, and Trial Court lied, in order to dismiss Plaintiff's case when they said, "Plaintiff claim the CPU is a sensor used for detecting hazardous materials". See the example preamble above and all the preambles for each of the twenty-five (25) patent claims asserted in *Golden v. The United States* CFC Case No. 13-307C as **Exhibit A**.

- DHS, DOJ, and Trial Court lied, in order to dismiss Plaintiff's case when they said, "Plaintiff impermissibly enlarged the complaint by adding the CPU". See the example preamble above and all the preambles for each of the twenty-five (25) patent claims asserted in *Golden v. The United States* CFC Case No. 13-307C as **Exhibit A**.

- DHS, DOJ, and Trial Court lied, in order to dismiss Plaintiff's case when they said, "a lock is part of the requirements in the *Cell-All* initiative". See the example preamble above and all the preambles for each of the twenty-five (25) patent claims asserted in *Golden v. The United States* CFC Case No. 13-307C as **Exhibit A**.

- DHS, DOJ, and Trial Court lied, in order to dismiss Plaintiff's case when they said, "Plaintiff is unable to provide a preliminary infringement contentions chart". See the example preamble above and all the preambles for each of the twenty-five (25) patent claims asserted in *Golden v. The United States* CFC Case No. 13-307C as **Exhibit A**.

Above are a few examples that describes just how far the Department of Homeland Security (DHS); the Department of Justice (DOJ); and the Court of Federal Claims were willing to go to ensure the property of the African-American Negro was taken from him.

After the 9/11 attacks, Plaintiff introduced three Economic Stimulus and Terrorism Prevention Packages to Government that was sent over to the Department of Homeland Security (DHS) for the development, implementation, and commercialization of the technology needed to stimulate the economy.

The development, implementation, and commercialization of the technology needed to stimulate the economy would create new businesses, grow existing businesses, add new jobs, decrease unemployment, increase taxable revenue from the new jobs' creation, and increase taxable revenue received from the companies selected to develop and commercialize the technology needed to stimulate the economy.

Samsung Electronics America, Inc. was one of the foreign companies selected in 2008 over the African-American Negro who introduced the Stimulus Packages and who holds the patents for the technology.

Below are the results of the Department of Homeland Security (DHS); the Department of Justice (DOJ); and the Court of Federal Claims taking from an African-American Negro and giving to a Foreign Company [Samsung Electronics America, Inc.].

The data below is evidence of how Samsung Electronics America, Inc. is allegedly liable to Plaintiff and the American people for damages sustained. Samsung defaulted on its obligation after signing onto the *Cell-All* initiative, to create businesses here in America, to increase jobs, to pay revenue taxes, and to pay royalties on the intellectual property it uses to generate hundreds of billions of dollars annually. According to CompaniesMarketCap.com Samsung's total revenue is an estimated $2.8 trillion dollars between the years 2008-2022.

**Samsung Electronics America**

| Year | Revenue |
|------|---------|
| 2022 | $241.60 B |
| 2021 | $240.71 B |
| 2020 | $203.43 B |
| 2019 | $198.03 B |
| 2018 | $221.67 B |
| 2017 | $214.57 B |
| 2016 | $175.51 B |
| 2015 | $174.66 B |
| 2014 | $195.22 B |
| 2013 | $210.86 B |
| 2012 | $184.22 B |
| 2011 | $146.43 B |
| 2010 | $133.94 B |
| 2009 | $113.64 B |
| 2008 | $104.33 B |
| **CompaniesMarketCap.com** | $2,758.82B |

"Number of Employees: 9,961 (8,458 on RocketReach) people are employed at Samsung Electronics America. Samsung Electronics America's headcount grew by 87 people (1.1%) in the last year" https://rocketreach.co/samsung-electronics-america-profile_b5d00fb2f42e47ed, compared to Apple's 80,000 employees; 450,000 Jobs through Apple's U.S.-based suppliers; and 1,530,000 U.S. jobs attributable to the App Store ecosystem https://www.apple.com/job-creation/

"Samsung Electronics Co. paid a total of 11.1 trillion won ($9.8 billion) in taxes and dues last year, up 14.4 percent from a year ago, its report showed Monday, with the majority going to its homeland. The tech giant paid 8.1 trillion

won ($6.2 billion), or 73 percent of its total tax bills, to the South Korean

government in 2020, according to its 2021 sustainability report. The Americas and

Europe followed with 14 percent ($1.2B) and Asia with 11 percent. South Korea

collected 86 percent of Samsung's tax payments in 2018 and 68 percent in 2019"

https://www.koreaherald. com/view: (SEA 2020 revenue was $203.43B,

*ComapniesMarketCap.com,* of which $1.2B split between America and Europe).

"Samsung shares don't trade on a U.S. stock exchange and the company

doesn't offer American Depositary Receipts (ADRs), making it difficult for

Americans to invest in the company. Samsung phones, TVs, laptops and

appliances are easy to find and purchase right here in the USA. Samsung stock, not

so much: Because it's a foreign company, American investors can't buy Samsung

stock shares the way they typically buy stock — through major U.S. exchanges

like the Nasdaq and NYSE. Individual shares of Samsung stock must be purchased

either over-the-counter as a "pink sheet" stock — which means your purchase isn't

regulated — or on the Korea Exchange (KRX), which entails opening a South

Korean brokerage account." https://www.nerdwallet.com/article/investing/how-to-

buy-samsung-stock

If Samsung had accepted a license to make, use, offer for sell, and sell

Plaintiff's patented CMDC devices beginning in 2008 thru 2022, at a 10% royalty

rate, ATPG Technology, LLC would have received $275.88B in royalties. Plaintiff

only asked for $27.59B (1%) to settle. One percent (1%) of $2.759 Trillion

Dollars. Plaintiff's patent term ends April 2026. Plaintiff did not include the

estimated total revenues for April 2023 thru April 2026, which is estimated to be

$724.8B in SEA total revenue. 1% equals an additional $7.2B in royalties.


### PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGEMENT

This case is "ripe" for summary judgement because Plaintiff has repeatedly

provided fair notice to Samsung when Plaintiff identified and named the accused

devices; named and identified the patents and patent claims Plaintiff has alleged

the Defendant's products are infringing upon; attached photos of the alleged

infringing products; and "attempted to map claim limitations to infringing product

features in a relatively straightforward manner". In *Disc Disease Solutions*, "the

Federal Circuit determined that identifying and naming the [] accused devices,

including attaching photos of the devices, provided fair notice of infringement

(even with minimal factual allegations as to the patents' claims), due to the

simplicity of the technology at issue." 888 F.3d at 1260.

The Rules of the COFC ("RCFC") provide contractors at least two avenues

for being heard at court. First, RCFC 14(b) allows parties to formally notify any

interested third-party, such as an indemnitor, of the § 1498(a) complaint. A noticed

party "may file an appropriate pleading setting forth the person's interest in the

subject matter of the litigation." RCFC 14(c)(1)(a). Second, RCFC 24 allows

interested parties to proactively intervene, permissively or by right.

In the COFC case *Larry Golden v. USA*; Case 1:13-cv-00307-EGB

Document 224 Filed 03/31/21 Page 2 of 4; Samsung Electronics of America, Inc.

was provided notice to appear to protect any interest Samsung may have in the

case (Dkt 1). Samsung failed to appear to protect its interest. Claiming an interest

in this current case is an indication Samsung deliberately defaulted on its

responsibility to appear and defend any interest Samsung may have had in the case.

It is a waste of judicial resources to allow Samsung the opportunity to defend

against Plaintiff's current claims of infringement; especially after the Federal

Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267.

Under Rule 14(b) of the Rules of the United States Court of Federal Claims

(RCFC), the court "may notify any person with the legal capacity to sue or to be

sued who is alleged to have an interest in the subject matter of the suit." Further, a

"person served with a notice issued . . . may file an appropriate pleading setting

forth the person's interest in the subject matter of the litigation."

In resolving a petition for mandamus, the Federal Circuit held in *In re* UUSI,

LLC, that a third party's potential obligation to indemnify the government for any

patent infringement liability provides "sufficient interest in litigation to offer

evidence and advance legal arguments appropriate to protect its own interests. As

the USCFC held in *Bowser, Inc. v. United States*:

> "We think there is implicit in the whole plan and purpose of Subsection
> 14(b) a congressional intent that the issues of fact and law decided in a suit
> against the United States in the Court of Claims may not be retried in
> another court at the insistence of a third party, who had a "possible" interest
> in the case in this court but who failed to appear and protect his interest after
> timely notice or summons had been served upon him." 420 F.2d 1057, 1060
> (Ct. Cl. 1970).

This case is "ripe" for summary judgement because throughout Plaintiff's

pleadings in this case Plaintiff has provided element-by-element claim charts of the

alleged infringement of Samsung products. Plaintiff has also provided the Court

with an element-by-element claim chart that was presented in *Larry Golden v.*

*Google LLC;* CAFC Case No. 22-1267 "***it is simply the language of the***

***independent claims being mapped to … [i]t attempts [] to map claim limitations***

***to infringing product features, and it does so in a relatively straightforward***

***manner … Mr. Golden has made efforts to identify exactly how the accused***

***products meet the limitations of his claims in this chart.***"

The Google claim chart is relevant here because the claim limitations of

Samsung's alleged infringing products' features *"mirrors"* the claim limitations of

Google's alleged infringing products' features. Recent Federal Circuit decisions []

illustrate the level of specificity required to plead patent infringement. *In Bot M8 LLC v. Sony Corporation of America*, which was decided after briefing on the instant Motion, the Federal Circuit held that "[a] plaintiff is not required to plead infringement on an element-by-element basis." 4 F.4th 1342, 1352 (Fed. Cir. 2021).

**Pursuant to FRCP Rule 56**

Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to challenge Plaintiff's alleged infringement claims; no genuine dispute that Plaintiff owns the patent rights for the smartphone; and, no genuine dispute to the validity of Plaintiff's patents. This case is ripe for summary judgement, and Plaintiff is entitled to judgment as a matter of law.

## CONCLUSION

This case, not Plaintiff's previous CFC Case *Golden v. US* 13-307C, is re-filed because it was affirmed and dismissed *without prejudice* at the Federal Circuit in *Golden v. Apple, Inc. et al* CAFC Case 22-1229, for "not pleading enough factual allegations for relief that is plausible on its face".

If Samsung truly wants to avoid infringing Plaintiff's patents, Samsung must do the following: 1) discontinue using the Google Android Open-Source Architecture with their mobile devices; 2) block all software applications that are

specific to integrating CBRNE sensors with their mobile devices; 3) design their

mobile devices to not include a port for CBRNE plug-ins; 4) design their mobile

devices to not include cameras for CBRNE detecting; 5) design their mobile

devices to not include the nine standard sensors that can be used as biosensors; or

6) settle previous damages with Plaintiff and negotiate a licensing agreement.



Sincerely,


Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 27th day of February, 2023, a true and correct copy of the foregoing "Plaintiff's Response to Defendant's Motion to Dismiss and Cross-Motion for Summary Judgement", was served upon the following Defendant by priority "express" mail:

Brian G. Bieluch bbieluch@cov.com

COVINGTON & BURLING LLP

1999 Avenue of the Stars

Los Angeles, CA 90067-4643

Telephone: (424) 332-4800

E-mail: bbieluch@cov.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605